Charles S. LiMandri, SBN 110841
  cslimandri@limandri.com
Paul M. Jonna, SBN 265389
  pjonna@limandri.com
Jeffrey M. Trissell, SBN 292480
  jtrissell@limandri.com
Robert E. Weisenburger, SBN 305682
  rweisenburger@limandri.com
Joshua A. Youngkin, SBN 332226
  jyoungkin@limandri.com
LiMANDRI & JONNA LLP
  *as Special Counsel to*
  THOMAS MORE SOCIETY
P.O. Box 9120
Rancho Santa Fe, CA 92067
Telephone: (858) 759-9930
Facsimile: (858) 759-9938

Attorneys for Plaintiff
*Captain Jeffrey Little*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAPTAIN JEFFREY LITTLE, an individual,<br><br>        Plaintiff,<br><br>        v.<br><br>LOS ANGELES COUNTY , a public entity; FERNANDO BOITEUX, both in his personal capacity and in his official capacity as Lifeguard Division Chief; ADAM UEHARA, both in his personal capacity and in his official capacity as Assistant Lifeguard Chief; ARTHUR LESTER, both in his personal capacity and in his official capacity as Section Chief;<br><br>        Defendants. | Case No.: 2:24-cv-04353-JLS-PD<br><br>**VERIFIED THIRD AMENDED COMPLAINT FOR:**<br><br>**1. Religious Creed Discrimination / Failure to Accommodate in Violation of Title VII of the Civil Rights Act of 1964**<br><br>**2. Religious Creed Discrimination / Failure to Accommodate in Violation of FEHA**<br><br>**3. Retaliation in Violation of Title VII of the Civil Rights Act of 1964**<br><br>**4. Retaliation in Violation of FEHA**<br><br>**5. Failure to Prevent Discrimination,** |

Harassment, and Retaliation in Violation of FEHA

**6. Violation of Free Exercise Clause of First Amendment to U.S. Constitution: Not Neutral Due to Animus and Hostility Against Religion**

**7. Violation of Free Exercise Clause of First Article of California Constitution**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1.      Flags have meanings. Nearly one hundred years ago, the U.S. Supreme Court struck down California's attempt to criminalize the display of a "Red Flag"—a symbol of support for Communism. *Stromberg v. California*, 283 U.S. 359, 361 (1931). A decade later, the U.S. Supreme Court struck down West Virginia's effort to require students to salute the American Flag as a condition of attending public school. *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 625 (1943). And flowing naturally from this, a few decades later, various courts struck down a requirement to salute the American Flag as a condition of government employment. *Russo v. Central Sch. Dist. No. 1*, 469 F.2d 623, 633 (2d Cir. 1972); *State v. Lundquist*, 262 Md. 534, 554 (1971); *Hanover v. Northrup*, 325 F. Supp. 170, 173 (D. Conn. 1970).

2.      Promoting the lofty goal of patriotism was widely popular at the time of these cases—the threat of both Communism and Nazism directed the national mood. Thus, when the same issue arose in California courts, the courts dismissed an objection to saluting the American Flag, stating that "[i]t is indeed repugnant to every idea and every consideration of the loyalty and love for our government and political institutions so essential to the maintenance thereof." *Hardwick v. Bd. of Sch. Trustees of Fruitridge Sch. Dist.*, 54 Cal. App. 696, 711 (1921).

/ / /

3.      This case presents a debate over a flag—one whose similarity to issues raised a hundred years ago is striking. In March 2023, the Los Angeles County Board of Supervisors passed a resolution requiring that all county-operated facilities fly the Progress Pride Flag during the month of June. Captain Jeffrey Little is a devout Christian who has worked for the Los Angeles County Fire Department as a lifeguard for over 22 years. He eventually rose through the ranks to become a Captain, and is responsible for overseeing his own lifeguard stations and patrols.

4.      When this resolution passed, Captain Little raised a simple objection: he would like another government employee to be responsible for maintaining the Progress Pride Flag. In his view, doing so would be "to confess by word or act [his] faith therein." *Barnette*, 319 U.S. at 642. Los Angeles said no. Under both statutory employment law and constitutional law, this was wrong.

5.      "Anti-discrimination laws undeniably serve valuable interests rooted in equality, justice, and fairness. And in a pluralistic society, these laws foster worthy goals such as inclusion and belonging." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 671 (9th Cir. 2023) (en banc). But forcing Captain Little to raise and fly the Progress Pride Flag "is petty tyranny unworthy of the spirit of this Republic." *Barnette v. W. Virginia State Bd. of Educ.*, 47 F. Supp. 251, 255 (S.D.W. Va. 1942), *aff'd*, *Barnette*, 319 U.S. at 642. The government cannot impose a "blanket requirement" that all employees "mouth support for views they find objectionable." *Janus v. AFSCME, Council 31*, 585 U.S. 878, 892, 907 (2018). Indeed, when the government's interest is ideological conformity through "the suppression of free expression," "it is not valid, let alone substantial." *Moody v. NetChoice, LLC*, 603 U.S. 707, 740 (2024).

6.      Thus, Plaintiff Captain Jeffrey Little brings this Verified Complaint against Defendant Los Angeles County Fire Department and three of its personnel, seeking both injunctive relief and damages.

/ / /

**JURISDICTION AND VENUE**

7.    This court has original jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiff's claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et. seq*., and 29 C.F.R. § 1605 *et. seq.*; and under 42 U.S.C. § 1983 in relation to Defendants' deprivation of Plaintiff's constitutional rights to free exercise of religion under the First Amendment to the U.S. Constitution.

8.    This court has supplemental jurisdiction over all state law claims because they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. 28 U.S.C. § 1367(a).

9.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants may be found in this District, Defendants employ Plaintiff to work in this District, and a substantial part of the events giving rise to claims presented in this Complaint occurred in this District.

**THE PARTIES**

10.    Plaintiff CAPTAIN JEFFREY LITTLE is an individual who, at all relevant times, was and continues to be employed by Defendant Los Angeles County Fire Department, and who at all relevant times worked in and continues to work in the County of Los Angeles, California. Captain Jeffrey Little is a devout Evangelical Christian who adheres to traditional Christian beliefs regarding the moral illicitness of same-sex sexual activity, the immutability of sex regardless of gender identity, and the view that all people are children of God regardless of their skin color.

11.    Defendant LOS ANGELES COUNTY is an a municipal and legal entity defined and authorized under the California Constitution, California law, and the Charter of the County of Los Angeles.  The Los Angeles County Fire Department is an executive department of Defendant LOS ANGELES COUNTY that has no separate or distinct legal existence from the Defendant LOS ANGELES COUNTY for liability purposes in this litigation.  For all purposes relevant to this litigation, the

1  conduct of the Fire Department as alleged herein is the conduct of the Defendant LOS
2  ANGELES COUNTY.

3       12.    Defendant FERNANDO BOITEUX, at all relevant times, was the
4  Lifeguard Division Chief for the Los Angeles County Fire Department acting under
5  color of state law. Defendant Boiteux is responsible for implementing Fire
6  Department policies, practices, customs, and acts, including the challenged policies,
7  practices, and procedures set forth in this Complaint. Defendant Boiteux is sued in
8  both his official and personal capacities, alternatively, for his role both in interpreting
9  and implementing the challenged policies, retaliating against Captain Little, and
10 refusing to extend a religious accommodation to Captain Little.

11      13.    Defendant ADAM UEHARA, at all relevant times, was the Assistant
12 Lifeguard Chief for the Los Angeles County Fire Department acting under color of
13 state law. Defendant Uehara is responsible for implementing Fire Department
14 policies, practices, customs, and acts, including the challenged policies, practices, and
15 procedures set forth in this Complaint. Defendant Uehara is sued in both his official
16 and personal capacities, alternatively, for his role both in interpreting and
17 implementing the challenged policies, retaliating against Captain Little, and refusing
18 to extend a religious accommodation to Captain Little.

19      14.    Defendant ARTHUR LESTER, at all relevant times, was a Section Chief
20 for the Los Angeles County Fire Department, Lifeguard Division, acting under color
21 of state law. Defendant Lester is responsible for implementing Fire Department
22 policies, practices, customs, and acts, including the challenged policies, practices, and
23 procedures set forth in this Complaint. Defendant Lester is sued in both his official
24 and personal capacities, alternatively, for his role both in interpreting and
25 implementing the challenged policies, retaliating against Captain Little, and refusing
26 to extend a religious accommodation to Captain Little.

27 / / /

28 / / /

## GENERAL FACTUAL ALLEGATIONS

**A.    The Parties: Government Agency Los Angeles County Fire Department and Devout Christian Lifeguard Jeffrey Little.**

15.    Defendant Los Angeles County Fire Department provides firefighting and emergency medical services for the unincorporated parts of Los Angeles County, as well as through contracting with various cities. The Department has three main divisions: (1) Fire Fighting; (2) Emergency Medical Services (Paramedics); and (3) Lifeguards. According to its most recent annual report, the Department is the fourth busiest Fire Department in the country—responsible for protecting the lives and property of over 4 million residents living in 1.25 million housing units across 60 cities and all unincorporated areas of Los Angeles County. *See* **Exhibit 1**.

16.    The Lifeguard Division is similarly exceptional in scope. It is the largest professional lifeguard service in the world, protecting 72 miles of coastline, 31 miles of sandy beaches, operating 24 lifeguard stations, 159 lifeguard towers, 8 rescue boats, and employing 174 full-time lifeguards and 614 recurrent lifeguards. In 2021, the Lifeguard Division watched over 51 million beach attendees, and made over 9,000 ocean rescues. *See* Exhibit 1, p.10.

17.    Plaintiff Captain Little has been a proud Los Angeles County lifeguard, saving countless lives, for over 22 years. Captain Little's work performance has been exemplary, as is his reputation at work. He eventually rose through the ranks to become a Captain, and is responsible for overseeing his own lifeguard stations and patrols, as explained in the official job description for Lifeguard Captain. **Exhibit 2**.

18.    Captain Little is also a Christian. Specifically, he is an Evangelical Christian with traditional and orthodox beliefs on marriage, family, and sexual behavior and identity. *See, e.g.*, Lev. 18:1-30; Matt. 5:28; Rom. 1:26-29; 1 Cor. 5:1, 6:9; 1 Thess. 4:1-8; Heb. 13:4. These include the traditional Christian views that:

(1)    any form of sexual immorality is sinful and offensive to God;

/ / /

(2)    that same-sex sexual activity is morally wrong for the individual to engage in and equally wrong for any human society to celebrate;

(3)    that gender and sex are inherently intertwined, and cannot be separated (any more than sex and sexual orientation), and that attempts to do so or to change one's sex are morally wrong;

(4)    that the traditional and only morally acceptable definition of marriage is the complete union of one man and one woman, and that it is not licit to recognize same-sex marriages; and

(5)    that Christians are required to express and show compassion and love toward all individuals, including those who identify as LGBT, while at the same time manifesting their adherence to biblical truths.

