DIMITRI D. PORTNOI (S.B. # 282871)
dportnoi@omm.com
KYLE M. GROSSMAN (S.B. # 313952)
kgrossman@omm.com
MARNI B. ROBINOW (S.B. # 313412)
mrobinow@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, Suite 1900
Los Angeles, California 90071
Telephone:  (213) 430 6000
Facsimile:   (213) 430 6407

*Attorneys for Defendants County of
Los Angeles, Fernando Boiteux,
Arthur Lester, and Adam Uehara*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| Jeffrey Little,<br><br>               Plaintiff,<br><br>   v.<br><br>Los Angeles County Fire Department, et al.,<br><br>               Defendants. | Case No. 2:24-cv-04353-JLS-BFM<br><br>**DEFENDANTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL MATERIAL FACTS**<br><br>*[Filed concurrently with Opposition to Motion for Partial Summary Judgment; Separate Statement of Evidentiary Objections; Declaration of Dimitri D. Portnoi; and [Proposed] Order]*<br><br>Hearing Date: May 8, 2026<br>Hearing Time: 10:30 a.m.<br>Judge:  Hon. Josephine L. Staton<br>Courtroom:  8A<br><br>TAC Filed:  October 21, 2025<br>Trial Date:  None set |

## I.    DEFENDANTS' GENUINE DISPUTES OF MATERIAL FACT

| | Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 1. | Jeff Little has been a Los Angeles County lifeguard for over 22 years. In that role, he has saved numerous lives and risen through the ranks to become a Captain. As a Captain, he was responsible for overseeing his own lifeguard stations and patrols. (3d Am. Verif. Cmpt. ¶17 & Ex. 2.) | Undisputed. |
| 2. | Becoming a Los Angeles County ocean lifeguard specialist is a significant accomplishment and is also "like winning the lottery"; Captain Little is a "really talented" lifeguard. (Lester Dep. pp.15:21-22, 21:10; Power Dep. pp.15:9-17, 124:23-25.) | Disputed, as only Chief Lester testified that Plaintiff is "really talented." (Dkt. 119-4 (Lester Dep. Tr.) 21:10.)  Undisputed as to the remainder of the facts. |
| 3. | Captain Little has maintained a good reputation and good reviews. He was promoted to ocean lifeguard specialist in 2013, and to captain in 2020. (Little Dep. p.49:14-16; Boiteux Dep. pp.25:13-26:1.) | Disputed as to the first sentence. Plaintiff "had a good review by the chiefs" and "good reputation" *at the time he was promoted in 2020*. (Dkt. 119-2 (Boiteux Dep. Tr.) 25:13-26:1; Dkt. 116-37 (Notice of Suspension).)  Undisputed as to the second sentence. |
| 4. | Captain Little's performance evaluation for April 2022-March 2023 discussed his laudable work as part of the Background Investigation Unit ("BIU"), and his overall rating for that period was very good and exceeded expectations. (Boiteux Dep. pp.37:19-40:4, 41:4-12.) | Undisputed. |
| 5. | Public safety, including saving lives, is the main priority of L.A. County's elite, talented lifeguards. (Lester Dep. pp.92:25-93:1.) | Undisputed. |
| 6. | Captain Little is an Evangelical Christian with traditional, orthodox beliefs on marriage, family, and sexual behavior and identity. (3d Am. Verif. Cmplt. ¶18.) | Undisputed. |

1

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 7. Captain Little professes a Biblical world view holding that marriage is between one man and one woman, and that sexual relations outside those parameters dishonors God. (Little Dep. pp.33:16-34:1; 3d Am. Verif. Cmplt. ¶18(1)-(5).) | Undisputed. |
| 8. Captain Little's sincere religious beliefs regarding marriage and sexuality include (a) that same-sex sexual activity is morally wrong, and that it is equally wrong to celebrate such activity and (b) gender and sex are inherently intertwined, and attempts to separate or change one's sex are morally wrong. (*Id.*) | Undisputed. |
| 9. Captain Little's sincere religious beliefs also dictate that Christians must demonstrate compassion and love toward all individuals, including those who identify as LGBTQ, while continuing to adhere to biblical truths. (*Id.*) | Undisputed. |
| 10. Captain Little's faith impacts everything he does. He practices daily prayer and scripture reading; attends prayer and church services; and leads his family in prayer and worship. He prays throughout the day every day. (Little Dep. pp.31:22-32:19.) | Undisputed. |
| 11. Captain Little understands that the "Progress Pride Flag" "promotes ... a sexual expression or sexual ethics that is outside of God's provision for sexual expression in the Bible." (Little Dep. p.34:11-17.) | Undisputed. |
| 12. He understands the Pride Flag "celebrate[s] the LGBT community, lifestyle, [and] sexual expression," regardless of what other people understand it to mean. (Little Dep. p.39:16-23.) | Disputed. It is unclear what Plaintiff means when he represents that this is the PPF's meaning "regardless of what other people understand it to mean." Plaintiff's testimony only describes his view of what the PPF represents. The PPF has a broader |

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | meaning than this. It "symbolize[s] the value and dignity of the gay community," and the PPF's various colors "represent[] sex, life, healing, sunlight, nature, magic and art, serenity, and spirit. … The [PPF's] black and brown stripes represent marginalized LGBTQ+ communities of color, community members lost to HIV/AIDS, and those currently living with HIV/AIDS." (Dkt. 116-1 (Board Motion).) The chevron shape "represent[s] a need for forward movement." (*Id.*) |
| 13. The Los Angeles County Board of Supervisors adopted a motion on March 7, 2023, titled "Raising the Progress Pride Flag at Los Angeles County Facilities," which resulted in adoption of EA-231. (3d Am. Cmplt. Exs. 3 & 4.) | Undisputed. |
| 14. The motion acknowledged that the Pride flag's original colors "represent[] sex, life, healing, sunlight, nature, magic and art, serenity, and spirit." It also states that in 2019, a new version of the Pride Flag debuted that added light blue, pink, and white stripes to promote "the transgender community." (3d Am. Cmplt. Ex. 3.) | Disputed to the extent that Plaintiff mischaracterizes the Board Motion to say that the PPF "added light blue, pink, and white stripes to *promote* 'the transgender community.'" The Board Motion states that the PPF adds these colors "to *embrace* the transgender community. (Dkt. 116-1 (Board Motion) (emphasis added).) |
| 15. The motion also stated that "[m]ost recently, the Progress Pride Flag was created by artist Daniel Quasar as a combination and reimaging of the original Pride Flag. The Progress Pride Flag's black and brown stripes represent marginalized LGBTQ+ communities of color, community members lost to HIV/AIDS, and those currently living with HIV/AIDS. The new flag colors are in a chevron shape to represent a need for forward movement." (3d Am. Cmplt. Ex. 3.) | Undisputed. |

3

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 16. The PPF "is very controversial within L.A. County" and is "a nationwide controversial topic that's all over the news and media." (Lester Dep. p.172:3-11) | Disputed. This fact requires more context. According to Chief Lester, "people … have feelings one way or the other" regarding the PPF. (Dkt. 119-4 (Lester Dep. Tr.) 172:8-9.) |
| 17. The Board's motion recognizes that the Progress Pride Flag "celebrate[s] LGBTQ+ Pride Month." (3d Am. Cmplt. Ex. 3; Boiteux Dep. pp.62:13-63:14, 68:8-13.) | Disputed. Chief Boiteux's testimony does not support this fact. Chief Boiteux's understanding is that the PPF "show[s] support for the alternate … community." The PPF has a broader meaning than this. It "symbolize[s] the value and dignity of the gay community," and the PPF's various colors "represent[] sex, life, healing, sunlight, nature, magic and art, serenity, and spirit. … The [PPF's] black and brown stripes represent marginalized LGBTQ+ communities of color, community members lost to HIV/AIDS, and those currently living with HIV/AIDS." (Dkt. 116-1 (Board Motion).) The chevron shape "represent[s] a need for forward movement." (*Id.*) |
| 18. The Board motion directed the Internal Services Department to raise the PPF at the Kenneth Hahn Hall of Administration, "and Los Angeles County facilities" *only* "where the American and California Flags are displayed during the month of June"; it otherwise directed the County CEO to "work with all County Departments to explore ways the [PPF] can be flown at all county facilities." (3d Am. Cmplt. Ex. 3; Oliva Dep. p.41:16-20.) | Disputed. The Board Motion "directs the chief executive officer to work with all County departments to explore ways the progress Pride flag can be flown at all county facilities." (Dkt. 119-12 (Oliva Dep. Tr.) 40:21-41:6; Dkt. 116-1 (Board Motion).) Thus, the Board Motion did not direct the PPF to be raised "*only* 'where the American and California Flags are displayed during the month of June.'" |
| 19. In implementing the Board's motion, the Fire Department issued a memorandum titled EA-231 to all employees on May 25, 2023, requiring the Progress Pride Flag be flown at certain locations in June. (3d Am. Verif. Cmplt. Ex. 4.) | Undisputed. |

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 20. EA-231 stated that "Captains/Site Supervisors shall:" "[e]nsure flags are received and flown throughout the month of June"; and "[a]t the end of June, ensure the PFF [sic] is folded and stored for use the following year." (3d Am. Verif. Cmplt. p.85 Ex. 3; Nuanes-Delgadillo Ex. 3 at p. 2.) | Undisputed. |
| 21. Under EA-231's requirements, if a station had only one flagpole, the PPF was not required to be flown if the pole had "[c]lasps for [only] one flag." But if the single pole had two sets of clasps, the PPF was required to fly beneath the U.S. flag *to the exclusion of the State flag*. (3d Am. Verif. Cmplt. pp.84, 87, Exs. 4 & 5; Oliva Dep. p.45:12-24.) | Undisputed. |
| 22. If a station had two flag poles, and "the right pole only has one set of clasps, the PPF flag shall be flown *in place of the State flag*." (3d Am. Verif. Cmplt. pp.84, 87, Ex. 4 (emphasis added).) | Disputed. This fact lacks context. Under EA-231, the California flag must also be flown if a station has two flagpoles and the right flagpole has two sets of clasps. (Dkt. 116-2 (EA-231).) Moreover, nothing in EA-231 prohibits adding clasps so that there are two sets on a flag pole. (*Id.*) |
| 23. In effect, EA-231 directed captains to take down the California flag if there were only clasps for two flags—even though the Board motion required the PPF only where both the American and California flags are also displayed. (Boiteux Dep. pp.56:1-25, 78:18-22, Boiteux Ex. 7.) | Disputed. The evidence does not support that EA-231 effectively "directed captains to take down the California flag[.]" EA-231 does not direct Captains to take down the California flag. (Dkt. 116-2 (EA-231).) |
| 24. Given EA-231's varying requirements for flying (or not flying) the PPF depending on the number of clasps on each pole, and on whether a station had more than one pole, Chief Arthur Lester found EA-231 to be "vague" and "a challenge to implement" in determining "how many of ... our poles" along a vast, 35-mile | Disputed. Chief Lester found EA-231 "vague" because of the "vast variety of ... flagpoles that we have within the lifeguard division, different sizes, different-sized flags, different stations, small poles, big poles, one pole, two pole, three poles." (Dkt. 119-4 (Lester Dep. Tr.) 40:7-17.) Chief Lester did not mention "EA-231's varying |

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| coastline constituting his battalion area (LG Battalion 100) "could actually fly the [PPF]...safely." (Lester Dep. pp.40:7-41:19.) | requirements for flying (or not flying) the PPF." (*Id.*) |
| 25. Chief Boiteux is responsible for the daily operations of the lifeguard division over 72 miles of coastline, including Catalina Island. Those operations include providing for public safety to beachgoers, maritime rescue, and addressing medical, and any emergencies that might arise within the maritime coast of L.A. County. (Boiteux Dep. pp.18:20-19:3.) | Undisputed. |
| 26. Chief Boiteux acknowledged that EA-231 left room for interpretation. (Boiteux Dep. p.92:6-14.) | Undisputed. |
| 27. Chief Boiteux, who is responsible for the entire lifeguard division of the Fire Department, believes people should not be forced to endorse a viewpoint that violates their sincerely held religious beliefs and that people who hold that marriage should be between one man and one woman should be respected. (Boiteux Dep. pp.59:25-60:4, 64:3-8.) | Undisputed. |
| 28. In 2023, the Fire Department received two requests for exemptions from EA-231, in addition to Captain Little's. (Sturdivant Dep. p.38:5-7.) | Undisputed. |
| 29. According to Captain Little's religious beliefs, he could "work in a building that had a flagpole that was flying the Progress Pride Flag," "[a]s long as [he] had no responsibilities associated with" it, including raising or ordering others to raise it. He can "work[] in an environment in which" the | Disputed. The evidence cited in Defendants' Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶¶32-33 contradicts this fact. This evidence indicates that Plaintiff further objected to working in a place where he could see the PPF flying and requested to not be required to fly the PPF at Will Rogers Beach. (Dkt. 115-2 (Little Dep. Tr.) 120:5-121:4; Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) |

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| PPF is "around." (Little Dep. pp.34:24-35:10.) | 163:18-164:5, 170:13-15, 219:3-219:14; Dkt. 115-8 (McMillon Dep. Tr.) 107:16-108:1, 118:14-119:1; Dkt. 115-15 (Crum Dep. Tr.) 96:21-97:1, 97:7-13, 100:13-25, 101:8-16, 105:10-106:2, 137:24-138:2; Dkt. 115-9 (Uehara Dep. Tr.) 89:2-90:16, 130:6-12, 166:15-167:1; Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4; Dkt. 116-20 (2023 IPM notes) at LAC-0001488-89; Dkt. 116-21 (2023 IPM report) at LAC-0000374.) |
| 30. Captain Little's religious beliefs prevent him from raising the PPF—primarily because he believes it "would be displeasing to God," based on "Biblical accounts that" require him "to honor God in everything I do" and thus forbid "participating in activities that dishonor God." (Little Dep. pp.36:4-21, 37:10-16, 38:1:5.) | Disputed. The evidence provides Plaintiff's religious beliefs that prevent him from ensuring the PPF is raised, not necessarily raising the PPF himself. (Dkt. 115-2 (Little Dep. Tr.) 37:23-25.) Undisputed only to the extent that this fact describes Plaintiff's religious beliefs. |
| 31. Captain Little was friends with Chief Arthur Lester and, in years past, had generally discussed his religious beliefs with Lester as "something that's really important to" (Little Dep. p.48:8-25; Lester Dep. pp.131:8-133:8.) | Disputed, this is an incomplete sentence. |
| 32. When Captain Little received EA-231 in late May 2023, he confirmed that the flagpole at the main location where he worked (Will Rogers) was flying only the American flag and thus, according to EA-231's express terms, was not required to fly a PPF. (Little Dep. p.61:9-19.) | Disputed. Based on the 100 percent compliance directive, Will Rogers was required to fly the PPF. (Dkt. 115-5 (Lester Dep. Tr.) 88:5-20.) |
| 33. Captain Little was on a pre-scheduled vacation from June 4 to June 17, 2023. (Little Dep. p.81:11-15.) | Undisputed. |
| 34. Captain Little realized he would have a religious conflict with EA- | Disputed. Plaintiff "became … concerned" and realized he "had this |

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| | Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| | 231 when, while on vacation, he was notified that the Will Rogers location was now flying the PPF. (Little Dep. pp.61:20-63:4; McMillon Dep. p.40:3-20.) | conflict," but did not specify that he would have a religious conflict or that EA-231 would conflict with his religious practices. (Dkt. 119-1 (Little Dep. Tr.) 62:8-22.) |
| 35. | While still on vacation, Captain Little contacted his union president, Greg Crum ("Crum"), who is also a licensed California attorney and captain in the lifeguard division, regarding his religious conflict with EA-231. (Little Dep. pp.64:10-66:1, Ex. 1062.) | Disputed. Plaintiff "became … concerned" and realized he "had this conflict," but did not specify that he would have a religious conflict or that EA-231 would conflict with his religious practices. (Dkt. 119-1 (Little Dep. Tr.) 62:8-22.) |
| 36. | On June 18, 2023, Captain Little emailed Lifeguard Division Chief Boiteux requesting a religious accommodation from EA-231. He stated that "I have always made it a priority to carry out the mission of the department, serve the community, and be an exemplary employee," but he was "requesting to be exempt from adhering to EA-231" because "it infringes on [his] sincere religious beliefs." Captain Little expressly explained that the "board motion and the responsibilities accompanying it" are "in conflict with my deep religious faith." (Little Dep. Ex 1068; Nuanes-Delgadillo Dep. p.162:22-25; Kim Dep. Ex. 12 at p.1.) | Undisputed. |
| 37. | Captain Little does not recall reading the Board motion, but he mentioned it in his request because EA-231 expressly referenced and relied on the Board motion. (Little Dep. p.98:16-22.) | Undisputed. |
| 38. | Chief Boiteux forwarded Captain Little's email to Chief Uehara and Julia Kim (a deputy chief who oversees the administrative side of the department). Chief Uehara quickly responded that Little's religious accommodation request was "orchestrated." (Boiteux Dep. | Disputed as to the second sentence. Regarding the request being "orchestrated," Chief Uehara testified that the timing of the request "seemed kind of odd" because it "hasn't been an issue in the past." (Dkt. 115-9 (Uehara Dep. Tr.) 109:23-110:16.) Disputed as to whether Chief Uehara |

8

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| pp.23:7-14, 117:19-118:8, Uehara Dep. Ex. 15.) | "quickly responded." Chief Uehara took one hour to respond. Dkt. 121-6 at 21 (Under Seal). Undisputed as to the first sentence. |
| 39. Chief Uehara doubted the consistency of Little's religious objection since Little had lifeguarded at a Pride-painted lifeguard tower without expressing a religious objection. (Uehara Dep. pp.109:9-118:22.) | Disputed. Chief Uehara testified that the timing of the request "seemed kind of odd" to Chief Uehara because it "hasn't been an issue in the past." (Dkt. 115-9 (Uehara Dep. Tr.) 109:23-110:16.) |
| 40. On June 18, 2023, Little's request for a religious accommodation was forwarded to Fire Department personnel responsible for facilitating an "Interactive Process Meeting" ("IPM"), which is an interactive, employer-employee process to determine whether an accommodation would be granted and, if granted, what the accommodation would be. (Kim Dep. pp.58:4–58:15; Kim Dep. Ex. 12 p.1 (LAC-0000377); Nuanes-Delgadillo Dep. p.59:1-19.) | Disputed. The evidence does not support that, during an IPM, there is a determination about "whether an accommodation would be granted and, if granted, what the accommodation would be." Typically, that final decision is made by "the chain of command … as well as counsel." (Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 210:12-16.) Undisputed as to the fact that Plaintiff's request was forwarded on June 18, 2023. |
| 41. Fire Department personnel responsible for facilitating the first IPM understood that Captain Little was requesting an accommodation "from EA-231." (Kim Dep. p.55:8–16; Nuanes-Delgadillo Dep. p.117:19–24.) | Disputed. The evidence cited in Defendants' Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶¶32-33 contradicts this fact. This evidence indicates that Plaintiff further objected to working in a place where he could see the PPF flying and requested to not be required to fly the PPF at Will Rogers Beach. (Dkt. 115-2 (Little Dep. Tr.) 120:5-121:4; Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 163:18-164:5, 170:13-15, 219:3-219:14; Dkt. 115-8 (McMillon Dep. Tr.) 107:16-108:1, 118:14-119:1; Dkt. 115-15 (Crum Dep. Tr.) 96:21-97:1, 97:7-13, 100:13-25, 101:8-16, 105:10-106:2, 137:24-138:2; Dkt. 115-9 (Uehara Dep. Tr.) 89:2-90:16, 130:6-12, 166:15-167:1; Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4; Dkt. 116-20 (2023 IPM notes) at LAC- |

