# EXHIBIT B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


CAPTAIN JEFFREY LITTLE, an        )
individual,                      )
                                 )
              Plaintiff,          )
                                 )
     vs.                          )   Case No. 2:24-
                                 )   cv-04353-JLS-PD
LOS ANGELES COUNTY FIRE          )
DEPARTMENT, a public entity,     )
et al.,                          )
                                 )
              Defendants.         )
_____  )


(Pages 191 through 193 are designated as attorneys' eyes

only and are bound under separate cover)



VIDEOTAPED DEPOSITION OF

FERNANDO BOITEUX

VIA ZOOM VIDEOCONFERENCE

DECEMBER 3, 2025






Reported by:
COLLEEN M. PETERMAN
CSR 7882
No. 25-J13744300

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


CAPTAIN JEFFREY LITTLE, an         )
individual,                        )
                                   )
                Plaintiff,         )
                                   )
        vs.                        )    Case No. 2:24-
                                   )    cv-04353-JLS-PD
LOS ANGELES COUNTY FIRE            )
DEPARTMENT, a public entity,       )
et al.,                            )
                                   )
                Defendants.        )
_____    )


                DEPOSITION OF FERNANDO BOITEUX, a

        witness herein, taken on behalf of the

        plaintiff via Zoom videoconference at

        10:08 a.m. on Wednesday, December 3,

        2025, before Colleen M. Peterman,

        CSR 7882.

THE SULLIVAN GROUP OF COURT REPORTERS

APPEARANCES (All Participants Appeared Remotely):


For Plaintiff:

        LIMANDRI AND JONNA LLP
        BY PAUL JONNA
           ROBERT WEISENBURGER
           WILLIAM DUKE
        16236 San Dieguito Road, Suite 3-15
        Rancho Santa Fe, California 92091
        858.759.9930
        858.759.9938 Fax
        pjonna@limandri.com
        rweisenburger@limandri.com
        wduke@limandri.com


For Defendants:

        O'MELVENY & MYERS LLP
        BY BRYAN RODRIGUEZ
           MARNI ROBINOW
        400 South Hope Street, Suite 1900
        Los Angeles, California 90071
        213.430.6000
        brodriguez@omm.com
        mrobinow@omm.com


Also Present:

        Alejandro Covarrubias, Videographer

        Jeffrey Little

I N D E X

WITNESS:  FERNANDO BOITEUX

EXAMINATION BY                                        PAGE

MR. JONNA                                              9

MR. RODRIGUEZ                                        317

MR. JONNA                                            318


ATTORNEYS' EYES ONLY EXCERPT BOUND UNDER SEPARATE COVER

Pages 191 through 193


E X H I B I T S

| PLAINTIFF'S | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 2 | Performance evaluations | 27 |
|  | (Exhibit 3 not used) | |
| Exhibit 4 | Document titled "Commentless Appraisal of Promotability Rating Form" | 47 |
| Exhibit 5 | Board of Supervisors' motion titled "Raising the Progress Pride Flag at Los Angeles County Facilities" dated March 7, 2023 | 53 |
| Exhibit 6 | L.A. County Board of Supervisors policy manual, policy 3.100 | 68 |
| Exhibit 7 | EA-231 | 73 |
|  | (Exhibit 8 not used) | |

