# EXHIBIT H

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CAPTAIN JEFFREY LITTLE, AN         )
INDIVIDUAL,                        )
                                   )
          Plaintiff,               )
                                   )
      vs.                          )    No. 2:24-cv-04353.
                                   )       JLS-PD
LOS ANGELES COUNTY FIRE            )
DEPARTMENT, A PUBLIC ENTITY, ET    )
AL.;                               )
                                   )
          Defendants.              )
_____ )

          VIDEOTAPED DEPOSITION OF JULIA KIM, as person

most qualified for County of Los Angeles and

individually, taken on behalf of the plaintiff, via

videoconference, commencing at 10:03 a.m., Monday,

February 9, 2026, before Diana L. Porter, Certified

Shorthand Reporter No. 12729.

APPEARANCES:

FOR PLAINTIFF:

        LIMANDRI & JONNA LLP
        AS SPECIAL COUNSEL TO THOMAS MORE SOCIETY
        BY:  PAUL M. JONNA, ESQ.
            WILLIAM T. DUKE, ESQ.
        P.O. Box 9120
        Rancho Santa Fe, California 92067
        (858)759-9930
        pjonna@limandri.com
        wduke@limandri.com

FOR DEFENDANTS COUNTY OF LOS ANGELES, FERNANDO BOITEUX, ARTHUR LESTER, AND ADAM UEHARA:

        O'MELVENY & MYERS LLP
        BY:  DIMITRI D. PORTNOI, ESQ.
            BRYAN R. RODRIGUEZ, ESQ.
        400 South Hope Street
        Suite 1900
        Los Angeles, California 90071
        (213)430-6000
        dportnoi@omm.com
        brodriguez@omm.com

ALSO PRESENT:

        ADRIEL OLVERA, VIDEOGRAPHER
        JEFFREY LITTLE

INDEX TO PROCEEDINGS

EXAMINATION(S)

By Mr. Jonna . . . . . . . . . . . . . . . . . . . . . . . . .9

INDEX TO INSTRUCTIONS NOT TO ANSWER

PAGE        LINE
126          7

INDEX TO EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|
| EXHIBIT 1A | Deponent's binder | 22 |
| EXHIBIT 12 | 23-06-18 Little RA req to Boiteux (BATES STAMPED LAC-000377) | 63 |
| EXHIBIT 13 | 23-06-18 re Kim's request for info on Little for IPM (BATES STAMPED LAC-000389) | 72 |
| EXHIBIT 14 | 23-06-18 McMillon PreIPM RA disc (BATES STAMPED LAC-0001391 - 1392) | 74 |
| EXHIBIT 15 | 23-06-19 Uehara to Kim re orchestrated RA request (BATES STAMPED LAC-0001811 - 1812) | 97 |
| EXHIBIT 16 | 23-06-19/20 McMillon text messages (BATES STAMPED LITTLE 1079, 481-482) | 162 |
| EXHIBIT 17 | 23-06-20 Delgadillo internal confirmation of RA (BATES STAMPED LAC-0000065 - 66) | 172 |
| EXHIBIT 20 | 23-06-21 benefit time off internal emails re denial of request (BATES STAMPED LAC 399 - 400) | 239 |
| EXHIBIT 28 | 23-06-22 direct order Boiteux (BATES STAMPED LAC 34) | 243 |
| EXHIBIT 29 | 23-06-22 re pictures of removed Malibu pole (BATES STAMPED LAC 413 - 420) | 256 |
| EXHIBIT 37 | 23-06-30 Little meeting with Power (BATES STAMPED LAC 367 - 372) | 278 |
| EXHIBIT 38 | 23-07-13 Delgadillo confirmation of IPM discussion (BATES STAMPED LAC-0000373 - 376) | 189 |
| EXHIBIT 41 | CPOE threat investigation update (BATES STAMPED LAC 396 - 398) | 282 |

INDEX TO EXHIBITS (continued)

EXHIBIT            DESCRIPTION                    PAGE

EXHIBIT 45    CPOE notice letter dated February 7,    289
              2024
              (BATES STAMPED LAC 278 - 279)

EXHIBIT 57    24-07-05 Kim's request for Little's    286
              file in response to CEOP request
              (BATES STAMPED LAC 365-366)

EXHIBIT 58    Suspension Letter                      303
              (BATES STAMPED LAC 53 - 63)

EXHIBIT 59    Email from Greg Crum dated             341
              11/19/2024
              (BATES STAMPED LITTLE 752)

EXHIBIT 60    Email from Captain little dated        341
              1/3/2025
              (BATES STAMPED LITTLE 747 - 752)

EXHIBIT 65    Email from Greg Crum to Spencer        316
              Parker

EXHIBIT 66    23-06-22 NOI, Boiteux                  270
              (BATES STAMPED LAC 112 - 113)

