Charles S. LiMandri, SBN 110841
 cslimandri@limandri.com
Paul M. Jonna, SBN 265389
 pjonna@limandri.com
Jeffrey M. Trissell, SBN 292480
 jtrissell@limandri.com
Joshua A. Youngkin, SBN 332226
 jyoungkin@limandri.com
William T. Duke, SBN 361823
 wduke@limandri.com
LiMANDRI & JONNA LLP
 *as Special Counsel to*
 THOMAS MORE SOCIETY
P.O. Box 9120
Rancho Santa Fe, CA 92067
Telephone: (858) 759-9930
Facsimile: (858) 759-9938

*Attorneys for Plaintiff*
*Captain Jeffrey Little*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAPTAIN JEFFREY LITTLE,<br><br>Plaintiff,<br><br>v.<br><br>LOS ANGELES COUNTY, et al.<br><br>Defendants. | **Case No.: 2:24-cv-4353-JLS-PD**<br><br>**DECLARATION OF PAUL M. JONNA, ESQ., IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: Hon. Josephine L. Staton<br>Courtroom: 8A<br>Date: May 8, 2026<br>Time: 10:30 a.m.<br><br>Action Filed: May 24, 2024 |

# PUBLIC / REDACTED VERSION

DECL. OF PAUL M. JONNA, ESQ., ISO PLAINTIFF'S
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I, Paul M. Jonna, Esq., declare and state as follows:

1.    I am an attorney at law duly licensed to practice before all courts in California, both state and federal. I am a partner with the law firm LiMandri & Jonna LLP, counsel of record for Plaintiff Captain Jeffrey Little. As such, I have personal knowledge of the matters set forth below and could and would testify thereto if called upon to do so.

2.    Attached hereto as **Exhibit A** is a true and correct copy of the relevant portions of, and exhibits from, the deposition of Captain Jeffrey Little taken in this action on December 12, 2025.

3.    Attached hereto as **Exhibit B** is a true and correct copy of the relevant portions of, and exhibits from, the deposition of Lifeguard Division Chief Fernando Boiteux taken in this action on December 3, 2025.

4.    Attached hereto as **Exhibit C** is a true and correct copy of the relevant portions of, and exhibits from, the deposition of Deputy Chief for Administrative Services Julia Kim taken in this action on February 9 and February 23, 2026.

5.    Attached hereto as **Exhibit D** is a true and correct copy of the relevant portions of the deposition of Section Chief Arthur Lester taken in this action on November 18, 2026.

6.    Attached hereto as **Exhibit E** is a true and correct copy of the relevant portions of, and exhibits from, the deposition of Section Chief Danielle McMillon taken in this action on November 25, 2025.

7.    Attached hereto as **Exhibit F** is a true and correct copy of the relevant portions of, and exhibits from, the deposition of Administrative Services Manager Renee Nuanes-Delgadillo taken in this action on November 24, 2025.

8.    Attached hereto as **Exhibit G** is a true and correct copy of the relevant portions of the deposition of Section Chief Kyle Power taken in this action on November 20, 2025.

9.    Attached hereto as **Exhibit H** is a true and correct copy of the relevant

portions of the deposition of Lifeguard Specialist Lauren Gottschalk taken in this action on December 4, 2025.

10.    Attached hereto as **Exhibit I** is a true and correct copy of (1) a County Policy of Equity complaint produced in this action as LAC-0003109-20; (2) the CISU Assessment Form for that Complaint, produced in this action as LAC-0003100-08; and (3) the Couty Equity Oversight Panel Briefing Memorandum regarding that complaint, produced in this action as LAC-0003472.

I declare until penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed this 10th day of April 2026, at Rancho Santa Fe, California.

Paul M. Jonna

DECL. OF PAUL M. JONNA, ESQ., ISO PLAINTIFF'S
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT A**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

JEFFREY LITTLE,                    ) CASE NO.
                                   ) 2:24-cv-04353-JLS-PD
     PLAINTIFF,                    )
                                   )
v.                                 )
                                   )
LOS ANGELES COUNTY FIRE            )
DEPARTMENT, ET AL.,                )
                                   )
     DEFENDANTS.                   )
_____)


VIDEO-RECORDED DEPOSITION OF JEFFREY LITTLE

DECEMBER 12, 2025


JOB NO. 7794496

REPORTED STENOGRAPHICALLY BY:

MARY K. MEDLEY, CSR NO. 9557

Page 1

outside of that is dishonoring God.                    09:36:39

MR. PORTNOI:                                            09:36:45

Q.  Do you have any religious beliefs that             09:36:45
pertain to the Progress Pride Flag?                    09:36:47

MR. JONNA:  Objection.  Vague and ambiguous.           09:36:50

THE WITNESS:  Could you rephrase that.                 09:36:56

MR. PORTNOI:                                            09:36:57

Q.  You're familiar with the Progress Pride            09:37:01
Flag; correct?                                         09:37:02

A.  Yes.                                                09:37:03

Q.  Do you have any beliefs of a religious             09:37:07
nature that relate to the Progress Pride Flag?         09:37:08

MR. JONNA:  Objection.  Vague.                          09:37:12

THE WITNESS:  Yes.  It promotes a -- as I just         09:37:15
referenced, a sexual expression or sexual ethic that   09:37:21
is outside of God's provision for sexual expression    09:37:26
in the Bible.                                           09:37:31

MR. PORTNOI:                                            09:37:32

Q.  Under your religious belief, can you work          09:37:39
near a Progress Pride Flag being flown on a County     09:37:42
facility flagpole?                                     09:37:45

A.  What's your definition of near and, like,          09:37:51
how long?  Like, could you describe that more.         09:37:55

Q.  Could you work in a building that had a            09:37:58
flagpole that was flying the Progress Pride Flag?      09:38:00

Page 34

A.    As long as I did -- had no responsibilities 09:38:09
associated with that, which would include putting it 09:38:13
up, ordering someone to put it up, notifying 09:38:16
supervisors that -- of noncompliance, I am fine 09:38:23
working in an environment in which that's around. 09:38:31

Q.    Earlier you asked me how near to the 09:38:34
Progress Pride Flag I was asking. 09:38:35

How near to a Progress Pride Flag would you 09:38:39
need to work for it to have a conflict with your 09:38:41
religious beliefs? 09:38:45

A.    I don't have a strict definition of that 09:38:49
but I was required to stand next to it all day long, 09:38:53
I think that would be a disingenuous ask as of me as 09:38:58
a Christian given what the sex- -- like the 09:39:09
expressions that I've already formulated. 09:39:11

Q.    Under your religious beliefs, are you able 09:39:20
to raise and lower the County flag? 09:39:22

A.    Yes. 09:39:26

Q.    How about the California flag? 09:39:26

A.    Yes. 09:39:29

Q.    And the United States flag? 09:39:30

A.    Yes. 09:39:33

Q.    Under your religious beliefs, are you able 09:39:33
to lower the Progress Pride Flag? 09:39:35

A.    Yes. 09:39:44

Page 35

Q.   Did you want to not work near the PPF?    11:16:47

A.   That was the best solution to --    11:16:54
that was -- to me, that was the best solution to --    11:17:02
to addressing not having to carry out the    11:17:05
responsibilities, was to not have it be in my area,    11:17:08
not necessarily not be near me.    11:17:15

Q.   Did you want to not work under the PPF    11:17:17
because doing so would convey a message that you    11:17:22
supported it?    11:17:24

A.   That -- that entered my mind.  That wasn't    11:17:31
the driving force of requesting the accommodation,    11:17:32
but it was definitely, like -- like, yeah,    11:17:37
ideally -- I mean, there's different tiers of, like,    11:17:43
acceptability, right, like, okay, I could live with    11:17:46
that.  Like, ideally, yeah, I wouldn't -- I wouldn't    11:17:49
be -- be working near it.    11:17:54

Q.   Did you not want to work where you could    11:17:56
see the PPF?    11:17:59

A.   My request was to be exempt from these    11:18:04
responsibilities in EA-231.  I mean, I -- and the    11:18:07
best way to do that, accommodate, is to work an area    11:18:12
where it's -- you're not responsible for it.    11:18:14

Q.   Did you want authority to take down the PPF    11:18:17
when you did see it?    11:18:19

A.   That was never discussed.    11:18:25

Page 100

A.  I did not.

Q.  -- look at the painted towers at Will Rogers; correct?

A.  Correct.

Q.  Okay.  Going back to the IPM form.  At the bottom of the paragraph that we were looking at, it states, it was confirmed that you are requesting to not fly the PPF at Will Rogers beach, and if this is not a possibility, then would like to be placed at a station where the PPF is flown.