**B.    The County decides to fly the Progress Pride Flag at all County facilities during Pride Month 2023.**

19.    On March 7, 2023, the Los Angeles County Board of Supervisors passed a motion titled *Raising the Progress Pride Flag at Los Angeles County Facilities*, attached as **Exhibit 3**. Under that motion, the Board of Supervisors "[d]irect[ed] the Chief Executive Officer to work with all County Departments to explore ways the Progress Pride Flag can be flown at all county facilities."

20.    In implementation of that Board motion, on May 25, 2023, the Fire Department issued a memorandum titled EA-231, to all employees, attached as **Exhibit 4**. As stated in the memo, "On March 7, 2023, the Board of Supervisors passed a motion requiring the Progress Pride flag ('PPF') to be flown at County facilities during the month of June, which will now be recognized as LGBTQ+ Pride month moving forward. With the exception of Flag Day, June 14th, when the Prisoner of War/Missing in Action flag is flown, the PFF [sic] shall be flown…" It continued, stating that Captains and Site Supervisors must "[e]nsure flags are received and flown throughout the month of June."

/ / /

21.     The Fire Department also provided a flow chart to employees to assist in the interpretation and application of EA-231, as the Progress Pride Flag could only be flown if there were adequate flagpoles and flag clasps available. In most relevant part, EA-231 provided that where only two flags are flown, the U.S. Flag and the Progress Pride Flag would be flown—replacing the California State Flag. A copy of that flowchart is attached as **Exhibit 5.**

22.     By its terms, EA-231 required Lifeguard Captains and other Site Supervisors, including Captain Little, to ensure that the Progress Pride Flag is appropriately flown (i.e., appropriately handled, raised, lowered, and stored), either personally or through subordinates, every June at all of the Department's lifeguard facilities in the County with flagpoles and sufficient clasps for mounting the flag.

**C.      The inherent expressiveness of flags.**

23.     Flags are inherently symbolic and universally expressive of ideological content. As explained by the Supreme Court, "nearly every society has taken a piece of cloth and 'endow[ed] it, through the circumstances of its display, with a condensed power' to speak for the community." *Shurtleff v. City of Boston*, 596 U.S. 243, 253 (2022) (quoting Whitney Smith, Flags Through the Ages and Across the World 1-2, 32, 34 (1975)). Indeed, "[t]he Court for decades has recognized the communicative connotations of the use of flags." *Spence v. Washington*, 418 U.S. 405, 410 (1974); *see, e.g.*, *Willson v. Bel-Nor*, 924 F.3d 995, 1001 (8th Cir. 2019); *Dimmitt v. Clearwater*, 985 F.2d 1565, 1569 (11th Cir. 1993); *Brown v. Calif. Dep't of Transp.*, 260 F. Supp. 2d 959, 966 (N.D. Cal. 2003).

24.     The primary, if not exclusive, purpose of flags is to express one or more ideas to the public at large—both through their presentation in a public setting, and through the ceremonial rites relating to proper handling, raising, folding, and presenting of a flag. Such expression is most often made ceremonially via raising the flag on its pole in proper fashion so that the flag can then be seen by the public. This is a precondition to public awareness of the ideas being expressed by those who have

personally raised it or required it to be raised.

25.    Thus, the act of raising a flag, especially in a ceremonial context, is a deliberate action intended to communicate specific messages or ideas to the public. One such aspect of the ceremonial handling of a flag—but not the only one—is the flag salute, which the Supreme Court has described as "a form of utterance," where symbolism serves as a "shortcut from mind to mind," symbolizing systems, ideas, institutions, or personalities. *Texas v. Johnson*, 491 U.S. 397, 405 (1989).

26.    For example, six U.S. servicemen raised the American Flag on February 23, 1945, on Mount Suribachi on the island of Iwo Jima. However, the order to raise the flag was given by Marine Corps Lt. Col. Chandler Johnson. This iconic moment, captured in the famous photograph by Joe Rosenthal, became a symbol of hope and perseverance for U.S. forces during World War II, and for the American public, too. The symbolic expression of these ideas via raising of the flag was that of the six servicemen, but also that of Lt. Col. Johnson, who gave the order to raise the flag.

### D.    The symbolic meaning of the Progress Pride Flag.

27.    According to the creator of the original Pride Flag, each colored stripe has a specific meaning. The Pride Flag had its origin during the bicentennial celebrations of 1976. "I thought of the original American flag with its thirteen stripes and thirteen stars, the colonies breaking away from England to form the United States. I thought of the vertical red, white, and blue tricolor from the French Revolution, and how both flags owed their beginnings to a riot, a rebellion, or a revolution. I thought a gay nation should have a flag too, to proclaim its own idea of power."[1]

28.    Thus, when designing the Pride Flag, its creator assigned a meaning to each stripe. "Pink is for sex. Red is for life. Orange is for healing. Yellow is for the sun. Green is for nature. Turquoise is for magic. Blue is for serenity. Purple is for the spirit. Every color has a meaning just like the American flag—symbolism all the

---

[1] Gilbert Baker, Rainbow Warrior: My Life in Color 35-36 (2019).

way."[2] The whole point of the flag is that "[w]e knew that flags were political statements."[3]

29.    Further, as explained by the creator of the Pride Flag, a rainbow was chosen specifically because of its connection to traditional Christian imagery:

> The idea for the Rainbow Flag had come to me in a dance to a tribal beat, on the wings of angels. Infused with the colors of God's covenant with humanity, the Rainbow Flag was more than mere cloth; it was a visual metaphor and an active proclamation of power, created and dedicated to gay and lesbian liberation. It declared that sexuality is a beautiful expression of nature, a human right.[4]…
>
> A Rainbow Flag was a conscious choice, natural and necessary. The rainbow came from earliest recorded history as a symbol of hope. In the book of Genesis, it appeared as proof of a covenant between God and all living creatures.[5]

30.    Although the original Pride Flag had eight colors, the version that became most popular among the LGBT rights movement in the 1970s and 1980s was limited to six colors. It dropped the artificial hot pink and turquoise, and omitted the indigo color that is present in a seven-color, naturally occurring rainbow. This was done for practical reasons regarding availability of dye and not as a rejection of the symbolism underlying any of the stripes.[6]

31.    Twenty years after the original Pride Flag debuted, in 1999, the Transgender Pride Flag was created. It also had six stripes, but with alternating colors of baby blue, baby pink, and white. Like the original Pride Flag, both the colors and the ordering of the stripes in the Transgender Pride Flag envisioned specific

---

[2] *Id.* at p.40.

[3] *Id.* at p.44.

[4] *Id.* at p.1.

[5] *Id.* at p.37.

[6] *Beyond the Rainbow*, University of Central Lancashire Students' Union (June 9, 2022), https://www.uclansu.co.uk/news/article/6013/Beyond-The-Rainbow/.

VERIFIED THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

symbolism.[7] Lastly, in 2016, the City of Philadelphia added black and brown stripes to the Pride Flag flown in front of its city hall to represent "Black and Latino communities."[8]

32.    In 2018, a designer unveiled the Progress Pride Flag, combining elements from these three Pride Flags. He separated the colors of the Transgender Pride Flag and the Philadelphia Pride Flag and placed them in a chevron on the left side of the flag. As he explained "[t]he arrow points to the right to show forward movement, while being along the left edge shows that progress still needs to be made."[9]

33.    The specific flag at issue—the Progress Pride Flag—is pictured below:



34.    When the Los Angeles County Board of Supervisors passed its motion relating to the Progress Pride Flag, it noted all of the above symbolism, stating: "The original Pride flag contained eight stripes, each a separate color of the rainbow plus hot pink. They colored [sic] represented sex, life, healing, sunlight, nature, magic and art, serenity, and spirit." *See* Exhibit 3.

35.    The Board motion continued: "While there have been several variations of the Pride flag. [sic] in 2019, a version was debuted that included the iconic six

---

[7] *The History of the Transgender Flag*, Point of Pride (Apr. 23, 2015), https://www.pointofpride.org/blog/the-history-of-the-transgender-flag.
[8] Ben Deane, *The Philly Pride flag, explained*, The Philadelphia Inquirer (June 12, 2021), https://www.inquirer.com/philly-tips/philadelphia-pride-flag-20210612.html.
[9] Daniel Quasar, *"Progress" A PRIDE Flag Reboot*, Kickstarter (June 2018), https://www.kickstarter.com/projects/danielquasar/progress-a-pride-flag-reboot.

VERIFIED THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

rainbow stripes: red, orange, yellow, green, blue and violet, as well as the colors from the Transgender Pride Flag, light blue, pink and white stripes, to embrace the transgender community." **Exhibit 3**.

36.     Thus, as acknowledged in the Board of Supervisors' motion, the Progress Pride Flag symbolizes and advances a range of controversial viewpoints, both religious and moral, regarding the family, the nature of marriage and human sexuality, certain sexual practices, and the identity, nature, and purpose of the human person. Particular aspects of the Progress Pride Flag were also originally intended by its creators, and echoed by the Board in its motion, to signify "sex," "magic," and "spirit," among other ideological and spiritual notions.

### E.     Due to the controversial symbolism of the Progress Pride Flag, Captain Little requests and receives a religious accommodation.

37.     As stated above, Captain Little is a devout Christian with bona fide religious beliefs on marriage, sex, and family that conflict with both the intended meaning and public meaning of the Progress Pride Flag—or any Pride Flag—on those same subjects. The views commonly associated with the Progress Pride Flag regarding marriage, sex, and family are in direct conflict with Captain Little's bona fide and sincerely held religious beliefs on the same subjects. His bona fide and sincerely held religious beliefs require him to reject those views.

38.     While Captain Little understands that the government can speak its own messages, and thus may promote Pride Month, he believes that he cannot personally do so by raising or maintaining the Progress Pride Flag. Doing so would be to personally participate in, espouse, and promote messages contrary to his sincerely held religious beliefs, similar to how many courts have recognized that Jehovah's Witnesses may not salute or pledge allegiance to the flag of any nation or state. *See, e.g.*, *Lawson v. Washington*, 296 F.3d 799, 803 (9th Cir. 2002).

39.     As stated above, in implementation of the Board motion, the Fire Department issued a memorandum titled EA-231 to all employees on May 25, 2023,

requiring the flying of the Progress Pride Flag at locations that were physically able to accommodate it. In practice, not all lifeguard properties have either flag poles or adequate flag clasps, so flying the Pride Flag was not possible at all locations. *See* Exhibits 4-5.

40.    During this time—the first half of 2023—Captain Little's regular assignment was Area 27 (Will Rogers Beach). For June 1-3, 2023, Captain Little worked Area 27 and no Progress Pride Flag had been delivered by management to be flown. Further, based on the instructions of EA-231, it appeared that the Progress Pride Flag would not be flown at Area 27. However, Captain Little would often work extra shifts at other work locations in the form of "Overtime" (volunteer for extra shifts), "Recall" (forced to work extra shifts), or "Relief" (prescheduled shifts on straight-time).