DEFS.' STATEMENT OF GENUINE DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | 0001488-89; Dkt. 116-21 (2023 IPM report) at LAC-0000374.) |
| 42. Fire Department personnel who facilitated the employee accommodation process did not recall anything during Captain Little's IPMs that caused them to question his honesty or sincerity. (Nuanes-Delgadillo Dep. pp.59:17–60:7.) | Undisputed. |
| 43. With respect to the conflict between his religious beliefs and EA-231, Captain Little explained: "[T]here's Pride Flags, like, all over the place. There's rainbow towers, there's -- this is everywhere, and I didn't object to any of those things because they didn't outline a responsibility for me to participate and, you know, endorse. This is -- this is where it crossed the line, that's where I really felt [the flag policy] -- it conflicted." (Little Dep. p.107:8-21.) | Disputed. This is Plaintiff's deposition testimony over two years after the IPM. Defendants dispute this fact to the extent it implies that he explained this position during his IPM, as the IPM summary and notes are not consistent with this testimony. (Dkt. 116-20 (2023 IPM notes) at LAC-0001488; Dkt. 116-21 (2023 IPM summary) LAC-0000374.) Moreover, the bracketed reference to "the flag policy" is vague. Undisputed as to the rest of the facts. |
| 44. Captain Little believed that working one of the locations not flying a PPF would be the best and/or easiest way to accommodate his religious conflict with EA-231's requirements for captains, i.e., where "you're not responsible for it," but he "could live with" a less "ideal" scenario of working in the same area as a PPF as long as he was exempt from EA-231. (Little Dep. p.100:1-22.) | Disputed. The evidence cited in Defendants' Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶¶32-33 contradicts this fact. Plaintiff further objected to working in a place where he could see the PPF flying. (Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 170:13-15, 219:3-219:14; Dkt. 115-8 (McMillon Dep. Tr.) 107:16-108:1, 118:14-119:1; Dkt. 115-15 (Crum Dep. Tr.) 96:21-97:1, 97:7-13,105:10-106:2, 137:24-138:2; Dkt. 115-9 (Uehara Dep. Tr.) 89:2-90:16, 166:15-167:1; Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4; Dkt. 116-20 (2023 IPM notes) at LAC-0001488-89; Dkt. 116-21 (2023 IPM report) at LAC-0000374.) |
| 45. Chief Boiteux acknowledged people should not be forced to endorse a viewpoint that violates | Undisputed. |

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| their sincerely held religious beliefs and that people who hold that marriage should be between one man and one woman should be respected. (Boiteux Dep. pp.59:25-60:4, 64:3-8.) | |
| 46. As part of his position, Captain Little could be assigned to any beach along the L.A. County coastline. (Lester Dep. p.50:5-15.) | Disputed. Plaintiff could be assigned anywhere, but subject to the Memorandum of Understanding between the County and the Los Angeles County Lifeguard Association and the "L Manual," an internal set of policies and procedures for the Lifeguard Division, which allows lifeguard personnel to bid on their work schedules and provides that assignments will be made based on seniority. (Dkt. 116 (Kim Decl.) ¶¶6-7; Dkt. 116-4 (MOU); Dkt. 116-5 (L Manual).) |
| 47. There were 160 lifeguard towers that flew only one flag and a few fixed facilities that also flew only one flag. (Boiteux Dep. p.76:1-21.) | Disputed. This fact requires more context. Chief Boiteux's testimony was regarding facilities as of June 2023. (Dkt. 115-14 (Boiteux Dep. Tr.) 75:9-76:21.) |
| 48. It is possible for the County to change lifeguards' schedules, which they otherwise bid on in advance, when an employee seeks such a change by working with Human Resources—including through the interactive process for an accommodation. (Lester Dep. pp.54:2-55:10, 56:15-57:24; Power pp.35:25-37:1; Crum Dep. pp.50:20-54:16.) | Disputed. The evidence does not support this fact. The Department "do[es] not usually change people's schedules[.]" (Dkt. 115-5 (Lester Dep. Tr.) 55:3-8.) Moreover, the Department "can't just unilaterally move people" through the IPM process. (Dkt. 115-17 (Kim Dep. Tr.) 130:20-132:11.) Chiefs Lester and Power responded to hypothetical questions and did not testify that this happens in practice. In practice, a "lifeguard shall not be involuntarily replaced in" their base work schedule, although vacancies are filled "based on seniority numbers." (Dkt. 116-5 (L Manual), at LAC-0003412-14; Dkt. 116-4 (MOU), at LITTLE.00815).)<br><br>Objection, best evidence. (*See* Defendant's Separate Statement of |

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | Evidentiary Objections ("Defs.' Stmt. Evid. Objs.") ¶48.) |
| 49. On June 18, 2023, Chief Danielle McMillon told Captain Little that she saw his religious accommodation request email to Chief Boiteux. She informed him of an IPM process to try to work out an accommodation, and that otherwise Captain Little could use his benefit time for the rest of the month if they couldn't find a different solution. (Little Dep. pp.102:4-103:2; McMillon Dep. Ex. 5 at p.1, pp.89:4-90:12.) | Disputed. It was Little's suggestion that he "burn the rest of [his] benefit time." (Declaration of Dimitri D. Portnoi in Support of Defendant's Statement of Genuine Disputes of Material Fact and Additional Material Facts ("Portnoi Decl."), Ex. C (McMillon Dep. Tr.) 94:1-18.) |
| 50. While speaking with Chief McMillon, Captain Little suggested that he could work in Area 33 on his scheduled days given his understanding that the Area 33 captain was "out on injury" leave. (Little Dep. pp.103:23-104:21.) | Undisputed. |
| 51. On June 18, 2023, Chief McMillon stated in an email that she spoke with Captain Little at length that day about a possible accommodation, specifically stating she "believe[s] he is willing to work Area 33 in Malibu until July 1" and that "[t]he other possible accommodation would be that he burns his own benefit time until July." (Little Dep. Ex. 1074; Boiteux Dep. pp.103:16-105:5; McMillon Dep. Ex. 5 at p.1.) | Undisputed. |
| 52. Even though Area 33 flew a PPF at headquarters, this was acceptable to him "because [he] wouldn't be responsible for it, and that was acceptable to [him] and [he] accepted it." (Little Dep. pp.127:21-128:1.) | Disputed. The evidence cited in Defendants' Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶¶39-40 contradicts this fact. This evidence indicates that Plaintiff was told he would likely not be responsible for ensuring the PPF was flying, but that he may still need to ensure that the PPF was flown at Area 33. (Dkt. 115-2 (Little Dep. Tr.) 121:13-121:15, 127:24-127:25, 128:3-129:22; Dkt. 115-7 (Nuanes- |

DEFS.' STATEMENT OF GENUINE DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | Delgadillo Dep. Tr.) 170:1-170:15, 212:25-213:2; Dkt. 115-8 (McMillon Dep. Tr.) 109:18-110:4, 111:20-25, 112:12-17, 126:18-127:8, 187:24-188:18, 189:5-14, 190:14-17; Dkt. 115-15 (Crum Dep. Tr.) 101:17-102:24, 104:10-106:2; Dkt. 115-9 (Uehara Dep. Tr.) 95:2-96:6; Dkt. 116-19 ¶¶3-4; Dkt. 116-20 (2023 IPM notes) at LAC-0001488-89; Dkt. 116-21 (2023 IPM report) at LAC-0000374.) |
| 53.    Despite Renee Nuanes-Delgadillo's assertion that Area 33 was suitable to Captain Little because he "would not visibly see the flag," the flag was visible. Ms. Nuanes-Delgadillo did not grasp that Captain Little's specific objection was responsibility for raising the flag. (Little Dep. pp.126:20-128:1; Crum Dep. p.110:15-21; McMillon Dep. p.100:8-18.) | Disputed. This misconstrues both Chief McMillon's and Captain Crum's respective testimony, who each testified that Ms. Nuanes-Delgadillo does not have familiarity with day to day lifeguard operations. They did not testify that Ms. Nuanes-Delgadillo did not grasp Captain Little's specific objection. The evidence indicates that during the IPM it was discussed that Plaintiff did not want to see the PPF from his office window like he could at Will Rogers, and that this would not be an issue at Area 33. The evidence does not support the statement that Ms. Nuanes-Delgadillo asserted that Plaintiff "would not visibly see the flag" at all while working at Area 33. (Dkt. 115-8 (McMillon Dep. Tr.) 100:8-18, 107:15-108:1, 118:14-119:1, 187:6-8, 187:24-188:18; Dkt. 115-15 (Crum Dep. Tr.) 110:15-21.) |
| 54.    Chief Boiteux did not have any concerns about possible accommodations proposed by Chief McMillon. (Boiteux Dep. p.108:18-109:11.) | Disputed. Chief Boiteux "had no concerns if it didn't implicate staffing issues that we were having … such as recalling people to work." (Dkt. 115-14 (Boiteux Dep. Tr.) 108:24-109:4.) |
| 55.    Chief Boiteux estimated if a recall was necessary to cover a *month* of shifts, the cost to the County would be approximately $16,000 from its annual $1.5 billion budget. (Boiteux Dep. pp.215:5-216:4.) | Disputed. The evidence does not support that the County has an "annual $1.5 billion budget," or whether the entirety of that figure is available to available for compensation of Lifeguard Division personnel. Further disputed to the extent it positions Boiteux's testimony as providing anything beyond a |

13

DEFS.' STATEMENT OF GENUINE DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | "rough estimate." (Dkt. 115-14 (Boiteux Dep. Tr.) 215:5-216:5.) Objection, foundation. (*See* Defs.' Stmt. Evid. Objs. ¶55.) |
| 56. Additionally, Chief Boiteux acknowledged if someone is available to work overtime, "we usually let them take time off when they ask for it." (Boiteux Dep. p.109:12-15.) | Undisputed that Chief Boiteux made this statement in his deposition. However, the citation is not to the correct portion of Chief Boiteux's deposition. (Dkt. 115-14 (Boiteux Dep. Tr.) 216:12-15.) |
| 57. On the morning of June 19, 2023, before the IPM meeting with Captain Little later that day, Renee Nuanes-Delgadillo emailed Julia Kim and Chiefs McMillon, Uehara, Boiteux, and Power, requesting "a quick pre meet to go over how [Captain Little] can be accommodated either at work, or by providing him a leave of absence." (Little Dep. Ex. 1074; Nuanes-Delgadillo Dep. pp.115:20-116:3) | Undisputed. |
| 58. Chief Uehara, Renee Nuanes-Delgadillo, Chief McMillon, and Chief Mayfield had never previously handled a religious accommodation request. (Boiteux Dep. pp.108:18-109:4, 113:5-16, 113:23-114:1; Nuanes-Delgadillo Dep. pp.33:8-34:14; 41:4-10; 42:3-9; Uehara Dep. pp.84:20-85:5; McMillon Dep. pp.89:24-90:12; Mayfield Dep. p.109:7-22.) | Disputed. This misconstrues deposition testimony. Chief Boiteux was asked if he was "aware at the time that both Adam Uehara and Renee Delgadillo had never actually dealt with a religious accommodation request," and he was "not aware." (Dkt. 115-14 (Boiteux Dep. Tr.) 113:13-16.) Ms. Nuanes-Delgadillo had previously sat in on a religious accommodation IPM; this was just the first time she moderated one herself. (Dkt. 121-8 (Nuanes-Delgadillo Dep. Tr.) 33:10-15.) While Chief Mayfield did not believe he had dealt with a religious accommodation prior to this one, he was not involved in handling Plaintiff's accommodation request or IPM process. (Dkt. 119-9 (Mayfield |

DEFS.' STATEMENT OF GENUINE DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
| --- | --- |
| | Dep. Tr.) 109:12-13 ("I didn't have anything to do with his accommodation or request."); *see also* Portnoi Decl., Ex. D (Mayfield Dep. Tr.) 107:19-24.) |
| 59. In the IPM on June 19, 2023—which was attended by Chief Uehara, Chief McMillon, union representative Captain Crum, and human resources representative Nuanes- Delgadillo—Captain Little explained that he had a religious conflict with carrying out the responsibilities of EA-231. "The request was to not be responsible to EA-231." (Little Dep. pp.106:4-107:7, Ex. 1069; Nuanes-Delgadillo Dep. pp.126:21-127:3; Crum Dep. p.96:8-17.) | Disputed to the extent this implies Plaintiff's only "request was to not be responsible to EA-231." The evidence cited in Defendants' Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶32 shows Plaintiff also objected to raising the PPF and working in a place where he could see the PPF flying. Undisputed as to the IPM on June 19, 2023 being attended by Chief Uehara, Chief McMillon, Captain Crum, and Ms. Nuanes-Delgadillo. (Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 170:13-15; Dkt. 115-8 (McMillon Dep. Tr.) 107:16-108:1, 118:14-119:1; Dkt. 115-15 (Crum Dep. Tr.) 96:21-97:1, 97:7-13, 105:10-106:2, 137:24-138:2; Dkt. 115-9 (Uehara Dep. Tr.) 89:2-90:16, 166:15-167:1; Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4; Dkt. 116-20 (2023 IPM notes) at LAC-0001488-89; Dkt. 116-21 (2023 IPM report) at LAC-0000374.) |
| 60. Although Captain Little preferred not to look at the PPF, he was clear that his religious conflict with EA-231 was being "responsib[le]" for flying the PPF as required of captains and site supervisors under EA-231. (Little Dep. p.107:8-21.) | Disputed as to the term "clear." The evidence cited in Defendants' Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶32, and additional testimony in Ms. Nuanes-Delgadillo's deposition show that Plaintiff was not clear on his specific conflict, and also objected to working in a place where he could see the PPF flying. (Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 170:13-15; Portnoi Decl., Ex. E (Nuanes-Delgadillo Dep. Tr.) 216:4-11; Dkt. 115-8 (McMillon Dep. Tr.) 107:16-108:1, 118:14-119:1; Dkt. 115-15 (Crum Dep. Tr.) 96:21-97:1, 97:7-13, 105:10-106:2, 137:24-138:2; Dkt. 115-9 (Uehara Dep. Tr.) 89:2-90:16, 166:15-167:1; Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4; Dkt. |

DEFS.' STATEMENT OF GENUINE DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | 116-20 (2023 IPM notes) at LAC-0001488-89; Dkt. 116-21 (2023 IPM report) at LAC-0000374.) |
| 61.  He explained in the June 19 IPM meeting that his "major issue is that it is the captain's responsibility to ensure that the crew is flying the PPF flag." (Little Dep. Ex. 1069; Nuanes-Delgadillo Dep. p.214:15-24.) | Disputed.  The evidence cited in Defendants' Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶32, and testimony in Ms. Nuanes-Delgadillo's deposition show that Plaintiff had many issues and "wasn't very clear."  (Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 170:13-15; Portnoi Decl., Ex. E (Nuanes-Delgadillo Dep. Tr.) 216:4-11; Dkt. 115-8 (McMillon Dep. Tr.) 107:16-108:1, 118:14-119:1; Dkt. 115-15 (Crum Dep. Tr.) 96:21-97:1, 97:7-13, 105:10-106:2, 137:24-138:2; Dkt. 115-9 (Uehara Dep. Tr.) 89:2-90:16, 166:15-167:1; Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4; Dkt. 116-20 (2023 IPM notes) at LAC-0001488-89; Dkt. 116-21 (2023 IPM report) at LAC-0000374.) |
| 62.  Captain Little stated that, if relocated to Area 33 as an accommodation, the chances of him being responsible for the PPF would be "one-in-a-million," or "one in a thousand," because the Area 30 and 34 captains would still be responsible for the Area 33 headquarters flag before he would. (Little Dep. pp.128:3-129:12, 145:12-22). | Disputed.  The cited excerpts of Plaintiff's deposition transcript are insufficient to show Plaintiff said these exact words in the June 19, 2023 IPM.  Rather the quoted language is from Plaintiff discussing his situation generally; he does not state that he said these things during the IPM.  The evidence cited in Defendants' Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶¶39-40 further disputes these statements.  (Dkt. 115-2 (Little Dep. Tr.) 121:13-121:15, 127:24-127:25, 128:3-129:22; Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 170:1-170:15, 212:25-213:2; Dkt. 115-8 (McMillon Dep. Tr.) 109:18-110:4, 111:20-25, 112:12-17, 126:18-127:8, 187:24-188:18, 189:5-14, 190:14-17; Dkt. 115-15 (Crum Dep. Tr.) 101:17-102:24, 104:10-106:2; Dkt. 115-9 (Uehara Dep. Tr.) 95:2-96:6; Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4; Dkt. 116-20 (2023 IPM notes) at LAC-0001488-89; Dkt. 116- |

DEFS.' STATEMENT OF GENUINE DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | 21 (2023 IPM report) at LAC-0000374.) |
| 63. Nuanes-Delgadillo's contemporaneous notes from the June 19 IPM state that Captain Little understood the PPF might be flown at other locations if he has to work there (although his preference would be to work at a location where the PPF isn't flown) and he accepted Area 33 because he would not be the Headquarters Captain responsible for "ensuring that the flag is flown." (Little Dep. Ex. 1072 at p.1; Nuanes-Delgadillo Dep. pp.120:12-121:10.) | Disputed to the extent this implies Plaintiff would never be responsible for ensuring the flag is flown at either Area 33 or Zuma Beach Headquarters. (Defendants' Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶39; Dkt. 115-2 (Little Dep. Tr.) 121:13-121:15, 127:24-127:25; Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 170:1-170:15; Dkt. 115-8 (McMillon Dep. Tr.) 109:18-110:4, 111:20-25, 112:12-17, 126:18-127:8, 187:24-188:18, 190:14-17; Dkt. 115-15 (Crum Dep. Tr.) 101:17-102:24, 104:10-106:2; Dkt. 115-9 (Uehara Dep. Tr.) 95:2-96:6; Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4; Dkt. 116-20 (2023 IPM notes) at LAC-0001488-89; Dkt. 116-21 (2023 IPM report) at LAC-0000374.) |
| 64. Chief Boiteux recalled that Captain Little's "objection was he didn't want to raise the flag." (Boiteux Dep. pp.147:23-148:8.) | Disputed.  The cited evidence does not provide support as to how Chief Boiteux would know Plaintiff's "objection," given that Chief Boiteux was not present at the June 19, 2023 IPM. (Dkt. 116-21 (2023 IPM report) at LAC-0000374.)