THE SULLIVAN GROUP OF COURT REPORTERS

4

| PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 9 | Email dated 6-6-2023 to Adam Uehara from Fernando Boiteux | 82 |
| Exhibit 10 | Email dated 5-30-2023 to Thomas Brown from Fernando Boiteux | 93 |
| Exhibit 11 | Email dated 6-5-2023 to Arthur Lester from Adam Uehara | 94 |
| Exhibit 12 | Email dated June 18, 2023, to Kazuko Takahashi and Renee Nuanes-Delgadillo from Julia Kim | 96 |
| Exhibit 13 | Email dated June 18, 2023, to Renee Nuanes-Delgadillo from Julia Kim | 102 |
| Exhibit 14 | Email dated 6-19-2023 to Renee Nuanes-Delgadillo from Fernando Boiteux | 103 |
| Exhibit 15 | Email dated 6-19-2023 to Adam Uehara and Fernando Boiteux from Julia Kim | 117 |
| Exhibit 16 | Text messages | 123 |
| Exhibit 17 | Email dated 6-20-2023 to Julia Kim and Fernando Boiteux from Renee Nuanes-Delgadillo | 141 |
| Exhibit 18 | Email dated 6-21-2023 to various people from Arthur Lester | 151 |
| | (Exhibit 19 not used) | |
| Exhibit 20 | Email dated June 21, 2023, to Adam Uehara from Fernando Boiteux | 148 |
| Exhibit 21 | Email dated 6-22-2023 to Adam Uehara from Jeffrey Little | 233 |
| | (Exhibit 22 not used) | |
| Exhibit 23 | Email dated 6-21-2023 to Adam Uehara from Jon O'Brien | 271 |

THE SULLIVAN GROUP OF COURT REPORTERS

| PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|
| | (Exhibit 24 not used) | |
| Exhibit 25 | Text messages | 253 |
| | (Exhibit 26 not used) | |
| Exhibit 27 | Text messages | 251 |
| Exhibit 28 | Direct order | 253 |
| | (Exhibits 29 and 30 not used) | |
| Exhibit 31 | Grievance form dated 6-22-23 | 279 |
| Exhibit 32 | EA-279 | 283 |
| | (Exhibits 33 through 36 not used) | |
| Exhibit 37 | Email dated June 30, 2023, to Amber Sturdivant and Julia Kim from Fernando Boiteux | 285 |
| Exhibit 38 | Email dated July 13, 2023, to Jeffrey Little from Renee Nuanes-Delgadillo | 219 |
| | (Exhibits 39 through 41 not used) | |
| Exhibit 42 | Email dated August 21, 2023, to William Mayfield from Fernando Boiteux | 289 |
| | (Exhibit 43 not used) | |
| Exhibit 44 | County Equity Oversight Panel briefing | 293 |
| | (Exhibits 45 and 46 not used) | |
| Exhibit 47 | Investigation report by Joanne Schaeffer | 295 |
| Exhibit 48 | Email dated May 8, 2024, to Julia Kim and Amber Sturdivant from Renee Nuanes-Delgadillo | 300 |

THE SULLIVAN GROUP OF COURT REPORTERS

| PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 49 | Email dated May 23, 2024, to Julia Kim from Adam Uehara | 301 |
| Exhibit 50 | EA-232 | 303 |
| Exhibit 51 | EMM-9 | 309 |
| | (Exhibit 52 not used) | |
| Exhibit 53 | Email dated June 3, 2024, to Renee Nuanes-Delgadillo from Jeff Little | 310 |
| | (Exhibit 54 not used) | |
| Exhibit 55 | Email dated 6-6-2024 to Kyle Power from Renee Nuanes-Delgadillo | 314 |
| | (Exhibits 56 and 57 not used) | |
| Exhibit 58 | Punitive action letter | 315 |
| | (Exhibits 59 through 64 not used) | |
| Exhibit 65 | Email dated 5-15-2025 to Jeffrey Little from Gregory Crum | 87 |
| Exhibit 66 | Notice of instruction | 273 |
| | (Exhibits 67 through 73 not used) | |
| Exhibit 74 | Email dated June 20, 2023, to various people from William Mayfield | 160 |
| Exhibit 75 | EMM-9 | 306 |

THE SULLIVAN GROUP OF COURT REPORTERS

7

common for section chiefs to make changes to the schedule.  Like, that happens all the time; right?

A.   Within the day.  Within -- you know, the section chiefs have ability to make some changes, but not schedule changes.