EXHIBIT 82    2022 staffing shortages and            146
              requested promotions
              (BATES STAMPED LAC-0003251 - 3255)

EXHIBIT 84    Training reporters                     232
              (BATES STAMPED LAC 3240 - 3243)

EXHIBIT 85    Notice of Intent to Suspend Dated      290
              July 12th, 2024
              (BATES STAMPED LITTLE 71 - 79)

EXHIBIT 88    Admin investigative interview          299
              lead-in subject of investigation,
              FBOR covered
              (BATES STAMPED LAC 240 - 241)

///

INDEX TO EXHIBITS (continued)

EXHIBIT                DESCRIPTION                          PAGE

EXHIBIT 91    Interactive Process Meeting          222
              Worksheet
              (BATES STAMPED LAC 1488 - 1492)

THE SULLIVAN GROUP OF COURT REPORTERS

**INDEX TO EXHIBITS RETAINED BY COUNSEL**

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|
| EXHIBIT 1 | April 4, 2025, org chart | 31 |
| EXHIBIT 71 | An email from Skye Patrick, dated June 1 of 2023 (BATES STAMPED LAC 1577 - 1679) | 177 |

THE SULLIVAN GROUP OF COURT REPORTERS

7

review.                                                      17:05

I'm certain that -- you know, because of sort of the circumstances, I'm certain that county counsel had some -- some review or eyes on all of these documents, so I'm not looking at these        17:05
carefully in the -- I'm just sort of -- I'm the process and the procedure.

Q    Did you look at them at all?  Like, did you open them up and read them?

A    I don't remember.                                       17:06

Q    If you don't think personal beliefs includes religious beliefs, do you think that should have been clarified in this notice of instruction?

MR. PORTNOI:  Objection.  Calls for speculation.                                                  17:06

BY MR. JONNA:

Q    I mean, with the benefit of hindsight now, would you -- do you think this is kind of a vaguely word notice of instruction?

A    I don't know.  I -- I don't think it's       17:06
vague, but yeah.

Q    Could you see how someone would reasonably interpret this to -- personal beliefs to include religious beliefs?  I mean, religious beliefs are personal beliefs.  I mean, wouldn't you agree with    17:06

that?

MR. PORTNOI: Objection. Compound. Vague. Outside the scope of the notice.

BY MR. JONNA:

Q   Your -- your religious beliefs, Ms. Kim, I'm sure, are personal to you. Would you agree with that?

MR. PORTNOI: Objection. Vague.

THE DEPONENT: I don't know how to answer that.

BY MR. JONNA:

Q   Religious beliefs are inherently personal; correct?

MR. PORTNOI: Objection. Vague. Outside the scope of the notice. Argumentative.

THE DEPONENT: I don't know how to answer that.

BY MR. JONNA:

Q   Okay. All right. Let's take a look at Exhibit 37. This is PMK Topic Number 30. Let's see here. Non-privileged facts regarding the fire department's response to the letter plaintiff received on June 28th, 2023, and subsequent referral of the same letter to law enforcement.

Exhibit 37 is a five-page document

Bates-stamped LAC 367 to 372. And I assume you've seen the -- this threatening letter that Captain Little received? 17:07

(Exhibit 37 marked.)

THE DEPONENT: Yes. 17:08

BY MR. JONNA:

Q    Okay. At the very top, there is a -- an email from Fernando Boiteux, and you're copied. It's sent to you, subject SIR incident, written threat to employee -- 17:08

A    Yes.

Q    -- dated June 30th, 2023. And there's a -- a meeting discussed here in this email. Do you know anything about the meeting?

A    No. I don't -- don't recall anything about the meeting. 17:08

Q    What are the department's policies and procedures for handling threats like this?

MR. PORTNOI: Objection. Assumes facts not in evidence. 17:09

THE DEPONENT: I mean, generally, there is a workplace violence policy, and associated with that is our security incident report, which appears that was filed based on this email in front of me. And that security incident report, you know, is -- 17:09

it's -- you know, you fill it out, and it's sent to -- a copy is sent to the sheriff's department's special operations unit.  I think it's called special operations unit, SOU.  And then a copy is usually sent to the department's safety office.  And then, depending on the nature of the threat, you know, the department will do what we can to try to work with law enforcement.  But, again, it just -- it depends on the -- the -- the nature of the threat and what, if anything, we can do.  I mean, if it's criminal, we turn it over to law enforcement.  We don't do criminal investigations.

BY MR. JONNA:

    Q    Did you conduct -- does --

    Did you, the fire department, conduct any interviews regarding the death-threat note?

    A    From my recollection, you know, the -- the lifeguard division is actually very good.  They're very on top of filing SIRS.  So if I recall correctly, we did not.  I did not or anyone in my staff did not have to direct lifeguard division to file the security incident report.  I think that the SIR had already been filed.  And based on this email, it looks like it was filed and it was reported to me that the SIR was filed.