Do you recall communicating that information?

A.  Sorry, where were you on this?

Q.  I'm sorry.  So if you look at the first paragraph under discussions --

A.  Okay.

Q.  -- the very last sentence.

A.  It was confirmed that you are requesting to not fly the PPF at Will Rogers beach.

So, yeah, the initial conversation was can I just stay at Will Rogers, and that was not really up for discussion.  I would be responsible for it there.  And so then we entertained other possibilities, and the easiest place was to move somewhere where I wouldn't have those

Page 120

responsibilities.  Not necessarily because it wasn't being flown, because I wouldn't have the responsibilities.  That's the easiest way to find a solution.

Q.  But was this -- that sentence, is that an accurate paraphrase of something you said in the IPM meeting?

A.  It's not a hundred percent accurate.

Q.  Tell me what's not accurate.

A.  My -- my request was I don't want the responsibilities of it, not to necessarily be placed in, like, in a station where it's not flown.  Because, you know, further in this discussion, I got moved into area 33, there was a PPF being flown there.  I did not dispute that.  I did not ask for an accommodation to, like, not have that being flown.  It was still up, I was seeing it every day.  I didn't contend that.

The difference was I just wasn't responsible for and that -- I was okay with that, that was very acceptable to me.  And so, yeah, I don't think -- I don't think this is a hundred percent accurate.

MR. PORTNOI:  I'm thinking maybe we should grab a break, I could certainly use the facilities.

Page 121

parked, like, 20 feet away from it, the facility's    12:12:44

there, the locker room's there, like, of course I    12:12:49

would see it, the difference is, I just wouldn't be    12:12:51

responsible for it.    12:12:54

Q.   So you think Ms. Nuanes-Delgadillo made up    12:12:56

the statement --    12:12:59

A.   I don't think --    12:13:00

Q.   -- that you would not visibly see the flag?    12:13:01

A.   Sorry for speaking over you.    12:13:04

I don't think she fully understood, like,    12:13:07

the operation and she didn't seem like she fairly,    12:13:09

like, really understood, like, where I was coming    12:13:14

from and the whole process, like, she didn't seem    12:13:17

she had a grasp on any of this.    12:13:20

Q.   But how do you think she came to the    12:13:23

conclusion and wrote that it would not be an issue    12:13:26

because you would not visibly see the flag?    12:13:30

MR. JONNA:   Objection.   Calls for speculation.    12:13:32

THE WITNESS:   I don't know.   I don't know what    12:13:38

she was thinking.   She didn't have a grasp on this    12:13:39

thing, like, it's not accurate.   I could send you    12:13:41

photos of the Zuma headquarters and the trucks.    12:13:47

Like, I would see it.    12:13:50

The whole reason being moved there was    12:13:52

because I wouldn't be responsible for it, and that    12:13:54

Page 127

was acceptable to me and I accepted it.    12:13:57

MR. PORTNOI:    12:14:08

Q.  And then it reads, you were reminded that    12:14:08
as the captain, there may be circumstances where you    12:14:10
would have the responsibility of ensuring that the    12:14:12
PPF is flown.    12:14:14

Do you see that?    12:14:16

A.  Yes.    12:14:18

Q.  Do you recall that being said?    12:14:18

A.  Yeah.  There was a conversation, I don't    12:14:23
think it's recorded on here but it was in relation    12:14:32
to that.  Think it was Chief Uehara who might have    12:14:35
brought it up, and he said, like, well, you might    12:14:40
have to be responsible for it still.  And I said    12:14:43
well, no, I don't want to be responsible for it.    12:14:45
Like, regardless, like, that's why we're doing this    12:14:47
whole process, right?    12:14:51

And he said, like, well, what if the    12:14:52
headquarters captain, area 30, what if something    12:14:55
happens and he -- he's not available to supervise    12:14:58
it, then what if we have to bring you in to, like,    12:15:01
be responsible?    12:15:06

And it was such, like, a one-off -- like,    12:15:09
one-in-a-million, like, circumstance, like, the    12:15:13
chances of that happening -- like, area 30 would    12:15:15

Page 128

have to somehow go out of service, then area 34, he   12:15:20
would be the logical next person to come in because   12:15:24
area 34 supervises Zuma Beach, which is right there   12:15:27
so he would be the next person in.  So,   12:15:33
theoretically, if area 30 would have to be out of   12:15:36
service, area 34 would have to be out of service,   12:15:39
and then I would be the only captain left for 21   12:15:41
miles of coastline and Zuma Beach and the   12:15:44
headquarters.  Like, the chances of that happening   12:15:47
in June, I have -- I've never heard of that   12:15:50
circumstance ever arising during that time of the   12:15:54
year.   12:15:56

And yet, like, they were trotting out that   12:15:58
scenario, well, then you would be responsible.  And   12:16:01
I said, like, no, I -- this -- the whole point of it   12:16:04
is I don't want to be responsible so no, I would not   12:16:07
agree to that part.  And that's when President Crum   12:16:10
chimed in, and he kind of like calmed the waters, it   12:16:14
was like -- and he realized, like, that what if was,   12:16:18
like, so remote that he's, like, hey, I'm confident   12:16:22
this works for everybody, could we just move forward   12:16:27
type thing.  And so we just left it at that.   12:16:30

Q.  I'll represent to you that Chief McMillon   12:16:33
also testified under oath that what you said during   12:16:37
the IPM is that you didn't want to look out the   12:16:38

Page 129

being targeted because the coincidence and the    15:56:53

timeline of having an IPM two days before and being    15:56:56

there on Monday and there was only the -- the    15:57:04

American flag flying, like, to me, the coincidences    15:57:07

just -- it's very random if it's not targeted.    15:57:11

Q.  Do you know if Chief Lester knew, as he was    15:57:21

walking the beach that morning, that you would be at    15:57:25

area 17?    15:57:29

A.  A section chief absolutely should know    15:57:34

who -- what captains are working in his area.  So    15:57:37

either he was incompetent and not doing his job or    15:57:40

he did know.  It's one of those two things.    15:57:46

Q.  But you don't know which of the two it is;    15:57:50

correct?    15:57:53

A.  I wasn't inside his head.    15:57:56

Q.  Do you know whether Chief Lester knew on    15:58:00

June 21st, 2023 that you had requested religious    15:58:03

accommodation?    15:58:07

A.  He should have known.  If the other section    15:58:11

chiefs and Uehara were doing their job, he should    15:58:14

have known.    15:58:21

Q.  So your contention is that your request for    15:58:21

religious accommodation should have been more    15:58:24

publicized?    15:58:26

A.  I did not say that.  That's a false    15:58:28

Page 227

STATE OF CALIFORNIA     )

                        ) ss.

COUNTY OF LOS ANGELES )

    I, MARY K. MEDLEY, CSR NO. 9557, in and for the

State of California, do hereby certify:

     That prior to being examined, the witness named

in the foregoing deposition was by me duly sworn to

testify the truth, the whole truth, and nothing but

the truth;

    That said deposition was taken down by me in

shorthand at the time and place therein named and

thereafter reduced to typewriting under my

direction, and the same is a true, correct, and

complete transcript of said proceedings;

    That if the foregoing pertains to the original

transcript of a deposition in a Federal Case, before

completion of the proceedings, review of the

transcript {  } was {  }  was not required.