41.    For the first two full weeks of June 2023 (June 4-17), Captain Little was taking a pre-scheduled vacation and used this time to consider how he can protect his religious beliefs. At the time, he did not know his options regarding how to respond when EA-231 was first issued. He discussed the issue with a few colleagues and they all expressed fear as they believed raising any objections would tarnish their promotability and eligibility for special assignments. As a result, Captain Little was conflicted. He had always been a low maintenance employee, but his faith was very important to him. However, after conducting some research and praying about it, he decided that he should ask for an exemption on his first day back at work.

42.    As a result, on June 18, 2023, Captain Little's first day back, he requested a religious accommodation. Captain Little's work schedule is not fixed, nor is it permanent. It changes and is changeable within certain limits, as governed by documents like the memorandum of understanding between the lifeguard's union (LACOLA) and the Fire Department, among others.

43.    In his written request, Captain Little made the broad and open-ended ask "to be exempt [from] adhering to EA-231" because compliance with it could violate

his religious beliefs in myriad ways. *See* **Exhibit 6**. For example, the flying of the Progress Pride Flag in his own workspace could be interpreted as a personal endorsement of its message. *See Brown v. Polk Cnty., Iowa*, 61 F.3d 650, 659 (8th Cir. 1995) (government wrongly ordered employee to remove religious poster from his office and Bible from his desk); *Swanson v. Flores*, No. 3:23-cv-2021, 2025 WL 97601, at *8 (S.D. Cal. Jan. 14, 2025) (similar).

44.    Later that day, he was informed by Fire Department Section Chief Danielle McMillon that they could schedule an Interactive Process Meeting (IPM) with Ms. Renée Nuanes-Delgadillo of the Fire Department's Risk Management and Disability Management and Compliance, Leadership and Professional Standards Bureau, for the next day.

45.    On June 19, 2023, Captain Little participated in the Interactive Process Meeting involving both lifeguards from the Fire Department and personnel from human resources. During that meeting, he explained that, under EA-231, the Progress Pride Flag should not be flown at Area 27 and he requested that it not be flown. In the alternative, he requested to be moved to a site not flying the Pride Flag. He explained that his religious beliefs did not allow him to raise the Progress Pride Flag or ensure that it is raised and properly flown.

46.    At the conclusion of the meeting, the Fire Department agreed to Captain Little's request for a religious accommodation. The Fire Department agreed to Captain Little's request by promising: (1) to move him to a site not flying the Progress Pride Flag; (2) that he need not personally raise the flag; and (3) that he need not ensure/oversee raising or flying of the flag because, if he were assigned to headquarters, he would not serve as supervisor.

47.    This accommodation appeared to be a practical solution because there were several sites that had not flown the Progress Pride Flag during the entire month of June. Working with his immediate supervisors, Captain Little negotiated a move to Area 17 and Area 33 for the remaining days in June.

48.    At Area 17, Captain Little would be the supervisor overseeing the entire Area, which included three sub-areas manned by Lifeguards: Dockweiler North, Dockweiler South, and El Segundo. The Fire Department agreed that that Progress Pride Flag would not be flown at Area 17 and they had not mandated it be flown at any time in June leading up to the day of the IPM on June 18.

49.    At Area 33 (Malibu Beach), Captain Little would not be responsible for the Progress Pride Flag being flown at Zuma Lifeguard Headquarters, since that was the responsibility of the Headquarters Captain working at Area 30. Thus, although the Progress Pride Flag would be flown, Captain Little would not be the site supervisor in charge of ensuring it is raised and would be far from it in the field. Even though Captain Little had to extend his commute by a full hour to move to the alternate beach of Area 17, protecting his religious beliefs while accomplishing his job duties was important to him.

50.    On behalf of the Fire Department, Assistant Lifeguard Chief Adam Uehara was present for and participated in the Interactive Process Meeting. Chief Uehara agreed on behalf of the Fire Department to the above terms. Section Chief McMillon was also present for and participated in the Interactive Process Meeting. Shortly after the terms of the accommodation were finalized, Assistant Lifeguard Chief Uehara communicated with Lifeguard Division Chief Fernando Boiteux about the meeting, the accommodation, and its terms.

51.    As stated above, a result of the accommodation, Captain Little believed he would be able to work in Area 17—which includes the subareas of the Dockweiler North, Dockweiler South, and El Segundo lifeguard stations—without either violating his religious beliefs or running afoul of EA-231. As of June 19, 2023, none of these sites were then flying the Progress Pride Flag or were even capable of doing so, due to insufficient flag clasps on the halyards of the flagpoles at the sites, and a lack of Progress Pride Flags at any of the sites. Further, none of these Area 17 sites had ever before flown the Progress Pride Flag.

52.     During the Interactive Process Meeting, Captain Little agreed with the Fire Department to be assigned to Area 33 for the month of June for his base schedule. They also agreed that for his upcoming recall day of June 21, 2023, he would be assigned to Area 17. They agreed that when he served at any headquarters subarea, where the Progress Pride Flag was being flown, that he would not serve as Headquarters Captain. By another lifeguard filling that role, that individual would assume responsibility for ensuring that the Progress Pride Flag is flown.

53.     Going forward, per the accommodation, Captain Little was to negotiate arrangements with others assigned to various sites to avoid a conflict between his religious beliefs and compliance with EA-231. Those arrangements could include shift swapping, use of recall exemption, and use of leave benefit time as a last resort.

**F.     The practical reasonableness of granting Captain Little a religious accommodation.**

54.     The Fire Department's decision to grant Captain Little a religious accommodation made perfect sense as it required no substantial increase of expenditures. It would be simple to make basic rearrangements of shifts and schedules and the Fire Department has many employees it already pays who could substitute for any Progress Pride Flag-related duties in June. Indeed, in an analogous situation, the San Diego City Fire Department adopted "an all-volunteer parade" policy after losing in litigation when it ordered personnel to participate in a Gay Pride Parade. *See Ghiotto v. City of San Diego*, No. D055029, 2010 WL 4018644, at *27 (Cal. Ct. App. Oct. 14, 2010).

55.     There was also no real likelihood that requiring another supervisor to monitor and ensure proper flying of the Progress Pride Flag would be an impact that goes on to affect the conduct of the Fire Department, Lifeguard Division, in its core function of providing lifeguard services to beachgoers. Because the Fire Department is a government employer, Captain Little's rights are doubly protected: "a government employer … must …provide religious accommodations under Title VII, and 'must

abide by the First Amendment' in doing so." *Does 1-11 v. Univ. of Colorado*, 100 F.4th
1251, 1280 (10th Cir. 2024).

56.     Here, the accommodation complied with the First Amendment. Captain
Little's job duties involve serving as a lifeguard, not affirming by word or deed
ideological views that he does not espouse. Thus, his job requirement—as laid out in
the lifeguard job description—to "ensur[e] the enforcement of all rules and
ordinances," cannot be read in the abstract, but must be tethered to lifeguard duties.
*See* Exhibit 2.

57.     As explained by the Supreme Court, the government may not "posit an
excessively broad job description" and thereby "treat[] everything teachers and coaches
say in the workplace as government speech subject to government control." *Kennedy
v. Bremerton Sch. Dist.*, 597 U.S. 507, 531 (2022). Nor may the government impose a
"blanket requirement" that all employees "mouth support for views they find
objectionable." *Janus v. AFSCME, Council 31*, 585 U.S. 878, 892, 907 (2018).

58.     As concisely explained by the Virginia Supreme Court, "[m]ath teachers
must teach math, science teachers must teach science, history teachers must teach
history, and so on. But none of them can be compelled into the service of controversial
'religious, political, [or] ideological causes.'" *Vlaming v. W. Point Sch. Bd.*, 895
S.E.2d 705, 739 (Va. 2023) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)).

59.     The role of Lifeguard Captain is a public safety position. It cannot be
transformed from a public safety role into the role of spokesperson for elected County
officials, over the objection of the employee. Conveyance of the County Supervisors'
message via flag raising, whether directly or indirectly, about "sex, life, healing,
sunlight, nature, magic and art, serenity, and spirit" would not—from the standpoint
of the reasonable public safety employee—be an expected part of compliance with
the job requirement to "ensure the enforcement of all [public safety] rules and
ordinances." *See Geraghty v. Jackson Loc. Sch. Dist. Bd. of Educ.*, No. 5:22-cv-2237,
2024 WL 3758499, at *11 (N.D. Ohio Aug. 12, 2024).

---

VERIFIED THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

60.     Directly or indirectly raising the Progress Pride Flag is government speech *only when* done pursuant to official duties of the governmental employee. Thus, an order from a superior to a subordinate to fly the Progress Pride Flag would reasonably appear to the subordinate as an affirmation by the superior of the message, values, or ideas commonly associated with the Progress Pride Flag.

61.     Whenever a Lifeguard Captain raises a flag, directly or indirectly, to communicate a message that has no relationship at all to public safety (and that is not a government flag), that speech does not become government speech merely because it occurs on government property. Whether by raising the Progress Pride Flag oneself or by ordering another to do so, flying the Progress Pride Flag is pure expression. Public messaging, ideological or otherwise, is not and has never been among the official duties of the Lifeguard Captain in the Lifeguard Division of the Fire Department of the County of Los Angeles.

### G.     Captain Little's religious accommodation is suddenly and maliciously revoked.

62.     On June 21, 2023, Captain Little was assigned by recall to work at Redondo Beach, where the Progress Pride Flag was being flown. Because of the accommodation, he arranged with Section Chief McMillon to change the assignment from Redondo Beach to Area 17. Specifically, Captain Little found a willing colleague to trade the shift so that Captain Little could work at Area 17 and Section Chief McMillon approved and coordinated the shift trade. Section Chief McMillon understood then that the reassignment to Area 17 was made in order to comply with the terms of the religious accommodation as it then existed.

63.     However, prior to June 21, 2023, Lifeguard Division Chief Boiteux had communicated to others in Lifeguard Division management, including Section Chief Lester, that he believed no religious accommodation should be extended to Captain Little, contrary to the accommodation negotiated between Captain Little, other Fire Department management, and human resources personnel. This was because of

Lifeguard Chief Boiteux's animus against Captain Little's religious beliefs. Chief Boiteux communicated to Section Chief Lester that the flagpoles at the Area 17 sites should be modified so that they could fly Progress Pride Flags, despite the assignment of Captain Little to that station.

64. Due to this conversation between Lifeguard Chief Boiteux and Section Chief Lester, on the morning of June 21, 2023, Section Chief Lester brought additional flag clasps and Progress Pride Flags to each of the three sub-area sites of Area 17. As stated above, before he did so there had not been sufficient clasps at any site of Area 17 to fly the Progress Pride Flag, and as such the sites also did not have any of the flags stored there.

65. In the early hours of June 21, 2023, Section Chief Lester added clasps to the halyards of the flagpoles of the Area 17 sites by ordering lifeguards who were present to do so. Section Chief Lester did this so that the sites of Area 17 would from then on become subject to the terms of EA-231, imposing flag-related duties on the Captain or Site Supervisor assigned to any of the Area 17 sites. Section Chief Lester knew this would be Captain Little as of approximately 10:30 a.m. on June 21, 2023.

66. Section Chief Lester knew Captain Little had an accommodation negotiated with and through the human resources department. Nonetheless, Section Chief Lester sought to defeat that religious accommodation due to his animus against Captain Little's religious beliefs.