Objection, foundation. (*See* Defs.' Stmt. Evid. Objs. ¶64.) |
| 65. Captain Little agreed to work at Area 33 as a religious accommodation from EA-231 despite knowing that it was flying the PPF, because he believed he would not be responsible for ensuring the PPF was flying there. (Little Dep. Ex. 1069, pp.124:1-5.) | Disputed.  The evidence cited in Defendants' Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶44 contradict Plaintiff's framing of this as a "religious accommodation." (Dkt. 115-2 (Little Dep. Tr.) 131:22-132:5; Dkt. 115-8 (McMillon Dep. Tr.) 109:21-110:4, 111:20-24, 112:12-17; Dkt. 115-15 (Crum Dep. Tr.). 112:8-17; Dkt. 116-19 ¶¶3-4, Dkt. 116-20 (2023 IPM notes) at LAC-0001489; Dkt. 116-21 (2023 IPM report) at LAC-0000375.)  The evidence cited in Defendants' Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶¶40 and 42 |

17

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
|  | contradicts Plaintiff's belief "he would not be responsible for ensuring the PPF was flying there." (Dkt. 115-2 (Little Dep. Tr.) 127:24-128:1, 128:3-129:22; Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 120:13-122:6, 212:25-213:2; Dkt. 115-8 (McMillon Dep. Tr.) 109:18-110:4, 111:20-25, 112:12-17, 126:18-127:8, 187:24-188:18, 189:5-14, 190:14-17; Dkt. 115-15 (Crum Dep. Tr.) 101:17-102:24, 104:10-106:2; Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4; Dkt. 116-20 (2023 IPM notes) at LAC-0001488-89; Dkt. 116-21 (2023 IPM report) at LAC-0000374; TAC ¶¶49, 52.)   Undisputed as to Plaintiff agreeing to work at Area 33. |
| 66.   Captain Little may have said during the June 19, 2023 IPM meeting that he "didn't want to look" at the PPF, but his base accommodation request was not to "be responsible for it." (Little Dep. pp.129:23-130:13.) | Disputed as to the terms "may have," and "base accommodation request." It is unclear how "base accommodation request" differs from Plaintiff's "accommodation request," which is itself unclear.  The evidence cited in Defendants' Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶32, and testimony in Ms. Nuanes-Delgadillo's deposition contradict these assertions.  (Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 170:13-15; Portnoi Decl., Ex. E (Nuanes-Delgadillo Dep. Tr.) 216:4-11; Dkt. 115-8 (McMillon Dep. Tr.) 107:16-108:1, 118:14-119:1; Dkt. 115-15 (Crum Dep. Tr.) 96:21-97:1, 97:7-13, 105:10-106:2, 137:24-138:2; Dkt. 115-9 (Uehara Dep. Tr.) 89:2-90:16, 166:15-167:1; Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4; Dkt. 116-20 (2023 IPM notes) at LAC-0001488-89; Dkt. 116-21 (2023 IPM report) at LAC-0000374.) |
| 67.   During the June 19 IPM meeting, Captain Little and the County also agreed to assign him to Area 33 in lieu of his Redondo Beach recall assignment on June 25, 2023. Chief Uehara stated that he would document the shift swap in Telestaff, and explained that if | Disputed.  The cited evidence states Plaintiff was scheduled for a relief day on June 25, 2023, not a recall.  Further, it is unclear from the cited evidence whether Chief Uehara's statement about using benefit time applied to June 25 specifically, a different shift (such as the June 21, |

18

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Captain Little was unable to swap, he would "need to use [his] own leave benefit time." (Kim Dep. Ex. 38 at p.3; Little Dep. Ex. 1069 at p.2.) | 2023 recall), or the process generally. (Dkt. 116-21 (2023 IPM report) at LAC-0000375) |
| 68. On the 19th, after the IPM, Chief McMillon texted Captain Little and Chief Uehara confirming she independently used Captain Little's "recall exemption" to move shifts for Captain Little to keep him from working at a location flying the PPF. (McMillon Dep. Ex. 7 at p.1, p.132:1-8.) | Disputed to the extent the term "independently" implies Chief McMillon did not discuss the possibility of using a recall exemption with Plaintiff prior to implementing one. (Dkt. 116-21 (2023 IPM report) at LAC-0000374.) |
| 69. Instead of using the recall exemption, forcing a different Captain to be recalled to the site, Captain Little swapped recall shifts with a captain to a site not flying the flag. Captain Little expressed his appreciation to Chiefs McMillon and Uehara his for the accommodation and thanked her. (*Id.*) | Disputed. The cited evidence does not provide support for the statement that using a recall exemption forces another captain to be recalled, or that Area 17 had not been flying the PPF. |
| 70. During the June 19 IPM meeting, Captain Little confirmed that he can work in lifeguard towers that are painted/decorated to support LGBTQ+, oversee maintenance of the towers, provide lifeguard assistance to LGBTQ+ patrons, or anything else that is required of him as captain. (Little Dep. Ex. 1069 at p.2.) | Undisputed. |
| 71. While a tower at the Will Rogers station where Captain Little worked was painted in rainbow colors, and Captain Little understood those colors were intended to convey a similar message as the PPF, Captain Little was not required to paint the rainbow colors himself or to endorse it in any way; he was not "forced to participate in it." (Little Dep. pp.118:9-119:23.) | Disputed. Ms. Nuanes-Delgadillo's 2023 IPM Report demonstrates Plaintiff did not have an issue with his "responsibility to oversee the maintenance of the towers." (Dkt. 116-21 (2023 IPM report) at LAC-0000375.) |

DEFS.' STATEMENT OF GENUINE DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 72. Captain Little found EA-231 to be "very unclear" about which locations and flagpoles were required to fly the PPF. (Little Dep. pp.109:11-110:16.) | Undisputed. |
| 73. Area 17, where Captain Little worked on June 21, 2023, had not flown a PPF from June 2, 2023, up to June 21, 2023. (Little Dep. Ex. 1070; Crum Dep. p.115:3-8.) | Undisputed. |
| 74. Particularly, on June 1, 2023, Captain Crum began putting up PPFs on Dockweiler Beach in Area 17, but as he was doing so, he "received a call from Chief Lester informing him that Chief Uehara had determined that the flags were not to be flown at flagpoles that do not typically fly more than one flag throughout the rest of the year." As a result of this instruction, Captain Crum removed a PPF that he had previously raised. (Little Dep. Ex. 1070 at p.1; Boiteux Dep. pp.88:11-89:13, 90:4-10, Ex. 65; Crum Dep. pp.202:19-207:23.) | Undisputed. |
| 75. In an email to Chief Boiteux on June 20, 2023, Nuanes-Delgadillo sent an internal confirmation summarizing Captain Little's accommodation granted to on June 19, including that he would be stationed at Area 33 through June 30, 2023, and that if he is recalled to a location "where he would be responsible for the PPF, he would try to find someone to switch with." (Little Dep. Ex. 1074; Nuanes-Delgadillo Ex. 6; Nuanes-Delgadillo Dep. pp.120:13-121:10; Kim Dep. Ex. 17 p.1.) | Disputed. The evidence cited in Defendants' Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶¶44-45, and testimony in Chief Uehara's deposition show Ms. Nuanes-Delgadillo's June 20, 2023 email did not communicate a finalized religious accommodation. (Dkt. 115-2 (Little Dep. Tr.) 123:7-14, 126:4-10, 131:9-21, 131:22-132:5; Dkt. 115-8 (McMillon Dep. Tr.) 109:21-110:4, 111:20-24, 112:12-17; Dkt. 115-15 (Crum Dep. Tr.). 112:8-17; Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4; Dkt. 116-20 (2023 IPM notes) at LAC-0001489; Dkt. 116-21 (2023 IPM report) at LAC-0000375; Dkt. 115-9 (Uehara Dep. Tr.) 126:9-127:22.) In addition, as Plaintiff's Separate Statement of Uncontroverted Facts (Dkt. 118-2) ¶76 recognizes, |

20

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | Ms. Nuanes-Delgadillo was still receiving guidance about the accommodation request at this time. |
| 76. In the same email, Nuanes-Delgadillo stated that she would be meeting with human resources later that day "to discuss Religious Accommodations in general and this particular case for their guidance..." (Little Dep. Ex. 1074; Kim Dep. Ex.17.) | Undisputed. |
| 77. Chief Boiteux understood that Captain Little obtained an agreed-upon religious accommodation at the IPM. (Boiteux Dep. pp.143:22-144:11.) | Disputed. The cited evidence shows Chief Boiteux does not testify he understood Plaintiff "obtained an agreed-upon religious accommodation." Instead, Plaintiff's counsel asks Chief Boiteux to confirm language in an exhibit is "consistent with [his] understanding that an accommodation was offered to Captain Little during the IPM, and there was an agreement during the IPM about the accommodation." Chief Boiteux responded, "Correct." Plaintiff's counsel does not use the term "religious accommodation" in the questioning. Chief Boiteux also was not present in the June 19, 2023 IPM; the best evidence of the IPM is the IPM summary report itself. (Dkt. 116-21 (2023 IPM report) at LAC-0000374.) |
| 78. Chief Boiteux understood that the agreed-upon religious accommodation could be accomplished with no expense to the Fire Department. (Boiteux Dep. p.213:5-9.) | Disputed. Chief Boiteux agreed "that there would be no expense to the Fire Department to accomplish the accommodation that was suggested and accepted." Plaintiff's counsel does not use the term "religious accommodation" in the questioning. (Dkt. 115-14 (Boiteux Dep. Tr.) 213:5-9.) |
| 79. Although Captain Little was recalled to Redondo Beach on June 21, 2023, where he would be responsible for ensuring the PPF was flying, he agreed with another | Disputed. Chief McMillon testified "[a]gain, that's Marine Battalion 100, but I'm pretty sure they were not" flying. (Dkt. 121-10 (McMillon Dep. Tr.) 41:24-42:3.) |

21

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| captain to switch recalls to work at Area 17, where he knew the PPF wasn't flying at the time. (Little Dep. pp.148:16-149:4, 154:18, Ex. 1075; McMillon Dep. pp.41:24-42:3.) | |
| 80. Captain Little made the shift swap to work Area 17 on June 21 before Chief McMillon texted him that she able to secure him an exemption from recall duty on June 21, 2023; at that point, Captain Little didn't want to trigger a recall for another lifeguard to have to take his place on June 21, 2023. (Little Dep. pp.150:9-151:16.) | Undisputed.<br><br>Objection, best evidence. (*See* Defs.' Stmt. Evid. Objs. ¶80.) |
| 81. Captain Little responded to Chief McMillon's text by informing her of his schedule swap so he could work Area 17 on June 21, 2023, and Chief McMillon agreed to the switch. (Little Dep. pp.154:24-155:7, Ex. 1075.) | Disputed. Chief McMillon's response simply acknowledged that Plaintiff made the switch, and that Telestaff was updated to reflect the switch. (Dkt. 116-18 (McMillon Decl. Ex. B) (text message correspondence between Plaintiff and Chiefs McMillon and Uehara) at LITTLE.00481-482.) |
| 82. Chief Uehara was on the same text string and was thus aware of Little's plan to work Area 17 on June 21. (Little Dep. p.155:9-12, Ex. 1075.) | Disputed. The cited evidence does not support that Chief Uehara was aware of Plaintiff's plan to work Area 17 on June 21. Chief Uehara does not testify that he recalls participating in the text thread or that he read it. (Portnoi Decl., Ex. F (Uehara Dep. Tr.) 138:2-142:21.) Undisputed that Chief Uehara was on the same text string.<br><br>Objection, foundation. (*See* Defs.' Stmt. Evid. Objs. ¶82.) |
| 83. Chief McMillion finalized the switch in Telestaff on June 19, 2023, which was observable by all lifeguard chiefs on Telestaff between June 19 and June 21. (Little Dep. pp.171:7-172:16.) | Disputed to the extent that the cited evidence does not provide support for the statement that the switch was finalized in Telestaff on June 19, 2023. Undisputed otherwise. |

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 84. Captain Little is aware that numerous other fire department employees did not comply with the order by "just flat-out" not "[following] it," whereas Captain Little attempted to use proper IPM procedures. (Little Dep. pp.181:11-182:3; Power Dep. pp.54:15-17; McMillon Dep. p.29:12-19.) | Disputed. Cited evidence does not support that Plaintiff is aware of the actions of other Fire Department employees generally, or those specifically described in the cited portions of the depositions of Chief Power or Chief McMillon. Further disputed as to the citation of Plaintiff's deposition, in which the quoted language actually says "people just flat-out weren't doing it." |
| 85. Indeed, Chief Lester "underst[ood] ... that there was [sic] many stations who magically had clasps go disappearing, and that where they used to be able to fly two flags . . . the clasps were disappearing," and "there was [sic] magically only one [set of] clasps. (Lester Dep. p.81:15-21.) | Undisputed. |
| 86. ███████████████████████ | ████████ |
| 87. ███████████████████████ | ████████ |

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 88.  | |
| 89. The June 11 CPOE complaint did not involve individuals who had religious accommodations or known religious objections to the PPF. (Stormer Dep. pp.94:1-95:25.) | Disputed. The cited evidence does not support this statement. Mr. Stormer testifies the complaint "does not appear to" involve individuals with religious objection. (Dkt. 115-16 (Stormer Dep. Tr.) 95:15-20.)<br><br>Objection, best evidence. (*See* Defs.' Stmt. Evid. Objs. ¶89.) |
| 90. | |
| 91. | |

[1] The term "Skelly hearing" refers to a pre-disciplinary hearing that is part of the due process rights of California public employees, who prior to disciplinary action, must be given notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the opportunity to respond to the proposed action. *Skelly v. State Pers. Bd.*, 15 Cal. 3d 194, 783-84 (1975).

DEFS.' STATEMENT OF GENUINE DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| ███████████████ | |
| 92. Boiteux was not aware of any assertions by anyone that Captain Little is a bigot or disrespects people in the LGBTQ community, and Captain Little had worked at Will Rogers Beach, which is frequented by the LGBQT community, but had never received reports that Captain Little did not serve such individuals or had discriminatory feelings towards them. (Boiteux Dep. pp.195:18-197:8.) | Undisputed. |
| 93. It was common for many fire station poles in the County to fly only one flag. (Lester Dep. pp.98:7-99:4.) | Disputed. The cited evidence does not support this statement. Chief Lester testifies as to Battalion 100 only, not the whole County. This statement also lacks context, as Chief Lester testified that flag poles in his Battalion had flown "multiple flags for years," but stopped because some lifeguards "decided that they don't want to put up more than one flag," which Chief Lester thought "felt very lazy." (Dkt. 115-5 (Lester Dep. Tr.) 98:7-99:10.) |
| 94. The Acting Deputy Chief for the Central Operations Bureau who was responsible for the Lifeguard Division, William Mayfield, sent an email to members of his leadership team, including Chief Boiteux, regarding enforcement of EA-231 on June 20, 2023. In it, he forwarded an email chain from his superiors, and stated that "100 percent compliance" with EA-231 was "to be achieved." In his email, Mayfield directed all battalion chiefs to inspect the flagpoles in their divisions "to ensure the flag is flown." For those locations where the flag was not being flown, Mayfield required an explanation. The email further stated, "Halyard clips are not an excuse." (Mayfield Dep. pp.73:9- | Disputed to the extent that the citations to Chief McMillon's deposition and Exhibit 3 to Chief McMillon's deposition do not support this statement because they do not address the discussed email from Chief Mayfield. Undisputed otherwise. |

25

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 19, 138:22-139:16, Ex.15 at p. 1; McMillon Depo. p.66:14-25, Ex. 3 at 3.) | |
| 95. In stating that "Halyard clips are not an excuse," Mayfield intended to prevent "manipulation" with compliance with EA-131, such as removal of clips or clips otherwise being missing from poles on which they were previously present. Mayfield's email was not intended to require that all flagpoles necessarily fly the PPF. (Mayfield Dep. pp.185:24-186:11, 193:21-194:17, 196:16-197:8, 213:14-18.) | Disputed. Chief Mayfield refers to "sites that could accommodate" the flag, rather than sites with flagpoles where clips "were previously present." (Dkt. 115-12, (Mayfield Dep. Tr.) 186:6-7, 194:4-5, 196:22-23.)<br><br>Objection. The term "EA-131" is vague and ambiguous, as there is no "EA-131" at issue in this action. For the purpose of responding to Plaintiff's statement of fact, Defendants interpret "EA-131" to mean "EA-231." |
| 96. Lifeguard Chief Boiteux viewed the directive as "stop playing games and do what we ask you from the EA-231." (Boiteux Dep. p.166:2-9.) | Undisputed. |
| 97. Chief Boiteux understood that clasps were being stolen and taken off of halyards; he interpreted the directive as "follow EA-231," which the Fire Department understood did not require PPFs where there were clasps for only one flag. (Boiteux Dep. pp.156:9-157:15.) | Disputed. The cited evidence does not support this statement. Chief Boiteux was not designated to speak on behalf of the County, and cannot confirm that the Fire Department understood EA-231 to not require PPFs where there were clasps for only one flag. Further disputed to the extent that Plaintiff cites to the incorrect portion of Chief Boiteux's deposition for the statement that "Chief Boiteux understood clasps were being stolen and taken off of halyards." Chief Boiteux testifies to this in another portion of the deposition. (Dkt. 121-5 (Boiteux Dep. Tr.) 157:21-25.) |
| 98. On June 20, 2023, Chief Boiteux issued a directive requiring that all flag poles in the department fly the PPF by 11 a.m. the next morning, specifying that lack of halyard clasps was no longer an "excuse." Boiteux issued the directive via a text message only to Assistant Chief Uehara and the four section | Disputed. Exhibit 2 to the McMillon deposition shows the Section Chiefs were instructed to look at every "fixed facility with a flag pole," not "all flag poles." (Dkt. 121-10, Ex. 2 at LAC-0001495.) |

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| chiefs (including Lester), which he sent at 8:10 p.m.; he reiterated the directive in an email to the same recipients at 9:19 p.m. (Lester Dep. pp.72:16-73:2, Ex 5, at p.12 & Ex. 9 at p.2; McMillon Dep. Ex. 2 at p.1, pp. 43:2-15, 45:18-24, 58:5-14.) | |
| 99. The directive was not communicated to Captain Little before he arrived at work the next day. (*Id.*; Lester Dep. pp.88:12-90:10, 92:8-16, 94:1-7, 99:13-18; Boiteux Dep. pp.161:12-162:10, 271:23-272:11; McMillon Dep. pp.59:19-60:2.) | Disputed to the extent that the citation to Chief McMillon's deposition testimony does not support this statement. Chief McMillon testifies she is "not sure" when the directive was conveyed to captains. (Dkt. 121-10 (McMillon Dep. Tr.) 60:4-11.) Undisputed otherwise. |
| 100. Chief Lester knew that "a lot of people were saying they didn't have...enough halyard clasps" to fly the PPF, so he went to the lifeguard administrative building early the next morning, June 21, 2023, picked up a box of clasps, and drove to stations across his 35- to 40-mile battalion area adding clasps and PPFs. (Lester Dep. pp.74:21-84:11.) | Disputed that Chief Lester delivered the halyard clasps on his own accord. Chief Lester "got that order," referring to order to be in "100 percent compliance" with EA-231, and in response to that order, delivered halyard clasps and PPFs to stations in his battalion. (Dkt. 121-7 (Lester Dep. Tr.) 74:21-84:11.) Undisputed that Chief Lester knew that "a lot of people were saying they didn't have … enough halyards." |
| 101. However, Lester was unable to add PPFs to three of his stations, and he communicated that in an email to Chief Boiteux. (Lester Dep. pp.84:12-85:3, Ex. 9 at p.1.) | Undisputed. |
| 102. Lester "can't really recall" if any of these problems at RCO, Torrance, or Marina were actually solved in time to fly the PPF in 2023, as it was "almost the end of June" anyway. (Lester Dep. p.47:3-12.) | Disputed to the extent that this fact suggests that those locations could fly the PPF. Chief Lester testified that these locations had certain specific issues with flying the PPF, including that "the pole was a little bit smaller and it was closer to the building...and the Pride flag, just based on the size of those flags, was grazing up against the wall and the building. And flag etiquette is a big part...of our militaristic organization … ." (Dkt. 119-4 (Lester Dep. Tr.) 84:12-85:3.) |

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 103. Indeed, even after the issuance of the 100% compliance mandate, there were still stations not flying the PPF because they could not. (Boiteux Dep. pp.169:12-170:8.) | Disputed to the extent the phrase "issuance of the 100% compliance mandate" implies this was a newly issued mandate, rather than a directive to come into compliance with an existing policy. Undisputed otherwise. |
| 104. Relocating Captain Little to an area not flying the PPF remained a way to accommodate him even after issuance of the directive. (Id.) | Disputed. Chief Boiteux testified that moving Plaintiff to Area 33 "remained a theoretical way to accommodate him…." Further disputed on the basis that Chief Boiteux was not involved in the accommodation process of June 2023 IPMs. (Dkt. 119-2 (Boiteux Dep. Tr.) 169:12-170:8; Dkt. 116-21 (2023 IPM report) at LAC-0000374.)<br><br>Objection, foundation. (See Defs.' Stmt. Evid. Objs. ¶104.) |
| 105. Chief Boiteux assumed that Captain Little agreed to work at Area 17 on June 21, 2023, on the expectation that the PPF would not be flying there, and it would have been better for someone in Captain Little's chain of command to inform him that the PPF was now flying in Area 17 before Captain Little arrived to work there that morning. (Boiteux Dep. pp.173:161-174:10, 183:7-13.) | Disputed. Chief Boiteux did not state it would have "been better for someone" to inform Plaintiff, but rather agreed with counsel's line of questioning that it "would have been good for someone" to inform him. (Dkt. 119-2 (Boiteux Dep. Tr.) 183:7-13.)<br><br>Objection, foundation and personal knowledge. (See Defs.' Stmt. Evid. Objs. ¶105.) |
| 106. Despite having knowledge of Captain Little's accepted religious accommodation and scheduled area on June 21, 2023, no chief within Captain Little's chain of command. (Boiteux Dep. pp.161:6-163:18, 181:23-183:13; Lester Dep. pp.88:12-96:22.) | Disputed, this sentence is incomplete. Further, disputed because this statement assumes that the religious accommodation was accepted and that all chiefs were aware of the accommodation. (Dkt. 115-5 (Lester Dep. Tr.) 69:4-70:20, 74:12-77:9.) |
| 107. A PPF was flying near the parking lot at Dockweiler Headquarter Building at Area 17 when Captain | Disputed to the extent that Capt. Little knew that the Dockweiler Headquarters Building was not a |