Q.   So even a minor schedule change, a section chief is not authorized to make without going to the head chief?

A.   The deputy chief has to authorize all the schedule changes.

Q.   Is that reflected in any written policy, by the way?

A.   On the Fire Department, yes.

Q.   Where would I find that if I wanted to see it?

A.   It's -- I would have to get back to you. But it's under one of the staffing manuals of the department.

Q.   Staffing manuals.  Okay.

Is that something that was in place for a long time, or is it a recent change, as far as you know?

A.   Oh, no, no.  This has been in place for a long time.  I mean --

Q.   Is it one of those things that's on the

books but no one really follows it because it's practically not feasible?  I mean section chiefs need to be able to manage their crew.  So they make changes anyway.

Is it one of those things that's technically a policy but no one really, in practice, uses it?  Is that -- is that your experience?

MR. RODRIGUEZ:  Objection.  Calls for speculation.

THE WITNESS:  No.  It's followed. Staffing procedures are followed.

BY MR. JONNA:

Q.  Okay.  Who is -- who would know -- who at the Fire Department would be the most familiar with that policy?

It sounds like you're generally familiar with it, but you don't know what number it is.

Who would be, like, the expert on that?

A.  Julia Kim.

Q.  Okay.  Okay.  Looking back at the message, though, he says thanks but Macko -- so, by the way, when she says pulled you out of Wednesday by -- the 21st using a recall exemption, is it -- is it -- do section chiefs have the authority to use a captain's recall exemption without their -- without checking

with them first?

A.  No.

Q.  No?

A.  No.

Q.  Okay.  So, anyway, she was trying to be helpful.  And that's why Captain Little says thanks but Macko was good to switch recalls on 6-21.  I can work area 17 to not force a recall.

Do you have any idea what Captain Little means when he says that?

MR. RODRIGUEZ:  Objection.  Foundation.

BY MR. JONNA:

Q.  Do you know what it means to switch recalls?

A.  He says that -- I don't know what he means with switch recalls.  Whatever the -- whatever the recall that he's referring to, he's saying that he can work the area 17 at Dockweiler Beach.

Q.  Okay.  So Dani McMillon says oh, yeah. Sorry.  I forgot.  Switched that.  So that -- to me, that means she already made the change on the system.  She did the switch.

Is that -- would you -- would you agree?

A.  This is the first time I'm seeing this. So I --

Q.  Again, this is a language that you're way more fluent in than me.  So when -- I'm trying to make sure I know what your understanding is.  I know you haven't seen this before.

So as the chief who's looking at this message and someone's asking to work area 17 to not force a recall and the response from the section chief is I switched that -- by the way, you used to be a section chief; right?

A.  Yes.

Q.  So if she says switched that, what does that mean to you?

A.  Whatever the location that -- whatever location that Captain Little was recalled for, the way I interpret, you know, she moved whatever the location was to area 17.

Q.  And Adam Uehara, who's on this thread, was made aware of that as well; correct?

A.  That's correct.

Q.  And then if you go down, the first message is a repeat.  Well, it actually has some more language here, actually.  Sorry.  It says switched that.  And then underneath switched that, it also says double-check your TeleStaff but we should be good.

Do you see that?

A.   I do.

Q.   What's TeleStaff?

A.   It's a staffing program.

Q.   So that means that the shift was already formally changed in TeleStaff.

A.   Yes.

MR. RODRIGUEZ:  Objection.  Calls for speculation.

BY MR. JONNA:

Q.   And that means that the scheduling changes that were discussed here were formally made on the Fire Department staffing system; correct?

MR. RODRIGUEZ:  Objection.  Calls for speculation.

THE WITNESS:  That was made on TeleStaff. It's not -- it's lifeguard division specific.  The Fire Department does not have the TeleStaff.

BY MR. JONNA:

Q.   Sorry.  So that means the shift was made formally on the lifeguard division staffing system, TeleStaff; correct?

A.   You know, the chain is very confusing and open for interpretation.

Q.   When --

discussed earlier.