And I'm trying to think.  So we filed the security incident report.  And the sheriff's department will reach out to the person that filed the security incident report sometimes if they need additional information.  But typically, on something like this, we will -- you know, for example, that Captain Little received a handwritten letter and it was sent to his home address, what we'll do is we'll -- oh, and -- and that's what he did here.  We'll refer him to law enforcement, local law enforcement to, like, file a report and then see what law enforcement -- you know, what, if anything, that they can do.  Oh, yeah.

Q    Did you ever identify any people with knowledge of this incident?

A    Gosh.  By knowledge, I mean, beyond the information that was provided by Captain Little to Chief Power, which is that there was a handwritten note.  And it sounded like, if -- if I'm remembering correctly, that I don't think it was mailed.  If I remember correctly, I thought it was just placed in his mailbox.  Either way, the security incident report was filed, and, you know, we had no idea who it was.  You know --

Q    Okay.

A     -- it was anonymous.  So that's why we -- we, you know, had -- had said the best course of action here, because we don't know who to interview and investigate.  We don't know who wrote the note. We turned it over to law enforcement.  And I -- yeah, I think you scrolled past it, but it looks like Ventura County took the report.

Q     Was there ever a suspect list prepared, as far as you remember?

A     I don't recall.  I know that we've had -- we had conversations.  I mean, the suspect list was short.  I mean, there were -- there were zero, because we don't -- we didn't know who it was.

Q     It was someone with access to his home address; correct?

A     I mean, presumably.

Q     Were there any internal communications that addressed this threat other than the emails that were produced to us here?

A     I don't recall.  I mean, it's -- mostly it was -- I think it was mostly conversations, just following up on, hey, did you hear anything from law enforcement, you know, things like that.  Because, like I said, this -- this to me was a -- it was something that we had to turn over.  I mean, if

there was anything that could be done, I would hope that law enforcement could do it, you know, criminal investigation, fingerprints.  I don't know.  That's definitely something that we could not.

Q    All right.  I'm pulling up Exhibit 41, which is CPOE threat investigation update, Bates-stamped LAC 396 to 398.

Have you seen this document before?

(Exhibit 41 marked.)

THE DEPONENT:  Yes.

BY MR. JONNA:

Q    So Justa Lopez from the county executive office of the board of supervisors was informing fire department, HR Captain Little's allegations -- that someone in the department was probably behind the letter given the limited people of knowledge of incident.  Is that your recollection?

MR. PORTNOI:  Objection.  Assumes facts not in evidence.

THE DEPONENT:  I mean, I guess that's based on what he reported; right?

BY MR. JONNA:

Q    And then, the conclusion states that:

"We're bringing these allegations to your attention out of an abundance of

precaution so that your department may take whatever action it deems appropriate."

Do you see that?

A    Yes.

Q    So Ms. Lopez was expecting the fire department to conduct its own investigation.  Would you agree?

MR. PORTNOI:  Objection.  Outside the scope of the notice.  Foundation.

THE DEPONENT:  No.  I would not agree.

BY MR. JONNA:

Q    Why not?

A    Because I think it's -- that we have to take whatever action we deem appropriate.  And then in the very next paragraph, she's saying that OSM or SOU's not going to do anything without filing a security incident report.  And, so, you know, to me when I read that, it was like you -- you should do whatever action you deem appropriate, but you should file a security incident report, which is what -- what was already done.

Q    So, again, why didn't the department conduct it's own investigation?

A     I mean, can I speak to my personal experience with conducting internal investigations

for the fire department?

Q    I mean, I'm not going to -- I'm not going to tell you what to -- how to answer the question. So my question to you is this is a PMK topic.  Why did the fire department not conduct its own investigation?

A    I would say that the department did conduct an investigation.  It was maybe just not formal and it wasn't in writing; but we did take the action that we needed to take, which was ensure that a SIR was filed, ensure that law enforcement was notified, a report was taken by law enforcement.

But in terms of doing, like, an administrative internal investigation, typically we have a subject of investigation.  We have, you know, the subject, the person that we are -- we have reasonable belief to have done something.  Here, I -- I -- we didn't have anybody.  I mean --

Q    Did Captain Little provide you with a list of names of people he thought may have been connected with this incident?

A    As far as I'm aware, no.  I think my concern would have been what would be the basis?  I mean, what's the information that Captain Little had?  Because we couldn't -- it's not a fishing

expedition.  We can't just put people under investigation without having some information.  I mean, we wouldn't do that even with -- with if we had, you know, random members of the public contacting us and complaining about, you know, the fire department.  They have to complain about someone.  We have to have somebody that we're looking into.