    I further certify that I am not interested in

the event of the action.

Witness my hand this 3rd day of January, 2026.


                        CSR No. 9557

                        Certified Shorthand Reporter

                        State of California


                                            Page 306

Little, Jeffrey v. Los Angeles County Fire Department

Jeffrey Little (#7794496)

E R R A T A   S H E E T

PAGE__194__ LINE___2___ CHANGE__Replace "were" with "weren't"____

_____

REASON_Typo_____

PAGE__217__ LINE___20___ CHANGE__Replace "purvie" with "purview"____

_____

REASON_Typo_____

PAGE__291__ LINE___4___ CHANGE_Replace "subrogated" with "subjugated"

_____

REASON_Typo_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____    _____
                                        02/06/2026

(Jeffrey Little)                         Date

Page 309

 Outlook

---

## Fw: EA-231: RAISING THE PROGRESS PRIDE FLAG

---

**From** Gregory Crum <Gregory.Crum@fire.lacounty.gov>

**Date** Thu 5/15/2025 12:02 PM

**To**    Jeffrey Little <Jeff.Little@fire.lacounty.gov>

📎 1 attachment (23 KB)

EA-231.pdf;

Gregory Crum

Captain, Lifeguard Services

Los Angeles County Fire Department

310 372 2162 (Work)

310 779 1513 (Cell)

gregory.crum@fire.lacounty.gov

---

**From:** Gregory Crum <Gregory.Crum@fire.lacounty.gov>

**Sent:** Friday, June 2, 2023 7:36 PM

**To:** Spencer Parker <Spencer.Parker@fire.lacounty.gov>

**Subject:** Fw: EA-231: RAISING THE PROGRESS PRIDE FLAG

Good evening,

I wanted to provide an update on the status of progress pride flags in the Dockweiler area.

Yesterday, I spoke with Chief Lester, who informed me the Dockweiler would be receiving progress pride flags to fly. We received three yesterday with the understanding that we were to display two at the DWS and DWN stations and hold onto one for safekeeping.

I attached the progress pride flag to the DWS flag pole and was about to head to DWN to attach a flag to that station, but then received a call from Chief Lester informing me that Chief Uehara had determined that the flags were not to be flown at flagpoles that do not typically fly more than one flag throughout the rest of the year.

The flag is now down. All three flags are safely stored in the second drawer of the DW Compound desk awaiting the next directive we receive.

Thanks,
Greg

**Exhibit 1070**
12/12/2025

**RFP 18**                                                                                          **LITTLE.00492**

Gregory Crum
Captain, Lifeguard Services
Los Angeles County Fire Department
310 372 2162 (Work)
310 779 1513 (Cell)
gregory.crum@fire.lacounty.gov

---

**From:** FIRE-Revisions-Manual <MRevisions@fire.lacounty.gov>
**Sent:** Thursday, May 25, 2023 5:28 PM
**To:** DDG-FIRE_Allsites <DDG-FIRE_Allsites@fire.lacounty.gov>
**Subject:** EA-231: RAISING THE PROGRESS PRIDE FLAG

If you have any questions, please contact your jurisdictional deputy fire chief.

**RFP 18**                                                              **LITTLE.00493**

**EXHIBIT B**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CAPTAIN JEFFREY LITTLE, an        )
individual,                      )
                                 )
                Plaintiff,       )
                                 )
        vs.                      )   Case No. 2:24-
                                 )   cv-04353-JLS-PD
LOS ANGELES COUNTY FIRE          )
DEPARTMENT, a public entity,     )
et al.,                          )
                                 )
                Defendants.      )
_____)

(Pages 191 through 193 are designated as attorneys' eyes

only and are bound under separate cover)

VIDEOTAPED DEPOSITION OF

FERNANDO BOITEUX

VIA ZOOM VIDEOCONFERENCE

DECEMBER 3, 2025

Reported by:
COLLEEN M. PETERMAN
CSR 7882
No. 25-J13744300

THE SULLIVAN GROUP OF COURT REPORTERS

A.   Thomas Brown is the division chief for the construction and maintenance for the department.

Q.   What's your understanding of the number of employees within the entire Fire Department?

A.   Probably, like, around just under 6,000.

Q.   What's your understanding of the budget of the Fire Department?

A.   It's about 1.5 billion.

Q.   When did you first meet Captain Little?

A.   Early 2000s.

Q.   What were you -- what was your title when you first met him?

Were you a captain at the time?

A.   I was a captain.

Q.   And what was his -- if you remember, what position was he in when you first met him?

A.   He was an ocean lifeguard at Dockweiler Beach.

Q.   So during the time period where you were a captain and then a section chief and then assistant chief, how would you describe the level of interaction that you had with Captain Little?

A.   Limited.

Q.   What was your impression of his work performance during the time period that you worked

speculation.

THE WITNESS:  As I said before, I really was indifferent.  I didn't pay attention to it.

BY MR. JONNA:

Q.  Do you have any understanding as to what that refers to?

A.  Reading right now, I do.

Q.  What is that?  What are they referring to when they say that the colors represent magic and spirit?

A.  Alternate lifestyle.

Q.  Can you understand why some people of faith might be uncomfortable endorsing those concepts?

MR. RODRIGUEZ:  Objection.  Vague and ambiguous.

THE WITNESS:  People these days take offense to everything.  So I mean, you know, everything -- everything that's done, it seems like 50 percent of the population likes it, 50 percent of the population doesn't like it.  So County Fire is just a representation of the general public.

BY MR. JONNA:

Q.  Okay.  At the bottom here, it says, on page 2, we move -- we, therefore, move that the

Board of Supervisors:  Direct the Internal Services Department to raise the Progress Pride flag at the Kenneth Hahn Hall of Administration and Los Angeles County facilities where the American and California flags are displayed during the month of June, while we celebrate LGBTQ+ Pride Month this year and every year moving forward.

Do you see that?

A.   I do.

Q.   So this motion from the Board of Supervisors required flying the PPF only on poles that were currently flying the American flag and California flag; correct?

We're going to talk about other -- we're going to talk about EA-231, other documents.  I'm focusing on this document.

This document only requires the PPF to fly on poles that are currently flying the American flag and the California flags; correct?

A.   That's correct.

Q.   And poles that only are flying one flag are not required to fly the PPF under this policy; correct?

A.   According to this document, it says where you fly the American and California flag.

A.   I do.

Q.   Okay.  So EA-231 did not require PPF on stations with clasps for one flag; correct?

MR. RODRIGUEZ:  Objection.  Calls for a legal conclusion.

THE WITNESS:  According to the EA, correct.

BY MR. JONNA:

Q.   And in June of 2023, you recall that there were certain facilities that were not flying Pride flags because they were only flying the U.S. flag; correct?

When the month started, not all facilities were flying the PPF 'cause not all of them were flying more than one flag; correct?

A.   Yes and no.

Q.   What do you mean by that?

A.   So what happened was during the month of June, the flagpoles that used to -- they had the second set of clasps, they disappeared.  The California flags disappeared.  So, therefore, there was a lot of games being played by -- at the stations.

Q.   Okay.  So setting aside those -- and we'll talk about some of that.

Now I got it, the context.

Q.   All right.  So just focusing on the -- on the email from the chief executive office --

A.   Uh-huh.

Q.   -- there was nothing in that email that stated that the PPF should replace the California flag unless there's a possibility of it being vandalized because it's too low; is that correct?

A.   That's what he says, yeah.

Q.   And there's also nothing in this email that says that you're required to add clasps to flagpoles so they can fly the PPF; correct?

A.   So that flagpole, that's where the clasps were disappearing 'cause that flagpole was designed to fly the California and the L.A. County flag.