67. Prior to June 21, 2023, Section Chief Lester knew of Captain Little's traditional Christian religious beliefs on marriage, sex, and family as a result of prior communication with Captain Little on those subjects. He also knew that by adding flag clasps and raising Progress Pride Flags at the Area 17 sites, he would be creating a conflict with Captain Little's religious beliefs and religious accommodation. Section Chief Lester acted as he did out of animus toward the religious beliefs of Captain Little, and with the specific intent to cause a religious conflict for him.

/ / /

68.    Nevertheless, Captain Little's religious accommodation was transfer to a site not flying the Progress Pride Flag. At 10:30 a.m. on June 21, 2023, Captain Little arrived at work. Upon arriving at Area 17 on June 21, 2023, Captain Little enforced the terms of his religious accommodation by lowering the Progress Pride Flags, so that he would be working in a site not flying the Progress Pride Flag, as mutually agreed.

69.    Prior to lowering the Progress Pride Flags at Area 17, Captain Little asked the lifeguards assigned to each sub-area that he was supervising whether they objected to his doing so; no staff objected. Thus, with the permission of the Ocean Lifeguard Specialists then stationed at Dockweiler, he took down the flags in specific reliance on his religious accommodation. That was between 11:30 a.m. and 2:30 p.m.

70.    Later that day, at about 2:45 p.m., the Fire Department informed Captain Little by Microsoft Teams that his religious accommodation had been revoked. Later that day, at around 5:45 p.m., Section Chief Lester also verbally directly ordered Captain Little to re-raise the Progress Pride Flags that he had lowered.

71.    In his words, demeanor, and tone, Section Chief Lester's conduct toward Captain Little in the circumstance was abusive, inappropriate, harassing, and discriminatory. Further, Section Chief Lester's conduct was motivated by animus toward Captain Little's religious beliefs. He acted this way toward Captain Little because of Captain Little's religious beliefs and in retaliation for Captain Little seeking a religious accommodation.

72.    Captain Little refused Section Chief Lester's verbal order to personally re-raise the Progress Pride Flags after lowering them. He refused to do so, in part, because that would have made the Area 17 sites noncompliant with the religious accommodation, and he was confused and flustered over its sudden revocation.

73.    At the end of the day on June 21, 2023, Assistant Lifeguard Chief Uehara confirmed the denial of any religious accommodation for Captain Little. Assistant Lifeguard Chief Uehara also denied Captain Little his right to use already earned

1  employment benefits, including paid leave, as a means to avoid the conflict between

2  his religious beliefs and compliance with EA-231.

3      74.    Thus, on June 21, 2023, without justification or notice, the Fire

4  Department abruptly ended the interactive process and refused Captain Little any

5  accommodation, less than two days after granting an accommodation. This was a

6  violation of Title VII and FEHA. The Department could easily grant Captain Little a

7  religious accommodation to EA-231 without undue burden to itself because other

8  Captains or Site Supervisors who do not have any religious objection could have

9  complied with EA-231 on his behalf.

10     75.    On June 22, 2023, Lifeguard Division Chief Fernando Boiteux issued a

11 written Direct Order to Captain Little to fly the Progress Pride Flag or ensure that the

12 Progress Pride Flag is flown as instructed in EA-231, which is attached as **Exhibit 7**.

13 The written Direct Order was hand-delivered by Chief Boiteux to Captain Little. It

14 states: "You are hereby ordered to: (1) Fly the Progress Pride Flag (PPF) as instructed

15 in Executive Action-231 (EA-231) during the month of June; OR (2) Ensure that the

16 PPF is flown as instructed in EA-231 during the month of June," and "Failure to

17 comply with this order will be considered insubordination and subject to disciplinary

18 action, which could include suspension and/or discharge from County service."

19     76.    When doing so, Chief Boiteux told Captain Little that "You need to stop

20 what you are doing," "You are an LA County employee; that's the only thing that

21 matters," and "Your religious beliefs do not matter; you are an LA County employee."

22 He repeated multiple times, "You are an LA County employee" and "Your religious

23 beliefs do not matter" in an instance of religious discrimination combined with

24 physical intimidation.

25     77.    Lifeguard Chief Boiteux is 6'4" tall and weighs 220 pounds. Captain

26 Little is aware that Chief Boiteux is also trained in martial arts. He delivered his

27 message to Captain Little in a violent and angry manner while standing over Captain

28

Little—who is only 5'9" tall and weighs 150 pounds. Captain Little believes that the specific intent of Chief Boiteux's demeanor was to be physically intimidating.

### H. Captain Little files a religious discrimination complaint with the Fire Department, and is retaliated against.

78. On June 22, 2023, at 11:58 a.m., Captain Little filed a County Policy of Equity "CPOE" administrative complaint with the Fire Department for religious discrimination and harassment, which is attached as **Exhibit 8**. As stated in that administrative complaint, Captain Little's "shift on 6/21 was changed to accommodate my religious beliefs so I would not have to work an area that flew the pride flag." But, as stated above, Section Chief Lester went to that area to order the Progress Pride Flag flown. So, Captain Little said, "I felt like I was being targeted or entrapped by Chief Lester and my religious beliefs were not being taken seriously," and "I believe that the actions by Chief Lester are retaliatory in nature." The Fire Department later notified Captain Little that it had received his County Policy of Equity (CPOE) complaint, and was investigating it. The notice is attached as **Exhibit 9**.

79. On that same day, June 22, 2023, Chief Boiteux informed Captain Little that he was the subject of an internal administrative investigation for lowering the Progress Pride Flag during his shift the day prior. The notice of that investigation is attached as **Exhibit 10**. On June 22, 2023, Chief Boiteux also delivered Captain Little a "Notice of Instruction," attached as **Exhibit 11**, which stated that: "All Department employees, *irrespective of personal beliefs*, are expected to comply with EA-231, which includes raising the flag as instructed." (Emphasis added.)

80. The Direct Order and Notice of Instruction specified that Captain Little is responsible for either flying the Progress Pride Flag as instructed in EA-231 or ensuring that it is flown. As such, whenever assigned to a site at which the Progress Pride Flag must be flown, and at which Captain Little could not ensure through another employee that the Progress Pride Flag is flown, by the terms of these

documents Captain Little would be personally responsible for flying the Progress Pride Flag as instructed in EA-231.

81.     Between June 22, 2023, and May 23, 2024, the Fire Department refused to engage in the interactive process with Captain Little to negotiate a reasonable religious accommodation. This violated both Title VII and FEHA. The Department is legally obliged to engage in the interactive process with Captain Little concerning his requested religious accommodation.

82.     Further, upon information and belief, the Fire Department breached Captain Little's right to employment-related privacy. The Department, through the persons discussed above, disclosed to unauthorized recipients that Captain Little requested a religious accommodation to not raise the Progress Pride Flag. This breach of privacy led to the following incidents:

A.    On June 23, 2023, Captain Little was suspended from his role on the background investigation unit, which conducts investigations of emergency incidents, resulting in a significant loss of overtime, income, and prestige. When this happened, Captain Little asked the individual informing him why it was happening. The tenor and cadence of the individual's response indicated to Captain Little that he was uncomfortable with Captain Little's questions and he responded with words to the effect of: "I'm just following orders, don't shoot the messenger." On information and belief, that individual's demeanor was indicating that he knew or suspected that the suspension was retaliatory.

B.    On June 28, 2023, Captain Little received via the U.S. Mail a death threat against him and his children, attached as **Exhibit 12**. The death threat was printed by hand in letters that alternate in color and said: "Jeff F*** you and your Jesus. Your hate won't be tolerated. We know where you live and work. You better pay respect to our pride flag or we will f*** you up. We know about your cute little girls and aren't afraid to rape the s*** out of

1    them if you don't honor us. You are a fascist pig and deserve to die."

2    C.    On June 30, 2023, the Fire Department notified Captain Little that it

3    received second and third County Policy of Equity (CPOE) complaints

4    against him, which it was investigating. The notices are attached as

5    **Exhibit 13** and **Exhibit 14**. These alleged complaints, ICMS #2023-

6    120504 and ICMS #2023-120591, are pretextual and retaliatory.

7    83.    On or about July 20, 2023, at 2:00 p.m., Captain Little spoke with

8    investigator Justa Lopez of the County's CPOE Investigative Unit regarding his own

9    complaint. During the investigative call, Captain Little added to his CPOE complaint

10    the June 22, 2023, Direct Order, the June 22, 2023, Notice of Instruction, the June 22,

11    2023, Notice of Investigation, the June 22, 2023, actions of Chief Boiteux, and the

12    receipt of the June 28, 2023, death threat. He asked Ms. Lopez whether he had to

13    supplement his June 22, 2023, CPOE complaint in writing. She told him that was not

14    necessary, and she deemed the additional facts part of his CPOE complaint.

15    84.    However, on July 28, 2023, the Fire Department informed Captain Little

16    that the conduct he had complained about did not violate the CPOE. The notice is

17    attached as **Exhibit 15**. The Department did not take any actions to protect Captain

18    Little from previous and future religious discrimination, harassment, and retaliation.

19    85.    On September 14, 2023, with respect to the Department's investigation

20    into Captain Little's lowering of the Progress Pride Flag, the Department notified him

21    that an administrative interview of him would occur on September 21, 2023. That

22    notice is attached as **Exhibit 16**. Then, on February 7, 2024, the Fire Department

23    notified Captain Little that he had violated the County Policy of Equity, and that

24    administrative action may follow—a retaliatory outcome of the pretextual

25    investigation launched in June 2023. The notice is attached as **Exhibit 17**.

26    86.    On July 16, 2024, the Fire Department presented Captain Little with an

27    intent to suspend letter, authored by Deputy Fire Chief Robert Harris of Central

28    Regional Operations Bureau, and which was issued earlier (but not delivered) on July

VERIFIED THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

12, 2024. The intended and proposed suspension is for 15 eight-hour days without pay, or three work weeks. The suspension letter is attached as **Exhibit 18** (with exhibits omitted).

87.    On October 24, 2024, the Fire Department presented Captain Little with a notice of suspension letter. That letter informed Captain Little that he would serve his suspension in November 2024, which he did. The suspension letter is attached as **Exhibit 19**. It states: "You are hereby advised that any further violation of the County's policies and procedures, or the Department's Standards of Behavior, may be grounds for more serious disciplinary action, including discharge."

88.    The suspension was ordered because the Department sought to retaliate against Captain Little for failing to comply with EA-231 and instead conforming the flags at Area 17 to the agreed to accommodation on June 21, 2023, and for holding the religious beliefs that prompted Captain Little to seek the accommodation in the first place.

89.    Both letters indicate that Captain Little had to seek approval from the Fire Department before lowering the Progress Pride Flags in Area 17 to conform the flagpoles to the religious accommodation. But nowhere does either letter cite to any authority for this proposition.

90.    The letters also indicate that conforming the flagpoles in Area 17 to the religious accommodation failed to show support for and inclusivity of the LGBT community. The letters conclude that discipline lies primarily for the act of lowering the Progress Pride Flags without prior authorization to do so, but nowhere do letters address or even mention the then-existing religious accommodation, even though the accommodation is referenced 57 times in the Investigation Reports.