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Little arrived to work at 10:30 a.m. on June 21, 2023, but Captain Little raised no objection to working in the vicinity of that PPF. (Little Dep. pp.194:8-197:9.) | Lifeguard Division facility. (Dkt. 119-1 (Little Dep. Tr.) 195:21-23.) |
| 108. The PPF flying near the Area 17 Dockweiler Headquarters parking lot was under the direction and control of the Beaches and Harbors Department, not the fire department. (Little Dep. pp.194:8-197:9.) | Undisputed. |
| 109. However, Captain Little was confused when he saw a PPF flying at the Area 17-2 station, because he knew Area 17 stations hadn't flown PPFs when he worked there on June 19, 2023. As a result, Captain Little checked his phone and email to see if there had been a change in policy, but Captain Little did not see any such change. (Little Dep. pp.201:12-203:5.) | Disputed. The cited excerpt does not include support for the following statement: "As a result, Captain Little checked his phone and email to see if there had been a change in policy, but Captain Little did not see any such change." (Dkt. 119-1 (Little Dep. Tr.) 201:12-203:5.) |
| 110. Ocean Lifeguard Specialist Jake Miller at Area 17-2 informed Captain Little that Chief Lester had dropped off the PPFs and clasps earlier that morning with instructions to raise the PPFs; however, Captain Little understood that Lester did not have authority to change department policies or Captain Little's religious accommodation. (Little Dep. p.203:6-21.) | Undisputed.<br><br>Objection, foundation. (*See* Defs.' Stmt. Evid. Objs. ¶110.) |
| 111. Captain Little asked Miller if he would be offended if Captain Little took down the PPF given the sensitivity of the topic; Miller said he would not be offended. (Little Dep. pp.204:22-205:15.) | Disputed. The cited evidence does not support this fact because Mr. Miller has not testified.<br><br>Objection, hearsay. (*See* Defs.' Stmt. Evid. Objs. ¶111.) |
| 112. Captain Little then went to Area 17-3 and spoke with Ocean Lifeguard Specialist Lauren Gottschalk; Captain Little | Disputed. Plaintiff "asked OLS Gottschalk if she would be offended if Captain Little took it down." Ocean Lifeguard Specialist ("OLS") |

DEFS.' STATEMENT OF GENUINE DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| observed the PPF flying in that area, too, and asked OLS Gottschalk if she would be offended if Captain Little took it down. (Little Dep. pp.205:22-207:10; Gottschalk Dep. p.193:10-18.) | Gottschalk testified that "he kind of pseudo-asked our or at least my opinion and then took the flag down anyway," and that "[h]e did not say would I be offended." (Dkt. 119-6 (Gottschalk Dep. Tr.) 193:3-9; Portnoi Decl. Ex. G (Gottschalk Dep. Tr.) 100:22-101:4.) |
| 113. Captain Little then removed the PPF flag from the Area 17-3 building's flagpole and carefully folded it and placed it on a counter inside. (Little Dep. p. 210:3-8.) | Undisputed. |
| 114. Captain Little did not discuss his religious beliefs regarding the PPF with Miller or Gottschalk or attempt to proselytize or lecture them in any way about the same. (Little Dep. pp.204:22-209:9.) | Undisputed. |
| 115. Captain Little then went to Area 17-1 and saw a PPF flying on an area flagpole that hadn't flown a flag in years. Captain Little asked Ocean Lifeguard Specialist Tenan-Snow and his co- lifeguard if they would be offended if Captain Little took the PPF down, and they said they didn't care; Captain Little then removed the PPF, folded it, and put in in the nearby Area 17-3 building. (Little Dep. pp.210:14-214:15.) | Disputed that Plaintiff "then went to Area 17-1." Plaintiff first went to Area 17-2 to do a "quick workout." Undisputed as to the remainder of the Fact. (Dkt. 119-1 (Little Dep. Tr.) 210:14-214:15.) Objection, hearsay, to the extent that the statement that Ocean Lifeguard Specialist Tenan-Snow and his co-lifeguard "said they didn't care" is being used for the truth of the matter asserted. (*See* Defs.' Stmt. Evid. Objs. ¶115.) |
| 116. The County enforced the June 20, 2023, 100% compliance mandate—as directed and implemented by Chief Boiteux in his instructions to Chief Lester—without regard for Captain Little's already-expressed religious conflict with ensuring PPFs were raised pursuant EA-231, and regardless of the religious accommodation he obtained on June 19, 2023. (Little Dep. pp.223:25-224:6, 225:23-226:5.) | Disputed. The cited excerpt does not include support for the proposition that the "100% compliance mandate" was enforced "without regard for Captain Little's already-expressed religious conflict…." (Dkt. 119-1 (Little Dep. Tr.) 223:25-224:6, 225:23-226:5.) |

30

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 117. Captain Little informed Lester of his religious accommodation when Lester came to talk to him in person at Area 17 on June 21, 2023; when Lester requested that Captain Little ensure the PPFs went back up, Captain Little stated he has a religious objection to doing so. (Little Dep. pp.239:10-241:9, 242:15-23;) | Disputed to the extent that Plaintiff had obtained a "religious accommodation." (Defendant's Separate Statement of Uncontroverted Facts, (Dkt. 114-2) ¶¶44-49, 83-90.) |
| 118. Captain Little broke down mentally and emotionally after meeting with Lester and would have gone home for the day if Lester had offered it. (Little Dep. p.246:5-11.) | Undisputed. |
| 119. Lester acknowledges that Captain Little was visibly upset, shaken teary-eyed, and emotional, and upset when Lester met with and told him that his accommodation had been nullified, and asked Captain Little to "ensure" the PPF would be flown per the terms of EA-231. (Lester Dep. p124:21-127:11, 132:15) | Disputed to the extent that Chief Lester "told him that his accommodation had been nullified." (Dkt. 119-4 (Lester Dep. Tr.) 124:21-127:11, 132:15.) |
| 120. While Chief Lester was confused about why Captain Little was so emotional, he also acknowledged that "I get it. **I knew he was religious**. .... And by his emotions, . . . he obviously cared about it." (Lester Dep. p.131:22-23.) | Disputed to the extent that the quoted passage does not appear in the cited excerpt. |
| 121. Chief Lester filed a CPOE complaint against Captain Little upon talking to Lauren Gottschalk, who Chief Lester says was upset and offended by Captain Little asking her that morning to take down the PPF at her stations, before Captain Little himself took it down. Lester says such reports are required when he observes an employee being "offended" or "feeling uncomfortable" at work. (Lester Dep. pp.128:1-130:6; Stormer Dep. pp.46:5-47:19.) | Undisputed. |

31

DEFS.' STATEMENT OF GENUINE DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 122. Lester did not file a CPOE report on Captain Little's behalf despite observing Captain Little being emotional, upset, and uncomfortable with being told his religious accommodation was revoked and asked to ensure PPFs were flying in his area. (Lester Dep. p.138:9-19.) | Disputed. The cited excerpt does not include support for the following statement: "Lester did not file a CPOE report on Captain Little's behalf despite observing Captain Little being emotional, upset, and uncomfortable with being told his religious accommodation was revoked and asked to ensure PPFs were flying in his area." (Dkt. 119-4 (Lester Dep. Tr.) 138:9-19.) |
| 123. █████████████████ | █████████████████ |
| 124. █████████████████ | █████████████████ |
| 125. Gottschalk would not have argued about taking the PPF down had she known that Captain Little had a religious accommodation. (Gottschalk Dep. p.221:7-9.) | Disputed. OLS Gottschalk said that "He didn't even tell me that day that he had a religious accommodation …. I don't know that I would have really argued it to the soft – even though I was pretty soft with it, wouldn't have argued it to the extent that I did if the county had granted him something that I was aware of. But he did not make me aware of his religious accommodation." (Dkt. 119-6 (Gottschalk Dep. Tr.) 221:2-11.) |
| 126. After talking with Lauren Gottschalk, Chief Lester called Chiefs Boiteux and Uehara to confirm that he should file a | Undisputed. |

32

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| CPOE report about Captain Little, and recounted that he had explained to Captain Little that "**I know he's religious**," and "**I respect his religious beliefs**." (Lester Dep. pp.140:10-141:5.) | |
| 127. The County's decisionmakers were thus aware that Captain Little's actions regarding the PPF were motivated by religious reasons. (Lester Dep. pp.99:21-100:25, 140:10-141:5.) | Disputed, to the extent that this fact asserts that OLS Gottschalk, Chief Lester, Chief Boiteux, and Chief Uehara constitute the "County's decisionmakers." Chiefs Uehara and McMillon attended the June 19 IPM as representatives of his chain of command. (Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 119:2-6; Dkt. 115-8 (McMillon Dep. Tr.) 108:18-22, 109:3-17; Dkt. 115-14 (Boiteux Dep. Tr.) 114:3-117:3, Dkt. 115-9 (Uehara Dep. Tr.) 47:25-48:5, 48:22-25.) However, Ms. Nuanes Delgadillo and Rachel Lara attended the June 19 IPM as human resources representatives. (Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 18:5-20:6.) To the extent that this refers to "decisionmakers" for any discipline, that process is handled separate from the Fire Department. (Dkt. 115-16 (Stormer Dep. Tr.) 27:8-28:18.)<br><br>Objection, this fact is vague as to who the "decisionmakers" it references are. Further, this fact contains a legal conclusion as to who were the "decisionmakers." Objection, foundation. (*See* Defs.' Stmt. Evid. Objs. ¶127.) |
| 128. Even OLS Gottschalk was aware that Captain Little had a religious concern regarding the PPF. (Gottschalk Dep. p.157:11-14.) | Disputed to the extent this fact implies that OLS Gottschalk was "aware" *on June 21, 2023* of a "religious concern regarding the PPF." OLS Gottschalk testified that the "word-on-the-street" was that Plaintiff's "religious values don't align with the flag being up." OLS Gottschalk answered a question about "*later* … find[ing] out" about Plaintiff's objections to the PPF. |

33

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | (Dkt. 115-6 (Gottschalk Dep. Tr.) 157:7-14 (emphasis added).) |
| 129. On June 22, 2023, Captain Little filed a CPOE complaint regarding the aforementioned events at Area 17 on June 21, 2023, further notifying the County that his actions were motivated by religious reasons. (Little Dep. pp.248:22-249:1.) | Disputed to the extent that filing the CPOE complaint meant that the County was "notified" that Plaintiff's actions were motivated by religious reasons. (Dkt. 116-11 (CPOE 2023-120504 Report Notification Form), at LAC-0000175.) Undisputed to the remainder.<br><br>Objection, best evidence. (*See* Defs.' Stmt. Evid. Objs. ¶129.) |
| 130. Chief Boiteux discussed Captain Little's grievance with Chief Mayfield, who directed Chief Boiteux to follow HR's recommendation. The grievance was denied. (Boiteux Dep. pp.282:8-10, 279:9-281:10, Ex. 31.) | Undisputed. |
| 131. During the second IPM with Captain Little on June 21, 2023, County representatives informed Captain Little that "the purpose of a religious accommodation is to allow an employee to be able to practice their religion, such as taking time to attend religious services, wear religious garments, or provide them time to pray during the workday"; they said Captain Little's request "does not fall under a religious accommodation"; he was further told his "concerns regarding EA 231 and flying the flag are outside of the interactive process forum." (Little Dep. Ex. 1069 at pp.2-3; Nuanes-Delgadillo Dep. p.158:10-25.) | Undisputed. |
| 132. During the second IPM, Fire Department personnel did not discuss whether the religious accommodation that Captain Little sought—to not raise or lower the PPF himself, except under extenuating circumstances— | Disputed. The cited evidence does not support the fact, as Ms. Nuanes-Delgadillo was testifying about what was discussed "during the first IPM meeting." (Dkt. 119-5 (Nuanes-Delgadillo Dep. Tr.) 127:3-13.) |

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| would pose a burden on fire department operations. (Nuanes-Delgadillo Dep. pp.127:3–127:13.) | |
| 133. Captain Little's religious beliefs do not require him to take down PPFs over which he has "no responsibility" and is "not participating in," including at the Zuma location at Area 33, consistent with the religious accommodation he obtained on June 19, 2023. (Little Dep. pp.259:2-12; 259:14-260:9.) | Disputed to the extent that Plaintiff had obtained a "religious accommodation." (Defendant's Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶¶44-49, 83-90.) |
| 134. Captain Little believed the "easiest way" to avoid having responsibility over the PPF was working in an area where PPFs would not be flying consistent with EA-231 with respect to flagpoles that flew only one flag. (Little Dep. p.260:16-19.) | Undisputed. |
| 135. Captain Little was motivated by his religious beliefs in taking down the Area 17 PPFs on June 21, 2023. (Little Dep. pp.257:12-259:1, 260:24-261:9) | Undisputed. |
| 136. Captain Little testified that what conflicted with his religious beliefs at Area 17 on June 21, 2023, was not merely that the PPF flags were flying at that location, but that as the lead captain for Area 17 that day he was responsible for ensuring the PPFs were flying under the express terms of EA-231. (Little Dep. pp.261:18-263:23.) | Disputed. During his first Interactive Process Meeting, Plaintiff said that in certain situations, "it would not be an issue because [he] would not visibly see the [PPF]" notwithstanding that he was the Captain overseeing an Area. (Dkt. 116-20 (2023 IPM Worksheet), at LAC-0001488.) |
| 137. Captain Little first learned of the 100% compliance mandate to EA-231 during the IPM meeting of June 21, 2023, when Chief Uehara informed Captain Little "that per the Fire Chief, and effective immediately, the PPF will need to be flown at all locations and an updated EA will be sent out | Disputed. The cited material does not support that Plaintiff "first learned of the 100% compliance mandate to EA-231 during the IPM meeting of June 21, 2023." (Dkt. 119-1 (Little Dep. Tr.) 266:11-19, Ex. 1069 at 2.) Undisputed as to the remainder of the facts. |

35

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| regarding this." (Little Dep. p.266:11-19, Ex. 1069 at p.2;) | |
| 138. During that second IPM, no one present mentioned Captain Little's lowering of the PPFs in Area 17, which had already occurred. (Little Dep. p.268:3-11.) | Undisputed. |
| 139. During the second IPM meeting, Nuanes-Delgadillo told Captain Little to reach out to his chain of command about getting time off for the rest of the month. (Little Dep. pp.268:24-269:2; Nuanes-Delgadillo Dep. p.184:7-11.) | Undisputed. |
| 140. As a result of the June 21, 2023 IPM meeting, Captain Little was again bound by the duties of EA-231 to ensure flagpoles in his respective beach areas were flying the PPFs, even though on June 19 the County allowed Captain Little to serve as captain even if he did not ensure the PPF flew on flagpoles in his respective areas, so long as another captain at a nearby beach would do so. (Little Dep. pp.128:3-129:12, 145:22, 146:1-12.) | Disputed. Plaintiff was never relieved from complying with EA-231. (Dkt. 116-20 (2023 IPM Worksheet), at LAC-0001488.) |
| 141. Before, on, and after June 21, 2023, including during the accepted religious accommodation on June 19, 2023, the captain responsible for Zuma Headquarters is the Area 30 headquarters captain, and that captain was ultimately responsible for raising and flying the PPF in Area 33. (Little Dep. p.146:1-12.) | Disputed to the extent that Plaintiff had obtained a "religious accommodation." (Defendant's Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶¶44-49, 83-90.) Further, under EA-231, Plaintiff was not responsible for "raising and flying the PPF," but rather, only ensuring that the PPF was raised. (Dk. 116-2 (EA-231), at LAC-0000036.) |
| 142. According to estimates from Captain Little's chain of command, the full economic cost of granting Captain Little the religious accommodation he sought would cost the fire department $3,000 to $8,000 of its roughly $1.5 billion annual budget. (Kim Dep. pp.130:10–18, | Disputed. Chief Kim could not recall the total annual budget. (Dkt. 119-14 (Kim Dep. Tr.) 130:10-18.)

Objection, foundation. (*See* Defs.' Stmt. Evid. Objs. ¶142.) |

36

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 132:17–133: 2; Boiteux Dep. p.24:6-8.) | |
| 143. The Fire Department's corporate representative testified that that $3,000 to $8,000 cost, on its own, would not create an undue burden for the fire department if it were to grant Captain Little's request for a religious accommodation. (Kim Dep. p.139:21–140:6.) | Disputed. Chief Kim testified that "if you're just focused on the cost of that financially for that one person," referring to the $3,000 to $8,000 figure, but that she "place[d] a pretty high value on the cost, you know, that it impacts other folks' mental health by recalling them as well." (Dkt. 119-14 (Kim Dep. Tr.) 139:21-140:6.) |
| 144. The fire department knows of no marginal noneconomic costs, such as lifeguards' mental health costs, that the department would incur as a cost of granting Captain Little the religious accommodation he sought. (Kim Dep. p.142:18–24.) | Disputed. The cited excerpt does not include support for the following statement: "The fire department knows of no marginal noneconomic costs, such as lifeguards' mental health costs, that the department would incur as a cost of granting Captain Little the religious accommodation he sought." |
| 145. The fire department faced no cost from moving Captain Little through non-recall- triggering shift transfers if the religious accommodation Captain Little sought was granted. (Kim Dep. p.133:8-11; Uehara Dep. pp.250:19-251:8, 253:25-254:5; Boiteux Dep. pp.212:14-213:9.) | Disputed. Chief Kim said that there is "no monetary impact when lifeguards … engage in voluntary trades." (Dkt. 119-14 (Kim Dep. Tr.) 133:8-15.) |
| 146. To minimize recalls, Los Angeles County permits the fire department to "hire behind" lifeguards who have been off on leave for ninety days or more, moving them to a position that does not exist in the fire department's budget to hire another lifeguard for the position and keep both lifeguards on staff. (Kim Dep. p.161:1–14.) | Undisputed. |
| 147. Captain Little's chain of command, being the decision makers as to operational impact of an accommodation, concluded that | Disputed. Chiefs Uehara and McMillon attended the June 19 IPM as representatives of his chain of command. (Dkt. 115-7 (Nuanes- |

37

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| the accepted accommodation made during the first IPM was operationally feasible. (Boiteux Dep. pp.218:10-219:17; Uehara Dep. pp.91:19-92:9, 238:24-239:5.) | Delgadillo Dep. Tr.) 119:2-6; Dkt. 115-8 (McMillon Dep. Tr.) 108:18-22, 109:3-17; Dkt. 115-14 (Boiteux Dep. Tr.) 114:3-117:3, Dkt. 115-9 (Uehara Dep. Tr.) 47:25-48:5, 48:22-25.) However, Ms. Nuanes Delgadillo and Rachel Lara attended the June 19 IPM as human resources representatives. (Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 18:5-20:6.) Further, Chief Boiteux responded, "yes and no" to counsel's question that "operationally, the accommodation was feasible." (Dkt. 119-2 (Boiteux Dep. Tr.) 218:17-219:1.) Further, Chief Uehara testified that his "entire role" in the IPM process "would be to make sure that we can operationally – it does not negatively affect the operation and if we can operationally make it happen…" He testified that it "would be highly speculative" to speak to the operational impact of Plaintiff's request now. (Dkt. 119-3 (Uehara Dep. Tr.) 91:19-92:9; 238:24-239:5.) |
| 148. Fire department personnel who facilitate the IPM process and make accommodation decisions jointly with a requester's chain of command typically defer to the requester's chain of command as to its conclusions about the effects of granting an accommodation on operations. (Kim Dep. p.165:2-8; Boiteux Dep. pp.114:3-14, 218:10-219:17; Uehara Dep. pp.85:14-21, 91:19-92:9, 238:24-239:8; McMillon Dep. p.81:2-9.) | Disputed. The cited material does not support the assertion that Fire Department personnel who facilitate the IPM process make accommodation decisions "jointly" with the requester's chain of command. |
| 149. Captain Little agreed as part of the granted June 19, 2023 religious accommodation that he would seek to trade shifts with other lifeguards to minimize whatever increase in lifeguard recalls might otherwise occur from the religious accommodation he sought. (Kim Dep. p.119:15–17; Kim Dep. p.143:2–7.) | Disputed to the extent that Plaintiff had obtained a "religious accommodation." (Defendant's Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶¶44-49, 83-90.) |