MR. JONNA:  I mean I don't want to -- I don't want to be unreasonable, but I really don't see how that's justified.  I mean it's directly relevant to the claims, but --

MR. RODRIGUEZ:  Sorry.  I just mean the names, for the same reasons we discussed earlier. There are just privacy concerns around, you know, identifying the people who had concerns.

MR. JONNA:  Well, you can make your -- I mean I don't know what to say.  I mean I'm not -- I'm not sure I agree that that's appropriate.  But I also don't want to waste time on the record right now.

So can we -- can we table that for another -- just, like, can we talk about that after the deposition?

MR. RODRIGUEZ:  Sure.  That works.

MR. JONNA:  Okay.

BY MR. JONNA:

Q.  Just -- the only question I have right now -- because I have a lot more to get through, and I want to -- I don't want to keep you here all day -- what was the general nature of what they expressed to you when they reached out?

A.   Unprofessional conduct.

And let me add one thing, too, that I -- when Jeff Little became an ocean lifeguard specialist back in 2012, he -- you know, he swear to -- he did an oath for -- to obey the laws, ordinances of the -- you know, the United States, California, and Los Angeles County, and be faithful to the department.

And the actions of Captain Little, they're totally in conflict with the oath that he did back then.

Q.   'Cause he took down a flag pursuant to a -- what he thought was his religious accommodation?

A.   Nowhere that was said on the accommodations that he was allowed to take flags down.

Q.   You also took an oath to uphold the Constitution, including the First Amendment rights of your captains and your employees; correct?

A.   Absolutely correct.

Q.   And that's an oath that you took seriously at the time you took it, I assume; correct?

A.   Yes.

Q.   Do you feel like you faithfully executed

that oath in the way you handled Captain Little's accommodation request?

MR. RODRIGUEZ:  Objection.  Calls for a legal conclusion.

BY MR. JONNA:

Q.  Are you going to answer the question, sir?

A.  Oh, okay.  We all have bosses.  I have my bosses.  I was following my boss's directions.

Q.  And which boss was that?

A.  Chief Mayfield.

Q.  So you were having conversations with OLS Manny Martinez about Captain Little, it sounds like?

A.  Very briefly.

Q.  So the chief can make time to speak to the -- to the little guys too; right?

I mean I know you're a busy guy, but why didn't you reach out to Captain Little and talk to him?

I mean he's the one who's the subject of all this.  You're willing to talk to the OLS and hear them out.

Why don't you hear out your captain, who's the -- in the middle of this big mess?

A.  They would -- they text me.  I didn't

reach out to them.  They text me.

Q.  But you also had conversations with other captains, it sounds like, and phone calls, and you made yourself available to hear them out.  Maybe that same courtesy should have been extended to Captain Little.

Would you agree?

A.  Or he could have called me too.

THE REPORTER:  I'm sorry.  The answer again?

THE WITNESS:  He could have called me.

BY MR. JONNA:

Q.  He did send you an email.  Actually, he directed the accommodation request to you, and you kind of were surprised that he did that.  You almost suggested it was -- it was wrong of him to do that.

A.  I didn't say that.

Q.  Well, you said it was kind of weird.  I mean at the beginning of the deposition -- I don't want to put words in your mouth.  You didn't use the word "weird."  You expressed surprise that he sent it to you, though.

Do you recall that?

A.  Because I'm not his direct supervisor.

Q.  First time you spoke to Captain Little

about the incident is when you handed him this direct order; is that correct?

A.   I believe so.

Q.   And you signed the direct order.

And I believe what you're saying now is you did it really at the direction of Chief Mayfield; is that correct?

A.   Correct.

Q.   And you're aware that -- well, why don't you just tell me what you remember happening that day, because I'm sure you've heard what Captain Little thinks happened that day.  So tell us about what happened when you handed him those documents.