So here, we didn't have someone, but it was -- you know, in my mind, it looked like a criminal threat.  We did what we had to do.  We reported it to law enforcement.  I think, you know, especially in particular to, you know, any threats of violence to Captain Little or his family, absolutely should have been something that law enforcement would have -- should have been reported on and they should have taken action on.

Q    Okay.  So is it your testimony that it's customary and standard that a matter like this would simply be referred to law enforcement and there would not be a department investigation unless there is some compelling evidence as to who the person would be?

A    I don't believe that's what I said.  Typically, for security incident reports, it's case

by case.  But I honestly can't remember another situation we've had like this, where we've had somebody get an anonymous complaint sent to their house and we have no idea who it is.  When -- when it -- could -- you know, when was it put in there?  Like, we don't have any information, really.  I don't know that we've ever had a situation like that, you know, so I think it -- it was appropriate.

I mean, typically, like I said, any -- any type -- time that there is a threat of violence towards our employee or employee's family members, the first thing that we always advise is file a security incident report and contact law enforcement.  The fire department cannot do criminal internal investigations.

Q    Okay.  I'm going to show you Exhibit 57 now.  This is relating to PMK Topic 26.  Exhibit 57 is a request that you sent to Rachel Lara, Renee Delgadillo, dated July 5th, 2023, where you ask for all of his information in response to an email from Justa Lopez.  And this is Bates-stamped LAC 365 to 366.

(Exhibit 57 marked.)

THE DEPONENT:  Okay.

///

17:18

17:18

17:18

17:19

17:19

THE SULLIVAN GROUP OF COURT REPORTERS

BY MR. JONNA:

Q    Do you recall this, this email exchange?

A    Not specifically, but, yeah, I'm looking at it now.

Q    Do you know why this email was sent?  Was it because you were preparing the notice of intent to suspend letter?

A    No.

Q    And why were you requesting this information?

A    Why was I requesting the information that DHR was requesting?

Q    Yeah.  Why -- why did you send this email asking for all of his information?

A    So if you --

That original email was from DHR; right? Justa Lopez?  She works for -- oh, I'm sorry.  The executive office of the board of supervisors, so that's the intake unit.

So when CEOP -- complaints initially get filed, it's kind of strange, because it's a board of supervisors unit.  It's the CISU that initially reviews and assesses.  And then, depending on whether it's designated an A, B, or C, it will potentially move on to DHR for investigation.

17:19

17:19

17:20

17:20

17:20

17:20

So if you look here, I work as a deputy compliance officer. DCOs work with the CEOP and the CPOE. And they sent a request to us asking, "Hey, we have a equity complaint." That's the number. And part of our intake -- part of our intake and assessment is I want this information, and it's records of his request for religious accommodations and copies of all his -- all of his IPMs, blah, blah, blah.

Well, it was directed towards Chief Breshears, who I think was the LPSB deputy at the time. Myself -- and I'm sorry. You keep moving it and it's --

Q    I'm sorry about that.

A    It's okay. I'm trying to read it and --

So Chief Breshears was the LPSB deputy at the time. It was myself, Amber. I think at the time, Amber was employee relations. She was in charge of employee relations. She's now in charge of HR, but at the time she was in charge of employee relations. And Sarineh was, I think, assisting employee relations with records requests that they would get from either DHR or the board of supervisors. You know, she was sort of like the assistant working on, like, the equity cases.

DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA        )
                           )    ss.
COUNTY OF SAN BERNARDINO   )

I, Diana L. Porter, hereby certify:

I am a duly qualified Certified Shorthand Reporter, in the State of California, holder of Certificate No. 12729, issued by the Court Reporters Board of California, and which is in full force and effect. (Bus. & Prof. Section 8016)

I am not financially interested in this action and am not a relative or employee of any attorney of the parties, or of any of the parties.  (Civ. Proc. Section 2025.320(a))

I am authorized to administer oaths or affirmations pursuant to California Code of Civil Procedure, Section 2093(b) and prior to being examined, the deponent was first placed under oath or affirmation by me.  (Civ. Proc. Sections 2025.320, 2025.540(a))

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition and the foregoing transcript is a true record of the testimony given. (Civ. Proc. Section 2025.540(a))

I have not, and shall not, offer or provide any

services or products to any party's attorney or third party who is financing all or part of the action without first offering same to all parties or their attorneys attending the deposition and making same available at the same time to all parties or their attorneys. (Civ. Proc. Section 2025.320(b))

I shall not provide any service or product consisting of the deposition officer's notations or comments regarding the demeanor of any witness, attorney, or party present at the deposition to any party or any party's attorney or third party who is financing all or part of the action, nor shall I collect any personal identifying information about the witness as a service or product to be provided to any party or third party who is financing all or part of the action. (Civ. Proc. Section 2025.320(c))

Dated: February 19, 2026

_____
Diana L. Porter, CSR No. 12729