Q.   Right.  We'll talk about that email in a second.  I'm focusing on the first email that you received from the chief executive office.  There's nothing in --

A.   I did not -- okay.  So just to make clear, this email did not come to me.

Q.   But you --

A.   It was forwarded by Mr. Foreman to make a point, not about the CEO's email, but basically an inquiry by Supervisor Horvath's office why we

weren't flying -- so it's two different things here. This is not related, you know -- the inquiry that we received is why we're not flying the Pride flag.

Q. Right. But when the email was forwarded to you, you did review this email from the chief executive office; correct?

A. I read it, yeah.

Q. And, again, just to make sure I understand the timeline, this email from the chief executive office never said that you are required to add clasps to flagpoles so they can fly the PPF; is that -- is that correct?

A. I mean according to this email, yes, that's correct.

Q. Do you have any understanding as to why they were worried about vandalism?

I see that referred to in the middle paragraph there.

A. Flags were being vandalized.

Q. What do you know about that?

A. They were being stolen. They were being --

(Simultaneous speakers)

THE WITNESS: They were being damaged.

12:04:12

BY MR. JONNA:

Q. Did you ever find out why?

A. There were so many that were sent through, you know. And it's not my part to investigate it.

12:04:27

Q. Okay. Did you have any suspicions as to why that was occurring at the time?

MR. RODRIGUEZ: Objection. Calls for speculation.

THE WITNESS: Well, speculation; right? I

12:04:42

mean we didn't have -- we didn't have a camera there to see who was -- so there was no way to --

BY MR. JONNA:

Q. Okay. I'm going to show you Exhibit 65. This is an email from Greg Crum to Spencer Parker

12:05:01

dated June 2nd, 2023.

(Exhibit 65 referenced)

BY MR. JONNA:

Q. You're not copied on this email, but I want to ask you about the contents. So if you can

12:05:08

take a quick look at it and let me know when you've had a chance to read it.

A. Okay.

Q. Okay. First of all, I just want to confirm, do you actually recall this directive that

12:05:45

Mr. Uehara provided to Mr. Lester?

A.   Is anything else on top of the email here that says Greg?

Q.   Yeah.  So it's just forwarded to Captain Little.

A.   Yeah.

Q.   And underneath it is a email from FIRE-Revisions-Manual to DDG-FIRE_Allsites.

A.   That's the -- yeah.  I was not -- I don't remember that 'cause I was not part of the conversation.

Q.   It says here that -- it says I attached the Progress Pride flag to the DWS flagpole and was about to head to DWN to attach a flag to that station, but then received a call from Chief Lester informing me that Chief Uehara had determined that the flags were not to be flown at flagpoles that do not typically fly more than one flag throughout the rest of the year.

Do you see that?

A.   I do.

Q.   And that's consistent with your understanding at the time, in early June, that the PPF was not to be placed on flagpoles that do not typically fly more than one flag throughout the rest of the year; correct?

A.   Yes and no, because some of the flags have been removed.  So I'm not really sure at that point which stations had, you know, two or three clasps because they were vandalized.

Q.   Right.  Setting those ones aside.  I'm not talking about that.

But setting aside poles that were vandalized and clasps that were being removed, if the flagpole did not typically fly more than one flag throughout the year, the PPF was not supposed to be on those flagpoles at the time; correct?

A.   According to this, yeah.

Q.   And do you know who Spencer Parker is?

A.   He's a captain.

Q.   Do you know why Gregory Crum would be emailing this information to Spencer Parker?

I know you're not on this chain, but give me the context of why a captain would be sent information along these lines, as far as you can --

MR. RODRIGUEZ:  Objection.  Foundation, calls for speculation.

THE WITNESS:  I have to look at my -- the only thing I can think of is that Spencer Parker was also a captain working Dockweiler.  So we have two

captains responsible for an area such as Dockweiler.

So he was giving them information.

BY MR. JONNA:

Q. So at the end there, where it says the flag is down, I interpret that to mean that the flag that he put up at DWS he took down because Chief Uehara and Chief Lester determined that that pole was not supposed to be flying a flag.

Is that how you interpret that?

A. Yes.

Q. And is it your recollection, as you sit here today, that in early June, the Dockweiler North and South flagpoles were only flying one flag at that time?

A. I don't remember.

Q. Would you assume that to be the case based on a conclusion reached in this email that basically the policy did not apply to those flagpoles?

MR. RODRIGUEZ: Objection. Calls for speculation and a legal conclusion.

THE WITNESS: This situation was very dynamic. You know, they would change day to day. So, you know, it could have been flown the next day. Captain --



Q.  And that's consistent with your understanding that an accommodation was offered to Captain Little during the IPM, and there was an agreement during the IPM about the accommodation; correct?

A.  Correct.

Q.  And the details of the accommodation are explained in this document with the four bullets that we see there; correct?

A.  Correct.

Q.  And that's -- so just going back now to Exhibit 16, which was a text message chain, after the IPM -- remember the IPM occurred on the 19th, at 2:00 p.m.; correct?

A.  Correct.

Q.  After the IPM, in which Adam Uehara participated, there's a -- excuse me -- there's a chain with Adam Uehara and Dani McMillon and Captain Little following up on the IPM itself.

A.  Correct.

Q.  All right.  So now that we've more -- we've more fully established the timeline, I probably should have started with Exhibit 17.

A.  Yes.  That would have been helpful.

copy and paste.

Q.   What's an AC?   Area chief or --

A.   Assistant chiefs.

Q.   Assistant chief?   Okay.

A.   Okay.

Q.   So other than the email that you sent out, was this the only way that it was formally communicated down the chain of command?

MR. RODRIGUEZ:  Objection.  Foundation.

BY MR. JONNA:

Q.   The hundred percent compliance directive.

Was this the only way, as far as you know, that it was formally -- or that it was, I should say, communicated down the chain of command?

MR. RODRIGUEZ:  Objection.  Foundation.

THE WITNESS:  I mean that's the email and the text that I sent to the lifeguard chiefs.

BY MR. JONNA:

Q.   There was never anything sent out to the entire department regarding this compliance mandate. It was only sent to the chiefs, and you were hoping that the chiefs would ensure hundred percent compliance; is that correct?

A.   EA-231 should reflect that.  This was just because the fire chief was under tremendous pressure

from the Board of Supervisors.  As you can see the timeline of the email, you know, I sent this at 9:20 in the evening.  And the deputy chief required me to notify him no later than 11:00 a.m.  So we didn't have much time; right?

Q.  Right.  So -- and I'm not -- I'm just asking you to confirm, there was nothing sent out more broadly.  It was just sent from you to the section chiefs; correct?

A.  Correct.

Q.  Okay.  And in hindsight, do you think it would have been a good idea to also inform the captains?

MR. RODRIGUEZ:  Objection.  Calls for speculation.

THE WITNESS:  A lot of times, on urgent situations, like this was put on us, it's best to be informed by the direct supervisor because people don't read emails necessarily.  Lifeguards are not in our building, where they have access to emails.

BY MR. JONNA:

Q.  It wouldn't have been -- there wouldn't have been any downside to also informing the captains about it, though -- correct -- since the responsibilities of EA-231 lie, in large part, with

14:10:23    captains; correct?

MR. RODRIGUEZ:  Objection.  Calls for

speculation.

THE WITNESS:  The way I look at the EA is

14:10:32    everybody's responsibility to comply.

BY MR. JONNA:

Q.  Would it have been a bad idea to also

inform the captains about this hundred percent

compliance directive?

14:10:42    MR. RODRIGUEZ:  Objection.  Asked and

answered.

THE WITNESS:  The section chiefs were

responsible for that.

BY MR. JONNA:

14:10:49    Q.  So the section chiefs should have informed

the captains about this 100 percent compliance

directive?

A.  Correct.

MR. RODRIGUEZ:  Objection.

14:10:56    BY MR. JONNA:

Q.  Okay.

MR. RODRIGUEZ:  [Inaudible].

THE REPORTER:  I'm sorry.  What was the

objection?

14:11:00    MR. RODRIGUEZ:  Misstates prior testimony.

be flying the PPF.  And I'm not asking about taking them down.  I'm just asking if you agree with that.