91.    The omission of the critical subject of the religious accommodation from the analysis of the facts and applicable standards is not accidental. It is deliberate. The grounds stated in the analysis for the intended and proposed discipline are utterly pretextual.

**I.      Developments in advance of and during Pride Month 2024.**

92.      On March 15, 2024, Ms. Ashley Hudson from the County Equity Oversight Panel notified Captain Little by email that the Panel was "in receipt of a County Policy of Equity complaint that was either filed by you or filed on your behalf," which email is attached as **Exhibit 20**. Ms. Hudson further requested that Captain Little contact her "within five (5) business days of the date of this letter so we can schedule a clarifying interview."

93.      On March 21, 2024, Captain Little responded to Ms. Hudson via letter from counsel, which is attached as **Exhibit 21**, with redundant exhibits omitted. In the letter, Captain Little clarified that he had filed charges with the Equal Employment Opportunity Commission ("EEOC") and the California Civil Rights Department ("CRD"), and asked her to forward the letter to the County's legal counsel. Captain Little further requested that Ms. Hudson confirm that the letter had been forwarded to legal counsel for further engagement and resolution of his claims.

94.      Nobody from the County responded to Captain Little's letter dated March 21, 2024. So, on April 19, 2024, Captain Little replied again to Ms. Hudson, via letter from counsel, attached as **Exhibit 22** (again with redundant exhibits omitted). In this comprehensive, 11-page letter, Captain Little explained in detail and with documentary support the basis for his claims against the Fire Department and his request for a religious accommodation and other remedies.

95.      Captain Little further advised Ms. Hudson that the EEOC and CRD had each provided him with a Right to Sue letter, that she had never acknowledged his letter dated March 21, 2024, and that he would timely file a complaint by June 24, 2024, at the absolute latest should the County and the Fire Department fail to engage in a good faith negotiation of his claims. Captain Little also requested acknowledgment of receipt of the letter, and further requested that the letter be forwarded to legal counsel for the County and the Fire Department. In the interest of

avoiding litigation, Captain Little requested a substantive response no later than May 3, 2024.

96.     In his April 19, 2024 letter, Captain Little also stated that he was willing to mediate the dispute before June 1 (the start of Pride Month). That is the date by which Captain Little would again be put at risk of violation of his religious beliefs because he would again become subject to compliance with EA-231 via the Fire Department's Direct Order, which had not been withdrawn or rescinded.

97.     By May 8, 2024, neither the County nor the Fire Department had responded to Captain Little's letters from counsel. So, instead, Captain Little directly emailed Ms. Renée Nuanes-Delgadillo—the human resources officer that he had spoken and emailed with in June through August 2023. *See* **Exhibit 23**. His discussions with her had stalled in August 2023 because she could not confirm whether the Progress Pride Flag would be flown every June, and stated that Captain Little should renew his request the next year.

98.     So, in accordance with Ms. Nuanes-Delgadillo's instruction, in his May 8, 2024, email, Captain Little renewed his request for a religious accommodation from having to raise the Progress Pride Flag during June 2024. To ensure a timely discussion, Captain Little requested that the religious accommodation process resume by no later than the end of the following week, or May 17, 2024.

99.     The Fire Department ignored counsel's letters dated March 21 and April 19, 2024, requesting engagement on the request for a standing exemption from compliance with EA-231. And, even though Captain Little did exactly as the Fire Department requested, the Department ignored his May 8 email until May 23, when the Fire Department suggested holding another meeting. This uncertain response came too late; Captain Little had no choice but to seek judicial relief.

100.    On Friday, May 24, 2024, Captain Little initiated this action. As stated above, Captain Little had been attempting to seek a religious accommodation for a full year—since June 2023. But he received no response from anyone at the County

until May 23, when Risk Management Officer Renée Nuanes-Delgadillo sought an Interactive Process Meeting with Captain Little on either May 28 or May 29, 2024.

101.   Captain Little responded via email later on May 23, accepting the May 29 meeting date. On Wednesday, May 29, 2024, Captain Little attended the Interactive Process Meeting. That meeting was conducted by Ms. Nuanes-Delgadillo as well as Captain Little's direct report, Chief Kyle Power, and a union representative, Gregory Crum.

102.   The meeting was entirely informational. Captain Little explained the nature of his religious beliefs, his need for a religious accommodation, and proposed practical means of achieving that accommodation. Ms. Nuanes-Delgadillo took this information down to present it to more senior officials with the Fire Department. No decision was made at the meeting, but a follow-up meeting was scheduled for Friday, May 31, 2024.

103.   On Thursday, May 30, 2024, the Fire Department issued a new directive relating to Pride Month, titled "EA-232." The prior directive, issued for Pride Month 2023, was titled "EA-231." A true and correct copy of EA-232 is attached as **Exhibit 24**. In relevant part, EA-232 states: "Fire Captains/Unit Supervisors shall … [e]nsure PPFs [Progress Pride Flags] are flown throughout the month of June at Department facilities within their respective jurisdiction per Attachment A." EA-232 also includes a FAQ to explain that not all Fire Department facilities will be flying the Progress Pride Flag, depending on whether it is practical to do so.

104.   EA-232 is a significant change of position by the Fire Department from June 2023's EA-231, which required that, at locations only able to fly two flags, the Progress Pride Flag must replace the California State Flag. The May 30, 2024 policy, EA-232, restores the California State Flag to its place of honor, behind only the Flag of the United States of America. *See* Cal. Gov. Code § 431.

105.   However, EA-232 also states that "Department members are also encouraged to reflect on and celebrate LGBTQ+ history and community," that "[l]ast

year we faced challenges with compliance at several Department facilities," and that
"compliance is not optional," as though no religious accommodation could be
provided at all, no matter the circumstances or costs. Thus, EA-232 continues the
County's goal of ideological conformity.

106. The Fire Department does not say in EA-231 nor in EA-232 why
compliance is "not optional" for those with a sincere religious objection, nor does it
say why a religious accommodation could not apply, nor does it specify how or why
non-compliance due to religious accommodation would burden the Fire Department,
nor to what extent there would be such a burden.

107. On Friday, May 31, 2024, Captain Little attended the second Interactive
Process Meeting, for which a summary memo by the Fire Department is attached as
**Exhibit 25**. At that meeting, Ms. Nuanes-Delgadillo explained that the Fire
Department had determined that it would offer Captain Little a partial religious
accommodation. Specifically, because of his work shift—which starts after the
Progress Pride Flag needs to be raised (at approximately 7:00 a.m.), and ends before
it needs to be lowered—Ms. Nuanes-Delgadillo explained that the Fire Department
could agree that Captain Little would not be personally responsible for raising or
lowering the Progress Pride Flag.

108. However, Ms. Nuanes-Delgadillo explained that Captain Little would
still be personally responsible for enforcing compliance with EA-232 and ensuring
that his subordinates comply. Thus, for example, if Captain Little arrived on site and
found that the Progress Pride Flag had not been raised, or had been positioned
incorrectly, he would still be responsible for ensuring its correction. Ms. Nuanes-
Delgadillo "explained that an essential job duty of a lifeguard captain is to supervise,
which includes ensuring that staff comply with policies, procedures, and directives,
which include EAs, and this essential job function cannot be removed as it would be
an undue hardship." *See* Exhibit 25, p.2.

109. Captain Little responded by explaining that this was not satisfactory as

it would still violate his sincere religious beliefs to enforce compliance and ensure his subordinates were properly flying the Progress Pride Flag. Captain Little also indicated that it was foreseeable that the Progress Pride Flag might not be raised because he believes and is informed that other Fire Department personnel have similar religious objections to his. His shift could also change such that he would need to be present when the flag is raised or lowered.

110.    But Ms. Nuanes-Delgadillo simply responded that Captain Little would need to follow regular protocol if an employee is being insubordinate. She insisted "that to remove this essential job function would result in another lifeguard captain having to supervise the staff at Area 33 by having someone come in on their day off or having a lifeguard captain from another area to come to that location." *See* Exhibit 25, p.2. But this was not true. Because the beaches are so large and lifeguards are spaced far from each other, they regularly communicate with each other using their cell phones, radios, or other devices. Another captain would just need to call or text the lifeguards at Captain Little's beaches periodically to check in with them.

111.    Ms. Nuanes-Delgadillo also explained that the Fire Department would not offer Captain Little a standing religious accommodation. Instead, he would have to renew his request in advance of every June—and go through new rounds of Interactive Process Meetings.

112.    Captain Little also raised the issue of the Direct Order which mandates Captain Little's specific, personal compliance with EA-231 under threat of discipline for noncompliance. Ms. Nuanes-Delgadillo denied Captain Little's request for suspension of that Direct Order and denied Captain Little's request to remove the Direct Order from his personnel file. This is significant in part because the Department has yet to clarify: (1) whether the Direct Order applies to EA-232 (or only EA-231); and (2) the relationship between EA-231 and EA-232 (whether the later supersedes or simply amends the prior). It is also significant because the Direct Order says that Captain Little's failure to ensure raising of the Progress Pride Flag could

1    lead to his discharge.

2    113.   Over the weekend of June 1-2, 2024, Captain Little secured an effective

3    accommodation by working with his direct report, Chief Kyle Power. For the month

4    of June, Captain Little was assigned to two locations: three days per week at Area 33

5    (comprising Nicholas Beach, Point Dume Beach, and Malibu Beach), and one day per

6    week at Zuma Headquarters. After walking the beach, Captain Little and Chief Power

7    thy were able to confirm that—under the terms of the new EA-232—none of the

8    lifeguard stations in Area 33 would be flying the Progress Pride Flag, because at each

9    location, "The flagpole is … not able to accommodate *three* flags." *See* Exhibit 24,

10   attch. B, p.1 (emphasis added).

11   114.   With respect to Captain Little's one day per week posting at Zuma

12   Headquarters, where the Progress Pride Flag would be flown during the month of

13   June, Captain Little was able to find another Captain who was willing to trade shifts

14   for a location where the Progress Pride Flag would not be flying—and Chief Power

15   approved the requested shift change.

16   115.   However, because the Fire Department refused to grant Captain Little a

17   workable and complete religious accommodation for both past and future threats,

18   including refusing him a standing accommodation for future Pride Months, Captain

19   Little will need to prosecute this action and seek both a preliminary and permanent

20   injunction.

21   **J.    Captain Little's need for a declaration of his constitutional rights.**

22   116.   Although Captain Little was very pleased that he was able to secure a

23   practical accommodation of his religious beliefs in June 2024, he still needs

24   prospective relief from this court. The absence of a clear process for requesting and

25   obtaining a religious accommodation—as shown through the tangle of emails and

26   meetings discussed above—leaves the issue of whether Captain Little's constitutional

27   rights in the future will be violated completely uncertain.

28   117.   This risk is made worse by the fact that there is no list of sites to which

31

the Progress Pride Flag policy currently applies or is expected to apply within any time. And, as this case reveals, an accommodation can be granted by the Fire Department one day, *de facto* rescinded the following day without notice to the employee, and then become a basis for discipline when the employee still believes in good faith that the accommodation has not been rescinded, and acts accordingly.