38

DEFS.' STATEMENT OF GENUINE DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 150. Before Captain Little's second IPM, the fire department had never denied any employee any kind of accommodation on the basis that granting it could cause a recall. (Kim Dep. pp.144:13-25, 145:18–146:3.) | Disputed. In response to counsel's question, Chief Kim responded, "Probably not specific to that. I mean, that was part of the – that was definitely part of the conversations we've had subsequently, I, as a whole, looking at it. Solely based on just that it was potentially cause a recall, I don't – I don't think that's been a *sole reason*. Although I can't remember. And I always know that we – that's part of the conversation that we have when we talk about accommodating." (Dkt. 119-14 (Kim Dep. Tr.) 144:21-145:8.) Chief Kim otherwise said that she could not recall another instance. (Dkt. 119-14 (Kim Dep. Tr.) 145:9-12.) |
| 151. Chief Boiteux understood that the reason Captain Little's original religious accommodation could not continue was *not* an operational feasibility issue, but a direction from human resources and legal counsel that it was not an *appropriate* accommodation. (Boiteux Dep. p.219:8-17.) | Disputed. This fact lacks context. Ms. Nuanes-Delgadillo explained to Plaintiff that the reason for denying his religious accommodation request was that there was no interference with a religious practice. (Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 172:18-173:21; Dkt. 115-15 (Crum Dep. Tr.) 141:9-16, 144:7-15; Dkt. 115-8 (McMillon Dep. Tr.) 127:25-128:3.) Also disputed to the extent that this fact asserts that there was a prior religious accommodation that could "continue." The evidence cited in Defendants' Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶¶44-45, and testimony in Chief Uehara's deposition show Ms. Nuanes-Delgadillo's June 20, 2023 email did not communicate a finalized religious accommodation. (Dkt. 115-2 (Little Dep. Tr.) 123:7-14, 126:4-10, 131:9-21, 131:22-132:5; Dkt. 115-8 (McMillon Dep. Tr.) 109:21-110:4, 111:20-24, 112:12-17; Dkt. 115-15 (Crum Dep. Tr.). 112:8-17; Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4; Dkt. 116-20 (2023 IPM notes) at LAC-0001489; Dkt. 116-21 (2023 IPM report) at LAC-0000375; Dkt. 115-9 (Uehara Dep. Tr.) 126:9-127:22.) |

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 152. On June 21, 2023, at 5:57 p.m., Captain Little emailed Chief Uehara stating that in light of the IPM meeting earlier that day rescinding his prior religious accommodation, Captain Little was requesting benefit time for the remainder of the month of June. (Little Dep. Ex. 1085 at p.4; Kim Dep. Ex. 20 at p.2.) | Disputed to the extent that this fact asserts that there was a prior religious accommodation. The evidence cited in Defendants' Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶¶44-45, and testimony in Chief Uehara's deposition show Ms. Nuanes-Delgadillo's June 20, 2023 email did not communicate a finalized religious accommodation. (Dkt. 115-2 (Little Dep. Tr.) 123:7-14, 126:4-10, 131:9-21, 131:22-132:5; Dkt. 115-8 (McMillon Dep. Tr.) 109:21-110:4, 111:20-24, 112:12-17; Dkt. 115-15 (Crum Dep. Tr.). 112:8-17; Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4; Dkt. 116-20 (Nuanes-Delgadillo Decl. Ex. A) (2023 IPM notes) at LAC-0001489; Dkt. 116-21 (Nuanes-Delgadillo Decl. Ex. B) (2023 IPM report) at LAC-0000375; Dkt. 115-9 (Uehara Dep. Tr.) 126:9-127:22.) Undisputed as to the rest. |
| 153. Chief Uehara forwarded Captain Little's request to Kim and Boiteux, stating: "See the message below from Captain Little. I would like to deny his request." (Boiteux Dep. Ex. 20; Kim Dep. Ex. 20 p.1.) | Undisputed. |
| 154. Chief Boiteux did not know why Chief Uehara wanted to deny Captain Little's request. And Kim responded that it was "the discretion of the lifeguard management." (Boiteux Dep. pp.227:10-228:2, Ex. 20.) | Disputed. Chief Boiteux's testimony is vague and unclear as to time. Chief Boiteux said that he "would ask" Chief Uehara why he said that, not that "he did not know why … ." (Dkt. 119-2 (Boiteux Dep. Tr.) 227:25-228:2.) |
| 155. Chief Boiteux recommended to Chief Uehara that Captain Little's request be denied if it will cause a recall, but Captain Little may be permitted to file a time exchange request. Lifeguard management was under pressure from Los Angeles County to reduce recalls even in circumstances involving a | Undisputed. |

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| religious objection. (Boiteux Dep. p.228:5-24; Ex. 20.) | |
| 156. Chief Uehara responded via email that he approves time off as long as it does not cause a recall, and otherwise recommended that Captain Little use Time Exchange procedures with other captains. (Little Dep. Ex. 1085 at 3; Crum Dep. p.147:8-18.) | Undisputed. |
| 157. Chief Uehara's response was effectively a denial of Captain Little's request to use benefit time, because at that time of year, taking benefit time would likely cause a recall. (Little Dep. p.282:19-24; Crum Dep. 60:25-61:3, 62:19-63:2.) | Disputed. Chief Uehara's response was not "effectively a denial." In fact, he approved the request. (*See* Plf.'s SSUF ¶156.) |
| 158. Lifeguard time off for sickness is treated differently than time off for other reasons; and when asked whether time off in cases of religious conflict should be treated more like sick time rather than the more restrictive and conditional time off allowed for others reasons, Boiteux testified that he relies on HR to make those decisions. (Boiteux Dep. pp.229:24-230:14, 233:3-15.) | Disputed to the extent that Boiteux "relies on HR to make those decisions." Chief Boiteux testified that this is "an HR question." (Dkt. 119-2 (Boiteux Dep. Tr.) 233:3-15.) He did not indicate that he had ever relied on HR to make this kind of decision. Boiteux also did not indicate that there is a "more restrictive and conditional time off allowed for other reasons" besides sick time. (Dkt. 119-2 (Boiteux Dep. Tr.) 229:24-230:14, 233:3-15.) Undisputed as to the rest of the facts. |
| 159. Chief Boiteux agreed that it would have been a good idea for Chief Uehara to talk with Captain Little before unilaterally denying Captain Little's request for time off for the rest of June. (Boiteux Dep. p.250:13-21.) | Disputed. Chief Boiteux did not testify that Chief Uehara "unilaterally den[ied] Captain Little's request for time off for the rest of June." (Dkt. 119-2 (Boiteux Dep. Tr.) 251:13-21.) Undisputed that Chief Boiteux "agreed that it would have been a good idea for Chief Uehara to talk with Captain Little before[.]" |
| 160. Additionally, as someone who regularly participates in IPMs, Chief Lester acknowledged that allowing an employee to use benefit time is generally a possible reasonable accommodation as long | Disputed. Chief Lester stated that whether using benefit time could be an accommodation "would be between an IPM process," and added that "it would cause a bunch of recalls." (Dkt. 119-4 (Lester Dep. Tr.) 161:10- |

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| as shifts are filled through recall—triggering recalls is usually not a barrier granting an accommodation in the form of benefit time. (Lester Dep. pp.161:10-164:15; Power Dep. p.35:13-20.) | 163:20.) Chief Power clarified that this would "be determined between the department [in an IPM] and whether or not we can operationally support it." (Dkt. 119-8 (Power Dep. Tr.) 35:13-20.) Neither testified that "allowing an employee to use benefit time is *generally* a possible reasonable accommodation," or that "triggering recalls is *usually* not a barrier granting (sic) an accommodation in the form of benefit time." (Dkt. 119-4 (Lester Dep. Tr.) 161:10-163:20; Dkt. 119-8 (Power Dep. Tr.) 35:13-20.) Neither testified about frequency ("generally," "usually"), either. (Dkt. 119-4 (Lester Dep. Tr.) 161:10-163:20; Dkt. 119-8 (Power Dep. Tr.) 35:13-20.) |
| 161. On June 22, 2023, Captain Little responded via email to Chief Uehara stating that he showed up to work to avoid causing a recall, but that "I cannot live with myself should I proceed to work under these conditions and [be] forced to compromise my religious convictions"; further, because his "mental and physical health [were] quickly deteriorating due to [his] religious convictions" and the rescission of his religious accommodation, Captain Little intended to go home sick and would make operational notifications to ensure area captains covered his work location. (Little Dep. Ex. 1085 at p.3; Boiteux Dep. Ex. 21.) | Undisputed. |
| 162. On June 22, 2023, Chief Boiteux met with Captain Little in person at the Malibu station and provided Captain Little a Direct Order, a Notice of Instruction, and a Subject of Internal Investigation notice because he lowered the PPFs at Area 17 on June 21, 2023. (Little Dep. Ex. 1087 at p.1 ; 3d Am. Verif. Cmplt. ¶79; Kim Dep. Ex. 28 at p.1 & Ex. 66 at p.1.) | Undisputed. |

42

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 163. The decision to issue the Direct Order was made by Chief Mayfield in consultation with Kim and Sturdivant. (Boiteux Dep. pp.254:9-21, 255:1-15, 262:5-8 .) | Undisputed. |
| 164. The Direct Order and Notice of Instruction specified that Captain Little is responsible for either flying the PPF or ensuring it is flown; the Notice of Instruction also stated that "All Department employees, *irrespective of personal beliefs*, are expected to comply with EA-231, which includes raising the flag as instructed." (3d Am. Verif. Cmplt. ¶79 (emphasis added), Exs. 10 & 11.) | Undisputed. |
| 165. While meeting with Captain Little on June 22, 2023, Chief Boiteux told Captain Little several times that Captain Little's "religious beliefs don't matter," and he needed to ensure the PPF flag is flown "regardless of [his] beliefs." (Little Dep. p.288:7-22.) | Disputed. Chief Boiteux did not remember making either statement. (Dkt. 115-14 (Boiteux Dep. Tr.) 270:20-271:1.) |
| 166. Boiteux *acknowledged* that he told Captain Little during this meeting that Captain Little's religious beliefs don't matter. (Boiteux Dep. pp.270:20-271:4.) | Disputed. Chief Boiteux did not acknowledge that he told Captain Little that Captain Little's religious beliefs don't matter. Boiteux Dep. Tr. 270:20-271:4. |
| 167. The Notice of Instruction was issued because Captain Little took down the PPFs. (Boiteux Dep. pp.273:16-274:1, 277:9-17.) | Undisputed.<br><br>Objection, best evidence. (*See* Defs.' Stmt. Evid. Objs. ¶167.) |
| 168. The Notice of instruction stated it was issued "to reiterate the Department's expectations regarding compliance with the Board of Supervisors' March 7, 2023 motion to fly the [PPF] at county facilities. (3d Am. Verif. Cmplt. Ex. 11.) | Undisputed. |

43

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 169. Boiteux issued the Direct Order compelling compliance under threat of discipline, including suspension or termination. (Kim Dep. Ex. 28 at p.1 (LAC-0000034).) | Disputed. Chief Boiteux did not personally threaten discipline, suspension, or termination. (Portnoi Decl., Ex. B (Boiteux Dep. Tr.) 262:25-265:25; Dkt. 115-25 (Direct Order) at LAC-0000034.) |
| 170. Boiteux is 6'4" and 220 pounds, whereas Little is 5'9", 150 pounds. Captain Little believes Boiteux's specific intent was to physically intimidate Little. (3d Am. Verif. Cmplt. ¶194.) | Disputed to the extent Plaintiff contends Chief Boiteux's intent was to physically intimidate Plaintiff. Chief Boiteux testified that he "stepped back, giving [Plaintiff] more room," and "[i]n no way … was near [Plaintiff]." (Portnoi Decl., Ex. B (Boiteux Dep. Tr.) 264:21-25). Undisputed as to the rest of the fact. |
| 171. On June 22, 2023, Chief McMillon learned that a flagpole at the Malibu station in Area 33 had been removed entirely, and an Ocean Lifeguard Specialist (OLS) told Chief McMillon that "he removed the flagpole for 'maintenance' reasons." (Little Dep. pp.268:3-271:20, Ex. 1082.) | Undisputed. |
| 172. No discipline resulted from the CPOE Complaint relating to the flagpole removed at the Malibu Station. (Jonna Decl., Ex. O, Supp. Resp. to Plaintiff's SROG No. 24.) | Disputed. Defendants' supplemental response to Special Interrogatory No. 24 indicates that "[a]side from Plaintiff, one LAC Fire Department employee was disciplined in connection with violating EA-231 or EA-232." (Dkt. 119-15 (Suppl. Response to Plf.'s SROG No. 24) at 5.) However, Plaintiff has no evidence to support that there was a CPOE complaint filed regarding this incident in the first place or that any individual did or not receive discipline. |
| 173. Little was standing near Chief McMillon at the Malibu station when she observed the Malibu flagpole had been removed; Little stated that he was going home sick that day because he was having an emotional breakdown as a result of EA-231; he also notified the other captains working in Area 33's | Disputed. No admissible evidence supports the fact that "the other captains working in Area 33's battalion area that day … were supportive." Further disputed that Plaintiff stated he "was going home sick that day because he was having an emotional breakdown as a result of EA-231." Chief McMillon testified |

DEFS.' STATEMENT OF GENUINE DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| battalion area that day, and those captains were supportive. (Little Dep. pp.273:2-274:12, Ex. 1082 at p.3.) | that Plaintiff told her he was going home sick, but did not communicate further details. (Dkt. 115-8 (McMillon Dep. Tr.) 164:3-21, 166:12-22.)<br><br>Objection, hearsay. (*See* Defs.' Stmt. Evid. Objs. ¶173.) |
| 174. Shortly after telling Chief McMillon he needed to go home sick, Little began crying. (Little Dep. pp.273:25-274:5.) | Undisputed. |
| 175. Chief Uehara forwarded Little's June 22 email regarding his intended sick time to Julia Kim and observed that the flagpole in the Malibu area where Little was working that day had been removed; but Chief Uehara noted he is aware that an OLS then working in Malibu also "doesn't seem to support the flag as well." (Little Dep. Ex. 1085 at p.2.) | Undisputed. |
| 176. L.A. County lifeguard employees, including Little, can request "benefit days" in addition to vacation days; the fire department's memorandum of understanding provides that benefit days must be submitted three days (72 hours) in advance of the date to be filled, but, in practice, benefit days are often requested *within* 72 hours of the date to be filled. (Little Dep. pp.278:12-279:3, Ex. 1084 at p.4; Crum Dep. pp.59:11-60:19.) | Disputed. The evidence cited in Defendants' Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶¶89-90 contradicts the statement that Chief Uehara did not grant his benefit request. (Dkt. 116-34 (Uehara Decl.) ¶4; Dkt. 116-36 (email correspondence between Plaintiff and Chief Uehara); Dkt. 115-9 (Uehara Dep. Tr.) 237:24-238:3, 263:14-22). |
| 177. Every benefit day Little had previously requested had been granted, except the benefit day request he made to Chief Uehara regarding EA-231. (Little Dep. p.279:5-8.) | Disputed. The evidence cited in Defendants' Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶¶89-90 contradicts the statement that Chief Uehara did not grant his benefit request. (Dkt. 116-34 (Uehara Decl.) ¶4; Dkt. 116-36 (email correspondence between Plaintiff and |

DEFS.' STATEMENT OF GENUINE DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | Chief Uehara); Dkt. 115-9 (Uehara Dep. Tr.) 237:24-238:3, 263:14-22). |
| 178. Little was not disciplined for using his sick time for his remaining shifts in June 2023. (Little Dep. p.283:24-284:11.) | Undisputed. |
| 179. On June 23, 2023, only two days following the June 20 flag-lowering incident, Captain Little was suspended from his role on the BIU, which conducts investigations of emergency incidents, resulting in a significant loss of overtime, income, and prestige. (3d Am. Verif. Cmplt. ¶82.A.) | Disputed as to the statement "resulting in a significant loss of overtime, income, and prestige." This is an improper legal conclusion, and Plaintiff cites no evidence in support of this statement beyond the allegation in his complaint.<br><br>Objection, foundation. (*See* Defs.' Stmt. Evid. Objs. ¶179.) |
| 180. There is no information or evidence that Little was not performing well at any time period on the BIU, which began during the 2022-2023 rating period. (Sturdivant Dep. p.113:9-12, Ex. 2 at p.79.) | Disputed. This misconstrues Chief Sturdivant's testimony. In the cited testimony, Plaintiff's counsel asks, "So do you have any information or evidence that he was not performing well at any time period on the background investigations unit?" Sturdivant responds, "Not that I'm aware of." (Dkt. 119-11 (Sturdivant Dep. Tr.) 113:9-12.) |
| 181. In late June 2023, after his IPM meetings, Little received a hand-written letter stating: "Jeff – Fuck you and your Jesus. Your hate won't be tolerated. We know where you live and work. You better pay respect to our pride flag or we will fuck you up. We know about your cute little girls and aren't afraid to rape the shit out of them if you don't honor us. You are a facist [sic] pig and you deserve to die[.]"Little reported it to the county police and his family relocated for approximately a week. But he was contacted by the police a year later and told the case was closed for being inconclusive. (Little Dep. pp.187:12-189:17, Ex. 1077; | Disputed. This fact lacks context. Plaintiff reported this letter to the Ventura County Sheriff, not any law enforcement agency under the control of the County of Los Angeles. (Dkt. 115-2 (Little Dep. Tr.) 46:22-47:2.) |

DEFS.' STATEMENT OF GENUINE DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Power Dep. pp.58:5-59:22; Kim Dep. pp.278:4-282:4.) | |
| 182. A security incident report was filed because of the letter. (Sturdivant Dep. p.143:22-23; Kim Dep. pp.279:15-280:13.) | Undisputed. |
| 183. Sturdivant is unaware of any steps taken to investigate Captain Little's threat except for filing a security incident report. (Sturdivant Dep. p.149:8-13; Crum Dep. pp.162:2-163:12.) | Disputed. The cited evidence does not support this statement. Sturdivant does not remember if other steps were taken. (Dkt. 115-2 (Little Dep. Tr.) 149:8-13.) Further disputed because Plaintiff improperly cited to Chief Sturdivant and Captain Crum's 30(b)(1) testimony where the County designated Julia Kim to testify as a 30(b)(6) witness about this letter. She provided testimony on the Fire Department's investigation process, explaining that a security incident report was filed, and a copy is sent to the "sheriff's department's special operations unit." Among other things, Chief Kim also explained that where the incident is criminal in nature, such as here, law enforcement handles the investigation. Plaintiff instead cited to Chief Sturdivant's 30(b)(1) testimony on her personal recollection of events. (Portnoi Decl., Ex. H (Kim Dep. Tr.) 278:7-286:15.)<br><br>Objection, foundation and personal knowledge. (*See* Defs.' Stmt. Evid. Objs. ¶183.) |
| 184. On July 16, 2024, the Fire Department presented to Captain Little an intent to suspend letter. (3d Am. Verif. Cmplt. ¶86, Ex. 18; Kim Dep. pp.283:16-284:1, Ex. 85 p.1.) | Undisputed. |
| 185. On October 24, 2024, Captain Little was notified that he was being suspended for 15 calendar days without pay, from Nov. 11, 2024 through November 25, 2024, for his "removal of the Progress Pride Flag (PPF) from three | Undisputed. |

47

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| lifeguard stations" in Area 17 on June 21, 2023. (Little Dep. Ex. 1089 at p.1, LAC-0001831; Kim Dep. p.296:10–17, Ex. 58 p.2 (LAC-0000054).) | |
| 186. The suspension notice asserted that Captain Little's actions in removing the PPFs constituted inappropriate conduct toward others and discrimination based on sexual orientation, in violation of the Department's Standards of Behavior, the County Policy of Equity, and L.A. County's Flag Policy, including EA-231, and Civil Service Rule 18.031. (Little Dep. Ex. 1089 at p.2.) | Disputed to the extent Plaintiff relies on an incomplete citation. Undisputed otherwise. |
| 187. According to Chief Boiteux, the difference between Captain Little's actions and a similar action taken by Captain Crum, at the request of Chiefs Uehara and Lester, to lower an already-flying PPF in Area 17 on June 1, 2023, was the number of people upset about Captain Little taking down the PPF. (Boiteux Dep. p.175:4-25.) | Disputed. This fact lacks context. Immediately prior to the cited portion of Chief Boiteux's testimony, Chief Boiteux states: "I don't do discipline. Discipline is done through deputy chiefs and above. And that conversation between him and Chief Lester and Chief Uehara, you need to ask them." (Dkt. 121-5 (Boiteux Dep. Tr.) 174:25-175:3.)<br><br>Objection, foundation. (*See* Defs.' Stmt. Evid. Objs. ¶187.) |
| 188. The suspension notice stated "[T]he mission of the Los Angeles County Fire Department is to protect lives, the environment, and property by providing prompt, skillful, and cost-effective fire protection, and life safety services." (Little Dep. Ex. 1089 at p.5.) | Undisputed. |
| 189. The suspension notice also stated "four [sic] of the Department's core values include caring, community, and teamwork." (Little Dep. Ex. 1089 at p.5.) | Undisputed. |
| 190. The suspension notice stated that "[c]aring and community entail | Undisputed. |