A.   On June 22nd?

Q.   Yes.

A.   I handled the -- I gave the -- so to start with, this is not the first time that I had had a difficult conversation with -- regarding discipline with an employee.  Part of my job -- it's one of the worst part of my job -- is to, you know, issue the discipline documents to.  Suspension, releases, or dismissal, you know.  And those are very difficult conversations.

And going up, delivering those three

documents to him, I knew it was going to be a very difficult conversation.

As I delivered them, I was really surprised with Captain Little's response, how emotional and -- yelling at me, you know. And I understand that, being the messenger. I stepped back, trying to give him some space, some room for him to read. But, you know, I could definitely tell that he was distressed by the situation.

Q.  All right. Well, you didn't really know all that Captain Little was going through at the time. You weren't aware of his mental and physical condition and how it was deteriorating at the time.

You had no idea about that; right?

A.  No, I was not. And I was very surprised with his reaction because, you know, he's a well-mannered person, you know. And although it was a very difficult situation, I thought he would handle, you know, in a more professional manner. He was very unprofessional with me.

Q.  How tall are you, sir?

A.  6'4".

Q.  And how much do you weigh?

I'm sorry if that's personal, but --

A.  245.

Q. And what's your understanding of how tall Captain Little is?

A. 5'10".

Q. How much do you think he weighs?

A. I don't know.  160.

Q. And you said earlier today that you could understand why Lauren Gottschalk was intimidated by Captain Little, since he's a higher rank and she's a more junior employee.

Do you remember that discussion?

A. She was a new employee.

Q. Right.  She's also beneath him in the chain of command?

A. She was a very new employee.  That's the difference.

Q. And you're the chief of the lifeguard division and, obviously, a bigger guy than Captain Little.  And he alleges that you physically intimidated him, standing over him and -- you know, when you delivered this order.

Did you sense that he felt physically intimidated?

MR. RODRIGUEZ:  Objection.  Foundation.

THE WITNESS:  No.  I stepped back, giving him more room.  In no way I was near him.

BY MR. JONNA:

Q.   And you have training in mixed martial arts; correct?

A.   I do not.

Q.   You don't?

A.   No.

Q.   In any martial arts?

A.   No.

Q.   But you do have military trainings.

A.   40 years ago.

Q.   And have you had other -- there have been other situations where you've had to physically confront what you perceived to be subordinate employees; correct?

A.   Can you --

MR. RODRIGUEZ:   Objection.  Vague.

THE WITNESS:   What's your question?

BY MR. JONNA:

Q.   Do you recall instances where you've confronted a subordinate and raised your voice and intimidated them in close physical proximity?

A.   I don't recall.

Q.   Do you recall a situation in summer of 2003 where you physically engaged a patron in a disagreement with another patron?

MR. RODRIGUEZ:  Objection.  Vague.

THE WITNESS:  What I remember, 2003, was a lifeguard was being attacked by a group of people. He was being beat up.  I fear for his safety.  I radioed for help, and I went to help him and wait until the police got on scene.  That's totally different.

BY MR. JONNA:

Q.  Did you physically -- did you knock out the troublesome patron with your rescue can?

A.  I did what I had to do to protect myself and the ocean lifeguard specialist at the time.

Q.  But you did that; right?

A.  I did what I had to do in fear of my safety.

Q.  Right.

A.  That was dozens -- that was dozens of people.

Q.  Okay.  But you did knock out a troublesome patron with your rescue can, as you said, because you felt fear for your safety.

A.  I fear for -- I fear for my safety and my -- the other ocean lifeguard that was, I mean, being beat up by a bunch of males.

Q.  Were you on duty at the time?

**REPORTER'S CERTIFICATE**

I, COLLEEN M. PETERMAN, CSR No. 7882, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken;

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 15th day of December, 2025.

_____

COLLEEN M. PETERMAN, CSR No. 7882