MR. RODRIGUEZ:  Objection.  Vague, compound, misstates prior testimony.

BY MR. JONNA:

Q.  You agree that Captain -- the reason why Captain Little was being relocated to area 17 after the first IPM meeting was because that was a location that would not be flying the PPF; correct?

A.  Well, that --

MR. RODRIGUEZ:  Objection.  Misstates prior testimony.

THE WITNESS:  That was Captain Little's assumption; right?

BY MR. JONNA:

Q.  Well, he asked to be moved to area 33 because it wasn't going to be flying the PPF, and that accommodation was granted; correct?

A.  Correct.

Q.  And then he was -- later, he worked with his section chief and with Adam Uehara to relocate to area 17 as part of that same accommodation; correct?

A.  Correct.

Q.  So setting aside the actual physical act

of removing the flags, can we agree that when Captain Little was showing up to work on June 21, as part of the accommodation he had discussed with everybody, including the section chief and Adam Uehara, that he was expecting to show up at a site that wasn't flying the PPF; correct?

MR. RODRIGUEZ:  Objection.  Foundation, calls for speculation.

THE WITNESS:  I mean that's the assumption.

BY MR. JONNA:

Q.  By the way, we talked earlier about the fact that -- in Exhibit 65, we talked earlier about the fact that Greg Crum had spoken to Chief Lester and Chief Uehara and actually took down PPF in early June of 2023 because those locations were not supposed to be flying Pride flags.

Do you recall that?

MR. RODRIGUEZ:  Objection.  Misstates the document, calls for speculation.

THE WITNESS:  I read that.

BY MR. JONNA:

Q.  Do you think that Greg Crum should have been disciplined for taking down the PPF?

A.  I don't do discipline.  Discipline is done

through deputy chiefs and above.  And that conversation between him and Chief Lester and Chief Uehara, you need to ask them.

Q.  Right.  But Chief -- but Captain Little had a conversation with Chief Uehara, his section chiefs, and HR, and he understood there was an accommodation and these locations weren't supposed to be flying flags.  So he took them down.

How is that any different than the discussion that Greg Crum had with Chief Lester and Chief Uehara and then taking a flag down?

MR. RODRIGUEZ:  Objection.  Argumentative.

BY MR. JONNA:

Q.  In other words, I mean, the whole thing blew up and became a big event.

But when you look at it in context of the accommodation meeting and you look at it in the context of what other people were doing and understanding that certain areas didn't have to fly the flag, how was this any different?

MR. RODRIGUEZ:  Objection.  Calls for speculation.

THE WITNESS:  So the difference on this one was the number of people that he made upset -- that were upset with Captain Little's actions.

Q.  I mean assuming that's the case.  I mean I'm not going to convince you, but assuming that's the case.

MR. RODRIGUEZ:  Objection.  Incomplete hypothetical.

BY MR. JONNA:

Q.  Assuming there wasn't a flag -- assuming the reason he was being moved to area 17 was because the flag was not flying there and that now that location was going to be flying the flag, it would have been good for someone on this chain to inform Captain Little before he shows up for work.

A.  I don't disagree with you on that. However, how people were acting with the flags, you know, the flags could go up in the morning, and by midday they will be gone.

Q.  So you also made a point about it would have been a good idea for Captain Little to check with his supervisor before taking the flags down.

And my question for you is, is that the kind of thing that, you know, justifies disciplinary action, or is that the kind of thing you can deal with similar to the counsel that you mentioned earlier, having an informal discussion, you know, for a guy that otherwise has a great record, and

chain of command.

BY MR. JONNA:

Q.  Whose job is it -- let's just say -- I want to make sure I understand this properly.

So if someone does something that could be considered, you know, cause for investigation or discipline, who decides whether to impose discipline or start an investigation?  Who decides that?

A.  It's -- so there's two deputy chiefs.  So it's -- on the lifeguard division case, it would be Chief Mayfield, with the deputy chief responsible for the performance -- professional performance section, and at that time it was Chief Breshears.

Q.  How do you spell his last name?

A.  It's in the document.  B-R-E- -- he's actually no longer working.

Q.  Okay.

A.  But Breshears.  It's in the -- it's in your document.  I saw his name somewhere.

So they -- I don't get involved in the decision process.  They don't ask questions.  I don't -- I do not start the investigations.  It's all done at the deputy chief level.  That's how it works in the Fire Department.

Q.  Do you ever recommend investigation be

initiated?

A. I don't recommend. I just report the facts that are presented to me.

Q. So you informed Captain Little that he was under investigation on June 22nd, 2023; correct?

A. Based on Chief Mayfield's decision.

Q. But your testimony today is that you had no say in that decision.

A. Correct.

Q. Okay. And it was Chief Mayfield's decision, but it was based on information that you provided to him.

A. Correct.

Q. Okay. And your testimony is that you didn't make a recommendation one way or the other. You just provide the information.

A. That's correct.

Q. Okay. How long have you known Chief Mayfield, by the way?

A. Probably, like, 15 years.

Q. Okay. This is Exhibit 48, and it's Bates stamped LAC-442 to 450.

(Exhibit 48 referenced)

BY MR. JONNA:

Q. And, again, just to confirm, you had said

and either misheard the directive or went rogue.

Do you see that?

A.  I do.

Q.  So just to make sure I understand what you just said in response to your counsel's question, you disagree with this conclusion that somewhere in the chain of command between Marrone and Lester, someone messed up big time and misheard the directive or went rogue?

A.  I do.  The reason being is there's no context of him replacing clasps that have been vandalized.

Q.  So you're -- are you saying that Lester was replacing clasps that were vandalized?

A.  Possible.  That's probably what I -- what I -- what I -- I think he was doing.  Like I had said before, clasps were disappearing throughout -- you know, throughout the whole division.

Q.  You do remember that we looked at an exhibit earlier in the day that showed that even Chief Uehara thought that that area, 17, did not require the PPF because of the configuration there.

Remember that exhibit we looked at earlier?

A.  I do remember that.

REPORTER'S CERTIFICATE

I, COLLEEN M. PETERMAN, CSR No. 7882, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken;

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 15th day of December, 2025.

_____

COLLEEN M. PETERMAN, CSR No. 7882

STATE OF CALIFORNIA     )
                        )   ss
COUNTY OF SAN DIEGO     )


     I, FERNANDO BOITEUX, having appeared for my

deposition on December 3, 2025, do this date declare

under penalty of perjury that I have read the foregoing

deposition, I have made any corrections, additions or

deletions that I was desirous of making in order to

render the within transcript true and correct.

     IN WITNESS WHEREOF, I have hereunto subscribed my

name this __8__ day of __January_____, 20__26__.




_____

          FERNANDO BOITEUX

EXHIBIT

**65**

Boiteux - 12-3-25

 Outlook

## Fw: EA-231: RAISING THE PROGRESS PRIDE FLAG

**From** Gregory Crum <Gregory.Crum@fire.lacounty.gov>

**Date** Thu 5/15/2025 12:02 PM

**To** Jeffrey Little <Jeff.Little@fire.lacounty.gov>

📎 1 attachment (23 KB)

EA-231.pdf;

Gregory Crum
Captain, Lifeguard Services
Los Angeles County Fire Department
310 372 2162 (Work)
310 779 1513 (Cell)
gregory.crum@fire.lacounty.gov

**From:** Gregory Crum <Gregory.Crum@fire.lacounty.gov>
**Sent:** Friday, June 2, 2023 7:36 PM
**To:** Spencer Parker <Spencer.Parker@fire.lacounty.gov>
**Subject:** Fw: EA-231: RAISING THE PROGRESS PRIDE FLAG

Good evening,

I wanted to provide an update on the status of progress pride flags in the Dockweiler area.

Yesterday, I spoke with Chief Lester, who informed me the Dockweiler would be receiving progress pride flags to fly. We received three yesterday with the understanding that we were to display two at the DWS and DWN stations and hold onto one for safekeeping.