118.    Further, the Fire Department can change the applicability of its Progress Pride Flag policy by adding or removing flag clasps as it likes, or by altering flagpoles as it likes, which it may decide to do just to undermine the ability of an employee to know how to seek an accommodation. It can also change at will and without notice or input to whom or to which positions the policy will apply. That is, *who* an applicant for accommodation might be from day to day, or *whether* an applicant could receive an accommodation under any iteration of the Progress Pride Flag policy, therefore depends on variables outside the applicant's knowledge and control.

119.    Because the Fire Department's Progress Pride Flag policy is open ended, ill defined, subject to change at any moment, silent on the accommodation process, highly discretionary in application, and believed by current Fire Department management to be free of any religion-based exemption, Captain Little's accommodation requests have naturally changed over time as more of the practical details of the policy have come to light at different times.

120.    Any changes in Captain Little's accommodation request during the negotiation process have been made in response to changes to the Progress Pride Flag policy, as written and as applied. As a result, any changes to the request for accommodation over time and in response to the Fire Department's changed positions should be understood as clarifications, not abrupt changes.

121.    Captain Little does not have a religious objection to temporarily or incidentally passing by a Progress Pride Flag while performing his official duties. His religious objection arises when the Fire Department redirects him away from his official lifeguard duties in order to attend to the Progress Pride Flag in any manner

that would, in the mind of a reasonable observer, associate Captain Little with the public message of the flag.

122.   Thus, for example, to the extent that the Progress Pride Flag policy, as applied by Fire Department management to Captain Little, requires him to be physically present for and in the vicinity of any Progress Pride Flag raising ceremony for no reason other than to be present, Captain Little would raise a religious objection to being required to participate.

**K.    Exhaustion of administrative remedies.**

123.   Captain Little filed an administrative complaint against Defendant the Los Angeles County Fire Department with the EEOC within the applicable statutory period concerning his claims arising under Title VII of the Civil Rights Act of 1964, as amended ("Title VII").

124.   Specifically, on March 11, 2024, Captain Little filed a charge with the EEOC against the Fire Department based on discrimination and retaliation in violation of Title VII, which the EEOC designated as Charge No. 480-2024-02766.

125.   On March 26, 2024, the United States Department of Justice (DOJ) issued to Captain Little a Determination of Charge and Notice of Your Right to Sue on EEOC Charge No. 480-2024-02766. This complaint was filed within ninety days of Plaintiff receiving the right-to-sue letter from DOJ.

126.   Captain Little also timely filed an administrative complaint against Defendant the Los Angeles County Fire Department with the California Civil Rights Department ("CRD") for religious discrimination and retaliation in employment in violation of California's anti-discrimination laws.

127.   Specifically, on February 29, 2024, Captain Little filed a complaint of discrimination with the CRD against the Fire Department based on religious discrimination and retaliation under Cal. Gov. Code § 12926 *et seq*, which the CRD designated as CRD Matter Number 202403-23805101.

128.   On February 29, 2024, the CRD issued to Captain Little a Notice of Case

Closure and Right to Sue on the CRD complaint.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Religious Creed Discrimination / Failure to Accommodate**

**in Violation of Title VII of the Civil Rights Act of 1964**

**(By Captain Little Against Los Angeles County)**

129.   Plaintiff Little incorporates by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

130.   Title VII prohibits an employer from discriminating against an employee "because of such individual's … religion." 42 U.S.C. § 2000e-2(a)(1). This "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's … religious observance or practice without undue hardship on the conduct of the employer's business." *Id*. at § 2000e(j).

131.   In other words, it is "unlawful 'for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees.'" *Opuku-Boateng v. California*, 95 F.3d 1461, 1467 (9th Cir. 1996) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977)).

132.   To establish a *prima facie* claim for failure to accommodate a plaintiff must present evidence that: "(1) [he] had a bona fide religious belief, the practice of which conflicted with an employment duty; (2) [he] informed [his] employer of the belief and conflict; and (3) the employer threatened [him] with or subjected [him] to discriminatory treatment, including discharge, because of [his] inability to fulfill the job requirements." *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993); *see also EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 614 n.5 (9th Cir. 1988) ("*Townley*") (threat of adverse action is sufficient).

133.   Here, (1) Plaintiff Little adheres to traditional Christian beliefs regarding the moral illicitness of same-sex sexual activity, the immutability of sex regardless of

gender identity, and the view that all people are children of God regardless of their skin color. As a result, he has a sincerely held religious belief, based on deeply and sincerely held religious, moral, and ethical convictions, that he cannot personally raise, ensure raising, maintain, or fly the Progress Pride Flag.

134.   Also, as a result of his faith, Plaintiff Little fully supports efforts to ensure that all homosexual, transgender, or people of color are treated kindly, with respect, and are not discriminated against. But his religious beliefs preclude him from affirming in any manner the ideological or philosophical premises espoused by the Progress Pride Flag.

135.   (2) The Fire Department also knew of the conflict between Plaintiff Little's religious beliefs and his job's requirement of personally raising, ensuring raising, maintaining or otherwise affirming the Progress Pride Flag because Plaintiff Little requested a religious accommodation from doing so on June 19, 2023. In initially granting that request for a reasonable accommodation, the Fire Department acceded to the sincerity of Plaintiff Little's religious beliefs.

136.   Yet the Fire Department has provided no reasonable accommodation options for Plaintiff Little and confirmed that he will be subject to discipline and eventual termination for failure to personally raise, ensure raising, maintain or otherwise affirm the Progress Pride Flag. The Fire Department would not even negotiate on the issue. The Department informed Plaintiff Little that it would not provide him with a religious accommodation and that he had no choice but to comply with EA-231. The Fire Department did not explore reasonable alternatives for accommodating Plaintiff Little.

137.   Lastly, (3) the Fire Department has both subjected Plaintiff Little to adverse employment action for non-compliance with EA-231, and has threatened to subject him to adverse employment action in the future for non-compliance with EA-232. Retrospectively, because Plaintiff Little failed to fly the Progress Pride Flag at his worksite, and instead lowered the flag, as stated above, the Fire Department

subjected Captain Little to an investigation, placed him on unpaid administrative leave, subjected him to hostile personal attacks, and removed him from the Background Investigation Unit.

138.   Prospectively, as stated above, the Direct Order which was issued to Plaintiff Little stated that "[f]ailure to comply with this order will be considered insubordination and subject to disciplinary action, which could include suspension and/or discharge from County service." *See* Exhibit 7. Further, the notice of suspension letter stated that "any further violation of the County's policies and procedures, or the Department's Standards of Behavior, may be grounds for more serious disciplinary action, including discharge." *See* Exhibit 19. And in the latest religious accommodation meeting, the Fire Department that it will not accommodate Captain Little's request to be exempt from "ensuring that staff comply with policies, procedures, and directives, which include EAs." *See* Exhibit 25.

139.   Once the plaintiff has made out a *prima facie* case for discrimination, the burden then shifts to the employer to show that it could not have reasonably accommodated the plaintiff's religious beliefs without undue hardship. *Groff v. DeJoy*, 600 U.S. 447, 468 (2023). Not only does the burden of *proving* an undue hardship fall on Defendant here, "at a minimum, the employer was required to negotiate with the employee in an effort reasonably to accommodate [his] religious beliefs." *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1513 (9th Cir. 1989), *overruled on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).

140.   To establish the defense of "undue hardship," the Fire Department must demonstrate that any of the accommodations proposed by Plaintiff Little would impose a burden that is "substantial in the overall context of an employer's business." *Groff*, 600 U.S. at 468. "[A] coworker's dislike of 'religious practice and expression in the workplace' or [dislike of] 'the mere fact [of] an accommodation' is not 'cognizable to factor into the undue hardship inquiry.'" *Id*. at 472.

141.   Further, "a hardship that is attributable to employee animosity [or

'adverse customer reaction'] to a particular religion, to religion in general, or to the very notion of accommodating religious practice cannot be considered 'undue.' If bias or hostility to a religious practice or a religious accommodation provided a defense to a reasonable accommodation claim, Title VII would be at war with itself." *Id.*

142. In addition, any "undue hardship" must be "on the conduct of the employer's business." *Townley*, 859 F.2d at 615 (citing 42 U.S.C. § 2000e(j)). As the Fire Department has operated without flying the Progress Pride Flag for years, and currently excuses locations without flagpoles or flag clasps from flying one, accommodating Plaintiff Little cannot be said to be an "undue hardship *on the conduct of the employer's business*." *Id.* (emphasis added).

143. As a direct and proximate result of the Fire Department's discriminatory actions against Plaintiff Little, as alleged herein, Plaintiff Little has suffered harm in the form of special damages, including but not limited to, back pay, front pay, pre-judgment and post-judgment interest, punitive damages, and compensatory damages and other affirmative relief necessary to eradicate the effects of the Fire Department's unlawful employment practices.

144. As a further direct and proximate result of the Fire Department's discriminatory actions against Plaintiff Little, as alleged herein, Plaintiff Little has suffered harm in the form of general damages including, but not limited to, emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and loss of civil rights, in an amount to be determined at trial.

145. Plaintiff Little further seeks a declaration that the Fire Department has discriminated against him and has violated his legal rights by failing to provide a reasonable accommodation of his religious beliefs.

146. Plaintiff Little found it necessary to engage the services of private counsel to vindicate his rights under the law. Plaintiff Little is therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

/ / /

**SECOND CLAIM FOR RELIEF**

**Religious Creed Discrimination / Failure to Accommodate**

**in Violation of FEHA, Cal. Gov. Code § 12940(a)**

**(By Captain Little Against Los Angeles County)**

147.   Plaintiff Little incorporates by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

148.   The Fair Employment and Housing Act prohibits an employer from discriminating against an employee "because of the … religious creed" of such individual. Cal. Gov. Code § 12940(a). This includes accommodating an employee's "religious belief or observance," if there are "reasonable alternative means" of achieving the employer's needs. *Id*. at subd. (l). The only difference is that, under FEHA, it is easier for a plaintiff to show irreparable harm. *Keene v. City and Cnty. of San Francisco*, No. 24-1574, 2025 WL 341831, at *2 (9th Cir. Jan. 30, 2025)

149.   For the exact same reasons as stated in the preceding allegations regarding the First Claim for Relief, the Fire Department has discriminated against Plaintiff Little by refusing to accommodate his religious beliefs.

150.   As a direct and proximate result of the Fire Department's discriminatory actions against Plaintiff Little, Plaintiff Little has suffered harm in the form of special damages, including but not limited to, back pay, front pay, pre-judgment and post-judgment interest, punitive damages, and compensatory damages and other affirmative relief necessary to eradicate the effects of the Fire Department's unlawful employment practices.

151.   As a further direct and proximate result of the Fire Department's discriminatory actions against Plaintiff Little, Plaintiff Little has suffered harm in the form of general damages including, but not limited to, emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and loss of civil rights, in an amount to be determined at trial.