48

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| committing to showing compassion for all members of the community and celebrating diversity." (Little Dep. Ex. 1089 at p.5.) | |
| 191. The suspension notice asserted that "[b]y removing the PPFs, [Captain Little] sent a message that sought to diminish the visibility of the LGBTQ+ community, which showed a lack of care for the struggles and identities for that community. Additionally, [Captain Little's] removal of the PPFs was nonconductive to teamwork, because it undermined the County's commitment to fostering a diverse and inclusive work environment for all employees." (Little Dep. Ex. 1089 at pp.5-6.) | Undisputed. |
| 192. The suspension notice asserted that Captain Little's actions "created an uncomfortable working environment for [his] staff," and that Captain Little's "actions were also disruptive, as [his] removal of the PPFs created confusion and discord among people who witnessed the incident." (Little Dep. Ex. 1089 at p.6.) | Undisputed. |
| 193. The suspension noticed asserted that Captain Little's actions "sent a message of disregard for your chain of command," and "demonstrated to his subordinates that if they do not agree with management's instructions, they need not comply." (Little Dep. Ex. 1089 at p.6.) | Undisputed. |
| 194. The suspension notice made no mention of the fact that Captain Little had made clear his actions were motivated by his sincerely held religious beliefs. (Little Dep. Ex. 1089.) | Disputed. The cited evidence does not support the assertion that Plaintiff had made clear his decision to take down and remove already flying PPFs was motivated by sincerely held religious beliefs. |

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 195. The suspension notice did not attempt to explain how enforcement of County policies against Captain Little's actions complied with state- and federal-law requirements (including those of the First Amendment) against religious discrimination, including requirements to accommodate employees' religious practices absent undue hardship. (Little Dep. Ex. 1089.) | Disputed to the extent this misconstrues the purpose of the October 24, 2024 suspension notice and the circumstances of Plaintiff's suspension. |
| 196. The suspension notice made no mention of the religious accommodation agreed to with Captain Little on June 19, 2023, even though the Investigation Reports reference the accommodation 57 times. (3d Am. Verif. Cmplt. ¶90.) | Disputed. This misconstrues the cause of Plaintiff's suspension. Plaintiff was suspended for taking down PPFs, which was not discussed as one of his requested religious accommodation requests. Defendants further dispute that a religious accommodation was agreed to on June 19, 2023. (Dkt. 116-21 (2023 IPM report).)<br><br>Objection, best evidence. (*See* Defs.' Stmt. Evid. Objs. ¶196.) |
| 197. While asserting that Captain Little "showed a lack of care for the struggles and identities of" the "LGBTQ+ community," the suspension did not explain how the County's actions towards Captain Little showed a "care for the struggles and identities" of *religious* employees like Captain Little in violation of County policy. (Little Dep. Ex. 1089 at p.5.) | Disputed. This misconstrues the cause of Plaintiff's suspension. Plaintiff was suspended for taking down PPFs. Defendants further dispute that a religious accommodation was agreed to on June 19, 2023. (Dkt. 116-21 (2023 IPM report).) |
| 198. The suspension notice did not explain how disregarding Captain Little's previously *granted* religious accommodation and concerns regarding the requirement that captains "ensure" PPFs were flying in their areas "foster[ed] a diverse and inclusive work environment for" religious employees like Captain Little, as | Disputed. This misconstrues the cause of Plaintiff's suspension. Plaintiff was suspended for taking down PPFs, which was not discussed as one of his religious accommodation requests. Defendants further dispute that a religious accommodation was agreed to on June 19, 2023. (Dkt. 116-21 (2023 IPM report).) |

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| required by County policy. (Little Dep. Ex. 1089 at pp. 5-6.) | |
| 199. ████████████████████ | ████████████████████ |
| 200. Captain Little dutifully served the 15-day suspension. (3d Am. Verif. Cmplt. ¶87.) | Undisputed that Captain Little served the 15-day suspension. (3d Am. Verif. Cmplt. ¶87.) |
| 201. Beginning in March 2024, well in advance of June 2024, Captain Little sent the County multiple letters renewing his request to be religiously accommodated from any requirement to ensure PPFs were flying, but the County ignored his communications until May 23, 2024, when the Fire Department suggested holding another IPM. (3d Am. Verif. Cmplt. ¶¶92-100.) | Disputed that Plaintiff sent multiple "letters" as opposed to emails. (Dkt. 116-22 (2024 E-Mail Thread) at LAC-0000499.) Further, as that email thread makes clear, the County did not "ignore" Plaintiff's communications. Rather, EA-232 was published on May 30, 2024. (Dkt. 116-3 (EA-232), at LAC-0000039.) As the County informed Plaintiff during his May 29, 2024 IPM, there would be a new EA, and the parties agreed to reschedule a follow up IPM accordingly. (Dkt. 116-23 (2024 IPM Notes), at LAC-0001483.) |
| 202. On May 29, 2024, Captain Little attended an IPM with Nuanes-Delgadillo, Chief Kyle Power, and union representative Captain Crum; Captain Little explained his continued need for a religious accommodation, and Nuanes-Delgadillo said she would present the information to more senior officials, and scheduled a follow-up IPM for May 31, 2024. (3d Am. Verif. Cmplt. ¶¶101-02; Power Dep. pp.81:17-82:25.) | Undisputed. |

51

DEFS.' STATEMENT OF GENUINE DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 203. EA-231's significant "gray area" sparked "a lot of feedback" from County employees that led to a revised policy in 2024 (EA-232). (Lester Dep. pp.51:21-52:2.) | Disputed. Chief Lester did not state that EA-231 had significant gray area. Rather, he stated that "there was a lot of feedback from the first year as far as trying to make it more specific so that it didn't put as much of a gray area to us as managers …." (Dkt. 119-4 (Lester Dep. Tr.) 51:21-52:2.) |
| 204. On Thursday, May 30, 2024, the Fire Department issued a new directive relating to Pride Month, titled "EA-232." EA-232 still required captains to "[e]nsure" PPFs are flown, but only on flagpoles able to fly three flags. (3d Am. Verif. Cmplt. ¶¶103-04, Ex. 24; Power Dep. pp.30:11-31:7.) | Undisputed. |
| 205. Insofar as EA-232 requires flying the PPF, it states that "compliance is not optional," without stating how non-optional compliance is consistent with federal and state law requirements to accommodate employees' religious practices absent undue hardship. (3d Am. Verif. Cmplt., Ex. 24.) | Undisputed. |
| 206. EA-232 took captains' duties under EA-231, and shared them with section chiefs pursuant to EMM-9. (Boiteux Dep. pp.306:21-307:13, Ex. 75.) | Disputed. EA-232 provided guidelines for Fire Captains and Unit Supervisors, and noted that "A separate EMM will be distributed to chief officers and division managers outlining their responsibilities." (Dkt. 116-3 (EA-232), at LAC-0000039.) |
| 207. Upon receiving EA-232 in 2024, Captain Little discussed with his immediate supervisor, Chief Power, his religious conflict with supervising the PPF flown at Zuma headquarters (which Captain Little was responsible for on Wednesdays) and whether flagpoles in Area 33 (which Captain Little was responsible for on Thursdays through Saturdays) were excluded from flying the PPF | Undisputed. |

52

DEFS.' STATEMENT OF GENUINE DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| under EA-232. (Little Dep. pp.74:20-76:1; Power Dep. pp.49:19-50:7, 83:6-15.) | |
| 208. Captain Little also reached to union president Captain Crum on May 31, 2024, in order to find out which locations were would fly all three flags. (Little Dep. pp.76:8-77:20, 82:14-23, Ex. 1065) | Undisputed. |
| 209. Captain Little understood that according to EA-232 Attachment A's plain terms, clasps should be added to fly three flags, including the PPF, only if could be done so "safely," that is, without a flag touching another structure, which violates flag etiquette. (Little Dep. pp.80:8-81:5, Ex. 1066; Power Dep. p.31:19-22; Oliva Dep. p.49:15-50:25.) | Undisputed. |
| 210. On May 31, 2024, Captain Little attended the follow-up IPM meeting in which Nuanes-Delgadillo explained that the Fire Department would offer Captain Little a partial religious accommodation from the requirement to fly PPFs—i.e., by agreeing that Captain Little did not need to raise or lower the PPFs himself, since that occurred outside the hours of his work shifts. (3d Am. Verif. Cmplt. ¶107, Ex. 25.) | Undisputed. |
| 211. However, Nuanes-Delgadillo stated that Captain Little would still be responsible for ensuring the PPF is flying during his work shift—in the same manner as had been required of captains under EA-231, if any flagpole in Captain Little's assigned area could accommodate three flags in accord with EA-232—which Captain Little said he still could not agree to. (*Id.*) | Undisputed. |

53

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 212. Because the County's beaches are so large and lifeguards are spaced far from each other, lifeguards— including captains— regularly communicate with each other using cell phones, radios, or other devices. (3d Am. Verif. Cmplt. ¶110; Gottschalk Dep. pp.31:19-32:2.) | Undisputed. |
| 213. Lifeguards can use Motorola radios, cell phones, or official Department phones to contact their section headquarters on any given day. (Gottschalk Dep. p.35:2-14.) | Undisputed. |
| 214. The section headquarters for Area 17 is at Hermosa Beach, which is in Area 15. (Gottschalk Dep. pp.34:12-38:19; 46:9.) | Undisputed. |
| 215. Nuanes-Delgadillo also explained that the Fire Department would not offer Captain Little a standing religious accommodation, but rather he must renew his request in advance of every June, and go through additional IPMs accordingly. (3d Am. Verif. Cmplt. ¶111.) | Undisputed. |
| 216. Nuanes-Delgadillo also denied Captain Little's request to suspend the Direct Order requiring him to ensure the raising of PPFs and Captain Little's request to remove the same from his personnel file— confirming that the County is still denying Captain Little a religious accommodation from the obligation on captains to ensure PPFs are flying when applicable, even though the County has numerous lifeguard areas with flagpoles that *cannot* safely accommodate three flags and thus which are not flying the PPF. (3d Am. Verif. Cmplt. ¶112.) | Disputed. Ms. Nuanes-Delgadillo informed Plaintiff that the direct order "is not something [she] would discuss" in the context of an IPM. (Dkt. 115-13 (Nuanes-Delgadillo Dep. Tr.) 149:13-22, 182:19-25.) |

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 217. Under EA-232, "many smaller stations" across the county are not flying the PPF. (Lester Dep. pp.53:16-54:2; Power Dep. pp.33:22-34:1.) | Disputed. This fact lacks context. Chief Lester testified that there were "many smaller stations that were not able to accommodate three flags as it was directed, and that change EA from '23 to '24. So, yes, in 2024, there would not have been as many stations that would have been able to fly it...." (Dkt. 119-4 (Lester Dep. Tr.) 53:16-54:1.) |
| 218. The County is still denying Captain Little's requested religious accommodation even though Chief Lester acknowledged that as someone who participates in IPMs "all the time," if HR asked him if he could move a lifeguard captain to a beach or station where the PPF isn't flying, he "would probably say we could move someone to [that] location," though he would need to consider its impact on other employees. (Lester Dep. pp.56:15-57:24, 119:18-19.) | Disputed. Nothing in the cited material supports the notion that "the County is still denying Captain Little's requested religious accommodation." (Dkt. 119-4 (Lester Dep. Tr.) 56:15-57:25, 119:18-19.) |
| 219. As part of the IPM accommodation process, the County can "do a lot of things for operational reasons and for other reasons" in order to accommodate an employee. (Lester Dep. p.59:1-11.) | Undisputed. |
| 220. Over the weekend of June 1-2, 2024, Captain Little worked with his direct report, Chief Kyle Power to secure an effective accommodation for the month of June 2024 in which he was assigned to two locations: three days per week at Area 33 (comprising Nocholas Beach, Point Dume Beach, and Malibu Beach), and one day per week at Zuma headquarters. Captain Little, working with Chief Power, confirmed that none of the lifeguard stations in Area 33 could fly three flags. And regarding the | Disputed. The County held IPMs with Plaintiff on both May 29, 2024 and May 31, 2024, and during the 2024 IPM, informed Plaintiff that he could swap with other captains to work where the PPF would not be flown. Defendants' Separate Statement of Uncontroverted Facts ¶¶136-137. |

55

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Zuma Headquarters, Captain Little was able to find another captain who was willing to trade shifts for a location where the PPF would not be flying. (3d Am. Verif. Cmplt. ¶¶113-14; Little Dep. pp.294:8-295:9; Power Dep. pp.85:2-86:5.) | |
| 221. Any effective accommodation secured by working with Chief Power is not standing and must be renewed annually. (3d Am. Verif. Cmplt. ¶115.) | Undisputed. |
| 222. Chief Boiteux agreed that this accommodation was acceptable from the department's perspective, and there has been no cost to the department resulting from Captain Little's shift trades. (Boiteux Dep. p.315:1-4.) | Undisputed. |

## II.    DEFENDANTS' ADDITIONAL MATERIAL FACTS[2]

| No. | Material Fact | Supporting Evidence |
|---|---|---|
| **Board of Supervisors Motion and EA-231** | | |
| 223. | In March 2023, the Board of Supervisors ("Board") passed a motion to fly the Progress Pride Flag ("PPF") during June at Los Angeles County ("County") facilities where the American and California flags are displayed and to explore ways the PPF can be flown at all County facilities to show support for LGBTQ+ communities during Pride Month. | SSUF No. 1<br><br>Dkt. 116 (Kim Decl.) ¶3, Dkt. 116-1 (Kim Decl. Ex. A) (Board of Supervisors resolution)<br><br>Third Amended Complaint ("TAC") ¶19 |
| 224. | The County Fire Department implemented the motion in May 2023 through a policy memorandum, EA-231, which provided guidance about which Department facilities with flagpoles should fly the PPF. | SSUF No. 2<br><br>Dkt. 115-11 (Oliva Dep. Tr.) 32:17-24<br><br>Dkt. 116 (Kim Decl.) ¶4, Dkt. 116-2 (Kim Decl. Ex. B) (EA-231)<br><br>TAC ¶20 |
| 225. | Typically, flags are flown using clasps, which are small metal devices that can be added to a flagpole. | SSUF No. 7<br><br>Dkt. 115-8 (McMillon Dep. Tr.) 36:18-19, 224:8-18<br><br>Dkt. 115-15 (Crum Dep. Tr.) 204:19-205:24 |

---

[2] Many of these facts and their supporting evidence are in Defendants' separately filed statement of uncontroverted facts in support of Defendants' motion for summary judgment.  *See* Dkt. 114-1.  For these facts, and for the Court's ease of reference, Defendants have included at the beginning of the "Supporting Evidence" column the corresponding SSUF number used in support of Defendants' motion for summary judgment, where applicable.

DEFS.' STATEMENT OF GENUINE DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| No. | Material Fact | Supporting Evidence |
|-----|---------------|---------------------|
| | | Dkt. 115-5 (Lester Dep. Tr.) 78:7-19<br><br>Dkt. 116-8 (Lester Decl.) ¶7, Dkt. 116-12 (Lester Decl. Ex. D) (halyard clasp) |
| **Directive for 100% Compliance with EA-231** | | |
| 226. | In early June 2023, the PPF was not flown at some Lifeguard Division facilities where it could safely be flown. | **SSUF No. 14**<br><br>Dkt. 115-10 (O'Brien Dep. Tr.) 68:1-4<br><br>Dkt. 115-8 (McMillon Dep. Tr.) 38:18-39:1, 123:18-124:2, 213:18-214:22<br><br>Dkt. 115-15 (Crum Dep. Tr.). 79:15-24<br><br>Dkt. 115-5 (Lester Dep. Tr.) 49:14-50:2, 68:9-19<br><br>Dkt. 115-9 (Uehara Dep. Tr.) 153:24-154:8, 157:4-16 |
| 227. | The PPF was not flown at some Lifeguard Division facilities because the flagpoles were under construction. | Dkt. 116-9 (email correspondence between Chiefs Lester and Boiteux) at LAC-0001965. |
| 228. | Beachgoers, lifeguards, and County Supervisors raised concerns about the PPF not consistently flying. | **SSUF No. 15**<br><br>Dkt. 115-10 (O'Brien Dep. Tr.) 68:1-4<br><br>Dkt. 115-8 (McMillon Dep. Tr.). 123:18-124:2, 124:12-21 |

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| No. | Material Fact | Supporting Evidence |
|---|---|---|
|  |  | Dkt. 115-5 (Lester Dep. Tr.) 68:9-19<br><br>Dkt. 115-20 (Boiteux Decl.) ¶¶3-4, Dkt. 115-21 (Boiteux Decl. Ex. A) (email correspondence between Chief Boiteux and County Department of Beaches & Harbors) at LAC-0000028, Dkt. 115-22 (Boiteux Decl. Ex. B) (email correspondence between Chief Boiteux and Supervisor Mitchell's Deputy of Constituent Engagement) at LAC-0001357<br><br>Dkt. 116-26 (O'Brien Decl.) ¶¶4-5, Dkt. 116-28 (O'Brien Decl. Ex. B) (June 12, 2023 major incident report), Dkt. 116-29 (O'Brien Decl. Ex. C )(June 20, 2023 major incident report) |
| 229. | The Board put extreme pressure on Fire Chief Anthony Marrone to comply with the Board's motion regarding the flying of the PPF. | **SSUF No. 16**<br><br>Dkt. 115-10 (O'Brien Dep. Tr.) 68:1-70:11<br><br>Dkt. 115-14 (Boiteux Dep. Tr.) 154:14-22<br><br>Dkt. 115-8 (McMillon Dep. Tr.) 124:12-21<br><br>Dkt. 115-12 (Mayfield Dep. Tr. Vol. II) 170:14-171:23<br><br>Dkt. 115-5 (Lester Dep. Tr.) 68:20-69:22 |

59

| No. | Material Fact | Supporting Evidence |
|---|---|---|
| 230. | On June 20, 2023 at 7:23 p.m. Chief Marrone requested an "immediate Teams meeting for all Chief Deputies and Deputy Chiefs." | **SSUF No. 17**<br><br>Dkt. 116-13 (Mayfield Decl.) ¶4, Dkt. 116-15 (Mayfield Decl. Ex. B) (email correspondence between Chief Marrone, chief deputies, and deputy chiefs) at LAC-0003223 |
| 231. | At the June 20, 2023 meeting that Chief Marrone had with his Chief Deputies and Deputy Chiefs, Chief Marrone relayed the importance of compliance with the Board's motion and EA-231 through the chain of command. | **SSUF No. 18**<br><br>Dkt. 115-14 (Boiteux Dep. Tr.) 151:1-154:22<br><br>Dkt. 115-10 (O'Brien Dep. Tr.) 77:17-25<br><br>Dkt. 115-12 (Mayfield Dep. Tr. Vol. II) 170:21-171:3, 171:18-25, 172:21-173:9, 180:12-14<br><br>Dkt. 115-5 (Lester Dep. Tr.) 68:9-69:22 |
| 232. | On June 20, 2023 at 7:14 p.m., Chief Marrone sent an email with "Progress Pride Flag FAQs" attached, asking his Chief Deputies to share it with their managers. | **SSUF No. 19**<br><br>Dkt. 115-10 (O'Brien Dep. Tr.) 83:18-84:12<br><br>Dkt. 116-13 (Mayfield Decl.) ¶3, Dkt. 116-14 (Mayfield Decl. Ex. A) (email correspondence between Chief O'Brien, Chief Mayfield, and division chiefs) at LAC-0002035-36<br><br>Dkt. 116-26 (O'Brien Decl.) ¶6, Dkt. 116-30 (O'Brien Decl. Ex. D) (email correspondence between Chief O'Brien, Chief Mayfield, and division chiefs) at LAC-0002036 |