I attached the progress pride flag to the DWS flag pole and was about to head to DWN to attach a flag to that station, but then received a call from Chief Lester informing me that Chief Uehara had determined that the flags were not to be flown at flagpoles that do not typically fly more than one flag throughout the rest of the year.

The flag is now down. All three flags are safely stored in the second drawer of the DW Compound desk awaiting the next directive we receive.

Thanks,
Greg

Gregory Crum
Captain, Lifeguard Services
Los Angeles County Fire Department
310 372 2162 (Work)
310 779 1513 (Cell)
gregory.crum@fire.lacounty.gov

---

**From:** FIRE-Revisions-Manual <MRevisions@fire.lacounty.gov>
**Sent:** Thursday, May 25, 2023 5:28 PM
**To:** DDG-FIRE_Allsites <DDG-FIRE_Allsites@fire.lacounty.gov>
**Subject:** EA-231: RAISING THE PROGRESS PRIDE FLAG

If you have any questions, please contact your jurisdictional deputy fire chief.

**EXHIBIT C**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


CAPTAIN JEFFREY LITTLE, AN           )
INDIVIDUAL,                          )
                                     )
          Plaintiff,                 )
                                     )
     vs.                             )   No. 2:24-cv-04353.
                                     )      JLS-PD
LOS ANGELES COUNTY FIRE              )
DEPARTMENT, A PUBLIC ENTITY, ET      )
AL.;                                 )
                                     )
          Defendants.                )
_____)


          VIDEOTAPED DEPOSITION OF JULIA KIM, as person

most qualified for County of Los Angeles and

individually, taken on behalf of the plaintiff, via

videoconference, commencing at 10:03 a.m., Monday,

February 9, 2026, before Diana L. Porter, Certified

Shorthand Reporter No. 12729.





















///











DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA          )
                             )    ss.
COUNTY OF SAN BERNARDINO     )

I, Diana L. Porter, hereby certify:

I am a duly qualified Certified Shorthand Reporter, in the State of California, holder of Certificate No. 12729, issued by the Court Reporters Board of California, and which is in full force and effect. (Bus. & Prof. Section 8016)

I am not financially interested in this action and am not a relative or employee of any attorney of the parties, or of any of the parties. (Civ. Proc. Section 2025.320(a))

I am authorized to administer oaths or affirmations pursuant to California Code of Civil Procedure, Section 2093(b) and prior to being examined, the deponent was first placed under oath or affirmation by me. (Civ. Proc. Sections 2025.320, 2025.540(a))

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition and the foregoing transcript is a true record of the testimony given. (Civ. Proc. Section 2025.540(a))

I have not, and shall not, offer or provide any

services or products to any party's attorney or third party who is financing all or part of the action without first offering same to all parties or their attorneys attending the deposition and making same available at the same time to all parties or their attorneys. (Civ. Proc. Section 2025.320(b))

I shall not provide any service or product consisting of the deposition officer's notations or comments regarding the demeanor of any witness, attorney, or party present at the deposition to any party or any party's attorney or third party who is financing all or part of the action, nor shall I collect any personal identifying information about the witness as a service or product to be provided to any party or third party who is financing all or part of the action. (Civ. Proc. Section 2025.320(c))

Dated: February 19, 2026

_____
Diana L. Porter, CSR No. 12729

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Los Angeles, CA _____,

this 10 _____ day of April _____, 2026 _____.

_Julia K___

_____
(Signature of Deponent)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CAPTAIN JEFFREY LITTLE, an ）
individual, ）
                                 ）
             Plaintiff, ）
                                 ）
        VS. ）CASE NO. 2:24-cv-04353-JLS-PD
                                 ）
LOS ANGELES COUNTY FIRE ）
DEPARTMENT, a public entity, ）
et al, ）
                                 ）
             Defendants. ）
_____）

REMOTE VIDEOTAPED DEPOSITION OF
JULIA KIM,
VOLUME 2

FEBRUARY 23, 2026

Reported by Therese K. Claussen, CSR#6552, RMR, CRR

Job # J14370225

THE SULLIVAN GROUP OF COURT REPORTERS











R E P O R T E R ' S

C E R T I F I C A T E


I, Therese K. Claussen, CSR No. 6552, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me at the time and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 24th day of February, 2026.


*Therese Claussen*

Therese K. Claussen
Certified Shorthand Reporter
California CSR#6552

State of California       )
                          )  ss
County of Los Angeles    )

    I, the undersigned, declare under penalty of perjury:

        That I have read the foregoing transcript;

        That I have made any corrections, additions, or deletions that I was desirous of making;

        That it is a true and correct transcript of my testimony contained herein.

    EXECUTED this __10__ day of ___April___, 20_26_, at___Los Angeles___,___California___.

                    {city}                    {state}

                    _Julia Kim_
                    _____
                              {WITNESS}

Kim, PMQ
2/9/2026
**29**

Confidential

LAC-0000413



Confidential

LAC-0000414

Confidential

LAC-0000415



Confidential

LAC-0000416

LAC-0000417

Confidential

LAC-0000418

Confidential

LAC-0000419

Confidential



LAC-0000420

Confidential

EXHIBIT
44

VOL 2 KIM DEPO EX. 44

Confidential

LAC-0000172



Confidential

LAC-0000173



LAC-0000174

**EXHIBIT D**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CAPTAIN JEFFREY LITTLE, an ) 
individual, )
 )
            Plaintiff, )
 )  No.
    vs. )  2:24-cv-04353-JLS-PD
 )
LOS ANGELES COUNTY FIRE )
DEPARTMENT, a public )
entity, et al., )
 )
            Defendants. )
_____ )

REMOTE DEPOSITION OF

SECTION CHIEF ARTHUR LESTER

PAGES 1 - 180

DATE:  Tuesday, November 18, 2025

TIME:  10:00 a.m. - 1:35 p.m.

ALL PARTIES APPEARING REMOTELY VIA ZOOM

REPORTED BY:  Taylor Maldonado, RPR, CSR No. 14482
JOB NO. J13744195

that was directed by the board of supervisors.

BY MR. WEISENBURGER:

Q.    Okay.

And was that also the case in 2025?

A.    I believe so, yes.









only been flying one flag at the time when EA-231 came out; is that correct?

A.    That was when it was -- I discovered, yes.

Q.    Okay.

And so you updated that area 17 to have two extra additional clips so that it could fly two flags?











███████████████████████████████████

████████████████████████████████

███████████████████████████████████

████████████████████

████████████████████████████████

██████████████████████████████████

█████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████

████████████████████████

Q.    Okay.

Is it fair to say, though, that then -- that this -- this 100 percent compliance mandate was never kind of formalized into a formal directive that went out to the entire department?

MR. PORTNOI:  Objection.  Vague.

THE WITNESS:  It was not in a formal email that I saw out to all sites, no.

BY MR. WEISENBURGER:

Q.    Okay.

So when did you first become aware of Captain Little's religious accommodation request?

A.    Religious accommodation request?

Q.    Yeah.

MR. PORTNOI:  Objection.  Vague.

**DECLARATION OF WITNESS**

I hereby declare I am the deponent in the within matter; that I have read the foregoing deposition and know the contents thereof, and I declare that the same is true of my knowledge except as to the matters which are therein stated upon my information or belief, and as to those matters, I believe them to be true.

I declare under the penalties of perjury of the State of California that the foregoing is true and correct.

Executed this 1st day of January, 2026, at Los Angeles, CA.
(City)                        (State)

SECTION CHIEF ARTHUR LESTER

CERTIFICATE OF REPORTER

I, TAYLOR M. MALDONADO, a Certified Shorthand Reporter, holding a valid and current license issued by the State of California, CSR No. 14482, duly authorized to administer oaths, do hereby certify:

That the witness in the foregoing deposition was administered an oath to testify to the whole truth in the within-entitled cause.