152.   Plaintiff Little further seeks a declaration that the Fire Department has

discriminated against him and has violated his legal rights by failing to provide a reasonable accommodation of his religious beliefs.

153.    Plaintiff Little found it necessary to engage the services of private counsel to vindicate his rights under the law. Plaintiff Little is therefore entitled to an award of attorneys' fees and costs pursuant to Cal. Gov. Code § 12965(c)(6) and Cal. Civ. Proc. Code § 1021.5.

### THIRD CLAIM FOR RELIEF

### Retaliation in Violation of Title VII of the Civil Rights Act of 1964

### (By Captain Little Against Los Angeles County)

154.    Plaintiff Little incorporates by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

155.    Title VII prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

156.    Here, in his employment with the Fire Department, Plaintiff Little engaged in protected activity by requesting a religious accommodation and exemption from being forced to personally raise, ensure raising, maintain or otherwise affirm the Progress Pride Flag.

157.    Plaintiff Little's request for a religious accommodation was protected under Title VII of the Civil Rights Act. As stated above, Plaintiff Little requested a religious accommodation on June 19, 2023, which was granted but then immediately rescinded the next day.

158.    Almost immediately after, various Fire Department personnel retaliated against Plaintiff Little, by angrily confronting him and ordering him to raise the Progress Pride Flag, by removing him from his role on the background investigation unit, by filing pretextual complaints against him, and informing third-parties of his

religious accommodation request—leading to a death threat being mailed to his home.

159.   Plaintiff Little's protected activities were a substantial motivating reason for the Fire Department's retaliation against him.

160.   The Fire Department's retaliatory conduct was a substantial factor in causing harm to Plaintiff Little.

161.   The above-described retaliatory harassment of Plaintiff Little was performed by, or ratified by, a managing agent or officer of the Fire Department, including without limitation, Lifeguard Division Chief Fernando Boiteux, Assistant Lifeguard Chief Adam Uehara, and Section Chief Arthur Lester.

162.   These acts were done with malice, fraud, oppression, and reckless disregard of Plaintiff Little's rights. Further, said actions were despicable in character and warrant the imposition of punitive damages in a sum sufficient to punish and deter the Fire Department's future conduct.

163.   As a direct and proximate result of the Fire Department's retaliatory actions against Plaintiff Little, as alleged herein, Plaintiff Little has suffered harm in the form of special damages, including but not limited to, back pay, front pay, pre-judgment and post-judgment interest, punitive damages, and compensatory damages and other affirmative relief necessary to eradicate the effects of the Fire Department's unlawful employment practices.

164.   As a further direct and proximate result of the Fire Department's retaliatory actions against Plaintiff Little, as alleged herein, Plaintiff Little has suffered harm in the form of general damages including, but not limited to, emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and loss of civil rights, in an amount to be determined at trial.

165.   Plaintiff Little further seeks a declaration that the Fire Department has retaliated against him and has violated his legal rights.

166.   Plaintiff Little found it necessary to engage the services of private counsel to vindicate his rights under the law. Plaintiff Little is therefore entitled to an

1  award of attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

2  <center>**FOURTH CLAIM FOR RELIEF**</center>

3  <center>**Retaliation in Violation of FEHA, Cal. Gov. Code §§ 12940(h), 12940(l)(4)**</center>

4  <center>**(By Captain Little Against Los Angeles County)**</center>

5      167.   Plaintiff Little incorporates by reference all allegations contained in the

6  preceding paragraphs as though fully set forth herein.

7      168.   The Fair Employment and Housing Act prohibits an employer from

8  "discriminat[ing] against any person because the person has opposed any practices

9  forbidden under this part or because the person has filed a complaint, testified, or

10  assisted in any proceeding under this part." Cal. Gov. Code § 12940(h). This includes

11  a specific prohibition on an employer "retaliat[ing] or otherwise discriminat[ing]

12  against a person for requesting [a religious] accommodation under this subdivision,

13  regardless of whether the request was granted." *Id*. at subd. (l)(4).

14      169.   For the exact same reasons as stated in the preceding allegations

15  regarding the Third Claim for Relief, the Fire Department has retaliated against

16  Plaintiff Little for requesting an accommodation for his religious beliefs.

17      170.   As a direct and proximate result of the Fire Department's retaliatory

18  actions against Plaintiff Little, Plaintiff Little has suffered harm in the form of special

19  damages, including but not limited to, back pay, front pay, pre-judgment and post-

20  judgment interest, punitive damages, and compensatory damages and other

21  affirmative relief necessary to eradicate the effects of the Fire Department's unlawful

22  employment practices.

23      171.   As a further direct and proximate result of the Fire Department's

24  retaliatory actions against Plaintiff Little, Plaintiff Little has suffered harm in the form

25  of general damages including, but not limited to, emotional pain, suffering,

26  inconvenience, loss of enjoyment of life, humiliation, and loss of civil rights, in an

27  amount to be determined at trial.

28      172.   Plaintiff Little further seeks a declaration that the Fire Department has

<center>41</center>
<center>VERIFIED THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF</center>

retaliated against him and has violated his legal rights.

173.   Plaintiff Little found it necessary to engage the services of private counsel to vindicate his rights under the law. Plaintiff Little is therefore entitled to an award of attorneys' fees and costs pursuant to Cal. Gov. Code § 12965(c)(6) and Cal. Civ. Proc. Code § 1021.5.

<div align="center">

**FIFTH CLAIM FOR RELIEF**

**Failure to Prevent Discrimination, Harassment, and Retaliation**

**in Violation of FEHA, Cal. Gov. Code § 12940(k)**

**(By Captain Little Against Los Angeles County)**

</div>

174.   Plaintiff Little incorporates by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

175.   The Fair Employment and Housing Act prohibits an employer from "fail[ing] to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Cal. Gov. Code § 12940(k).

176.   For the exact same reasons as stated in the preceding allegations regarding the Third Claim for Relief, the Fire Department has failed to take all reasonable steps to prevent employees from discriminating against and harassing Plaintiff Little due to his religious beliefs.

177.   As a direct and proximate result of the Fire Department's failure to take reasonable actions, Plaintiff Little has suffered harm in the form of special damages, including but not limited to, back pay, front pay, pre-judgment and post-judgment interest, punitive damages, and compensatory damages and other affirmative relief necessary to eradicate the effects of the Fire Department's unlawful employment practices.

178.   As a further direct and proximate result of the Fire Department's failure to take reasonable actions, Plaintiff Little has suffered harm in the form of general damages including, but not limited to, emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and loss of civil rights, in an amount to be

1   determined at trial.

2       179.   Plaintiff Little further seeks a declaration that the Fire Department failed

3   to take reasonable actions to protect him and has violated his legal rights.

4       180.   Plaintiff Little found it necessary to engage the services of private

5   counsel to vindicate his rights under the law. Plaintiff Little is therefore entitled to an

6   award of attorneys' fees and costs pursuant to Cal. Gov. Code § 12965(c)(6).

7                          SIXTH CLAIM FOR RELIEF

8   **Violation of Free Exercise Clause of U.S. Constitution (42 U.S.C. § 1983):**

9       **Not Neutral Due to Animus and Hostility Against Religion**

10                  **(By Captain Little Against All Defendants)**

11      181.   Plaintiff Little incorporates by reference all allegations contained in the

12  preceding paragraphs as though fully set forth herein.

13      182.   The First Amendment to the U.S. Constitution provides that "Congress

14  shall make no law respecting an establishment of religion, or prohibiting the free

15  exercise thereof[.]" U.S. Const. amend. I. This Free Exercise Clause applies to the

16  states through the Due Process Clause of the Fourteenth Amendment. *Cantwell v.*

17  *Connecticut*, 310 U.S. 296 (1940).

18      183.   The Free Exercise Clause "protects not only the right to harbor religious

19  beliefs inwardly and secretly. It does perhaps its most important work by protecting

20  the ability of those who hold religious beliefs of all kinds to live out their faiths in

21  daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy*

22  *v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (quoting *Employment Div. v. Smith*,

23  494 U.S. 872, 877 (1990)).

24      184.   Under the Free Exercise Clause, "government actions coupled with

25  'official expressions of hostility to religion ... [are] inconsistent with what the Free

26  Exercise Clause requires ... [and] must be set aside.'" *Fellowship of Christian Athletes*

27  *v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 690 (9th Cir. 2023) (en

28  banc) (original alteration) (quoting *Masterpiece Cakeshop, Ltd. v. Colorado C. R.*

1    *Comm'n*, 584 U.S. 617, 639 (2018)).

2    185.    "[I]n cases like that [courts] 'set aside' such policies without further
3    inquiry." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 n.1 (2022). "That is
4    because government action motivated by religious animus cannot be narrowly tailored
5    to advance a compelling governmental interest." *Does 1-11 v. Univ. of Colorado*, 100
6    F.4th 1251, 1269 (10th Cir. 2024) (quotations omitted).

7    186.    "The constitutional benchmark is 'government *neutrality*,' not
8    'governmental avoidance of bigotry.'" *Roberts v. Neace*, 958 F.3d 409, 415 (6th Cir.
9    2020). Thus, it is inappropriate for government officials to describe religious beliefs
10    as a pretextual justification for discrimination, or akin to "slavery" and "the
11    Holocaust." *See Masterpiece Cakeshop*, 584 U.S. at 635-36; *accord Church of the
12    Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 541 (1993) (describing
13    religious practice as "an abomination").

14    187.    And viewing "neutrality" as secularism, and thereby "disqualify[ing]"
15    recipients from a public benefit "solely because they are religious" is also
16    unconstitutional. *Carson v. Makin*, 596 U.S. 767, 785 (2022). The government acts
17    with hostility, not neutrality, when it "endorse[s] the impermissible view 'that
18    religious beliefs cannot legitimately be carried into the public sphere or commercial
19    domain, implying that religious beliefs and persons are less than fully welcome…'"
20    *New Hope Family Services, Inc. v. Poole*, 966 F.3d 145, 168, n.22 (2d Cir. 2020)
21    (quoting *Masterpiece Cakeshop*, 584 U.S. at 634).

22    188.    Here, Plaintiff Little's religious beliefs preclude him from raising the
23    Progress Pride Flag—either personally or through an agent. They further preclude
24    him from honoring or otherwise expressing support for the Progress Pride Flag, either
25    verbally, through physical gesture, or through physical proximity that would be
26    reasonably understood as endorsement.

27    189.    Compelling Plaintiff Little to personally raise, ensure raising, maintain,
28    or otherwise affirm the Progress Pride Flag or leave his employment with the Fire

Department is a substantial burden on Plaintiff Little's free exercise of religion.

190. As stated above, after Captain Little was granted a religious accommodation, but prior to June 21, 2023, Lifeguard Division Chief Boiteux and Section Chief Lester conspired to practically defeat Captain Little's religious accommodation by modifying the flagpoles at the Area 17 sites so that they could fly Progress Pride Flags, despite the assignment of Captain Little to that station. This was done out of religious animus.