60

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| No. | Material Fact | Supporting Evidence |
|---|---|---|
| 233. | On June 20, 2023 at 8:20 p.m., Chief Deputy Jon O'Brien forwarded this email to his Deputy Chiefs, calling for 100% compliance with EA-231 and the Board motion. | SSUF No. 20<br><br>Dkt. 116-13 (Mayfield Decl.) ¶3, Dkt. 116-14 (Mayfield Decl. Ex. A) (email correspondence between Chief O'Brien, Chief Mayfield, and division chiefs) at LAC-0002035-36<br><br>Dkt. 116-26 (O'Brien Decl.) ¶6, Dkt. 116-30 (O'Brien Decl. Ex. D) (email correspondence between Chief O'Brien, Chief Mayfield, and division chiefs) at LAC-0002036<br><br>Dkt. 115-10 (O'Brien Dep. Tr.) 83:18-84:12 |
| 234. | On June 20, 2023 at 8:34 p.m., Deputy Fire Chief William Mayfield forwarded Chief O'Brien's email to his Assistant Chiefs and indicated that the absence of clasps is "not an excuse" not to fly the PPF. | SSUF No. 21<br><br>Dkt. 116-13 (Mayfield Decl.) ¶3, Dkt. 116-14 (Mayfield Decl. Ex. A) (email correspondence between Chief O'Brien, Chief Mayfield, and division chiefs) at LAC-0002035-36<br><br>Dkt. 116-26 (O'Brien Decl.) ¶6, Dkt. 116-30 (O'Brien Decl. Ex. D) (email correspondence between Chief O'Brien, Chief Mayfield, and division chiefs) at LAC-0002035 |
| 235. | Deputy Fire Chief Mayfield is the bureau commander for three Fire Department divisions, including the Lifeguard Division, the EMS Division, and all training aspects within the Department. | SSUF No. 22<br><br>Dkt. 115-12 (Mayfield Dep. Tr.) 26:7-8, 24:8-16<br><br>Dkt. 116-13 (Mayfield Decl.) ¶2 |

61

| No. | Material Fact | Supporting Evidence |
|---|---|---|
| 236. | Neither Chief O'Brien nor Chief Mayfield knew details about Plaintiff's request for a religious accommodation at the time of the 100% compliance directive. | Portnoi Decl. Ex. A (O'Brien Dep. Tr.) 73:6-14<br><br>Dkt. 115-12 (Mayfield Dep. Tr.) 122:22-123:15 |
| 237. | The evening of June 20, 2023, Chief Fernando Boiteux conveyed Chief O'Brien's 100% directive to Chief Adam Uehara and the lifeguard section chiefs, including Chief Arthur Lester, instructing them to ensure that the PPF was raised at all fixed flagpoles under their management regardless of whether clasps were currently installed and report to him the next morning if any PPFs were missing or could not be flown. | **SSUF No. 23**<br><br>Dkt. 116-8 (Lester Decl.) ¶3, Dkt 116-9 (Lester Decl. Ex. A) (email correspondence between Chief Boiteux, Chief Uehara, and section chiefs) at LAC-0001966<br><br>Dkt. 115-20 (Boiteux Decl.) ¶¶5-6, Dkt. 115-23 (Boiteux Decl. Ex. C) (email correspondence between Chief Boiteux, Chief Uehara and section chiefs) at LAC-0001343, Dkt. 115-24 (Boiteux Decl. Ex. D) (text message correspondence between Chief Boiteux, Chief Uehara, and section chiefs) at LAC-0001495<br><br>Dkt. 115-12 (Mayfield Dep. Tr. Vol. II) 175:13-176:22, 185:24-186:11<br><br>Dkt. 115-5 (Lester Dep. Tr.) 69:4-22, 73:5-16<br><br>Dkt. 115-9 (Uehara Dep. Tr.) 148:19-149:19 |
| 238. | At 8:00 a.m. on June 21, 2023, Chief Lester began ensuring that the fixed flagpoles at the sites he supervised were flying the PPF by either raising them himself or | **SSUF No. 24**<br><br>Dkt. 115-5 (Lester Dep. Tr.). 69:23-70:20, 74:12-77:9 |

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| No. | Material Fact | Supporting Evidence |
|-----|---------------|---------------------|
|  | confirming that they were being flown. | Dkt. 115-13 (Gottschalk Dep. Tr.) 197:13-16, 224:3-7 |
| 239. | Chief Lester visited all sites other than those on Catalina Island personally, including Area 17 (Dockweiler North, Dockweiler South, and El Segundo). | **SSUF No. 25**<br><br>Dkt. 115-5 (Lester Dep. Tr.) 75:4-77:9<br><br>Dkt. 115-13 (Gottschalk Dep. Tr.) 197:13-16, 224:3-7 |
| **Plaintiff's 2023 Religious Accommodation Request** | | |
| 240. | On June 18, 2023, Plaintiff emailed Chiefs Boiteux, Kyle Power, and Danielle McMillon to request to be exempt from EA-231. | **SSUF No. 27**<br><br>Dkt. 115-8 (McMillon Dep. Tr.) 27:4-11<br><br>Dkt. 116-16 (McMillon Decl.) ¶2, Dkt. 116-17 (McMillon Decl. Ex. A) (email correspondence between Plaintiff, Captain Crum, and Chiefs Boiteux, McMillon, Power, Uehara, and Kim) at LAC-0001549<br><br>TAC ¶¶42-43 |
| 241. | Chiefs Power and McMillon were Plaintiff's usual supervisors in late June 2023. | **SSUF No. 28**<br><br>Dkt. 115-2 (Little Dep. Tr.) 26:9-14 |
| 242. | At the June 19 IPM, Plaintiff requested that he either not be required to fly the PPF at Will Rogers Beach or be reassigned to a site where he would not be responsible for flying the PPF. | **SSUF No. 33**<br><br>Dkt. 115-2 (Little Dep. Tr.) 120:5-121:4<br><br>Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 163:18-164:5, 219:3-219:14<br><br>Dkt. 115-8 (McMillon Dep. Tr.) 118:14-119:1 |

63

| No. | Material Fact | Supporting Evidence |
|---|---|---|
| | | Dkt. 115-15 (Crum Dep. Tr.) 100:13-25, 101:8-16<br><br>Dkt. 115-9 (Uehara Dep. Tr.) 130:6-12<br><br>Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4, Dkt. 116-20 (Nuanes-Delgadillo Decl. Ex. A) (2023 IPM notes) at LAC-0001488, Dkt. 116-21 (Nuanes-Delgadillo Decl. Ex. B) (2023 IPM report) at LAC-0000374 |
| 243. | At the June 19 IPM, Plaintiff was told that there was a PPF flying at Zuma Headquarters, which is near Area 33 and where the Area 33 Captain's office is located, but that he would likely not be responsible for ensuring it was flying it because the Area 30 and Area 34 Captains also work out of that location and could ensure that it was flown. | **SSUF No. 39**<br><br>Dkt. 115-2 (Little Dep. Tr.) 121:13-121:15, 127:24-127:25<br><br>Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 170:1-170:15<br><br>Dkt. 115-8 (McMillon Dep. Tr.) 109:18-110:4, 111:20-25, 112:12-17, 126:18-127:8, 187:24-188:18, 190:14-17<br><br>Dkt. 115-15 (Crum Dep. Tr.) 101:17-102:24, 104:10-106:2<br><br>Dkt. 115-9 (Uehara Dep. Tr.) 95:2-96:6<br><br>Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4, Dkt. 116-20 (Nuanes-Delgadillo Decl. Ex. A) (2023 IPM notes) at LAC-0001488-89, Dkt. 116-21 (Nuanes-Delgadillo Decl. |

64

| No. | Material Fact | Supporting Evidence |
|---|---|---|
| | | Ex. B) (2023 IPM report) at LAC-0000374 |
| 244. | At the June 19 IPM, it was explained to Plaintiff that he may still need to ensure that the PPF was flown at Area 33. | **SSUF No. 40**<br><br>Dkt. 115-2 (Little Dep. Tr.) 128:3-129:22.<br><br>Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 212:25-213:2<br><br>Dkt. 115-8 (McMillon Dep. Tr.) 109:18-110:4, 111:20-25, 112:12-17, 126:18-127:8, 187:24-188:18, 189:5-14, 190:14-17<br><br>Dkt. 115-15 (Crum Dep. Tr.) 101:17-102:24, 104:10-106:2<br><br>Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4, Dkt. 116-20 (Nuanes-Delgadillo Decl. Ex. A) (2023 IPM notes) at LAC-0001488-89, Dkt. 116-21 (Nuanes-Delgadillo Decl. Ex. B) (2023 IPM report) at LAC-0000374 |
| 245. | At the June 19 IPM, Plaintiff agreed to work at Area 33. | **SSUF No. 42**<br><br>Dkt. 115-2 (Little Dep. Tr.) 127:24-128:1<br><br>Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 120:13-122:6<br><br>Dkt. 115-8 (McMillon Dep. Tr.) 126:18-127:8<br><br>Dkt. 115-15 (Crum Dep. Tr.). 104:10-106:2 |

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| No. | Material Fact | Supporting Evidence |
|---|---|---|
| | | Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4, Dkt. 116-20 (Nuanes-Delgadillo Decl. Ex. A) (2023 IPM notes) at LAC-0001488-89, Dkt. 116-21 (Nuanes-Delgadillo Decl. Ex. B) (2023 IPM report) at LAC-0000374 <br><br> TAC ¶¶49, 52 |
| 246. | At the June 19 IPM, Plaintiff never requested to lower the PPF. | **SSUF No. 43** <br><br> Dkt. 115-2 (Little Dep. Tr.) 132:8-16. <br><br> Dkt. 115-9 (Uehara Dep. Tr.). 285:6-9 <br><br> Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4, Dkt. 116-20 (Nuanes-Delgadillo Decl. Ex. A) (2023 IPM notes) at LAC-0001488-89, Dkt. 116-21 (Nuanes-Delgadillo Decl. Ex. B) (2023 IPM report) at LAC-0000374 <br><br> Dkt. 115-19 (Portnoi MSJ Decl. Ex. S) (Plaintiff's Responses to Requests for Admission) at 6-7 |
| 247. | Chief McMillon offered to obtain a recall exemption for Plaintiff for June 21, 2023. | **SSUF No. 48** <br><br> Dkt. 115-8 (McMillon Dep. Tr.) 186:17-23, 187:24-188:6 <br><br> Dkt. 115-13 (Gottschalk Dep. Tr.) 25:24-26:1, 42:3-9 |

66

| No. | Material Fact | Supporting Evidence |
|---|---|---|
| | | Dkt. 116-16 (McMillon Decl.) ¶3, Dkt. 116-18 (McMillon Decl. Ex. B) (text message correspondence between Plaintiff and Chiefs McMillon and Uehara) at LITTLE.00481 |
| 248. | Lifeguards have two recall exemptions they can use per year, which allow them to decline a recall shift when they get recalled. | **SSUF No. 49**<br><br>Dkt. 115-15 (Crum Dep. Tr.) 107:9-20 |
| 249. | Chief Uehara believed that a lifeguard's (other than Plaintiff) "acting out" regarding the PPF was "orchestrated." | Dkt. 115-9 (Uehara Dep. Tr.) 116:14-117:9 |
| 250. | Chief Uehara was confused why Plaintiff requested a religious accommodation in mid-June 2023 from a policy that had been announced in May 2023 and foreshadowed in March 2023. | Dkt. 115-9 (Uehara Dep. Tr.) 109:21-110:16, 115:1-116:3 |
| | **Plaintiff's June 21, 2023 Shift at Area 17** | |
| 251. | After his June 19 IPM, Plaintiff declined Chief McMillon's recall exemption offer and coordinated to switch shifts with another captain so that he would work at Area 17 on June 21, 2023. | **SSUF No. 50**<br><br>Dkt. 115-2 (Little Dep. Tr.) 152:2-153:24, 170:13-170:23<br><br>Dkt. 115-8 (McMillon Dep. Tr.) 186:17-23, 187:24-188:6<br><br>Dkt. 116-16 (McMillon Decl.) ¶3, Dkt. 116-18 (McMillon Decl. Ex. B) (text message correspondence between Plaintiff and Chiefs McMillon and Uehara) at LITTLE.00481<br><br>TAC ¶62 |

67

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| No. | Material Fact | Supporting Evidence |
|---|---|---|
| 252. | Plaintiff's shifts in June 2023, including on June 21, 2023, started at 10:00 a.m. | **SSUF No. 54**<br><br>Dkt. 115-2 (Little Dep. Tr.) 143:4-13, 194:5-12 |
| 253. | Plaintiff arrived at the beach on June 21, 2023 to find the PPF flying at Dockweiler South and Dockweiler North. | **SSUF No. 56**<br><br>Dkt. 115-2 (Little Dep. Tr.) 201:12-16<br><br>Dkt. 115-13 (Gottschalk Dep. Tr.) 68:19-21<br><br>Dkt. 115-26 (Gottschalk Decl.) ¶¶2-3, Dkt. 115-27 (Gottschalk Decl. Ex. A) (July 5, 2023 Gottschalk CPOE interview) at 2:53-3:20, 6:30-38 (Lodged, Under Seal), 115-28 (Gottschalk Decl. Ex. B) (Aug. 23, 2023 Gottschalk CPOE interview) at 7:30-46 (Lodged, Under Seal)<br><br>Dkt. 115-4 (Portnoi MSJ Decl. Ex. B) (Plaintiff CPOE Interview) at 12:40-52, 17:07-10 (Lodged, Under Seal)<br><br>Dkt. 116-31 (Stormer Decl.) ¶3, Dkt. 133-6 (Stormer Decl. Ex. A) (CPOE Investigative Report) at LAC-0000192, LAC-0000196 (Under Seal) |
| 254. | Chief Lester had ensured that the PPF was raised at Dockweiler South and Dockweiler North on June 21 before Plaintiff arrived at work. | **SSUF No. 57**<br><br>Dkt. 115-2 (Little Dep. Tr.) 202:12-18 |

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| No. | Material Fact | Supporting Evidence |
|---|---|---|
|  |  | Dkt. 115-13 (Gottschalk Dep. Tr.) 111:22-112:18<br><br>Dkt. 115-5 (Lester Dep. Tr.) 69:23-70:7, 75:4-77:9<br><br>Dkt. 115-9 (Uehara Dep. Tr.). 283:23-284:7 |
| 255. | OLS Lauren Gottschalk was Plaintiff's direct report on June 21. | **SSUF No. 58**<br><br>Dkt. 115-13 (Gottschalk Dep. Tr.) 26:2-5, 171:23-172:3, 187:23-188:5 |
| 256. | Plaintiff asked OLS Gottschalk if she would be okay with him removing the PPF at Dockweiler South | **SSUF No. 59**<br><br>Dkt. 115-2 (Little Dep. Tr.) 206:14-206:17<br><br>Dkt. 115-13 (Gottschalk Dep. Tr.) 86:13-15<br><br>Dkt. 116-8 (Lester Decl.) ¶5, Dkt. 116-11 (Lester Decl. Ex. C) (CPOE complaint) at LAC-0000180 |
| 257. | OLS Gottschalk told Plaintiff that Chief Lester had ensured the PPF was raised that morning, that she was fine with the PPF up, and that she was concerned about receiving conflicting orders. | **SSUF No. 60**<br><br>Dkt. 115-2 (Little Dep. Tr.) 206:5-207:10<br><br>Dkt. 115-13 (Gottschalk Dep. Tr.) 86:13-15, 87:23-88:24, 101:3-7, 101:22-103:4; Dkt. 133-2 (Gottschalk Dep. Tr.) 282:2-10 (Under Seal)<br><br>Dkt. 115-5 (Lester Dep. Tr.) 144:13-145:2 |

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| No. | Material Fact | Supporting Evidence |
|-----|--------------|---------------------|
|  |  | Dkt. 116-8 (Lester Decl.) ¶5, Dkt. 116-11 (Lester Decl. Ex. C) (CPOE complaint) at LAC-0000180<br><br>Dkt. 116-31 (Stormer Decl.) ¶3, Dkt. 133-6 (Stormer Decl. Ex. A) (CPOE Investigative Report) at LAC-0000192, LAC-0000196 (Under Seal) |
| 258. | Plaintiff took down the Dockweiler South PPF himself. | **SSUF No. 61**<br><br>Dkt. 115-2 (Little Dep. Tr.) 204:22-205:21<br><br>Dkt. 116-8 (Lester Decl.) ¶5, Dkt. 116-11 (Lester Decl. Ex. C) (CPOE complaint) at LAC-0000180<br><br>Dkt. 116-31 (Stormer Decl.) ¶3, Dkt. 133-6 (Stormer Decl. Ex. A) (CPOE Investigative Report) at LAC-0000192, LAC-0000196 (Under Seal) |
| 259. | Plaintiff then drove to Dockweiler North and El Segundo, removing the PPF at both sites. | **SSUF No. 62**<br><br>Dkt. 115-2 (Little Dep. Tr.) 200:2-10, 204:17-205:24, 210:3-13<br><br>Dkt. 115-13 (Gottschalk Dep. Tr.) 85:20-22, 86:13-15<br><br>Dkt. 116-31 (Stormer Decl.) ¶3, Dkt. 133-6 (Stormer Decl. Ex. A) (CPOE Investigative Report) at, LAC-0000196 (Under Seal)<br><br>Dkt. 115-26 (Gottschalk Decl.) ¶3, 115-28 (Gottschalk Decl. Ex. B) |

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| No. | Material Fact | Supporting Evidence |
|---|---|---|
| | | (Aug. 23, 2023 Gottschalk CPOE interview) at 12:51-13:18 (Lodged, Under Seal)<br><br>Dkt. 115-4 (Portnoi MSJ Decl. Ex. B) (Plaintiff CPOE Interview) at 28:12-49<br><br>Dkt. 115-29 (Hastings Decl.) ¶¶4-5, Dkt. 115-30 (Hastings Decl. Ex. A) (video from El Segundo Beach) (Lodged) |
| 260. | Plaintiff did not have an accommodation to lower the PPF at any of these three sites. | Dkt. 115-19 (Plaintiff's Responses to Requests for Admission) at 8-9<br><br>Dkt. 115-2 (Little Dep. Tr.) 121:10-18<br><br>Portnoi Decl., Ex. B (Boiteux Dep. Tr.) 260:15-17<br><br>Dkt. 116-21 (Nuanes-Delgadillo Decl. Ex. B) (2023 IPM Summary) at 2-3 |
| 261. | Chiefs Lester, Uehara, and Boiteux learned of Plaintiff's conduct taking down the PPFs later in the day on June 21, 2023. | **SSUF No. 65**<br><br>Dkt. 115-14 (Boiteux Dep. Tr.) 170:9-19<br><br>Dkt. 115-5 (Lester Dep. Tr.) 105:24-106:11, 108:13-109:18, 111:15-25<br><br>Dkt. 115-9 (Uehara Dep. Tr.) 172:7-173:1 |
| 262. | Chief Lester had not known that Plaintiff requested a religious | **SSUF No. 66** |

71

| No. | Material Fact | Supporting Evidence |
|---|---|---|
| | accommodation until after Plaintiff lowered the PPFs on June 21, 2023. | Dkt. 115-5 (Lester Dep. Tr.) 106:13-14 |
| 263. | Chief Lester had not known that Plaintiff would be working at Area 17 until after Plaintiff lowered the PPFs on June 21, 2023. | **SSUF No. 67**<br><br>Dkt. 115-5 (Lester Dep. Tr.) 102:15-103:3 |
| 264. | Chief Boiteux had not known that Plaintiff would be working at Area 17 until after Plaintiff lowered the PPFs on June 21, 2023. | Dkt. 115-14 (Boiteux Dep. Tr.) 128:23-129:3<br><br>Portnoi Decl. Ex. B (Boiteux Dep. Tr.) 134:19-24 |
| 265. | Chiefs Lester, Uehara, and Boiteux determined, after receiving guidance from the Department of Human Resources, that Plaintiff did not have an accommodation to work only at sites where the PPF was not flown. | **SSUF No. 68**<br><br>Dkt. 115-14 (Boiteux Dep. Tr.) 171:7-20<br><br>Dkt. 115-5 (Lester Dep. Tr.). 114:1-115:16, 117:4-5 |
| 266. | Chief Lester went to Area 17 to meet with Plaintiff and re-raise the PPF. | **SSUF No. 69**<br><br>Dkt. 115-13 (Gottschalk Dep. Tr.) 165:24-166:7, 274:25-275:6<br><br>Dkt. 115-5 (Lester Dep. Tr.) 118:7-19, 121:23-122:2<br><br>Dkt. 115-9 (Uehara Dep. Tr.) 177:25-178:3 |
| 267. | When they spoke on June 21, 2023, Chief Lester asked if Plaintiff would re-raise the PPF. | **SSUF No. 75**<br><br>Dkt. 115-2 (Little Dep. Tr.) 242:15-17<br><br>Dkt. 115-5 (Lester Dep. Tr.) 125:6-9, 125:17-18, 126:6-15 |