That said deposition was taken down by me in shorthand at the time and place therein stated and thereafter transcribed into typewriting, by computer, under my direction and supervision.

Should the signature of the witness not be affixed to the deposition, the witness shall not have availed himself/herself of the opportunity to sign or the signature has been waived.

I further certify that I am neither counsel for nor related to any party in the foregoing deposition and caption named nor in any way interested in the outcome thereof.

DATED: 12/03/2025

*Taylor Maldonado*

_____

TAYLOR M. MALDONADO, RPR, CSR NO. 14482

**EXHIBIT E**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


CAPTAIN JEFFREY LITTLE, an )
individual, )
)
                Plaintiff, )
)
        vs. )  Case No. 2:24-CV-04353-JLS-PD
)
LOS ANGELES COUNTY FIRE )
DEPARTMENT, a public entity, et )
al., )
)
                Defendants. )
_____)


VIDEOTAPED REMOTE VIDEOCONFERENCE DEPOSITION OF

CAPTAIN DANIELLE MCMILLON

NOVEMBER 25, 2025


REPORTED BY:  LEESAH TERAN, CSR NO. 12675

THE SULLIVAN GROUP OF COURT REPORTERS

Q.    Okay.

My question is:  What did you mean by that?  What does that mean?

A.    To a fixed facility.  So, the request above is that there needs to be flown at fixed facilities.  The fixed facility at Area 23 would have been another spot where we could have put a Pride Flag, but that flagpole was inaccessible due to safety concerns, where you would have to go to to be able to put the flags up and down, it also doesn't even fly an American Flag.  So, there were no other flagpoles.  When I sent this text, I was -- I was thinking about Area 23.

Q.    Okay.

And so, EA 231, as we looked at earlier, it has specific responsibilities for captains and site supervisors.

Do you see that?

A.    Yes.

Q.    And this directive from the fire chief that was conveyed to you all, this was -- this was not conveyed, at least at this time, to captains.  It was conveyed to section chiefs; is that correct?

MS. ROBINOW:  Objection.  Calls for speculation.  Vague.  Assumes facts not in evidence.

THE WITNESS:  Can you scroll to the top of

THE SULLIVAN GROUP OF COURT REPORTERS

this?  So, this text came in at 8:10 p.m., so it initially was given to the section chiefs.

BY MR. JONNA:

Q.  And what's your understanding of at what point it was -- this directive was conveyed to captains?

MS. ROBINOW:  Objection.  Assumes facts not in evidence.

THE WITNESS:  I believe the next day, but

BY MR. JONNA:

Q.  Okay.

A.  -- I'm not sure.

Q.  All right.

And then underneath the text we just read that you sent, Dan Murphy says, "Venice Division, and RCO?  I understand the expectation, but there are some logistical/safety issues with some of our older facilities."

Do you see that?

A.  Yes.

Q.  And what do you understand that to mean?

A.  So, this is, like I said earlier, Area 23 is Venice Division, and that flagpole is not accessible because of safety concerns.  The building is condemned. So, it -- we weren't able to -- that is a fixed facility that should have a flagpole, and a flag, and an American

BY MR. JONNA:

Q.    Okay.  Going back for a minute to Exhibit 7.

The message on June 20th, at 3:47 p.m.  What's -- I mean, we talked about this a little bit, but just to make sure I understand.  What's your understanding as to why you sent this message to Captain Little about needing another follow-up IPM?

A.    I'm pretty sure Chief Uehara called me and told me, Hey, we need to do a follow-up IPM.  And so, I just sent a message to the group, because we already had a group going.

Q.    So, this was June 20th, 2023, 3:47 p.m.  The e-mail, Exhibit 8 e-mail, was June 20th, 2023, at 11:05 a.m.  So, this e-mail was sent to Captain -- well, I guess, sent to you guys, not Captain Little, confirming the accepted IPM.  And then that same day, a few hours later, you reach out about needing to do another IPM.

So, I know, again, this was a couple of years ago.  What do you think -- what's your recollection as to what happened between this e-mail getting sent out to these folks, and then this message?  What happened that led to this request to do a second follow-up IPM?

A.    I don't know, because I wasn't involved in

that process, but I'm sure Renee would know.

Q.    Involved in which process?

A.    About the follow-up IPM -- I mean, I was involved in the follow-up IPM, but I wasn't involved in why the request came to do another follow-up IPM.  I just sent the message saying, Hey, we need to do another one.

Q.    So, did you -- you said you thought you heard something from Mr. Uehara about the need to do another one, and --

A.    Yeah.  Yes.

Q.    Do you remember what he said?

A.    We need -- I think he just said, Hey, we've got to schedule a follow-up with Little.  Can you find out if he's available tomorrow at 2:30, and so, I sent the text.

I mean, again, 2023, I'm not completely sure, but that's usually how these go for me, or if there is a request, he will call me and have me follow up with the employee.

Q.    Okay.

Just to -- sorry, I'm going to go back --

A.    That's okay.

Q.    -- to earlier exhibits here.

So, we looked at Exhibit 2 earlier today where

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the __21st__ day of ___January___, 20_26_ .

Signed by:

*Danielle McMillon*
D708495619954DE...
**DANIELLE MCMILLON**

REPORTER'S CERTIFICATION

I, Leesah Teran, a certified shorthand reporter, in and for the State of California, Certificate No. 12675, do hereby certify:

That the foregoing proceedings were reported by me stenographically and later transcribed into typewriting under my direction; that the foregoing is a true record of the proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this 10th day of December, 2025.

_____
Leesah Teran, CSR No. 12675

THE SULLIVAN GROUP OF COURT REPORTERS

231



11/25/2025

DANIELLE
MCMILLON

**No. 5**

Confidential

LAC-0001392

25/2025

DANIELLE
MCMILLON

No. 8

Confidential

LAC-0000065



Confidential                                                                        LAC-0000066

**EXHIBIT F**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


CAPTAIN JEFFREY LITTLE, an )
individual, )
 )
            Plaintiff, )
 )    Case No.
   vs. )    2:24-cv-04353-JLS-PD
 )
LOS ANGELES COUNTY FIRE )
DEPARTMENT, a public entity, )
et al., )
 )
            Defendants. )
_____)


VIDEO DEPOSITION OF RENEE NUANES-DELGADILLO

VIA ZOOM VIDEOCONFERENCE

MONDAY, NOVEMBER 24, 2025


REPORTED BY:

LISA MOSKOWITZ

CA-CSR 10816, RPR, CRR, CLR

WASHINGTON CCR 21001437, NEVADA CCR 991

ILLINOIS CSR 084.004982

THE SULLIVAN GROUP OF COURT REPORTERS

Mr. Crum, Gregory Crum and Chief McMillon, but I'm not 100 percent sure. I'd have to look at that IPM document.

Q. What do you remember taking place at that first IPM meeting?

A. So during the first IPM meeting it was one for me to get a better understanding of what he was requesting as a religious accommodation and then also based on that, to discuss the accommodation that the department would be able to provide him.

Q. Do you remember who actually contributed to the discussion besides Captain Little?

A. I'm sorry. What do you mean?

Q. Who else spoke during the meeting?

A. Oh, I believe his representative, and I don't remember who else. Possibly one of the chiefs to get clarification in regards to -- because I don't have an understanding of the areas, the regions. That's not my area of expertise. So possibly one of them to provide guidance.

Q. Do you remember if Captain Little -- what he said about what his religious beliefs were or his religious objections?

A. During that IPM in 2023?

Q. Yes.

REPORTER'S CERTIFICATE

I, LISA MOSKOWITZ, a Certified Shorthand Reporter, licensed in the states of California, Nevada, Illinois, and Washington, do hereby certify that RENEE NUANES-DELGADILLO was by me duly sworn or affirmed; that said deposition was reported stenographically by me at the time and place herein named;

That the deposition is a true record of all testimony as reported stenographically by me and was thereafter transcribed under my direction; that if this is a Federal case, a request [ ] was [X] was not made to read and correct said deposition; that the dismantling of the original transcript will void the reporter's certificate.

I further declare that I have no interest in the outcome of said action nor am I related to any of the parties or counsel in said action.

IN WITNESS WHEREOF, I have subscribed my name this 8th day of December, 2025.

_____
LISA MOSKOWITZ
California CSR 10816, RPR, CRR, CLR
Washington CCR 21001437, Nevada CCR 991,
Illinois CSR 084.004982

* * * * *

I do solemnly swear under penalty of perjury under the laws of the State of California that the foregoing is my deposition under oath; are the questions asked of me and my answers thereto; that I have read same and have made the necessary corrections, additions, or changes to my answers that I deem necessary.

In witness thereof, I hereby subscribe my name this _23_ day of _January_, 2025.

RENEE NUANES-DELGADILLO

**EXHIBIT G**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CAPTAIN JEFFREY LITTLE, an )
individual, )
)
            Plaintiff, )
)
    vs. ) Case No. 2:24-
) cv-04353-JLS-PD
LOS ANGELES COUNTY FIRE )
DEPARTMENT, a public entity, )
et al., )
)
           Defendants. )
_____)

VIDEOTAPED DEPOSITION OF

KYLE POWER

VIA ZOOM VIDEOCONFERENCE

NOVEMBER 20, 2025

Reported by:
COLLEEN M. PETERMAN
CSR 7882
No. 25-J13744196

THE SULLIVAN GROUP OF COURT REPORTERS



BY MR. WEISENBURGER:

Q.  Was 20- -- was June of 2025 different from June of 2024 in terms of the locations where you were flying the Pride flag -- Progress Pride flags in MB 300?

MR. BROVMAN:  Objection.  Lacks foundation and calls for speculation.

THE WITNESS:  I do not recall any change from 2024 with the locations.

BY MR. WEISENBURGER:

Q.  Okay.  So in your understanding, it was the same?

A.  Yes.





BY MR. WEISENBURGER:

Q. In June of 2023, do you know if that would have been a possibility for Captain Little?

MR. BROVMAN: Objection. Calls for speculation.

THE WITNESS: I do not. I do not know what he was requesting in his accommodations.

BY MR. WEISENBURGER:

Q. Okay. In June of 2024, would that have been a possibility for Captain Little?

MR. BROVMAN: Objection. Calls for speculation.

THE WITNESS: I believe that was something we achieved in that IPM, but at the same time, I don't recall receiving the final result of that IPM.

BY MR. WEISENBURGER:

Q. Okay. We'll review some of those documents a little bit later.

So were you not involved in the June 2023 accommodation process for Captain Little?

A. Correct.

REPORTER'S CERTIFICATE

I, COLLEEN M. PETERMAN, CSR No. 7882, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken;

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 4th day of December, 2025.

_____

COLLEEN M. PETERMAN, CSR No. 7882

STATE OF CALIFORNIA      )
                         )  ss
COUNTY OF SAN DIEGO      )


        I, KYLE POWER, having appeared for my deposition on November 20, 2025, do this date declare under penalty of perjury that I have read the foregoing deposition, I have made any corrections, additions or deletions that I was desirous of making in order to render the within transcript true and correct.

        IN WITNESS WHEREOF, I have hereunto subscribed my name this __19__ day of __December__, 20_25_.


                        _____
                              KYLE POWER

**EXHIBIT H**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


CAPTAIN JEFFREY LITTLE, AN          )
INDIVIDUAL,                         )
                                    )
          Plaintiff,                )
                                    )
     vs.                            )   No. 2:24-cv-04353-JLS-PD
                                    )
LOS ANGELES COUNTY FIRE             )
DEPARTMENT, A PUBLIC ENTITY, ET     )
AL.,                                )
                                    )
          Defendants.               )
_____)


          VIDEOTAPED DEPOSITION OF LAUREN GOTTSCHALK,

taken on behalf of the plaintiff, via videoconference,

commencing at 8:05 a.m., Thursday, December 4, 2025,

before Diana L. Porter, Certified Shorthand Reporter

No. 12729.

THE SULLIVAN GROUP OF COURT REPORTERS

facts not in evidence.  Hypothetical and vague.

THE DEPONENT:  I'm just not sure.  He didn't even tell me that day that he had a religious accommodation, so I -- I don't even know that I -- again, this is hypothetical.  I don't know that I would have really even argued it to the soft -- even though I was pretty soft with it, wouldn't have argued it to the extent that I did if the county had granted him something that I was aware of.  But he did not make me aware of his religious accommodation.

BY MR. YOUNGKIN:

Q   If he did have a religious accommodation, would you have liked the county to have made that known to you?

MS. MEEK:  Calls for a hypothetical speculation.  Vague and a legal conclusion.

BY MR. YOUNGKIN:

Q   In your own words.

A   It certainly would have cleared up my chain of command -- right? -- or, like, the -- what I'm supposed to be following, because if -- like, you can have rules, but then if there is something saying this trumps the -- the rules that you were originally given, then what can I do; right?

30(f)(1)).

Before completion of the deposition, review of the transcript [xx] was [  ] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto.  (Fed. R. Civ. P. 30(e)).

Dated: December 16, 2025

_____
DIANA L. PORTER, CSR NO. 12729

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at __Los Angeles, CA_____,

this __15__ day of __January__, 2026.

Signed by:

_Lauren Gottschalk_____

34223CDEAD49497...

**(Signature of Deponent)**

THE SULLIVAN GROUP OF COURT REPORTERS

291

**EXHIBIT I(1)**

CONFIDENTIAL - ATTORNEYS EYES ONLY

CONFIDENTIAL - ATTORNEYS EYES ONLY

LAC-0003110

CONFIDENTIAL - ATTORNEYS EYES ONLY

LAC-0003111

CONFIDENTIAL - ATTORNEYS EYES ONLY

LAC-0003112



2023-120281

**5** of **12**
County Policy of Equity Report/Notification Form

CONFIDENTIAL - ATTORNEYS EYES ONLY

LAC-0003113

CONFIDENTIAL - ATTORNEYS EYES ONLY

LAC-0003114



CONFIDENTIAL - ATTORNEYS EYES ONLY

LAC-0003115

CONFIDENTIAL - ATTORNEYS EYES ONLY

LAC-0003116

CONFIDENTIAL - ATTORNEYS EYES ONLY

CONFIDENTIAL - ATTORNEYS EYES ONLY

LAC-0003118

CONFIDENTIAL - ATTORNEYS EYES ONLY

LAC-0003119

CONFIDENTIAL - ATTORNEYS EYES ONLY

LAC-0003120

**EXHIBIT I(2)**



CONFIDENTIAL - ATTORNEYS EYES ONLY



CONFIDENTIAL - ATTORNEYS EYES ONLY

LAC-0003101



CONFIDENTIAL - ATTORNEYS EYES ONLY



CONFIDENTIAL - ATTORNEYS EYES ONLY

LAC-0003103



CONFIDENTIAL - ATTORNEYS EYES ONLY

LAC-0003104



CONFIDENTIAL - ATTORNEYS EYES ONLY

LAC-0003105



CONFIDENTIAL - ATTORNEYS EYES ONLY

LAC-0003106



CONFIDENTIAL - ATTORNEYS EYES ONLY

LAC-0003107



CONFIDENTIAL - ATTORNEYS EYES ONLY

LAC-0003108

**EXHIBIT I(3)**

CONFIDENTIAL - ATTORNEYS EYES ONLY

LAC-0003472

CONFIDENTIAL - ATTORNEYS EYES ONLY

LAC-0003472_0001

CONFIDENTIAL - ATTORNEYS EYES ONLY

CONFIDENTIAL - ATTORNEYS EYES ONLY

LAC-0003472_0003

CONFIDENTIAL - ATTORNEYS EYES ONLY

CONFIDENTIAL - ATTORNEYS EYES ONLY

LAC-0003472_0005