191. In addition, on June 21, 2023, after Captain Little's religious accommodation was revoked, Section Chief Lester directly ordered Captain Little to raise the Progress Pride Flag that he had lowered. In his words, demeanor, and tone, Section Chief Lester's conduct toward Captain Little in the circumstance was abusive, inappropriate, harassing, and discriminatory. Further, Section Chief Lester's conduct was motivated by animus toward Captain Little's religious beliefs. He acted this way toward Captain Little because of Captain Little's religious beliefs and in retaliation for Captain Little seeking a religious accommodation.

192. At the end of the day on June 21, 2023, Assistant Lifeguard Chief Adam Uehara confirmed the denial of any religious accommodation for Captain Little and denied his right to use his already earned employment benefits, including paid leave, as a means for him to avoid the conflict that would be caused by compelled compliance with EA-231 and violation of his bona fide and sincerely held religious beliefs.

193. In June 22, 2023, Lifeguard Division Chief Fernando Boiteux issued a Direct Order to Captain Little to fly the Progress Pride Flag and ensure that the Progress Pride Flag is flown as instructed in EA-231. When doing so, he told Captain Little that "You need to stop what you are doing," "You are an LA County employee; that's the only thing that matters," and "Your religious beliefs do not matter; you are an LA County employee." He repeated multiple times, "You are an LA County employee" and "Your religious beliefs do not matter" in an instance of religious

discrimination combined with physical intimidation.

194.   Lifeguard Chief Boiteux is 6'4" tall and weighs 220 pounds. Captain Little is aware that Chief Boiteux is also trained in martial arts. He delivered his message to Captain Little in a violent and angry manner while standing over Captain Little—who is only 5'9" tall and weighs 150 pounds. Captain Little believes that the specific intent of Chief Boiteux's demeanor was to be physically intimidating.

195.   As a result, the Fire Department's policies must be set aside without further inquiry and not applied to Captain Little.

196.   The Fire Department's policies, and its enforcement of those policies, violates Plaintiff Little's right to free exercise of religion as guaranteed by the First Amendment to the United States Constitution. Plaintiff Little has no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless Defendants are enjoined from implementing and enforcing the Fire Department's policies.

197.   Pursuant to 42 U.S.C. § 1983, Plaintiff Little is entitled to nominal and actual damages, declaratory relief, and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Fire Department's policies.

198.   Plaintiff Little found it necessary to engage the services of private counsel to vindicate his rights under the law. Plaintiff Little is therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### SEVENTH CLAIM FOR RELIEF

### Violation of Free Exercise Clause of First Article to California Constitution
### (By Captain Little Against All Defendants)

199.   Plaintiff Little incorporates by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

200.   The First Article of the California Constitution provides that "[f]ree exercise and enjoyment of religion without discrimination or preference are

guaranteed." Cal. Const. art. I, § 4. This Free Exercise Clause is interpreted using a pre-1990 federal test. *Smith v. Fair Emp. & Hous. Comm'n*, 12 Cal. 4th 1143, 1179 (1996) (plurality); *Valov v. Dep't of Motor Vehicles*, 132 Cal. App. 4th 1113, 1126 & n.7 (2005).

201.   Under this standard, there is a simple, "two-fold analysis which calls for a determination of, first, whether the application of the statute imposes any burden upon the free exercise of the defendant's religion, and second, if it does, whether some compelling state interest justifies the infringement." *Montgomery v. Bd. of Ret.*, 33 Cal. App. 3d 447, 451 (1973) (quoting *People v. Woody*, 61 Cal. 2d 716, 719 (1964)).

202.   Alternatively, "California case law suggests that analysis of a claim of the constitutional right to the free exercise of religion is generally similar under both federal and state constitutional law." *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1392 (9th Cir. 1994).

203.   Here, Plaintiff Little's religious beliefs preclude him from raising the Progress Pride Flag—either personally or through an agent. They further preclude him from honoring or otherwise expressing support for the Progress Pride Flag, either verbally, through physical gesture, or through physical proximity that would be reasonably understood as endorsement.

204.   Compelling Plaintiff Little to personally raise, ensure raising, maintain, or otherwise affirm the Progress Pride Flag or leave his employment with the Fire Department is a substantial burden on Plaintiff Little's free exercise of religion.

205.   For the exact same reasons as stated in the preceding allegations regarding the Sixth Claim for Relief, the Fire Department has discriminated against Plaintiff Little.

206.   As a result, the Fire Department's policies must meet strict scrutiny and/or should be set aside without further inquiry. But the Fire Department has no compelling interest in requiring Plaintiff Little to raise the Progress Pride Flag, and requiring him to do so is not the least restrictive means of achieving any such interest.

207.   The Fire Department's policies, and its enforcement of those policies, violates Plaintiff Little's right to free exercise of religion as guaranteed by the First Article of the California Constitution. Plaintiff Little has no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless Defendants are enjoined from implementing and enforcing the Fire Department's policies.

208.   Plaintiff Little is entitled to nominal and actual damages, declaratory relief, and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Fire Department's policies.

209.   Plaintiff Little found it necessary to engage the services of private counsel to vindicate his rights under the law. Plaintiff Little is therefore entitled to an award of attorneys' fees pursuant to Cal. Civ. Proc. Code § 1021.5.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Captain Jeffrey Little prays for the following relief, as allowed by each of the above-stated causes of action:

1.   For an award of compensatory damages proximately caused by Defendants' discriminatory and retaliatory conduct, including for past pecuniary loss, future pecuniary loss, and nonpecuniary loss. Compensatory damages should include, but not be limited to:

A.   An award of damages of back pay, including all forms of compensation (wages and benefits) that Plaintiff would have earned from Defendants from June 20, 2023, until the date of trial.

B.   An award of damages for future salary (if reinstatement is not ordered), benefits and bonuses, and other forms of compensation that Defendants would have paid to Plaintiff but for the wrongful conduct of Defendants, in an amount according to proof at trial.

C.   For an award of damages for Plaintiff's severe emotional distress, in an amount according to proof at trial.

2.      For an order that Defendants are to reinstate Plaintiff to his background investigation role, with any raises and promotions that Plaintiff should have received but for Defendants' discrimination and retaliation against Plaintiff.

3.      For an order that Defendants are to grant Plaintiff a standing exemption from raising or flying the Progress Pride Flag from any work site, or ordering others to do so, or otherwise maintain the flag, no renewal required, whether in the month of June or in another month, for the entirety of his employment by Defendants.

4.      For an order that Defendants are to withdraw from Plaintiff's personnel file all negative material that might impact performance reviews, promotions, career progression, or the like.

5.      For an award of punitive damages or other penalties recoverable by law.

6.      For an order and judgment declaring that Defendants' policies, as applied to Plaintiff, violate the First Amendment to the U.S. Constitution and First Article of the California Constitution.

7.      For an order temporarily, preliminarily, and permanently enjoining and prohibiting Defendants from enforcing their unlawful policies against Plaintiff, and from engaging in any practices or conduct that chills Plaintiff's free exercise of religion.

8.      For an award of reasonable attorneys' fees and costs pursuant to all applicable statutes or legal principles, including 42 U.S.C. § 2000e-5(k), Cal. Gov. Code § 12965(c)(6), and Cal. Civ. Proc. Code § 1021.5.

9.      For orders requiring senior management of the Department, including but not limited to Fernando Boiteux, Adam Uehara, and Arthur Lester, to enroll in and complete certain EEOC and Fair Treatment classes, including the following: SHRM: US Employment Law and Compliance, a 5-week live online program; SHRM: Creating an Inclusive Workplace, eLearning; Harassment and Diversity: Respecting Differences, Managers Version, DVD Learning; SHRM: Employee Relations: Creating a Positive Work Environment, two-week Live Online Program; SHRM:

Employment Laws: What Supervisors Need to Know - Corporate, eLearning.

      10.    For any other relief that is just and proper.

## DEMAND FOR JURY TRIAL

    Plaintiff hereby demands a trial by jury on all triable issues.


                            LiMANDRI & JONNA LLP


Dated: October 21, 2025       By: _____

                              Charles S. LiMandri
                              Paul M. Jonna
                              Jeffrey M. Trissell
                              Robert E. Weisenburger
                              Joshua A. Youngkin
                              Attorneys for Plaintiff
                              *Captain Jeffrey Little*

VERIFIED THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## VERIFICATION OF CAPTAIN JEFFREY LITTLE

I, Jeffrey Little, am a plaintiff in this action. I have read the above Verified Third Amended Complaint and know its contents. The information supplied in the foregoing is based on my own personal knowledge or has been supplied by my attorneys or other agents or compiled from available documents. The information in the foregoing document is true to the extent of my personal knowledge. As to the information provided by my attorneys or other agents or compiled from available documents, including all contentions and opinions, I do not have personal knowledge but made a reasonable and good faith effort to obtain the information by inquiry to other natural persons or organizations, and believe it is true.

Thus, I am informed and believe that the matters stated in the foregoing document are true and on that ground certify or declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this 21st day of October 2025, at Los Angeles County, California.

Jeffrey Little

VERIFIED THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

# CERTIFICATE OF SERVICE

*Captain Jeffrey Little v. Los Angeles County Fire Department, et al.*
USDC Court - Central District - Case No.: 2:24-cv-04353-JLS-PD

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen years and not a party to this action; my business address is P.O. Box 9120, Rancho Santa Fe, California 92067, and that I served the following document(s):

- **VERIFIED THIRD AMENDED COMPLAINT FOR: 1. Religious Creed Discrimination / Failure to Accommodate in Violation of Title VII of the Civil Rights Act of 1964; 2. Religious Creed Discrimination / Failure to Accommodate in Violation of FEHA; 3. Retaliation in Violation of Title VII of the Civil Rights Act of 1964; 4. Retaliation in Violation of FEHA; 5. Failure to Prevent Discrimination, Harassment, and Retaliation in Violation of FEHA; 6. Violation of Free Exercise Clause of First Amendment to U.S. Constitution: Not Neutral Due to Animus and Hostility Against Religion; 7. Violation of Free Exercise Clause of First Article of California Constitution.**

on the interested parties in this action by placing a true copy in a sealed envelope, addressed as follows:

Dimitri D. Portnoi, Esq.
Kyle M. Grossman, Esq.
Marni B. Robinow, Esq.
O'MELVENY & MYERS LLP
400 South Hope Street, Suite 1900
Los Angeles, CA 90071
Tel: (213) 430 6000; Fax: (213) 430 6407
E-Mail:  dportnoi@omm.com
E-Mail:  kgrossman@omm.com
E-Mail:  mrobinow@omm.com
**Attorneys for Defendants County of Los Angeles, Fernando Boiteux, Arthur Lester, and Adam Uehara**

 X     **(BY ELECTRONIC MAIL)** I served a true copy, electronically on designated recipients via electronic transmission of said documents.

 X     (**BY ELECTRONIC FILING/SERVICE)** I caused such document(s) to be Electronically Filed and/or Service using the ECF/CM System for filing and transmittal of the above documents to the above-referenced ECF/CM registrants.

I declare under penalty of perjury, under the laws of the United States and the State of California, that the above is true and correct.

Executed on October 21, 2025, at Rancho Santa Fe, California.

Kathy Denworth