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| No. | Material Fact | Supporting Evidence |
|---|---|---|
| 268. | When he spoke with Chief Lester on June 21, 2023, Plaintiff refused to re-raise the PPF, citing his religious beliefs. | **SSUF No. 76**<br><br>Dkt. 115-2 (Little Dep. Tr.) 242:15-17<br><br>Dkt. 115-5 (Lester Dep. Tr.) 126:16-18<br><br>Dkt. 115 (Portnoi MSJ Decl.) ¶2, Dkt. 115-1 (Portnoi MSJ Decl. Ex. A) (text message communications between Plaintiff and Captain Crum) at LITTLE.00257, LITTLE.01083 |
| 269. | After Plaintiff refused to re-raise the PPF on June 21, 2023, and cited his religious beliefs, Chief Lester said that he would re-raise it himself and ensure that someone else lowered it at the end of the day. | **SSUF No. 77**<br><br>Dkt. 115-2 (Little Dep. Tr.) 242:24-243:5<br><br>Dkt. 115-5 (Lester Dep. Tr.) 126:19-127:25, 138:16-139:1, 140:8-19<br><br>Dkt. 115 (Portnoi MSJ Decl.) ¶2, Dkt. 115-1 (Portnoi MSJ Decl. Ex. A) (text message communications between Plaintiff and Captain Crum) at LITTLE.00257, LITTLE.01083 |
| 270. | On June 21, 2023, Plaintiff did not re-raise the PPFs in Area 17 after speaking with Chief Lester. | **SSUF No. 78**<br><br>Dkt. 115-2 (Little Dep. Tr.) 243:1-8<br><br>Dkt. 115-5 (Lester Dep. Tr.) 126:23-25, 127:9-10 |
| 271. | After Plaintiff sent Chief Uehara an email on June 21, 2023, asking to use his benefit time, Chief Uehara | Dkt. 115-9 (Uehara Dep. Tr.) 255:15-257:10 |

73

| No. | Material Fact | Supporting Evidence |
|-----|--------------|---------------------|
| | was concerned that Plaintiff using benefit time might cause recalls, and thus granted Plaintiff's request only to the extent it would not cause a recall. | |
| **Effects of Recalls on the County** | | |
| 272. | Lifeguards bid on benefit time annually, so their schedules are determined during the preceding calendar year. | **SSUF No. 91** <br><br> Dkt. 115-2 (Little Dep. Tr.) 275:16-276:10 <br><br> Dkt. 115-14 (Boiteux Dep. Tr.) 230:19-231:11 <br><br> Dkt. 115-15 (Crum Dep. Tr.) 49:6-51:6, 61:12-62:14 <br><br> Dkt. 115-5 (Lester Dep. Tr.) 55:13-17 <br><br> Dkt. 115-9 (Uehara Dep. Tr.) 99:8-14, 234:16-20, 236:22-237:7 <br><br> Dkt. 116 (Kim Decl.) ¶7, Dkt. 116-5 (Kim Decl. Ex. E) ("L Manual") at LAC-0003412 |
| 273. | The County is subject to a memorandum of understanding ("MOU") between itself and the L.A. County Lifeguard Association ("LACoLA"), the County's collective bargaining unit. | **SSUF No. 93** <br><br> Dkt. 115-17 (Kim Dep. Tr.) 129:10-19, 132:4-9 <br><br> Dkt. 115-10 (O'Brien Dep. Tr.) 119:17-19 <br><br> Dkt. 115-15 (Crum Dep. Tr.) 42:19-43:6 |

74

| No. | Material Fact | Supporting Evidence |
|-----|---------------|---------------------|
|     |               | Dkt. 116 (Kim Decl.) ¶6, Dkt. 116-4 (Kim Decl. Ex. D) (Memorandum of Understanding) |
| 274. | The MOU is akin to a collective bargaining agreement, signed by the President of LACoLA and the Chief Executive Officer of the County. | **SSUF No. 94**<br><br>Dkt. 115-17 (Kim Dep. Tr.) 129:10-19, 132:4-9<br><br>Dkt. 115-6 (Power Dep. Tr.) 66:4-10<br><br>Dkt. 116 (Kim Decl.) ¶6, Dkt. 116-4 (Kim Decl. Ex. D) (Memorandum of Understanding) at LITTLE.00856 |
| 275. | There are minimum staffing requirements for captains in summer months due to public safety concerns. | **SSUF No. 97**<br><br>Dkt. 115-14 (Boiteux Dep. Tr.) 116:20-23<br><br>Dkt. 115-8 (McMillon Dep. Tr.) 62:16-63:5, 101:12-14, 103:13-104:5, 104:12-17, 105:8-19, 105:25-105:2<br><br>Dkt. 115-15 (Crum Dep. Tr.) 47:1-10<br><br>Dkt. 115-12 (Mayfield Dep. Tr. Vol. I) 134:21-135:5, 135:25-136:10<br><br>Dkt. 115-6 (Power Dep. Tr.) 38:3-5<br><br>Dkt. 115-9 (Uehara Dep. Tr.) 99:15-20, 207:10-22, 243:11-21, 244:7-14 |

DEFS.' STATEMENT OF GENUINE DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| No. | Material Fact | Supporting Evidence |
|---|---|---|
| 276. | Lifeguards serve a critical public safety function, requiring constant vigilance and coverage at County beaches. | Dkt. 115-14 (Boiteux Dep. Tr.) 172:2-4 |
| 277. | Many lifeguard employees take preapproved vacation time in the summer. | **SSUF No. 98**<br><br>Dkt. 115-2 (Little Dep. Tr.) 72:25-73:13<br><br>Dkt. 115-8 (McMillon Dep. Tr.) 62:16-63:5, 103:13-104:5<br><br>Dkt. 115-15 (Crum Dep. Tr.) 62:19-63:2, 106:20-108:17<br><br>Dkt. 115-9 (Uehara Dep. Tr.) 204:8-11, 258:9-13 |
| 278. | Recalls impinge on employees' physical and mental health. | **SSUF No. 100**<br><br>Dkt. 115-9 (Uehara Dep. Tr.) 92:23-93:2, 99:15-100:2, 258:4-258:13, 260:17-22<br><br>Dkt. 115-5 (Lester Dep. Tr.) 158:22-159:5<br><br>Dkt. 115-17 (Kim Dep. Tr.) 114:17-116:19<br><br>Dkt. 116 (Kim Decl.) ¶8, Dkt. 116-6 (Kim Decl. Ex. F) (Wellness Recall Exemption Pilot Program), Dkt. 116-7 (Kim Decl. Ex. G) (Addressing Fire Department Workplace Trauma or Potential Workplace Trauma resolution) |
| 279. | Recalls, which cause employees to miss time at home with their | Dkt. 115-17 (Kim Dep. Tr.) 114:17-116:2 |

76

| No. | Material Fact | Supporting Evidence |
|---|---|---|
| | families, cause significant mental health issues. | |
| 280. | On June 22, 2021, the Board issued a Board Motion, "Addressing Fire Department Workplace Trauma or Potential Workplace Trauma," in response to a murder and attempted murder, and subsequent suicide, perpetrated by a firefighter against two other firefighters. | **SSUF No. 101**<br><br>Dkt. 115-17 (Kim Dep. Tr.) 114:17-118:20<br><br>Dkt. 116 (Kim Decl.) ¶8, Dkt. 116-7 (Kim Decl. Ex. G) (Addressing Fire Department Workplace Trauma or Potential Workplace Trauma resolution) |
| 281. | The Board Motion directed the Fire Department's Executive Staff to draft a report that, in relevant part, addressed how to "[r]educ[e] staff recall due to vacancies and injury vacancies by at least 50% by March 1, 2022." | **SSUF No. 102**<br><br>Dkt. 115-17 (Kim Dep. Tr.) 114:17-118:20<br><br>Dkt. 116 (Kim Decl.) ¶8, Dkt. 116-7 (Kim Decl. Ex. G) (Addressing Fire Department Workplace Trauma or Potential Workplace Trauma resolution) at LAC-0003272-73 |
| 282. | LACoLA, the lifeguard union, approached the County with concerns that were just as dire as those affecting firefighters. | Dkt. 115-17 (Kim Dep. Tr.) 114:17-116:2 |
| **Chief Lester's CPOE Complaint Regarding Plaintiff's June 21, 2023 Conduct** | | |
| 283. | Chief Lester spoke with OLS Gottschalk on June 21, 2023 regarding Plaintiff's lowering of the PPFs. | **SSUF No. 105**<br><br>Dkt. 115-13 (Gottschalk Dep. Tr.) 165:24-166:7<br><br>Dkt. 115-5 (Lester Dep. Tr.) 128:1-129:12 |

77

| No. | Material Fact | Supporting Evidence |
|---|---|---|
| 284. | When they spoke, OLS Gottschalk informed Chief Lester that Plaintiff's lowering the PPF had been in public view. | **SSUF No. 106**<br><br>Dkt. 115-13 (Gottschalk Dep. Tr.) 144:17-20, 166:12-167:5, 196:13-197:2; Dkt. 133-2 (Gottschalk Dep. Tr.) 199:10-15, 201:1-12 (Under Seal)<br><br>Dkt. 115-5 (Lester Dep. Tr.) 128:12-129:12 |
| 285. | In 2012, Plaintiff took an oath "to obey the laws, ordinances of … the United States, California, Los Angeles County, and [to] be faithful to the department." | Dkt. 115-14 (Boiteux Dep. Tr.) 260:2-8 |
| 286. | Chief Lester believed that Plaintiff's conduct made OLS Gottschalk uncomfortable and constituted a potential violation of the County Policy of Equity ("CPOE"). | **SSUF No. 107**<br><br>Dkt. 115-5 (Lester Dep. Tr.) 129:13-130:6, 134:2-19, 134:24-135:7<br><br>Dkt. 115-13 (Gottschalk Dep. Tr.) 171:15-18 |
| 287. | Chief Lester is a mandated reporter of violations of the CPOE. | **SSUF No. 108**<br><br>Dkt. 115-16 (Stormer Dep. Tr.) 44:6-45:15<br><br>Dkt. 115-5 (Lester Dep. Tr.) 129:13-20, 130:2-6 , 134:24-135:7 |
| 288. | Failure to file a CPOE complaint as a mandated reporter can lead to discipline. | **SSUF No. 109**<br><br>Dkt. 115-5 (Lester Dep. Tr.) 135:4-7<br><br>Dkt. 115-16 (Stormer Dep. Tr.) 53:4-16 |

78

DEFS.' STATEMENT OF GENUINE DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| No. | Material Fact | Supporting Evidence |
|---|---|---|
| 289. | It is not appropriate for individual supervisors to decide whether religious beliefs justify a violation of the CPOE, as this determination is left to the County Equity Oversight Panel. | Dkt. 133-3 (Stormer Dep. Tr.) 28:11-18 (Under Seal) |
| 290. | Chief Lester filed a CPOE complaint the evening of June 21, 2023. | **SSUF No. 110**<br><br>Dkt. 115-5 (Lester Dep. Tr.) 130:16-131:1<br><br>Dkt. 116-8 (Lester Decl.) ¶5, Dkt. 116-11 (Lester Decl. Ex. C) (CPOE complaint) |
| 291. | The CPOE complaint that Chief Lester filed related to Plaintiff's request that OLS Gottschalk lower the PPF at Dockweiler South and Plaintiff's subsequent lowering of the PPF. | **SSUF No. 111**<br><br>Dkt. 116-8 (Lester Decl.) ¶5, Dkt. 116-11 (Lester Decl. Ex. C) (CPOE complaint) at LAC-0000180-81 |
| 292. | The CPOE complaint that Chief Lester filed did not relate to Plaintiff's inability to fulfill his job requirements. | **SSUF No. 112**<br><br>Dkt. 116-8 (Lester Decl.) ¶5, Dkt. 116-11 (Lester Decl. Ex. C) (CPOE complaint) at LAC-0000180-81 |
| 293. | One lifeguard took a video of Plaintiff lowering the PPF at El Segundo on June 21, 2023. | **SSUF No. 114**<br><br>Dkt. 115-9 (Uehara Dep. Tr.) 177:2-14, 290:3-23<br><br>Dkt. 115-29 (Hastings Decl.) ¶5, Dkt. 115-30 (Hastings Decl. Ex. A) (video from El Segundo Beach) (Lodged)<br><br>Dkt. 116-34 (Uehara Decl.) ¶3, Dkt. 116-35 (Uehara Decl. Ex. A) |

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| No. | Material Fact | Supporting Evidence |
|-----|---------------|---------------------|
| | | (text message correspondence between ocean lifeguard and Chief Uehara) |
| **Plaintiff's Discipline for His June 21, 2023 Conduct** | | |
| 294. | On June 22, 2023, Chief Boiteux received from his chain of command a Direct Order addressed to Plaintiff requiring him to comply with EA-231. | **SSUF No. 116**<br><br>Dkt. 115-14 (Boiteux Dep. Tr.) 253:23-256:9<br><br>Dkt. 115-20 (Boiteux Decl.) ¶7, Dkt. 115-25 (Boiteux Decl. Ex. E) (Direct Order) |
| 295. | The Direct Order ordered Plaintiff to either "(1) Fly the[PPF] as instructed in [EA-231] during the month of June OR (2) Ensure that the PPF is flown as instructed in EA-231 during the month of June." | **SSUF No. 117**<br><br>Dkt. 115-20 (Boiteux Decl.) ¶7, Dkt. 115-25 (Boiteux Decl. Ex. E) (Direct Order) |
| 296. | The Direct Order was prepared because Plaintiff took down the PPFs on June 21, 2023. | **SSUF No. 118**<br><br>Dkt. 115-14 (Boiteux Dep. Tr.) 255:16-256:1<br><br>Dkt. 115-12 (Mayfield Dep. Tr. Vol. II) 263:22-25, 265:24-266:10 |
| 297. | On June 22, 2023, Chief Boiteux delivered the Direct Order to Plaintiff. | **SSUF No. 119**<br><br>Dkt. 115-2 (Little Dep. Tr.) 284:22-285:3 |
| 298. | The County removed Plaintiff from his role on the Background Investigation Unit because Plaintiff was the subject of an investigation. | **SSUF No. 122**<br><br>Dkt. 115-17 (Kim Dep. Tr.) 342:1-342:16, 343:2-21 |
| 299. | The Background Investigation Unit investigates prospective employees | **SSUF No. 123** |

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| No. | Material Fact | Supporting Evidence |
|-----|---------------|---------------------|
| | and handles sensitive applicant and personnel information. | Dkt. 115-17 (Kim Dep. Tr.) 339:6-340:4, 343:2-21 |
| 300. | The County investigated the CPOE complaint against Plaintiff through its usual channels. | **SSUF No. 124**<br><br>Dkt. 133-3 (Stormer Dep. Tr.) 40:14-43:24, 61:3-62:2, 75:1-78:2 (Under Seal) |
| 301. | The process for investigating a CPOE complaint involves an investigation and interviews. | **SSUF No. 125**<br><br>Dkt. 133-3 (Stormer Dep. Tr.) 12:11-13:15, 17:2-18:5, 22:22-24:16, 40:14-43:24, 61:3-62:2, 75:1-78:2 (Under Seal) |
| 302. | The CPOE investigation process occurs separate from the specific departments, such as the Fire Department. | **SSUF No. 126**<br><br>Dkt. 133-3 (Stormer Dep. Tr.) 27:8-28:18 (Under Seal) |
| 303. | The County Equity Oversight Panel determined that the allegations in the CPOE complaint against Plaintiff were substantiated and rose to the level of a CPOE violation. | **SSUF No. 127**<br><br>Dkt. 133-3 (Stormer Dep. Tr.) 80:10-22 (Under Seal)<br><br>Dkt. 116-31 (Stormer Decl.) ¶4, Dkt. 133-7 (Stormer Decl. Ex. B) (CPOE Briefing Information and Recommendations) at LAC-0000173-74 (Under Seal) |
| 304. | The County Equity Oversight Panel recommended that the Fire Department issue Plaintiff a 15-day suspension for violating the CPOE. | Dkt. 116-31 (Stormer Decl.) ¶4, Dkt. 133-7 (Stormer Decl. Ex. B) (CPOE Briefing Information and Recommendations) at LAC-0000173-74 (Under Seal) |
| 305. | The Fire Department investigated Plaintiff for violating the County's flag policy when he lowered the PPFs. | **SSUF No. 128**<br><br>Dkt. 115-17 (Kim Dep. Tr.) 307:9-308:3 |

81

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| No. | Material Fact | Supporting Evidence |
|---|---|---|
| 306. | The Fire Advisory Board determined based on the Fire Department's investigation that a suspension was appropriate. | **SSUF No. 129**<br><br>Dkt. 115-17 (Kim Dep. Tr.) 307:9-308:3 |
| 307. | The FAB recommended that the Fire Department issue Plaintiff a 15-day suspension for violating departmental policies. | Dkt. 115-17 (Kim Dep. Tr.) 306:20-21 |
| 308. | Based on Plaintiff's CPOE violation and the FAB's conclusion, the County issued Plaintiff a notice of 15-day suspension on October 24, 2024. | **SSUF No. 130**<br><br>Dkt. 116-34 (Uehara Decl.) ¶5, Dkt. 116-37 (Uehara Decl. Ex. C) (Notice of Suspension) |
| 309. | Chief Boiteux was not involved in the CPOE review process, including the decision to remove Plaintiff from the Background Investigation Unit or to suspend him. | **SSUF No. 131**<br><br>Dkt. 115-14 (Boiteux Dep. Tr.) 293:18-294:24 |
| 310. | ███████████████████ | ███████████████████ |
| | **Plaintiff's 2024 Religious Accommodation Request** | |
| 311. | In 2024, Plaintiff requested a religious accommodation in advance of Pride Month, on May 8, 2024. | **SSUF No. 134**<br><br>Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶5, Dkt. 116-22 (Nuanes-Delgadillo Decl. Ex. C) (email correspondence between Plaintiff |

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| No. | Material Fact | Supporting Evidence |
|---|---|---|
| | | and Ms. Nuanes-Delgadillo) at LAC-0000507-08 |
| 312. | The Fire Department issued EA-232, which provided guidance about which Department facilities with flagpoles should fly the PPF in 2024, on May 30, 2024. | **SSUF No. 135**<br><br>Dkt. 116 (Kim Decl.) ¶5, Dkt. 116-3 (Kim Decl. Ex. C) (EA-232) |
| 313. | In 2024, the County held IPMs with Plaintiff on both May 29, 2024 and May 31, 2024. | **SSUF No. 136**<br><br>Dkt. 115-15 (Crum Dep. Tr.) 179:8-16<br><br>Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶6-7, Dkt. 116-23 (Nuanes-Delgadillo Decl. Ex. D) (2024 IPM notes), Dkt. 116-24 (Nuanes-Delgadillo Decl. Ex. E) (2024 IPM report) |
| 314. | In the 2024 IPM, the County informed Plaintiff that he could swap with other captains to work where the PPF would not be flown. | **SSUF No. 137**<br><br>Dkt. 115-6 (Power Dep. Tr.) 82:10-25<br><br>Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶6-7, Dkt. 116-23 (Nuanes-Delgadillo Decl. Ex. D) (2024 IPM notes), Dkt. 116-24 (Nuanes-Delgadillo Decl. Ex. E) (2024 IPM report) |
| 315. | The County's 2024 proposal for Plaintiff to swap with other captains to work where the PPF would not be flown was an effective accommodation. | **SSUF No. 138**<br><br>Dkt. 115-2 (Little Dep. Tr.) 294:13-295:9<br><br>TAC ¶113 |

83

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

Dated: April 10, 2026

/s/ *Dimitri D. Portnoi*
Dimitri D. Portnoi
Kyle M. Grossman
Marni B. Robinow
O'MELVENY & MYERS LLP

*Attorneys for Defendants County of Los Angeles, Fernando Boiteux, Adam Uehara, and Arthur Lester*

84

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM