DIMITRI D. PORTNOI (S.B. # 282871)
dportnoi@omm.com
KYLE M. GROSSMAN (S.B. # 313952)
kgrossman@omm.com
MARNI B. ROBINOW (S.B. # 313412)
mrobinow@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, Suite 1900
Los Angeles, California 90071
Telephone:   (213) 430 6000
Facsimile:    (213) 430 6407

*Attorneys for Defendants County of
Los Angeles, Fernando Boiteux,
Arthur Lester, and Adam Uehara*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| Jeffrey Little,<br><br>          Plaintiff,<br><br>     v.<br><br>Los Angeles County Fire Department, et al.,<br><br>          Defendants. | Case No. 2:24-cv-04353-JLS-BFM<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT**<br><br>*[Filed concurrently with Defendants' Reply in Support of Motion for Summary Judgment; Response to Plaintiff's Separate Statement of Evidentiary Objections; Separate Statement of Additional Evidentiary Objections; and Supplemental Declaration of Dimitri D. Portnoi]*<br><br>Hearing Date: May 8, 2026<br>Hearing Time: 10:30 a.m.<br>Judge:  Hon. Josephine L. Staton<br>Courtroom:  8A<br><br>TAC Filed:  October 21, 2025<br>Trial Date:  None set |

## I.   DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 1. In March 2023, the Board of Supervisors ("Board") passed a motion to fly the Progress Pride Flag ("PPF") during June at Los Angeles County ("County") facilities where the American and California flags are displayed and to explore ways the PPF can be flown at all County facilities to show support for LGBTQ+ communities during Pride Month.<br><br>Kim Decl. ¶3, Ex. A (Board of Supervisors resolution)<br><br>Third Amended Complaint ("TAC") ¶19 | 1. **Undisputed** that in March, 2023 the Board of Supervisors passed a motion regarding the Progress Pride Flag. **Disputed** as to the accuracy of Defendants' paraphrase of the March, 2023 motion because the motion, directed "the Internal Services Department to raise the Progress Pride Flag at the Kenneth Hahn Hall of Administration, and Los Angeles County facilities where the American and California Flags are displayed during the month of June..." [Emphasis added.]<br>*See* Kim Decl. ¶3, Ex. A [ECF No. 116-1]<br>Undisputed at to the remainder of Paragraph 1. |
| 1. Plaintiff's Response misleadingly quotes the Board motion.  The Board motion requires (1) "the Internal Services Department to raise the Progress Pride Flag at … Los Angeles County facilities where the American and California Flags are displayed during the month of June" *and* (2) "County Departments to explore ways the Progress Pride Flag can be flown at all county facilities." (Dkt. 116-1 (Board of Supervisors resolution).) | |
| 2. The County Fire Department implemented the motion in May 2023 through a policy memorandum, EA-231, which provided guidance about which Department facilities with flagpoles should fly the PPF.<br><br>Portnoi Decl. Ex. K (Oliva Dep. Tr.) 32:17-24 | 2. **Disputed** as to whether the County Fire Department in fact implemented the Board motion through its adoption of EA-231, because EA-231 was inconsistent with the Board motion. The Board motion directed the Internal Services Department to raise the PPF at "Los Angeles County facilities" "where the American and California Flags are displayed during the month |

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Kim Decl. ¶4, Ex. B (EA-231)<br><br>TAC ¶20 | of June". *See* Kim Decl. ¶3, Ex. A [ECF No. 116-1]<br>EA-231 provides in relevant part, "[c]lasps for two flags: Fly the U.S. flag at peak and the PPF directly below" and "[c]lasps for three flags: Fly the U.S. flag at peak, State, and then PPF." *See* Kim Decl. ¶4, Ex. B [ECF No. 116-2]<br>The Board motion did not dictate the removal of the California state flag in order to fly the PPF. Jonna MSJ Opp. Decl., Ex. B, Boiteux Dep., p. 55:24-56:1-20).<br>**Undisputed** as to the assertion that EA-231 provided guidance about which Department flagpoles should fly the PPF. |

2. Plaintiff's Response misleadingly quotes the Board motion.  The Board motion requires (1) "the Internal Services Department to raise the Progress Pride Flag at … Los Angeles County facilities where the American and California Flags are displayed during the month of June" *and* (2) "County Departments to explore ways the Progress Pride Flag can be flown at all county facilities." (Dkt. 116-1 (Board of Supervisors resolution).)  EA-231 is not inconsistent with these requirements.  It provides guidance about when to fly the PPF when the American and California flag are flying and states, on its face: "On March 7, 2023, the Board of Supervisors passed a motion requiring the Progress Pride Flag ('PPF') to be flown at County facilities during the month of June … ." (Dkt. 116-2 (EA-231).)

| | |
|---|---|
| 3. All Lifeguard Division employees, including Plaintiff, were sent EA-231 on May 25, 2023.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 59:18-60:21<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 37:8-38:14 | 3. **Undisputed**. |

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Portnoi Decl. Ex. I (Uehara Dep. Tr.) 115:18-116:3<br><br>O'Brien Decl. ¶3, Ex. A (email correspondence attaching EA-231) | |
| 4. As a member of the Fire Department, following County policies is part of Plaintiff's job.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 19:4-7<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 117:15-118:6 | 4. **Undisputed but irrelevant. See Obj. No. 11.** |
| 4. To the extent Plaintiff asserts that this fact is irrelevant, that is an evidentiary objection, and not a real dispute of fact. | |
| 5. Under EA-231, if a flagpole could accommodate only the U.S. flag, the PPF would not be flown; otherwise, it would be.<br><br>Portnoi Decl. Ex. N (Boiteux Dep. Tr.) 74:21-75:7<br><br>Portnoi Decl. Ex. H (McMillon Dep. Tr.). 37:10-14, 226:4-12<br><br>Portnoi Decl. Ex. L, Mayfield Dep. Tr.. (Vol. II) 192:7-8, 194:4-6, 203:14-16<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 75:25-76:2<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 41:13-20, 48:2-25, 77:12-78:6, 79:23-80:11, 88:15-20<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 160:22-161:21 | 5. **Undisputed**. |

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Kim Decl. ¶4, Ex. B (EA-231) | |
| 6. Under EA-231, Lifeguard Captains are responsible for making sure that the PPF is flown.<br><br>Kim Decl. ¶4, Ex. B (EA-231)<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 76:9-17<br><br>Portnoi Decl. Ex. L (Mayfield Dep. Tr. Vol. II) 233:13-24 | 6. **Undisputed**. |
| 7. Typically, flags are flown using clasps, which are small metal devices that can be added to a flagpole.<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 204:19-205:24<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 78:7-19<br><br>Lester Decl. ¶7, Ex. D (halyard clasp) | 7. **Undisputed**. |
| 8. Large flags will hit the roof when flown at some lifeguard stations.<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.). 183:23-184:11, 185:2-5<br><br>Portnoi Decl. Ex. L (Mayfield Dep. Tr. Vol. II) 205:23-206:3.<br><br>Portnoi Decl. Ex. F (Power Dep. Tr.) 28:19-29:1<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 40:7-12, 48:10-25, 84:17-23 | 8. **Undisputed**. |
| 9. Clasps on flagpoles at lifeguard stations sometimes break due to exposure to weather. | 9. **Disputed** because the cited testimony does not support the assertion that flagpole clasps |

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Portnoi Decl. Ex. H (McMillon Dep. Tr.) 224:14-18<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 83:8-15 | sometimes break through exposure to weather.<br><br>Lester testified, "There was several stations, through—how—however you want to say it, that through—through the years, through replacing the flags, through the wear and tear of the—of the ocean, you know, like, ripping the—lines down, that had gone to just having two clasps on a flagpole, just raising the American flag only, and so there was several stations that just had that." Lester Dep., 83:8-15 [ECF No. 110-5 at 64]<br><br>McMillon testified, "So, we put on and take off clasps for flags all the time, is what I'm trying to say. We do not leave them on the flagpole, because of wind and elements, and they will get rusted, and they—they hit against the flagpole." McMillon Dep., 224:14-18 [ECF No. 115-8 at 112] |
| 9. As Plaintiff's Response demonstrates, the clasps on flagpoles at lifeguard stations would break from the "wear and tear" due to proximity to the ocean, "wind and elements," and "rust[]." (Dkt. 115-8 (McMillon Dep. Tr.) 224:14-18; Dkt. 115-5 (Lester Dep. Tr.) 83:8-15.) | |
| 10. In June 2023, clasps went missing at lifeguard stations.<br><br>Portnoi Decl. Ex. N (Boiteux Dep. Tr.) 318:2-318:4<br><br>Portnoi Decl. Ex. H (McMillon Dep. Tr.). 38:18-39:1, 226:4-12, 227:1-4<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 79:5-12, 81:11-21, 96:23-97:13 | 10. **Undisputed**. |

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Portnoi Decl. Ex. I (Uehara Dep. Tr.) 60:15-17, 153:24-154:25, 157:4-16, 160:9-13, 161:10-21, 162:5-16 | |
| 11. In June 2023, flag lines were cut at lifeguard stations.<br><br>Portnoi Decl. Ex. H (McMillon Dep. Tr.) 64:12-18, 123:21-24<br><br>Portnoi Decl. Ex. F (Power Dep. Tr.) 54:15-16<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 154:1-3, 154:17-18, 160:9-13, 161:10-21, 162:5-16 | 11. **Undisputed**. |
| 12. In June 2023, flagpoles were taken down at lifeguard stations.<br><br>Portnoi Decl. Ex. H (McMillon Dep. Tr.) 165:3-10, 196:7-8, 197:21-22, 213:18-214:22<br><br>Portnoi Decl. Ex. F (Power Dep. Tr.) 54:15-16<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 166:2-167:6<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 160:9-13, 161:10-21 | 12. **Undisputed**. |
| 13. The Board motion and EA-231 did not account for differences in the size of flags, clasps breaking due to weather, the number of flags not remaining consistent, clasps going missing, flag lines being cut, or flagpoles being taken down.<br><br>Portnoi Decl. Ex. J (O'Brien Dep. Tr.) 53:15-23 | 13. **Undisputed** as to differences in the size of flags, clasps breaking due to weather, clasps going missing, flags being cut, or flagpoles being taken down.<br>**Disputed** as to "clasps breaking due to weather," "the number of flags not remaining consistent," "flags being cut" or "flagpoles being taken down" |

6

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Portnoi Decl. Ex. E (Lester Dep. Tr.) 39:21-41:20<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 153:24-154:8, 157:4-16 | as the cited testimony does not reference those considerations. **Disputed** as irrelevant. ***See* Obj. No. 12**. |

13. Claps on flagpoles at lifeguard stations would break from the "wear and tear" due to proximity to the ocean, "wind and elements," and "rust[]." (Dkt. 115-8 (McMillon Dep. Tr.) 224:14-18; Dtk. 115-5 (Lester Dep. Tr.) 83:8-15.)  Chief O'Brien also testified that clasps were "remov[ed]," (Dkt. 115-10 (O'Brien Dep. Tr.) 53:15-23), which Chief Uehara confirmed (Dkt. 115-9 (Uehara Dep. Tr. 153:24-154:8).

Further, Plaintiff does not dispute Fact Nos. 11 or 12, which address flag lines being cut or flagpoles being taken down at lifeguard stations.  In fact, Plaintiff incorporates this fact in his own Separate Statement of Uncontroverted Facts. (Dkt. 118-2 ¶144.)

| | |
|---|---|
| 14. In early June 2023, the PPF was not flown at some Lifeguard Division facilities where it could safely be flown.<br><br>Portnoi Decl. Ex. J (O'Brien Dep. Tr.) 68:1-4 | 14. **Disputed**. The cited testimony fails to support the assertion for which it is cited. It provides: "During the course of that month, we received phone calls from the board offices inquiring as to why facilities weren't flying the flag in accordance with their approved flag policy."<br>Further, even if the cited testimony could be deemed supportive of the fact for which it is cited, it is inadmissible hearsay. ***See* Obj. No. 1**. |

14. Chief O'Brien—the Fire Department's Chief Deputy, who oversees the Department's three operations bureaus (Dkt. 116-26 (O'Brien Decl.) ¶2)— clearly explained in his testimony that there were some facilities not flying the PPF in early June.  (Dkt. 115-10 (O'Brien Dep. Tr.) 68:1-4.)  EA-231 accounted for situations where the PPF would not be flown, which were predicated on what the flagpole could accommodate.  (Dkt. 116 (Kim Decl.) ¶4; Dkt. 116-2 (EA-231).)  Plaintiff does not dispute Fact No. 15, "Under EA-231, if a flagpole could accommodate only the U.S. flag, the PPF would not be flown; otherwise, it would be."

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 15. Beachgoers, lifeguards, and County Supervisors raised concerns about the PPF not consistently flying.<br><br>Portnoi Decl. Ex. J (O'Brien Dep. Tr.) 68:1-4<br><br>Portnoi Decl. Ex. H (McMillon Dep. Tr.). 123:18-124:2, 124:12-21<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 68:9-19<br><br>Boiteux Decl. ¶¶3-4, Ex. A (email correspondence between Chief Boiteux and County Department of Beaches & Harbors) at LAC-0000028, Ex. B (email correspondence between Chief Boiteux and Supervisor Mitchell's Deputy of Constituent Engagement) at LAC-0001357<br><br>O'Brien Decl. ¶¶4-5, Exs. B (June 12, 2023 major incident report), C (June 20, 2023 major incident report) | 15. **Undisputed** as to County Supervisors and lifeguards but disputed as to beachgoers because the citations fail to support the assertion that "[b]eachgoers … raised concerns about the PPF not consistently flying" |
| 15. Plaintiff's Response is unfounded.  The e-mail correspondence between Chief Boiteux and Supervisor Mitchell's Deputy of Constituent Engagement states, "We have *Manhattan Beach Community* eager to see the lifeguard station there fly a pride flag."  (Dkt. 115-20 (Boiteux Decl.) ¶¶3-4; Dkt. 115-21 (email correspondence between Chief Boiteux and County Department of Beaches & Harbors) at LAC-0000028 (emphasis added).) ||
| 16. The Board put extreme pressure on Fire Chief Anthony Marrone to comply with the Board's motion regarding the flying of the PPF.<br><br>Portnoi Decl. Ex. J (O'Brien Dep. Tr.) 68:1-70:11 | 16. **Disputed**. The only cited testimony which supports the assertion that the Board put "extreme pressure" on the Fire Chief to comply with the Board's motion regarding the flying of the PPF" was Chief Boiteux's inadmissible hearsay testimony. Chief Boiteux testified, "I was not part of |

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Portnoi Decl. Ex. N (Boiteux Dep. Tr.) 154:14-22<br><br>Portnoi Decl. Ex. H (McMillon Dep. Tr.) 124:12-21<br><br>Portnoi Decl. Ex. L (Mayfield Dep. Tr. Vol. II) 170:14-171:23<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 68:20-69:22 | any meetings, but I heard there was a meeting at the fire headquarters with all executive team members regarding the Pride flag compliance. The fire chief was under extreme pressure from the Board of Supervisors because the Fire Department was not complying with board direction." Boiteux Dep., 154:14-22 [ECF No. 115-14 at 38]. *See* **Obj. No. 2**.<br>The balance of the citations indicate that there were inquiries from Board staff members about compliance but they fail to support the "extreme pressure" assertion and, with the exception of the testimony of Mayfield, who was presented as a 30(b)(6) witness, are in any event similarly inadmissible hearsay. ***See* Obj. Nos. 3-6**. |

16. Plaintiff's Response addresses an evidentiary objection, not a dispute that the cited material does not support the Statement of Undisputed Material Fact. As such, Defendants address this Response in their separately filed Response to Plaintiff's Separate Statement of Evidentiary Objections.

Regardless, Plaintiff's Response is also unfounded. Chief Lester stated that "their [the Board's] understanding was that they thought all flagpoles should have the pride flag … and the directive was, is that they would like to see 100 percent compliance on all these facts … ." (Dkt. 115-5 (Lester Dep. Tr.) 68:20-69:22.) Chief O'Brien stated that "the department received calls from board offices…expressing concern as to why the flag wasn't being flown at County facilities…in accordance with their policy." (Dkt. 115-10 (O'Brien Dep. Tr.) 68:1-70:11.) Chief McMillon similarly spoke to the outreach from the Board. (Dkt. 115-8 (McMillon Dep. Tr.) 124:12-21.) Taken together, these establish that the Board put "extreme pressure" on compliance with the Board's motion regarding the flying of the PPF. To the extent Plaintiff disagrees with Defendants' characterization here, that does not create an issue of material fact.

9

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 17. On June 20, 2023 at 7:23 p.m. Chief Marrone requested an "immediate Teams meeting for all Chief Deputies and Deputy Chiefs." <br><br> Mayfield Decl. ¶4, Ex. B (email correspondence between Chief Marrone, chief deputies, and deputy chiefs) at LAC-0003223 | 17. **Undisputed**. |
| 18. At the June 20, 2023 meeting that Chief Marrone had with his Chief Deputies and Deputy Chiefs, Chief Marrone relayed the importance of compliance with the Board's motion and EA-231 through the chain of command. <br><br> Portnoi Decl. Ex. N (Boiteux Dep. Tr.) 151:1-154:22 <br><br> Portnoi Decl. Ex. J (O'Brien Dep. Tr.) 77:17-25 <br><br> Portnoi Decl. Ex. L (Mayfield Dep. Tr. Vol. II) 170:21-171:3, 171:18-25, 172:21-173:9, 180:12-14 <br><br> Portnoi Decl. Ex. E (Lester Dep. Tr.) 68:9-69:22 | 18. **Undisputed** that Chief Marrone had a meeting with his Chief Deputies and Deputy Chiefs regarding compliance with the Board of Supervisor's directive regarding flying the progress flag during the month of June. Mayfield Dep., pp. 170-171. [ECF No 115-12 at 30-31] **Disputed** to the extent that the meeting also included discussion of "the *importance* of compliance," as opposed to merely passing on a directive, because the cited testimony does not support that assertion. |
| 18. Plaintiff disputes Defendants' characterization of compliance with the Board's motion and EA-231 through the chain of command as important, but does not otherwise dispute that this meeting occurred and that Chief Marrone relayed that his Chief Deputies and Deputy Chiefs that they should comply with the Board motion and EA-231.  To the extent Plaintiff disagrees with Defendants' characterization here, that does not create an issue of material fact. | |
| 19. On June 20, 2023 at 7:14 p.m., Chief Marrone sent an email with "Progress Pride Flag FAQs" attached, | 19. **Undisputed**. |

10

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| asking his Chief Deputies to share it with their managers.<br><br>Portnoi Decl. Ex. J (O'Brien Dep. Tr.) 83:18-84:12<br><br>Mayfield Decl. ¶3, Ex. A (email correspondence between Chief O'Brien, Chief Mayfield, and division chiefs) at LAC-0002035-36 | |
| 20. On June 20, 2023 at 8:20 p.m., Chief Deputy Jon O'Brien forwarded this email to his Deputy Chiefs, calling for 100% compliance with EA-231 and the Board motion.<br><br>Mayfield Decl. ¶3, Ex. A (email correspondence between Chief O'Brien, Chief Mayfield, and division chiefs) at LAC-0002035-36<br><br>O'Brien Decl. ¶6, Ex. D (email correspondence between Chief O'Brien, Chief Mayfield, and division chiefs) at LAC-0002035-36<br><br>Portnoi Decl. Ex. J (O'Brien Dep. Tr.) 83:18-84:12 | 20. **Undisputed** that on June 20, 2023 at 8:20 p.m., Chief Deputy Jon O'Brien forwarded this email to his Deputy Chiefs.<br>**Disputed** that Fact No. 20 accurately summarizes the content of the email, which provided, "Informational FAQ to pass along to your A C's as they engage with their stations to achieve 100% compliance with flying the PRIDE Progress Flag as outlined in EA-231." |
| 20. Plaintiff's Response takes issue with the term "calling for." Chief O'Brien's e-mail stated, "Informational FAQ to pass along to your AC's as they **engage with their stations to achieve 100% compliance with flying the PRIDE Progress Flag as outlined in EA-231.**" (Dkt. 116-13 (Mayfield Decl.) ¶3; Dkt. 116-14 (email correspondence between Chief O'Brien, Chief Mayfield, and division chiefs) at LAC-0002035-36.) To the extent that Plaintiff disputes the term "calling for," the document speaks for itself, and his argument about how to interpret it is insufficient to establish a dispute of fact. | |
| 21. On June 20, 2023 at 8:34 p.m., Deputy Fire Chief William Mayfield forwarded Chief O'Brien's email to his | 21. **Undisputed.** |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Assistant Chiefs and indicated that the absence of clasps is "not an excuse" not to fly the PPF.<br><br>Mayfield Decl. ¶3, Ex. A (email correspondence between Chief O'Brien, Chief Mayfield, and division chiefs) at LAC-0002035<br><br>O'Brien Decl. ¶6, Ex. D (email correspondence between Chief O'Brien, Chief Mayfield, and division chiefs) at LAC-0002035 | |
| 22. Deputy Fire Chief Mayfield is the bureau commander for three Fire Department divisions, including the Lifeguard Division, the EMS Division, and all training aspects within the Department.<br><br>Portnoi Decl. Ex. L, (Mayfield Dep. Tr.) 26:7-8, 24:8-16<br><br>Mayfield Decl. ¶2 | 22. **Undisputed**. |
| 23. The evening of June 20, 2023, Chief Fernando Boiteux conveyed Chief O'Brien's 100% directive to Chief Adam Uehara and the lifeguard section chiefs, including Chief Arthur Lester, instructing them to fixed flagpoles under their management regardless of whether clasps were currently installed and report to him the next morning if any PPFs were missing or could not be flown.<br><br>Lester Decl. ¶3, Ex. A (email correspondence between Chief | 23. **Undisputed**. |

12

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Boiteux, Chief Uehara, and section chiefs) at LAC-0001966<br><br>Boiteux Decl. ¶¶5-6, Ex. C (email correspondence between Chief Boiteux, Chief Uehara and section chiefs) at LAC-0001343, Ex. D (text message correspondence between Chief Boiteux, Chief Uehara, and section chiefs) at LAC-0001495<br><br>Portnoi Decl. Ex. L (Mayfield Dep. Tr. Vol. II) 175:13-176:22, 185:24-186:11<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 69:4-22, 73:5-16<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 148:19-149:19 | |
| 24. At 8:00 a.m. on June 21, 2023, Chief Lester began ensuring that the fixed flagpoles at the sites he supervised were flying the PPF by either raising them himself or confirming that they were being flown.<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.). 69:23-70:20, 74:12-77:9<br><br>Portnoi Decl. Ex. M (Gottschalk Dep. Tr.) 197:13-16, 224:3-7 | 24. **Undisputed** in significant part; **disputed** as to "fixed" because the cited deposition testimony does not refer to "fixed flag poles." |
| 24. Plaintiff disputes that Chief Lester ensured that the flagpoles were "fixed," but otherwise does not dispute that Chief Lester ensured that the flagpoles at the sites he supervised were flying the PPF by either raising them himself or confirming that they were being flown.  This distinction does not create a genuine issue of material fact. | |
| 25. Chief Lester visited all sites other than those on Catalina Island personally, including Area 17 | 25. **Undisputed**. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| (Dockweiler North, Dockweiler South, and El Segundo). Portnoi Decl. Ex. E (Lester Dep. Tr.) 75:4-77:9 Portnoi Decl. Ex. M (Gottschalk Dep. Tr.) 197:13-16, 224:3-7 | |
| 26. At 10:22 a.m. on June 21, 2023, Chief Lester emailed Chief Boiteux confirming where the PPF was flying. Lester Decl. ¶3, Ex. A (email correspondence between Chief Boiteux, Chief Uehara, and section chiefs) at LAC-0001965 | 26. **Undisputed**. |
| 27. On June 18, 2023, Plaintiff emailed Chiefs Boiteux, Kyle Power, and Danielle McMillon to request to be exempt from EA-231. Portnoi Decl. Ex. H (McMillon Dep. Tr.) 27:4-11 McMillon Decl. ¶2, Ex. A (email correspondence between Plaintiff, Captain Crum, and Chiefs Boiteux, McMillon, Power, Uehara, and Kim) at LAC-0001549 TAC ¶¶42-43 | 27. **Undisputed**. |
| 28. Chiefs Power and McMillon were Plaintiff's usual supervisors in late June 2023. Portnoi Decl. Ex. B (Little Dep. Tr.) 26:9-14 | 28. **Undisputed**. |
| 29. Plaintiff's June 18, 2023 email was forwarded to Renee Nuanes- | 29. **Undisputed**. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Delgadillo, who organized an interactive process meeting ("IPM") for June 19, 2023.<br><br>McMillon Decl. ¶2, Ex. A (email correspondence between Plaintiff, Captain Crum, and Chiefs Boiteux, McMillon, Power, Uehara, and Kim) at LAC-0001548-49<br><br>Portnoi Decl. Ex. G (Nuanes-Delgadillo Dep. Tr.) 100:13-101:18, 116:11-18<br><br>Portnoi Decl. Ex. H, (McMillon Dep. Tr.) 87:25-88:8, 99:10-21 | |
| 30. Chiefs Uehara and McMillon attended the June 19 IPM to represent the Lifeguard Division chain of command and provide an operational perspective on the feasibility of an accommodation.<br><br>Portnoi Decl. Ex. G (Nuanes-Delgadillo Dep. Tr.) 119:2-6<br><br>*Portnoi Decl. Ex. H (McMillon Dep. Tr.) 108:18-22, 109:3-17*<br><br>Portnoi Decl. Ex. N (Boiteux Dep. Tr.) 114:3-117:3<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.). 47:25-48:5, 48:22-25 | 30. **Undisputed** that Chiefs Uehara and McMillon attended to represent the Lifeguard Division chain of command.<br>**Disputed** as to the characterization of their presence as to "provide an operational perspective on the *feasibility* of an accommodation"; rather, they were there to effect options that were already determined to be feasible. *See* McMillon Dep., 108:24-109:17, 115:4-9 [ECF No. 115-8 at 43-44, 50]; Uehara Dep., 48:19-49:1-3 [ECF No. 115-9 at 11-12] |
| 30. Plaintiff's Response lacks merit.  The cited deposition testimony supports the notion that Lifeguard Division staff attend IPMs to provide input on operational issues.  Chief Uehara stated that he "will put [his] operational input, if we can support that, and then we collaborate."  (Dkt. 115-9 (Uehara Dep. Tr.) 47:25-48:5.)  Chief McMillon's testimony discusses various options, including taking time off, the possibility of recalls, relief shifts, and moving Plaintiff to a different area.  (Dkt. 115-8 (McMillon Dep. Tr.) 108:18-22, 109:3-17.)  Chief Boiteux | |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| confirmed the purpose of having "operations," i.e., in this case, Chiefs Uehara and McMillon, in IPMs: "We get involved to make sure that our operations – it doesn't affect the operations." (Dkt. 115-14 (Boiteux Dep. Tr.) 114:3-117:3.) | |
| 31. Ms. Nuanes Delgadillo and Rachel Lara attended the June 19 IPM as human resources representatives.<br><br>Portnoi Decl. Ex. G (Nuanes-Delgadillo Dep. Tr.) 18:5-20:6<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.). 47:25-49:3 | 31. **Disputed** on the basis that the cited testimony does not support the fact asserted. Nuanes Delgadillo testified: "Q. What was -- how would you describe [Rachel Lara's] role in those initial IPM meetings with Captain Little as opposed to your role? A. We both have the same role. We facilitate interactive process meetings or IPMs." Nuanes Delgadillo Dep., 19:11-15 [ECF No. 115-7 at 10] |
| 31. It is unclear what part of this Fact Plaintiff disputes.  Nonetheless, the cited deposition testimony from Chief Uehara confirms that, "from HR, it was Rachel Lara" who attended the IPM, and then Ms. Nuanes Delgadillo confirms that she and Ms. Lara "have the same role."  (Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 18:5-20:6; Dkt. 115-9 (Uehara Dep. Tr.) 47:25-49:3.) | |
| 32. At the June 19 IPM, Plaintiff explained that he had religious objections to raising the PPF and to working in a place where he could see the PPF flying.<br><br>Portnoi Decl. Ex. G (Nuanes-Delgadillo Dep. Tr.) 170:13-15<br><br>Portnoi Decl. Ex. H (McMillon Dep. Tr.) 107:16-108:1, 118:14-119:1<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 96:21-97:1, 97:7-13, 105:10-106:2, 137:24-138:2<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 89:2-90:16, 166:15-167:1 | 32. **Undisputed** that Plaintiff explained that he had religious objections to raising the PPF. **Disputed** as to the assertion that Plaintiff explained he had religious objections to working in a place where he could see the PPF flying. *See* Jonna MSJ Opp. Decl., Ex. A, Little Dep., 100:17-25, 120:7-12, 120:20-121:4, 121:10-23, 127:3-129:22. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Nuanes-Delgadillo Decl. ¶¶3-4, Ex. A (2023 IPM notes) at LAC-0001488-89, Ex. B (2023 IPM report) at LAC-0000374 | |
| 32. To the extent Plaintiff relies on his own, after-the-fact deposition testimony to create a material issue of fact, that is insufficient. Plaintiff's deposition testimony was over two years after the IPM. The IPM summary and notes are not consistent with this testimony. (Dkt. 116-20 (2023 IPM notes) at LAC-0001488; Dkt. 116-21 (2023 IPM summary) at LAC-0000374.) | |
| 33. At the June 19 IPM, Plaintiff requested that he either not be required to fly the PPF at Will Rogers Beach or be reassigned to a site where he would not be responsible for flying the PPF.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 120:5-121:4<br><br>Portnoi Decl. Ex. G (Nuanes-Delgadillo Dep. Tr.) 163:18-164:5, 219:3-219:14<br><br>Portnoi Decl. Ex. H (McMillon Dep. Tr.) 118:14-119:1<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 100:13-25, 101:8-16<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 130:6-12<br><br>Nuanes-Delgadillo Decl. ¶¶3-4, Ex. A (2023 IPM notes) at LAC-0001488, Ex. B (2023 IPM report) at LAC-0000374 | 33. **Undisputed** to the extent Captain Little sought an exemption from personally flying the PPF at Will Rogers Beach.<br>**Disputed** that Plaintiff attempted to keep the PPF from being flown to stifle the County's message.<br>Captain Little testified that, upon reading EA-231 and the accompanying flow chart, he determined that the flagpole at Will Rogers Beach would not fly a PPF.<br>The PPF did not fly at that location for the first three days of June 2023.<br>Little Depo., pp.61:5- 63:4<br>Kim Decl. ¶3, Ex. B, EA-231 [ECF No. 116-2] |
| 33. Defendants' fact does not state that "Plaintiff attempted to keep the PPF from being flown to stifle the County's message" as Plaintiff's Response suggests, so it is unclear what, if anything, Plaintiff disputes. Nonetheless, the evidence cited in Defendants' Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶¶32-33 | |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| indicates that Plaintiff further objected to working in a place where he could see the PPF flying and requested to not be required to fly the PPF at Will Rogers Beach.  (Dkt. 115-2 (Little Dep. Tr.) 120:5-121:4; Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 163:18-164:5, 170:13-15, 219:3-219:14; Dkt. 115-8 (McMillon Dep. Tr.) 107:16-108:1, 118:14-119:1; Dkt. 115-15 (Crum Dep. Tr.) 96:21-97:1, 97:7-13, 100:13-25, 101:8-16, 105:10-106:2, 137:24-138:2; Dkt. 115-9 (Uehara Dep. Tr.) 89:2-90:16, 130:6-12, 166:15-167:1; Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4; Dkt. 116-20 (2023 IPM notes) at LAC-0001488-89; Dkt. 116-21 (2023 IPM report) at LAC-0000374.)  Further, based on the 100 percent compliance directive, Will Rogers was required to fly the PPF.  (Dkt. 115-5 (Lester Dep. Tr.) 88:5-20.) | |
| 34. As of June 19, 2023, Plaintiff was assigned to Will Rogers Beach.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 61:13-61:15<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 110:4-7, 112:18-23, 191:15-19 | 34. **Undisputed**. |
| 35. Plaintiff did not voice any objections to how two lifeguard towers at Will Rogers Beach were painted with the colors of the Pride Flag.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 118:3-120:4<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 64:21-23, 110:4-25<br><br>Nuanes-Delgadillo Decl. ¶¶3-4, Ex. A (2023 IPM notes) at LAC-0001489, Ex. B (2023 IPM report) at LAC-0000375 | 35. **Undisputed**.<br>**Disputed** as irrelevant. ***See* Obj. No. 13**. |
| 35. To the extent Plaintiff asserts that this fact is irrelevant, that is an evidentiary objection, and not a real dispute of fact.  Plaintiff's Separate Statement of Uncontroverted Facts also belies his claim that this fact is irrelevant, as it addresses the exact same subject matter.  (Dkt. 121-2 ¶¶70-71.) | |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 36. Plaintiff had previously been assigned to Venice Beach.<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 110:7-9, 112:18-23 | 36. **Undisputed**. |
| 37. Plaintiff did not voice any objections to working at Venice Beach, which has had a Pride Flag–painted tower since 2017.<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.). 64:14-24, 109:23-110:25, 111:9-15 | 37. **Disputed** that Venice Beach has had a Pride Flag-painted tower since 2017 since that fact is not reflected in any of the citations set forth in support of that assertion.<br>**Disputed** as irrelevant. ***See* Obj. No. 14**.<br>**Undisputed** as to the remaining allegations of Paragraph 37. |
| 37. To the extent Plaintiff asserts that this fact is irrelevant, that is an evidentiary objection, and not a real dispute of fact.  Further, Chief Uehara stated that the "Pride towers on Venice Beach … were painted in the Pride colors," and that this has been the case since "approximately around 2016 ish on Venice Beach." (Dkt. 115-9 (Uehara Dep. Tr.) 64:14-24.) ||
| 38. At the June 19 IPM, Plaintiff's chain of command determined that it would be operationally feasible for him to work at Area 33, which covers Malibu Beach, for some dates in June 2023.<br><br>Portnoi Decl. Ex. H (McMillon Dep. Tr.) 98:1-5, 109:18-110:4, 111:20-25, 112:12-17, 126:18-127:8, 187:24-188:6, 190:14-17<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 101:17-102:24, 104:10-105:9<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 95:3-96:13, 127:12-16, 131:13-133:7<br><br>Nuanes-Delgadillo Decl. ¶¶3-4, Ex. A (2023 IPM notes) at LAC-0001488-89, | 38. **Disputed** as to the characterization of what occurred at the June 19 IPM and what "Plaintiff's chain of command determined" at that meeting as a "determin[ation] that it would be operationally feasible for [Little] to work at Area 33 ... for some dates in June, 2023.<br>*See* Nuanes-Delgadillo Decl, Ex. B (2023 IPM report) [ECF No. 116-21]; Uehara Dep., p.95:2-17, pp.126:21-127:22 [ECF No. 115-9 at 36, 55-56]; Nuanes-Delgadillo Dep., p.18:5-8 [ECF No. 115-7 at 9] |

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Ex. B (2023 IPM report) at LAC-0000374-75 | |
| 38. Ms. Nuanes-Delgadillo's 2023 IPM report states, "You were informed that this request was discussed with your chain of command and the department is able to accommodate you with an assignment to Area 33, which you accepted." (Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶4; Dkt. 116-21 (2023 IPM report) at LAC-0000374.)  So it is unclear what the basis for Plaintiff's response is. | |
| 39. At the June 19 IPM, Plaintiff was told that there was a PPF flying at Zuma Headquarters, which is near Area 33 and where the Area 33 Captain's office is located, but that he would likely not be responsible for ensuring it was flying it because the Area 30 and Area 34 Captains also work out of that location and could ensure that it was flown.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 121:13-121:15, 127:24-127:25<br><br>Portnoi Decl. Ex. G (Nuanes-Delgadillo Dep. Tr.) 170:1-170:15<br><br>Portnoi Decl. Ex. H (McMillon Dep. Tr.) 109:18-110:4, 111:20-25, 112:12-17, 126:18-127:8, 187:24-188:18, 190:14-17<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 101:17-102:24, 104:10-106:2<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 95:2-96:6<br><br>Nuanes-Delgadillo Decl. ¶¶3-4, Ex. A (2023 IPM notes) at LAC-0001488-89, Ex. B (2023 IPM report) at LAC-0000374 | 39. **Undisputed**. |

20

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 40. At the June 19 IPM, it was explained to Plaintiff that he may still need to ensure that the PPF was flown at Area 33.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 128:3-129:22.<br><br>Portnoi Decl. Ex. G (Nuanes-Delgadillo Dep. Tr.) 212:25-213:2<br><br>Portnoi Decl. Ex. H (McMillon Dep. Tr.) 109:18-110:4, 111:20-25, 112:12-17, 126:18-127:8, 187:24-188:18, 189:5-14, 190:14-17<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 101:17-102:24, 104:10-106:2<br><br>Nuanes-Delgadillo Decl. ¶¶3-4, Ex. A (2023 IPM notes) at LAC-0001488-89, Ex. B (2023 IPM report) at LAC-0000374 | 40. **Undisputed**. |
| 41. At the June 19 IPM, Plaintiff objected to instructing others to raise the PPF.<br><br>Portnoi Decl. Ex. H (McMillon Dep. Tr.) 107:15-108:1<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 104:20-106:2<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 127:14-16<br><br>Nuanes-Delgadillo Decl. ¶¶3-4, Ex. A (2023 IPM notes) at LAC-0001489, Ex. B (2023 IPM report) at LAC-0000374 | 41. **Undisputed**. |
| 42. At the June 19 IPM, Plaintiff agreed to work at Area 33. | 42. **Undisputed**. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Portnoi Decl. Ex. B (Little Dep. Tr.) 127:24-128:1<br><br>Portnoi Decl. Ex. G (Nuanes-Delgadillo Dep. Tr.) 120:13-122:6<br><br>Portnoi Decl. Ex. H (McMillon Dep. Tr.) 126:18-127:8<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.). 104:10-106:2<br><br>Nuanes-Delgadillo Decl. ¶¶3-4, Ex. A (2023 IPM notes) at LAC-0001488-89, Ex. B (2023 IPM report) at LAC-0000374<br><br>TAC ¶¶49, 52 | |
| 43. At the June 19 IPM, Plaintiff never requested to lower the PPF.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 132:8-16.<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.). 285:6-9<br><br>Nuanes-Delgadillo Decl. ¶¶3-4, Ex. A (2023 IPM notes) at LAC-0001488-89, Ex. B (2023 IPM report) at LAC-0000374-75<br><br>Portnoi Decl. Ex. S (Plaintiff's Responses to Requests for Admission) at 6-7 | 43. **Undisputed**.<br>**Disputed** as irrelevant. *See* **Obj. No. 15**. |
| 43. To the extent Plaintiff asserts that this fact is irrelevant, that is an evidentiary objection, and not a real dispute of fact. | |
| 44. At the end of the June 19 IPM, Ms. Nuanes-Delgadillo informed those present that she needed to follow up with the Department of Human | 44. **Disputed**. The Little and Crum testimony cited in support of the assertion reflects only that they were informed that "if anything changes on |

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Resources (who she had previously contacted but not yet heard from) and may reconnect regarding Plaintiff's request for a religious accommodation.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 131:22-132:5<br><br>Portnoi Decl. Ex. H (McMillon Dep. Tr.) 109:21-110:4, 111:20-24, 112:12-17<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.). 112:8-17<br><br>Nuanes-Delgadillo Decl. ¶¶3-4, Ex. A (2023 IPM notes) at LAC-0001489, Ex. B (2023 IPM report) at LAC-0000375 | either end we would engage again." *See* Little Dep., pp.131:22-132:5 [ECF No. 115-2 at 76-77]; Crum Dep., 112:5-13 [ECF No. 115-15 at 70]; *see also* Jonna MSJ Opp. Decl., Ex. E, McMillon Dep. Ex. 8.<br>McMillon testified that after the IPM she sent a June 20, 2023 e-mail because Chief Uehara called her and told her they needed to do a follow-up IPM. McMillon stated she wasn't involved in why the request came to do another follow-up IPM. *See* Jonna MSJ Opp. Decl., Ex. E, McMillon Dep., pp. 136:3-137:20. |

44. The basis of Plaintiff's dispute is unclear. Chief McMillon stated as follows: "The IPM didn't end. It was mostly a fact-finding IPM. Again, we followed up, and it was discussed. Renee, specifically, said that she was unclear about the religious accommodation, and that she would have to reach out to county counsel to confirm, but she wasn't sure." (Dkt. 115-8 (McMillon Dep. Tr.) 109:21-110:4.) Ms. Nuanes-Delgadillo's notes reflect the need for follow up as well: "You were informed that if anything changes on either end, we would engage again, you replied that you understood." (Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶4; Dkt. 116-21 (2023 IPM report) at LAC-0000374.) The Little and Crum testimony Plaintiff references are consistent with the idea that Ms. Nuanes-Delgadillo might need to reconnect about Plaintiff's request.

| | |
|---|---|
| 45. Plaintiff did not indicate his disagreement with the characterization of events in Ms. Nuanes-Delgadillo's IPM summary after she emailed it to him on July 13, 2023.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 123:7-14, 126:4-10, 131:9-21 | 45. **Disputed**; Little indicated his disagreement at the time of his deposition.<br>At Little's deposition he disputed the statements in the IPM summary that he would like to be placed at a station where the PPF is not flown because "it should read then you would like to be placed at a station where you do not |

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
|  | have the responsibilities outlined for the PPF." Little Dep., p.123:12-24 [ECF No. 115-2 at 68] He disputed the statement in the IPM summary, "You replied that your main issue is working in a building where the PPF is flown since it goes against your religious beliefs." Nuanes-Delgadillo Decl., Ex. B (2023 IPM report) at LAC-0000374 [ECF No. 116-21 at 2] He disputed the statement that it would not be an issue if he was assigned to area 33, where the PPF was flown, because he would not visibly see the flag and the assignment required him to be in the field. Little Dep., p. 126:11-127:4, 131:9-16 [ECF No. 115-2 at 71-72, 76] **Disputed** as irrelevant. ***See* Obj. No. 16**. |
| 45. To the extent Plaintiff asserts that this fact is irrelevant, that is an evidentiary objection, and not a real dispute of fact. In addition, Plaintiff concedes that he did not indicate his disagreement with the characterization of events in the IPM summary at any point before December 2025 in his deposition in this litigation, well after the June 2023 IPMs. | |
| 46. Prior to Plaintiff's June 18 emailed accommodation request, he had been scheduled for a recall shift on June 21, 2023. Portnoi Decl. Ex. H (McMillon Dep. Tr.) 186:13-23, 187:24-188:6 McMillon Decl. ¶3, Ex. B (text message correspondence between Plaintiff and Chiefs McMillon and Uehara) at LITTLE.00481 | 46. **Disputed** on the basis that the cited materials don't establish the fact that he was scheduled for a recall shift prior to his June 18 religious accommodation request. |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 46. The statement from Chief McMillon demonstrates that Capt. Little was moved from "Area 15 to Area 17, which is where he was assigned for the 21st," during his IPM. (Dkt. 115-8 (McMillon Dep. Tr.) 186:13-23, 187:24-188:6.) Plaintiff's own testimony demonstrates that he was "already recalled …" for that assignment. (Portnoi Decl. Ex. B (Little Dep. Tr.) 148:19-21.) | |
| 47. Recalls force employees to work on days and/or at locations where they are not already assigned.<br><br>Portnoi Decl. Ex. N (Boiteux Dep. Tr.) 130:22-131:17<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 47:1-10, 68:5-13<br><br>Portnoi Decl. Ex. H (McMillon Dep. Tr.) 105:8-19<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 59:19-60:1<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 233:24-234:3 | 47. **Undisputed**. |
| 48. Chief McMillon offered to obtain a recall exemption for Plaintiff for June 21, 2023.<br><br>Portnoi Decl. Ex. H (McMillon Dep. Tr.) 186:17-23, 187:24-188:6<br><br>Portnoi Decl. Ex. M (Gottschalk Dep. Tr.) 25:24-26:1, 42:3-9<br><br>McMillon Decl. ¶3, Ex. B (text message correspondence between Plaintiff and Chiefs McMillon and Uehara) at LITTLE.00481 | 48. **Undisputed**. |
| 49. Lifeguards have two recall exemptions they can use per year, | 49. **Undisputed**. |

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| which allow them to decline a recall shift when they get recalled.<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 107:9-20 | |
| 50. After his June 19 IPM, Plaintiff declined Chief McMillon's recall exemption offer and coordinated to switch shifts with another captain so that he would work at Area 17 on June 21, 2023.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 152:2-153:24, 170:13-170:23<br><br>Portnoi Decl. Ex. H (McMillon Dep. Tr.) 186:17-23, 187:24-188:6<br><br>McMillon Decl. ¶3, Ex. B (text message correspondence between Plaintiff and Chiefs McMillon and Uehara) at LITTLE.00481<br><br>TAC ¶62 | 50. **Disputed** as to the order of events. McMillon testified that she had given Little a Wellness Recall Exemption, but Little declined because he had already agreed to switch shifts so he would work at Area 17. **Otherwise undisputed**. *See* McMillon Dep., 186:18-187:6 [ECF No. 115-9 at 92-93]. |

50. Plaintiff's citation to the McMillon deposition does not support his Response that "she had given little a Wellness Recall Exemption, but Little declined because he had already agreed to switch shifts so he would work at Area 17." (Dkt. 115-8 (McMillon Dep. Tr.) 186:17-23.) Rather, what Chief McMillon states is that she "worked with him to move his schedule. I thought it was Redondo, but in previous texts it was Area 15, which was Hermosa…" (*Id.*) Therefore, the evidence, retaken as a whole, demonstrates that Plaintiff declined his recall exemption and coordinated to switch shifts with another captain.

| | |
|---|---|
| 51. Area 17 encompasses three substation areas, each of which contains multiple lifeguard towers: Dockweiler North ("DWS"), Dockweiler South ("DWS"), and El Segundo. | 51. **Undisputed**. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Lester Decl. ¶6 | |
| 52. On June 21, 2023, Plaintiff parked at Dockweiler HQ.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 195:5-9 | 52. **Undisputed**. |
| 53. Dockweiler HQ is a Beaches and Harbors facility, not a Lifeguard Division facility.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 196:16-197:2<br><br>Portnoi Decl. Ex. N (Boiteux Dep. Tr.) 147:10-15<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 115:19-116:17<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 183:16-22 | 53. **Disputed** on the basis that the Crum testimony lacks foundation, and on the basis that the rest of the cited evidence does not support the proposition. *See* **Obj. No. 7**. |

53. To the extent this raises an evidentiary objection, that does not create a genuine dispute of material fact.  Regardless, the remaining testimony demonstrates that Dockweiler HQ is a Beaches and Harbors facility.  For example, Chief Uehara says, "in that area [referring to the "Dockweiler Area"], I do know that it's a shared facility with Beaches and Harbors."  (Dkt. 115-9 (Uehara Dep. Tr.) 183:16-22.)  Chief Boiteux said, "Dockweiler Beach, the entrance to the parking lot, it's managed by [] Department of Beach and Harbors."   (Dkt. 115-14 (Boiteux Dep. Tr.) 147:10-15.)

| | |
|---|---|
| 54. Plaintiff's shifts in June 2023, including on June 21, 2023, started at 10:00 a.m.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 143:4-13, 194:5-12 | 54. **Undisputed** as to the general 10:00 a.m. start time of Plaintiff's shifts in June 2023, but disputed as to a 10:00 a.m. start time on June 21, 2023. See Little Dep., p.194:5-12 [ECF No. 115-2 at 122]. |

54. Plaintiff said that he "believe[d]" he "started at 10:30, which there's a discrepancy in the schedule … ," but also that "Area 33, that time of year is a

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| late start, so it would start at 10:00 o'clock." (Dkt. 115-2 (Little Dep. Tr.) 143:4-13, 194:5-12.)  In any case, whether Plaintiff arrived at 10:00 a.m. or 10:30 a.m. is not a genuine dispute of material fact, as it is undisputed that Plaintiff did not arrive *before* 10:00 a.m., when the PPFs were raised at Area 17. | |
| 55. Absent inclement weather, flags are usually raised before 10:00 a.m.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 143:22-144:5 | 55. **Undisputed**. |
| 56. Plaintiff arrived at the beach on June 21, 2023 to find the PPF flying at Dockweiler South and Dockweiler North.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 201:12-16<br><br>Portnoi Decl. Ex. M (Gottschalk Dep. Tr.) 68:19-21<br><br>Gottschalk Decl. ¶¶2-3, Ex. A (July 5, 2023 Gottschalk CPOE interview) at 2:53-3:20, 6:30-38, Ex. B (Aug. 23, 2023 Gottschalk CPOE interview) at 7:30-46<br><br>Portnoi Decl. Ex. D (Plaintiff CPOE Interview) at 12:40-52, 17:07-10<br><br>Stormer Decl. ¶3, Ex. A (CPOE Investigative Report) at LAC-0000192, LAC-0000196 | 56. **Undisputed** but misleading by omission. *See* Additional Facts. |
| 56. Plaintiff's Response does not adequately demonstrate how this fact is purportedly misleading by omission. | |
| 57. Chief Lester had ensured that the PPF was raised at Dockweiler South and Dockweiler North on June 21 before Plaintiff arrived at work. | 57. **Undisputed** but misleading by omission. *See* Additional Facts. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Portnoi Decl. Ex. B (Little Dep. Tr.) 202:12-18<br><br>Portnoi Decl. Ex. M (Gottschalk Dep. Tr.) 111:22-112:18<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 69:23-70:7, 75:4-77:9<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.). 283:23-284:7 | |
| 57. Plaintiff's Response does not adequately demonstrate how this fact is purportedly misleading by omission. | |
| 58. OLS Lauren Gottschalk was Plaintiff's direct report on June 21.<br><br>Portnoi Decl. Ex. M (Gottschalk Dep. Tr.) 26:2-5, 171:23-172:3, 187:23-188:5 | 58. **Undisputed**. |
| 59. Plaintiff asked OLS Gottschalk if she would be okay with him<br><br>removing the PPF at Dockweiler South<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 206:14-206:17<br><br>Portnoi Decl. Ex. M (Gottschalk Dep. Tr.) 86:13-15<br><br>Lester Decl. ¶5, Ex. C (CPOE complaint) at LAC-0000180 | 59. **Undisputed**. |
| 60. OLS Gottschalk told Plaintiff that Chief Lester had ensured the PPF was raised that morning, that she was fine with the PPF up, and that she was concerned about receiving conflicting orders. | 60. **Undisputed** but misleading by omission. *See* Additional Facts. To the extent this fact is offered to prove Gottschalk's state of mind and that Gottschalk was actually concerned about conflicting orders (as opposed to merely that she made the statement to Little), the testimony is inadmissible |

29

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Portnoi Decl. Ex. B (Little Dep. Tr.) 206:5-207:10<br><br>Portnoi Decl. Ex. M (Gottschalk Dep. Tr.) 86:13-15, 87:23-88:24, 101:3-7, 101:22-103:4, 282:2-10<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 144:13-145:2<br><br>Lester Decl. ¶5, Ex. C (CPOE complaint) at LAC-0000180<br><br>Stormer Decl. ¶3, Ex. A (CPOE Investigative Report) at LAC-0000192, LAC-0000196 | under Fed. R. Evid. 803(3) as a then-existing state of mind. *See* **Obj. No. 8**. |
| 60. Plaintiff's Response does not adequately demonstrate how this fact is purportedly misleading by omission.  Further, to the extent that Plaintiff raises an evidentiary objection, that does not establish an issue of material fact. | |
| 61. Plaintiff took down the Dockweiler South PPF himself.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 204:22-205:21<br><br>Lester Decl. ¶5, Ex. C (CPOE complaint) at LAC-0000180<br><br>Stormer Decl. ¶3, Ex. A (CPOE Investigative Report) at LAC-0000192, LAC-0000196 | 61. **Undisputed** but misleading by omission. *See* Additional Facts. |
| 61. Plaintiff's Response does not adequately demonstrate how this fact is purportedly misleading by omission. | |
| 62. Plaintiff then drove to Dockweiler North and El Segundo, removing the PPF at both sites.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 200:2-10, 204:17-205:24, 210:3-13 | 62. **Undisputed** but misleading by omission. *See* Additional Facts. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Portnoi Decl. Ex. M (Gottschalk Dep. Tr.) 85:20-22, 86:13-15<br><br>Stormer Decl. ¶3, Ex. A (CPOE Investigative Report) at LAC-0000196<br><br>Gottschalk Decl. ¶3, Ex. B (Aug. 23, 2023 Gottschalk CPOE interview) at 12:51-13:18<br><br>Portnoi Decl. Ex. D (Plaintiff CPOE interview) at 28:12-49<br><br>Hastings Decl. ¶¶4-5, Ex. A (video from El Segundo Beach) | |
| 62. Plaintiff's Response does not adequately demonstrate how this fact is purportedly misleading by omission. | |
| 63. When Plaintiff removed the PPF at El Segundo, he did so in view of the public and surrounded by participants in the County's junior lifeguard program.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 214:12-23, 216:1-217:12<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 177:7-14, 290:20-291:4<br><br>Hastings Decl. ¶¶4-5, Ex. A (video from El Segundo Beach) | 63. **Disputed as mischaracterizing the record**. The phrase "surrounded by participants in the County's junior lifeguard program" is designed to imply that Little made a spectacle targeting minors. The cited testimony tells a different story. Junior lifeguards happened to be operating in the El Segundo area—as they routinely do during the summer—and Little had no interaction with them.<br>The asserted fact also misstates the cited testimony by exaggerating that Little was "surrounded" by the junior lifeguards. The cited testimony instead says that some junior lifeguards were "in front of" Little.<br>Little Dep. 216:8-217:24 [ECF No. 115-2 at 144-45]; Uehara Dep. 177:7-14, 290:21-23 [ECF No. 115-9 at 96, 168]; Hastings Decl. ¶¶4-5 [ECF No. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | 115-29]; Lester Dep. 111:22-25 [ECF No. 110-6 at 15] |
| 63. Chief Uehara stated that Plaintiff had removed the PPF "in front of all the [J]unior Lifeguards," (Dkt. 115-9 (Uehara Dep. Tr.) 290:20-291:4), and as the video demonstrates, the junior lifeguards surrounded Plaintiff.  To the extent Plaintiff takes issue with the term used here, that is insufficient to establish a genuine issue of material fact that he removed the PPF in the presence of several junior lifeguards. | |
| 64. Junior lifeguard participants are minors. Portnoi Decl. Ex. B (Little Dep. Tr.) 16:12-17 Portnoi Decl. Ex. M (Gottschalk Dep. Tr.) 13:8-11 Portnoi Decl. Ex. O (Crum Dep. Tr.) 21:18-20 | 64. **Undisputed but irrelevant**. It is undisputed that junior lifeguard participants are 9-17 years old, but this fact is not material to any element of any claim or defense. Defendants pair it with immediately preceding Fact 63 solely to create an inflammatory inference that Little's conduct was somehow directed at or harmful to minors. Defendants have offered no evidence into the record that any junior lifeguard was affected by Little's lowering of the PPF. |
| 64. To the extent Plaintiff asserts that this fact is irrelevant, that is an evidentiary objection, and not a real dispute of fact. | |
| 65. Chiefs Lester, Uehara, and Boiteux learned of Plaintiff's conduct taking down the PPFs later in the day on June 21, 2023. Portnoi Decl. Ex. N (Boiteux Dep. Tr.) 170:9-19 Portnoi Decl. Ex. E (Lester Dep. Tr.) 105:24-106:11, 108:13-109:18, 111:15-25 Portnoi Decl. Ex. I (Uehara Dep. Tr.) 172:7-173:1 | 65. **Undisputed**. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 66. Chief Lester had not known that Plaintiff requested a religious accommodation until after Plaintiff lowered the PPFs on June 21, 2023.<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 106:13-14 | 66. **Undisputed**. |
| 67. Chief Lester had not known that Plaintiff would be working at Area 17 until after Plaintiff lowered the PPFs on June 21, 2023.<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 102:15-103:3 | 67. **Disputed**.<br>Captain Little testified that "a section chief absolutely should know what captains are working in his area. So either [Lester] was incompetent and not doing his job or he did know" in advance that Little would be working at Area 17 on June 21, 2023. Jonna MSJ Opp. Decl., Ex. A, Little Dep. 227:9-12. |

67. Plaintiff's Response is based on Plaintiff's own speculation about what an individual in a position Plaintiff has never held "should" know and lacks foundation as to what Chief Lester in fact knew; and, in any event, the Response does not even state that Chief Lester knew Plaintiff would be working at Area 17. Chief Lester stated, "I wasn't aware that Jeff Little was working area 17 that day … . His normal spot is somewhere up north at a different beach … since he had moved up north and him working up north, occasionally, we would talk when I had seen him on the list, but I – I wasn't talking to him regularly….So I – I had no idea he was going to be working there that day." (Dkt. 115-5 (Lester Dep. Tr.) 102:15-103:3.)

| | |
|---|---|
| 68. Chiefs Lester, Uehara, and Boiteux determined, after receiving guidance from the Department of Human Resources, that Plaintiff did not have an accommodation to work only at sites where the PPF was not flown.<br><br>Portnoi Decl. Ex. N (Boiteux Dep. Tr.) 171:7-20 | 68. **Disputed**. In collaboration with the Human Resource Department, Chiefs Lester, Uehara, and Boiteux rescinded the prior accommodation offered to Captain Little.<br>Jonna MSJ Opp. Decl., Ex. B, Boiteux Dep. pp.143:22-144:11.<br>Lester Dep. 114:1-117:5 [ECF No. 110-6 at 18-21] |

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Portnoi Decl. Ex. E (Lester Dep. Tr.). 114:1-115:16, 117:4-5 | |
| 68. Plaintiff's Response contains a conclusion of law. The evidence cited in support of Facts No. 44-45 and testimony in Chief Uehara's deposition show Ms. Nuanes-Delgadillo's June 20, 2023 email did not communicate a finalized religious accommodation. (Dkt. 115-2 (Little Dep. Tr.) 123:7-14, 126:4-10, 131:9-21, 131:22-132:5; Dkt. 115-8 (McMillon Dep. Tr.) 109:21-110:4, 111:20-24, 112:12-17; Dkt. 115-15 (Crum Dep. Tr.) 112:8-17; Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4; Dkt. 116-20 (Nuanes-Delgadillo Decl. Ex. A) (2023 IPM notes) at LAC-0001489; Dkt. 116-21 (Nuanes-Delgadillo Decl. Ex. B) (2023 IPM report) at LAC-0000375; Dkt. 115-9 (Uehara Dep. Tr.) 126:9-127:22.)<br><br>Furthermore, none of the testimony that Defendants cited or that Plaintiff cited in his response supports Plaintiff's bald assertion that Chiefs Lester, Uehara, and Boiteux "rescinded" an accommodation, as none of them were decisionmakers as to whether Plaintiff would or would not receive an accommodation. (Dkt. 119-3 (Boiteux Dep. Tr.) 143:22-144:11; 110-6 (Lester Dep. Tr.) 114:1-117:.) | |
| 69. Chief Lester went to Area 17 to meet with Plaintiff and re-raise the PPF.<br><br>Portnoi Decl. Ex. M (Gottschalk Dep. Tr.) 165:24-166:7, 274:25-275:6<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 118:7-19, 121:23-122:2<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 177:25-178:3 | 69. **Undisputed**. |
| 70. On June 21, 2023, after learning that Plaintiff had lowered the PPFs, Chief Lester met privately with Plaintiff at Dockweiler North to discuss Plaintiff's lowering of the PPF.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 240:2-5 | 70. **Undisputed**. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Portnoi Decl. Ex. E (Lester Dep. Tr.) 124:14-18 | |
| 71. Chief Lester has known Plaintiff since high school.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 48:9-15<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 13:11 | 71. **Undisputed but irrelevant.** *See* **Obj. No. 17**. |
| 71. To the extent Plaintiff asserts that this fact is irrelevant, that is an evidentiary objection, and not a real dispute of fact. | |
| 72. Chief Lester came up through the lifeguard ranks with Plaintiff.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 48:9-50:9<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 13:11-22:22 | 72. **Undisputed but irrelevant.** *See* **Obj. No. 18**. |
| 72. To the extent Plaintiff asserts that this fact is irrelevant, that is an evidentiary objection, and not a real dispute of fact. | |
| 73. Chief Lester considers Plaintiff a friend.<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 13:21-22 | 73. **Undisputed** as to what Lester believes.<br>**Disputed** as to whether Lester and Plaintiff Little are actually friends. Little does not consider Lester to be a friend since they have not spoken since 2023.<br>Little Depo., p.50:14-18 [ECF No. 115-2 at 30]<br>Disputed as irrelevant. *See* **Obj. No. 19**. |
| 73. Plaintiff's Response does not rebut that *Chief Lester* considers Plaintiff a friend. This fact does not discuss what Plaintiff thinks. Further, to the extent | |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Plaintiff asserts that this fact is irrelevant, that is an evidentiary objection, and not a real dispute of fact. | |
| 74. Chief Lester attended Plaintiff's wedding. Portnoi Decl. Ex. B (Little Dep. Tr.) 49:12-13 Portnoi Decl. Ex. E (Lester Dep. Tr.) 20:23-21:1, 25:24-26:3 | 74. **Undisputed but irrelevant.** *See* **Obj. No. 20**. |
| 74. To the extent Plaintiff asserts that this fact is irrelevant, that is an evidentiary objection, and not a real dispute of fact. | |
| 75. When they spoke on June 21, 2023, Chief Lester asked if Plaintiff would re-raise the PPF. Portnoi Decl. Ex. B (Little Dep. Tr.) 242:15-17 Portnoi Decl. Ex. E (Lester Dep. Tr.) 125:6-9, 125:17-18, 126:6-15 | 75. **Disputed.** Chief Lester ordered Plaintiff to put the flag up. Little Depo., p.242:15-16 [ECF No. 115-2 at 156] |
| 75. The evidence Plaintiff cites does not support the notion that there was an "order." Rather, all Plaintiff testified to was, "Before that, he asked – he told me to put the flags up." (Dkt. 115-2 (Little Dep. Tr.) 242:15-16.) Plaintiff also does not dispute Facts No. 76 and 77, which state that he did not ultimately raise the PPF, and which are inconsistent with him receiving an order to do so. Instead, the evidence cited in support of Facts No. 75-77 are consistent—that Chief Lester *asked* if Plaintiff would re-raise the PPF. | |
| 76. When he spoke with Chief Lester on June 21, 2023, Plaintiff refused to re-raise the PPF, citing his religious beliefs. Portnoi Decl. Ex. B (Little Dep. Tr.) 242:15-17 | 76. **Undisputed.** |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Portnoi Decl. Ex. E (Lester Dep. Tr.) 126:16-18<br><br>Portnoi Decl. ¶2, Ex. A (text message communications between Plaintiff and Captain Crum) at LITTLE.00257, LITTLE.01083 | |
| 77. After Plaintiff refused to re-raise the PPF on June 21, 2023, and cited his religious beliefs, Chief Lester said that he would re-raise it himself and ensure that someone else lowered it at the end of the day.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 242:24-243:5<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 126:19-127:25, 138:16-139:1, 140:8-19<br><br>Portnoi Decl. ¶2, Ex. A (text message communications between<br><br>Plaintiff and Captain Crum) at LITTLE.00257, LITTLE.01083 | 77. **Undisputed**. |
| 78. On June 21, 2023, Plaintiff did not re-raise the PPFs in Area 17 after speaking with Chief Lester.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 243:1-8<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 126:23-25, 127:9-10 | 78. **Undisputed**. |
| 79. Chief McMillon had notified Plaintiff of the need for a second IPM on June 20, 2023 at 3:47 p.m. | 79. **Undisputed**. |

37

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Portnoi Decl. Ex. H (McMillon Dep. Tr.) 132:14-23<br><br>McMillon Decl. ¶3, Ex. B (text message correspondence between Plaintiff and Chiefs McMillon and Uehara) at LITTLE.00482 | |
| 80. After Chief Lester spoke with Plaintiff on June 21, 2023, Ms. Nuanes-Delgadillo convened a second IPM with Plaintiff.<br><br>Portnoi Decl. Ex. G (Nuanes-Delgadillo Dep. Tr.) 154:12-14<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 251:2-11 | 80. **Undisputed** as to the fact that Ms. Nuanes-Delgadillo convened a second IPM with Plaintiff on June 21; **Disputed** as unsupported by the cited evidence as to when it occurred in relation to speaking with Chief Lester. |
| 80. Capt. Little testified that the second IPM occurred "around 2:30, 2:45." (Dkt. 115-2 (Little Dep. Tr.) 251:2-11). That is when the meeting was convened. | |
| 81. At the time of Plaintiff's second IPM, Ms. Nuanes-Delgadillo did not know that Plaintiff had lowered the PPFs at Area 17 on June 21, 2023.<br><br>Portnoi Decl. Ex. G (Nuanes-Delgadillo Dep. Tr.) 149:3-151:6 | 81. **Undisputed**. |
| 82. Ms. Nuanes-Delgadillo learned that Plaintiff had lowered the PPFs at Area 17 from Plaintiff in 2024.<br><br>Portnoi Decl. Ex. G (Nuanes-Delgadillo Dep. Tr.) 149:3-151:6 | 82. **Disputed**. Nuanes-Delgadillo testified that she learned of Plaintiff's actions "[r]ecently through counsel," and Plaintiff merely sent her a document in 2024 "referencing" it, but it was not something she would discuss with Little and she didn't know the details of what happened. Nuanes-Delgadillo Depo. pp.149:9-150:13 [ECF No. 115-7 at 33-34] |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 82. To the extent that Plaintiff disputes whether Ms. Nuanes-Delgadillo learned that Plaintiff had lowered the PPFs at Area 17 from Plaintiff or another source, that does not create a genuine dispute of material fact.  What is relevant is that Ms. Nuanes-Delgadillo did not learn of Plaintiff's actions until 2024, many months after she facilitated the June 21, 2023 IPM with Plaintiff.  Plaintiff does not dispute this fact; indeed, his cited authority establishes it.  (Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 149:9-150:13.) | |
| 83. At the June 21 IPM, Plaintiff was informed that not wanting to work under the PPF did not qualify him for an accommodation because there was no interference with a religious practice.<br><br>Portnoi Decl. Ex. G (Nuanes-Delgadillo Dep. Tr.) 172:18-173:21<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 141:9-16, 144:7-15<br><br>Portnoi Decl. Ex. H (McMillon Dep. Tr.) 127:25-128:3<br><br>Nuanes-Delgadillo Decl. ¶¶3-4, Ex. A (2023 IPM notes) at LAC-0001490, Ex. B (2023 IPM report) at LAC-0000375 | 83. **Undisputed** to the extent that's what Plaintiff was told, **Disputed** that Plaintiff's requested accommodation was "not wanting to work under the PPF," and that Defendants' denial of his accommodation request did not interfere with his religious practice. Jonna MSJ Opp. Decl., Ex. A, Little Depo. pp.34:24-35:10 Little Depo., pp.107:8-21, 124:1-5, 129:23-130:13 [ECF No. 115-2 at 57, 69, 74-75] |
| 83. Plaintiff's Response concedes that he was told that not wanting to work under the PPF did not qualify him for an accommodation, and therefore fails to create a dispute of material fact with respect to this fact.  As for Plaintiff's commentary regarding his requested accommodation, his Response relies on Plaintiff's deposition testimony over two years after the IPM.  As Defendants' Separate Statement of Uncontroverted Facts makes clear, (Dkt. 114-2 ¶¶32-33), Plaintiff further objected to working in a place where he could see the PPF flying.  (Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 170:13-15, 219:3-219:14; Dkt. 115-8 (McMillon Dep. Tr.) 107:16-108:1, 118:14-119:1; Dkt. 115-15 (Crum Dep. Tr.) 96:21-97:1, 97:7-13,105:10-106:2, 137:24-138:2; Dkt. 115-9 (Uehara Dep. Tr.) 89:2-90:16, 166:15-167:1; Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3- | |

39

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 4; Dkt. 116-20 (2023 IPM notes) at LAC-0001488-89; Dkt. 116-21 (2023 IPM report) at LAC-0000374.) | |
| 84. At the June 21 IPM, Plaintiff was informed that case law and County policies did not require the granting of his accommodation request.<br><br>Portnoi Decl. Ex. G (Nuanes-Delgadillo Dep. Tr.) 174:6-9<br><br>Portnoi Decl. Ex. H (McMillon Dep. Tr.) 122:12-22, 142:1-11, 149:19-150:10<br><br>Nuanes-Delgadillo Decl. ¶¶3-4, Ex. A (2023 IPM notes) at LAC-0001490, Ex. B (2023 IPM report) at LAC-0000375 | 84. **Undisputed** to the extent the County informed Plaintiff that, in the County's view, caselaw does not require excusing someone from working in the presence of the PPF. **Disputed** to the extent the County did not discuss whether the religious accommodation that Captain Little sought—to not raise the PPF himself—would pose a burden on fire department operations.<br>Jonna MSJ Opp. Decl., Ex. F, Nuanes-Delgadillo Depo. p.127:3-13 |
| 84. Plaintiff's Response that "the County did not discuss whether the religious accommodation that Captain Little sought—to not raise the PPF himself—would pose a burden on fire department operations" is not responsive to this Fact. Regardless, as Ms. Nuanes-Delgadillo's notes indicate, "It was explained that if you are unable to swap, you will need to use your own leave benefit time and you replied that you understood." (Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶4; Dkt. 116-21 (2023 IPM report) at LAC-0000375.)<br><br>Plaintiff does not dispute that he was not required to raise the PPF, as explained in Facts No. 56, 57, and 78, none of which Plaintiff disputes. Accordingly, there was no reason to discuss any potential burden of Plaintiff raising or not raising the PPF on the Fire Department or its operations. | |
| 85. At the June 21 IPM, Plaintiff asked to submit time-off requests for the rest of June.<br><br>Portnoi Decl. Ex. G (Nuanes-Delgadillo Dep. Tr.) 184:4-11<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 143:21-144:15 | 85. **Undisputed**. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Nuanes-Delgadillo Decl. ¶¶3-4, Ex. A (2023 IPM notes) at LAC-0001491, Ex. B (2023 IPM report) at LAC-0000376 | |
| 86. At the June 21 IPM, Plaintiff was told that time-off requests would be handled by chain of command, outside the IPM process.<br><br>Portnoi Decl. Ex. G (Nuanes-Delgadillo Dep. Tr.) 184:4-11<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 144:7-15<br><br>Nuanes-Delgadillo Decl. ¶¶3-4, Ex. A (2023 IPM notes) at LAC-0001491, Ex. B (2023 IPM report) at LAC-0000376 | 86. **Undisputed** as to what Plaintiff was told.<br>**Disputed** as to whether time-off requests, based on a religious accommodation request, are normally handled outside of the IPM process.<br>Jonna MSJ Opp. Decl., Ex. E, McMillon Depo., Ex. 5 at p.1;<br>Jonna MSJ Opp. Decl., Ex. D, Lester Depo., pp.54:2-55:10, 56:15-57:24;<br>Jonna MSJ Opp. Decl., Ex. G, Power Depo., pp.35:25-37:1;<br>Crum Depo., pp.50:20-54:16 [ECF No. 115-15 at 22-26] |
| 86. Plaintiff does not appear to dispute the Fact as stated. Ms. Nuanes-Delgadillo's 2023 IPM report states, "You were informed that your time off requests would be done by your chain of command and yourself, and not within the interactive forum." (Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶4; Dkt. 116-21 (2023 IPM report) at LAC-0000376.) Further, Mr. Crum—the President of the County of Los Angeles Lifeguard Association and Plaintiff's union representative during Plaintiff's 2023 IPMs—agreed that it is the "normal process for time-off requests to be dealt with outside of the interactive forum" and that "Chain of command has to review time-off requests." (Dkt. No. 114-14 (Crum Dep. Tr.) 114:7-15.) | |
| 87. At the June 21 IPM, Plaintiff asked whether he could remain at Area 33 for the remainder of June 2023.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 104:9-16<br><br>Nuanes-Delgadillo Decl. ¶¶3-4, Ex. A (2023 IPM notes) at LAC-0001491, | 87. **Undisputed**. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Ex. B (2023 IPM report) at LAC-0000376 | |
| 88. At the June 21 IPM, Chief McMillon told Plaintiff that he would return to his normal assignment on either June 29 or 30, 2023. Portnoi Decl. Ex. H (McMillon Dep. Tr.) 152:16-23 Nuanes-Delgadillo Decl. ¶¶3-4, Ex. A (2023 IPM notes) at LAC-0001491, Ex. B (2023 IPM report) at LAC-0000376 | 88. **Undisputed**. |
| 89. On June 21, 2023, Plaintiff emailed Chief Uehara asking to use his benefit time to take off his shifts for the rest of June. Uehara Decl. ¶4, Ex. B (email correspondence between Plaintiff and Chief Uehara) | 89. **Undisputed**. |
| 90. On June 21, 2023, Chief Uehara emailed Plaintiff that he could use his benefit time "as long as it did not cause a recall," and that he could use a time exchange with another Captain. Portnoi Decl. Ex. I (Uehara Dep. Tr.) 237:24-238:3, 263:14-22 Uehara Decl. ¶4, Ex. B (email correspondence between Plaintiff and Chief Uehara) | 90. **Undisputed** as to what Chief Uehara emailed Plaintiff Little. **Disputed** that allowing benefit time only if it didn't cause a recall was a legitimate accommodation, given that taking benefit time at that time of year would invariably cause a recall; thus, Uehara's email was effectively a denial of Plaintiff Little's accommodation request. Little Depo., p.282:19-24 [ECF No. 115-2 at 187]; Crum Depo., pp.60:25-61:3, 62:19-63:2 [ECF No. 115-15 at 32-35] |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Further, the fire department had never previously denied any employee an accommodation on the basis that granting it could cause a recall. Jonna MSJ Opp. Decl., Ex. C, Kim Depo., pp.144:13-25; 145:18-146:3 |

90. Plaintiff's Response, to the extent it disputes this Fact, is not responsive to the stated Fact.  Further, Plaintiff's Response contains a conclusion of law, unsupported by fact, as to whether Plaintiff's email constituted an accommodation request.  (Dkt. 116-34 (Uehara Decl.) ¶4; Dkt. 116-36 (email correspondence between Plaintiff and Chief Uehara).)

Additionally, the testimony cited in Plaintiff's Response does not support the claim "that taking benefit time at that time of year would invariably cause a recall." The cited portion of Plaintiff's deposition testimony does not provide foundation as to Chief Uehara's knowledge on whether Plaintiff taking time off would force a recall.  (Dkt. 115-2 (Little Dep. Tr.) 282:19-24.)  In the cited portions of Captain Crum's deposition, he testifies that it is his "understanding that if someone requests the day off and there's no one available to backfill them, the supervisor will deny that request for the day off."  (Dkt. 115-15 (Crum Dep. Tr) 60:25-61:3.)  He then testifies generally that a lot of employees take time off in the summer, not that it would "invariably cause a recall."  (*Id.* at 62:19-63:2.)

Plaintiff's assertion that "the fire department had never previously denied an accommodation on the basis that granting it would cause a recall" is not responsive to the fact.  Plaintiff's request to use benefit time was not, at that time, an accommodation request, so it is immaterial whether the Fire Department had previously denied accommodation requests on the basis that granting them could cause a recall.

| | |
|---|---|
| 91. Lifeguards bid on benefit time annually, so their schedules are determined during the preceding calendar year.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 275:16-276:10<br><br>Portnoi Decl. Ex. N (Boiteux Dep. Tr.) 230:19-231:11 | 91. **Undisputed**. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Portnoi Decl. Ex. O (Crum Dep. Tr.) 49:6-51:6, 61:12-62:14<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 55:13-17<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 99:8-14, 234:16-20, 236:22-237:7<br><br>Kim Decl. ¶7, Ex. E ("L Manual") at LAC-0003412 | |
| 92. Lifeguards have certain job protections, and the County's ability to alter schedules and assignments is circumscribed.<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 51:12-15<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 55:4-8, 55:17-21, 58:8-10, 161:23-162:18<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 92:17-23, 223:12-19<br><br>Kim Decl. ¶6, Ex. D (Memorandum of Understanding) at LITTLE.00815 | 92. **Disputed**. Lifeguard management retains unilateral power to change work location, workweek or daily shift time with five days' notice, make changes for employees working fewer than 40 hours per week without notice, make changes for emergencies without defining what constitutes an emergency, and make temporary changes to work location without notice.<br><br>Kim Decl. ¶6, Ex. D (Memorandum of Understanding) at LITTLE.00815 [ECF Nos. 116, 116-4] |

92. Plaintiff's Response does not refute the stated fact or the evidence it relies upon.  Plaintiff's Response states lifeguard management must provide "five days' notice" before making a change to "work location, workweek or daily shift time,"  which is an example of the ways in which the County's ability to alter schedules and assignments is circumscribed.  Further, whether changes can be made to the shifts of "employees working fewer than 40 hours per week without notice" is another way the County's ability to alter schedules is circumscribed, because it cannot unilaterally change schedules of those working 40 or more hours.  Plaintiff does not dispute that captains, along with all other full-time lifeguards, work 40-hour workweeks.  (Dkt. 116 (Kim Decl.) ¶6; Dkt. 116-4 (Memorandum of Understanding) at LITTLE.00815.)  Defendants note that the language "unilateral power" does not appear in the Memorandum of Understanding, nor does any equivalent language.  The evidence cited also states

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| that while the County may "make assignments to different shifts for the purpose of meeting emergencies . . . such emergency assignments shall not extend beyond the period of such emergency." (Dkt. 116 (Kim Decl.) ¶6; Dkt. 116-4 (Memorandum of Understanding) at LITTLE.00815.) | |
| 93. The County is subject to a memorandum of understanding ("MOU") between itself and the L.A. County Lifeguard Association ("LACoLA"), the County's collective bargaining unit.<br><br>Portnoi Decl. Ex. Q (Kim Dep. Tr.) 129:10-19, 132:4-9<br><br>Portnoi Decl. Ex. J (O'Brien Dep. Tr.) 119:17-19<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 42:19-43:6<br><br>Kim Decl. ¶6, Ex. D (Memorandum of Understanding) | 93. **Undisputed**. |
| 94. The MOU is akin to a collective bargaining agreement, signed by the President of LACoLA and the Chief Executive Officer of the County.<br><br>Portnoi Decl. Ex. Q (Kim Dep. Tr.) 129:10-19, 132:4-9<br><br>Portnoi Decl. Ex. F (Power Dep. Tr.) 66:4-10<br><br>Kim Decl. ¶6, Ex. D (Memorandum of Understanding) at LITTLE.00856 | 94. **Undisputed**. |
| 95. Under the MOU, lifeguards have certain job protections, including that the County generally cannot | 95. **Disputed**. This provision only applies to employees who are scheduled on a minimum 40-hour workweek, not to all lifeguards, and because the same policy permits |

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| unilaterally alter schedules and assignments.<br><br>Portnoi Decl. Ex. Q (Kim Dep. Tr.) 132:4-9<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 44:7-45:4, 56:11-14<br><br>Kim Decl. ¶6, Ex. D (Memorandum of Understanding) at LITTLE.00815 | temporary assignments to different work locations.<br>Kim Decl. ¶6, Ex. D (Memorandum of Understanding) at LITTLE.00815 [ECF Nos. 116, 116-4] |

95. Plaintiff's Response does not refute the stated fact or the evidence it relies upon. The fact states the County "generally cannot unilaterally alter schedules and assignments," and the exceptions outlined in Plaintiff's Response do not refute this.

| | |
|---|---|
| 96. Except in the case of emergencies, the County cannot change a lifeguard's work location, workweek, or daily shift time less than five days in advance.<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 44:7-45:4, 56:11-14<br><br>Kim Decl. ¶6, Ex. D (Memorandum of Understanding) at LITTLE.00815 | 96. **Disputed**. This provision only applies to employees who are scheduled on a minimum 40-hour workweek, not to all lifeguards, and because the same policy permits temporary assignments to different work locations.<br>Kim Decl. ¶6, Ex. D (Memorandum of Understanding) at LITTLE.00815 [ECF Nos. 116, 116-4]<br>Furthermore, the County could presumably change a lifeguard's work location and/or shift time less than five days in advance for the purposes of accommodating in instances where there is a willing swap partner.<br>Jonna MSJ Opp. Decl., Ex. G, Power Depo., pp.34:25-37:1 |

96. Plaintiff's Response does not refute that the County "generally cannot unilaterally alter schedules and assignments" or the cited evidence. Defendants acknowledge that this provision only applies to employees who are scheduled on a minimum 40-hour workweek, but Respond that this distinction is immaterial because this provision does apply to Plaintiff because he is a full time, 40-hour

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| workweek employee.  Indeed, Plaintiff does not dispute that captains, along with all other full-time lifeguards, work 40-hour workweeks.  (Dkt. 116 (Kim Decl.) ¶6; Dkt. 116-4 (Memorandum of Understanding) at LITTLE.00815.) Further, this fact refers to policy in the Memorandum of Understanding, which governs the Fire Department's ability to make schedule changes without sufficient notice to the affected employee.  This does not refer to or preclude circumstances where a lifeguard with a "willing swap partner" requests a schedule change with less than 5 days' notice to the Fire Department. At no point did the County prohibit Plaintiff from using shift exchanges for his shifts.  To the contrary, he was allowed to do so on June 21, 2023 (Dkt. 116-18 (text message correspondence between Plaintiff, Chief McMillon, and Chief Uehara)), and Chief Uehara encouraged him to do so in response to Plaintiff's request to use benefit time (Dkt. 116-34 (Uehara Decl.) ¶4; Dkt. 116-36 (email correspondence between Plaintiff and Chief Uehara)). | |
| 97. There are minimum staffing requirements for captains in summer months due to public safety concerns. Portnoi Decl. Ex. N (Boiteux Dep. Tr.) 116:20-23 Portnoi Decl. Ex. H (McMillon Dep. Tr.) 62:16-63:5, 101:12-14, 103:13-104:5, 104:12-17, 105:8-19, 105:25-105:2 Portnoi Decl. Ex. O (Crum Dep. Tr.) 47:1-10 Portnoi Decl. Ex. L (Mayfield Dep. Tr. Vol. I) 134:21-135:5, 135:25-136:10 Portnoi Decl. Ex. F (Power Dep. Tr.) 38:3-5 Portnoi Decl. Ex. I (Uehara Dep. Tr.) 99:15-20, 207:10-22, 243:11-21, 244:7-14 | 97. **Disputed** on the basis that the cited evidence does not support the statement. Boiteux testified that there are general minimum staffing requirements to operate beaches, but did not discuss minimum staffing requirements for captains during summer months. Boiteux Depo., p.116:20-23 [ECF No. 115-14 at 19] McMillon testified to the recall exemption policy, an unexplained minimum staffing requirement, a maximum amount of time off per rank each week, a need for staffed beaches, how recalls operate to fill shifts, and the existence of minimum staffing, but did not discuss minimum staffing requirements for captains during summer months. McMillon Depo., pp.62:16-63:5 [ECF No. 115-8 at 20], 101:12-14 [ECF No. 115-8 at 36], 103:13-104:5 [ECF No. |

47

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
|  | 115-8 at 38-39], 104:12-17 [ECF No. 115-8 at 39], 105:8-19 [ECF No. 115-8 at 40], 106:1-2 [ECF No. 115-8 at 41] Crum testified that recalls are how open schedules are backfilled for public safety, but did not discuss minimum staffing requirements for captains during summer months. Crum Depo., p.47:1-10 [ECF No. 115-15 at 19] Mayfield testified that he did not know a vacancy or vacation schedule for a particular day, and discussed a hypothetical situation involving vacancies, but did not discuss minimum staffing requirements for captains during summer months. Mayfield Depo., pp.134:21-135:5 [ECF No. 115-12 at 16-17], 135:25-136:10 [ECF No. 115-12 at 17-18] Power mentioned the existence of minimum staffing levels, but did not discuss minimum staffing requirements for captains during summer months. Power Depo., p.38:3-5 [ECF No. 115-6 at 15] |
| 97. Plaintiff's Response does not dispute that there are minimum staffing requirements. The evidence cited in support of Defendants' fact does support the existence of minimum staffing requirements, and no evidence suggest these profiles would not apply during the summer or to Captains. Chief McMillon, Chief Boiteux, and Captain Power testify about minimum staffing requirements specifically in the context determining possible accommodations for Captain Little in connection with his June 19, 2023 IPM about potential accommodations for Plaintiff. (Dkt. 115-14 (Boiteux Dep. Tr.) 115:25-116:23; Dkt. 115-8 (McMillon Dep. Tr.) 100:8-101:14; 103:13-104:5, 104:12-17.; Dkt. 115-6 (Power Dep. Tr.) 37:14-38:5.) Chief McMillon also testifies about minimum | |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| staffing requirements in response to questions from Plaintiff's counsel about addressing "staffing needs" by "recall[ing]] another captain," and the amount of recalls during June 2023. (Dkt. 115-8 (McMillon Dep. Tr.) 105:3-19.)  It is clear from the context of the cited testimony that minimum staffing requirements are applicable to Captains, such as Plaintiff, during the summer.<br><br>The evidence cited in Fact No. 99 and testimony in Chief Uehara's deposition show there are minimum staffing requirements for captains in summer months due to public safety concerns.  (Dkt. 115-9 (Uehara Dep. Tr.) 92.17-93:2, 99:15-20, and 258:4-18.)  In his response to Fact No. 99, Plaintiff even concedes that "Uehara testified that proposed accommodations are considered in light of how they could affect safety, that captains are necessary during summer, and that captains cannot take time off during summer and holidays for whatever reason they wanted." | |
| 98. Many lifeguard employees take preapproved vacation time in the summer.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 72:25-73:13<br><br>Portnoi Decl. Ex. H (McMillon Dep. Tr.) 62:16-63:5, 103:13-104:5<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 62:19-63:2, 106:20-108:17<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 204:8-11, 258:9-13 | 98. **Disputed**. Although summer is a popular time for lifeguard employees to *request* vacation time, testimony does not show that many lifeguard employees *in fact* take vacation time in the summer, due to vacation restrictions.<br>Little testified that vacations are one factor, alongside injuries, that cause recalls during the summer, but did not state that many lifeguard employees take vacation time during the summer. Little Depo., pp.72:25-73:13 [ECF No. 115-2 at 44-45]<br>McMillon testified as to how the recall exemption pilot program worked and how benefit time works, but did not discuss summer vacation time at all. McMillon Depo., pp.62:16-63:5 [ECF No. 115-8 at 20-21], 103:13-104:5 [ECF No. 115-8 at 38-39] |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
|  | Crum testified that vacation is more sought after during the holidays and summer than other times of year, and that recalls are based on seniority, but did not state that many lifeguard employees do in fact take vacation time during the summer. Crum Depo., pp.62:19-63:2 [ECF No. 115-15 at 34-35], 108:13-17 [ECF No. 115-15 at 66] Uehara testified that employees bid in advance for summertime vacation, and that he wanted to avoid letting many people take time off during the summertime, but did not state that many lifeguard employees do in fact take vacation time during the summer. Uehara Depo., pp.204:8-11 [ECF No. 115-9 at 112], 258:9-13 [ECF No. 115-9 at 150] |
| 98. The cited testimony shows that the summer is one of the most popular times to request vacation, and demonstrates problems with recalls during the summer due, in part, to the amount of people taking vacation time.  Plaintiffs do not cite any testimony indicating there was simply an average, or a below average, amount of lifeguard employees taking preapproved vacation time.  (Dkt. 115-2 (Little Dep. Tr.) 72:25-73:13; Dkt. 115-8 (McMillon Dep. Tr.) 62:16-63:5, 103:13-104:5; Dkt. 115-15 (Crum Dep. Tr.) 62:19-63:2, 106:20-108:17; Dkt. 115-9 (Uehara Dep. Tr.) 204:8-11, 258:9-13.) | |
| 99. Recalls jeopardize the Lifeguard Division's public safety mission. Portnoi Decl. Ex. E (Lester Dep. Tr.) 55:4-8, 59:19-60:1, 163:11-164:13 Portnoi Decl. Ex. I (Uehara Dep. Tr.) 92:23-93:2, 99:15-24, 258:4-258:18 | 99. **Disputed**. Deponents consistently show that recalls serve, rather than jeopardize, public safety. Lester testified to the need to have someone at every beach, and the need to fill shifts using recalls, but did not state that recalls themselves jeopardize safety. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Portnoi Decl. Ex. O (Crum Dep. Tr.) 47:1-10 | Lester Depo., pp.55:4-8 [ECF No. 110-5 at 39], 59:18-25 [ECF No. 110-5 at 43], 164:11-15 [ECF No. 110-6 at 66] Uehara testified that proposed accommodations are considered in light of how they could affect safety, that captains are necessary during summer, and that captains cannot take time off during summer and holidays for whatever reason they wanted, but did not state that recalls themselves jeopardize public safety. Uehara Depo., pp.92:17-93:2 [ECF No. 115-9 at 33-34], 99:15-20 [ECF No. 115-9 at 40], 258:4-18 [ECF No. 115-9 at 150] Crum only testified that recalls are how open schedules are backfilled for public safety, but did not state that recalls themselves jeopardize public safety. Crum Depo., p.47:1-10 [ECF No. 115-15 at 19] |

99. Plaintiff's Response does not refute the stated fact or cited evidence. Plaintiff mischaracterizes Chief Lester's testimony, which explains that changing people from their typical schedules "would be putting public safety at potential jeopardy if we weren't able to fill the shifts." (Dkt. 110-5 (Lester Dep. Tr.) 55:4-8, 59:18-25, 164:7-13.)

The cited testimony from Captain Crum's deposition explains how recall shifts are filled, and necessarily involve a change to the recalled employee's schedule. (Dkt. 115-15 (Crum Dep. Tr.) 47:1-10.)

Chief Uehara's deposition testimony states causing a recall would "create a undue hardship on the recalling of other captains that would also like to take time off that we couldn't possibly grant. If we created this precedence where people could just take time off … then it would negatively affect operation and

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| jeopardize public safety." (Dkt. 115-9 (Uehara Dep. Tr.) 92:23-93:2, 99:15-24, 258:4-258:18). | |
| 100. Recalls impinge on employees' physical and mental health.<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 92:23-93:2, 99:15-100:2, 258:4-258:13, 260:17-22<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 158:22-159:5<br><br>Portnoi Decl. Ex. Q (Kim Dep. Tr.) 114:17-116:19<br><br>Kim Decl. ¶8, Ex. F (Wellness Recall Exemption Pilot Program), Ex. G (Addressing Fire Department Workplace Trauma or Potential Workplace Trauma resolution) | 100. **Disputed**. Chief Uehara did not testify to impacts of recalls on physical and mental health. Uehara instead testified regarding consideration of operations and safety issues in granting an accommodation, fairness to other captains that would also like to take time off, and captains not wanting to work more recalls, but did not link recalls with health.<br>Uehara Depo., pp.92:23-93:2 [ECF No. 115-9 at 33-34], 99:12-20 [ECF No. 115-9 at 40], 258:4-8 [ECF No. 115-9 at 150], 260:17-22 [ECF No. 115-9 at 152]<br>Lester testified that people get frustrated by recalls, but did not link recalls with health.<br>Lester Depo., p.159:4-5 [ECF No. 110-6 at 39]<br>Kim's testimony is **disputed** as hearsay, because Kim only testified that "you can ask any firefighter. It always ties back into the recalls." *See* **Obj. No. 9**.<br>Kim Depo., pp.114:17-116:19 [ECF No. 115-17 at 10-12] |
| 100. Plaintiff's Response does not refute the fact or cited evidence. Plaintiff says that Chief Uehara's testimony "did not link recalls with health," which is a mischaracterization. Chief Uehara testified that in an IPM he must consider how proposed accommodations, including ones that could trigger a recall, could affect "employee safety, and affect[] the mission and harm[] the membership." (Dkt. 115-9 (Uehara Dep. Tr.) 91:19-93:2; 258:4-258:13.) | |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Plaintiff's Response includes an evidentiary objection to Chief Kim's testimony. As such, Defendants address this portion of Plaintiff's Response in ¶10 of their separately filed Response to Plaintiff's Separate Statement of Evidentiary Objections. Plaintiff's hearsay objection lacks merit, and they do not otherwise refute the cited testimony from Chief Kim's deposition. | |
| 101. On June 22, 2021, the Board issued a Board Motion, "Addressing Fire Department Workplace Trauma or Potential Workplace Trauma," in response to a murder and attempted murder, and subsequent suicide, perpetrated by a firefighter against two other firefighters.<br><br>Portnoi Decl. Ex. Q (Kim Dep. Tr.) 114:17-118:20<br><br>Kim Decl. ¶8, Ex. G (Addressing Fire Department Workplace Trauma or Potential Workplace Trauma resolution) | 101. **Undisputed** but misleading by omission. *See* Additional Facts. **Disputed** as irrelevant. *See* **Obj. No. 21**. |
| 101. Plaintiff's Response does not adequately demonstrate how this fact is purportedly misleading by omission. Plaintiff's explanation and cited evidence for this claim are addressed in ¶172 of Plaintiff's Statement of Additional Facts. As such, Defendants address this portion of Plaintiff's Response in Defendants' Response to ¶172 of Plaintiff's Statement of Additional Facts.<br><br>Plaintiff's Response includes an evidentiary objection. As such, Defendants address this portion of Plaintiff's Response in their separately filed Response to Plaintiff's Separate Statement of Evidentiary Objections. Further, to the extent that Plaintiff raises an evidentiary objection, that does not establish an issue of material fact. | |
| 102. The Board Motion directed the Fire Department's Executive Staff to draft a report that, in relevant part, addressed how to "[r]educ[e] staff recall due to vacancies and injury | 102. **Undisputed** but misleading by omission. *See* Additional Facts. **Disputed** as irrelevant. *See* **Obj. No. 22**. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| vacancies by at least 50% by March 1, 2022."<br><br>Portnoi Decl. Ex. Q (Kim Dep. Tr.) 114:17-118:20<br><br>Kim Decl. ¶8, Ex. G (Addressing Fire Department Workplace Trauma or Potential Workplace Trauma resolution) at LAC-0003272-73 | |

102. Plaintiff's Response does not adequately demonstrate how this fact is purportedly misleading by omission. Plaintiff's explanation and cited evidence for this claim are addressed in ¶173 of Plaintiff's Statement of Additional Facts. As such, Defendants address this portion of Plaintiff's Response in Defendants' Response to ¶173 of Plaintiff's Statement of Additional Facts.

Plaintiff's Response includes an evidentiary objection. As such, Defendants address this portion of Plaintiff's Response in their separately filed Response to Plaintiff's Separate Statement of Evidentiary Objections. Further, to the extent that Plaintiff raises an evidentiary objection, that does not establish an issue of material fact.

| 103. The Lifeguard Division's staffing and vacancy issues—particularly at the captain level—contributed to increased recalls in 2023 and, as a result, mental health issues.<br><br>Portnoi Decl. Ex. N (Boiteux Dep. Tr.) 227:21-24<br><br>Portnoi Decl. Ex. Q (Kim Dep. Tr.) 115:9-17<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 260:17-22 | 103. **Disputed**. Neither Boiteux nor Uehara testified to mental health issues caused by increased recalls among lifeguards in 2023, nor do they testify to vacancies. Boiteux only discussed captain staffing problems due to injuries in 2023. Uehara stated that captains did not want to work additional recalls.<br>Further **disputed** because Kim testified to the murder, suicide, and attempted murder in the firefighter community in 2021, but offered no evidence of mental health issues linked to lifeguard captain recalls in 2023. Kim's testimony repeating statements from the LACoLA union in 2021 are |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
|  | hearsay and do not show increased recalls nor a link between increased recalls and mental health issues among lifeguard captains. *See* **Obj. No. 10**. Kim Depo., pp.114:7-116:19 [ECF No. 115-17 at 10-12] Further **disputed** because the statement ignores the documented mental health issues the Division created for Captain Little by denying an exemption. Boiteux Depo., p.227:21-24 [ECF No. 115-14 at 55]; Uehara Depo., p.260:17-22 [ECF No. 115-9 at 152]; Kim Depo., pp.114:17-25 [ECF No. 115-17 at 114], 117:19-24 [ECF No. 115-17 at 13]; Little Depo., pp.246:4-11 [ECF No. 115-2 at 160], 273:3274:12 [ECF No. 115-2 at 178-179] |

103. Plaintiff's Response does not refute the fact or cited evidence. Chief Boiteux's and Chief Uehara's testimony support the presence of staffing and vacancy issues in 2023, and increased recalls. (Dkt. 115-9 (Uehara Dep. Tr.) 260:17-22; Dkt. 115-14 (Boiteux Dep. Tr.) 227:21-24.) Plaintiff's own deposition testimony also supports that the Lifeguard Division's staffing and vacancy issues—particularly at the captain level—contributed to increased recalls in 2023. (Dkt. 115-2 (Little Dep. Tr.) 72:25-73:13.)

The assertions in Plaintiff's Response that "the Division created" his mental health issues or denied him an exemption are legal conclusions. Further, this assertion does not refute the fact.

Plaintiff's Response includes an evidentiary objection. As such, Defendants address this portion of Plaintiff's Response in their separately filed Response to Plaintiff's Separate Statement of Evidentiary Objections. Further, to the extent that Plaintiff raises an evidentiary objection, that does not establish an issue of material fact. Chief Kim's deposition testimony does support the fact that the

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| recalls contributing to mental health issues were still occurring in 2023. (Dkt. 115-17 (Kim Dep. Tr.) 115:9-118:20.) | |
| 104. Recalls cost additional money for overtime for recalled staff. Portnoi Decl. Ex. I (Uehara Dep. Tr.) 249:8-12, 251:9-21, 252:3-13, 253:15-23, 257:7-257:22 Portnoi Decl. Ex. N (Boiteux Dep. Tr.) 215:8-215:23 | 104. **Disputed**. "Additional money" lacks context. The fire department budget is $1.5 billion, whereas the cost of an overtime shift is $800. Jonna MSJ Opp. Decl., Ex. B, Boiteux Depo., pp.24:6-8, Boiteux Dep., p.215:22-23 [ECF No. 115-14 at 50] **Undisputed** to the extent that there is a *de minimis* cost associated to recall staff. |
| 104. Plaintiff's Response does not refute this fact or the cited evidence. Defendants object to the statement in Plaintiff's Response that "the fire department budget is $1.5 billion, whereas the cost of an overtime shift is $800" to the extent it implies the entire Fire Department budget is available to pay wages and/or overtime. Objection, foundation, relevance. (Defs.' Separate Stmt. of Add'l Evidentiary Objs. ¶104.) | |
| 105. Chief Lester spoke with OLS Gottschalk on June 21, 2023 regarding Plaintiff's lowering of the PPFs. Portnoi Decl. Ex. M (Gottschalk Dep. Tr.) 165:24-166:7 Portnoi Decl. Ex. E (Lester Dep. Tr.) 128:1-129:12 | 105. **Undisputed**. |
| 106. When they spoke, OLS Gottschalk informed Chief Lester that Plaintiff's lowering the PPF had been in public view. | 106. **Undisputed**. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Portnoi Decl. Ex. M (Gottschalk Dep. Tr.) 144:17-20, 166:12-167:5, 196:13-197:2, 199:10-15, 201:1-12<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 128:12-129:12 | |
| 107. Chief Lester believed that Plaintiff's conduct made OLS Gottschalk uncomfortable and constituted a potential violation of the County Policy of Equity ("CPOE").<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 129:13-130:6, 134:2-19, 134:24-135:7<br><br>Portnoi Decl. Ex. M (Gottschalk Dep. Tr.) 171:15-18 | 107. **Undisputed** to the extent Defendant Chief Lester contends that he believed Plaintiff's conduct made Gottschalk "uncomfortable" and potentially violated the CPOE. |
| 107. Plaintiff's response states that this fact is undisputed "to the extent Defendant Chief Lester contends that he believed Plaintiff's conduct made OLS Gottschalk "uncomfortable" and potentially violated the CPOE," but it does not state any grounds for disputing any portion of this fact.  Accordingly, this fact should be treated as undisputed in full. | |
| 108. Chief Lester is a mandated reporter of violations of the CPOE.<br><br>Portnoi Decl. Ex. P (Stormer Dep. Tr.) 44:6-45:15<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 129:13-20, 130:2-6 , 134:24-135:7 | 108. **Undisputed**. |
| 109. Failure to file a CPOE complaint as a mandated reporter can lead to discipline.<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 135:4-7<br><br>Portnoi Decl. Ex. P (Stormer Dep. Tr.) 53:4-16 | 109. **Undisputed** to the extent that a given situation gives rise to the duty of a Mandatory Reporter to report. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 109. Plaintiff's Response states that this fact is undisputed "to the extent that a given situation gives rise to the duty of a Mandatory Reporter to report," but it does not state any grounds for disputing any portion of this fact. Accordingly, this fact should be treated as undisputed in full. Further, Plaintiff's response is vague and unclear as to what "a given situation" means. | |
| 110. Chief Lester filed a CPOE complaint the evening of June 21, 2023. <br><br> Portnoi Decl. Ex. E (Lester Dep. Tr.) 130:16-131:1 <br><br> Lester Decl. ¶5, Ex. C (CPOE complaint) | 110. **Undisputed** that Chief Lester filed a CPOE complaint against Captain Little on June 21, 2023. |
| 111. The CPOE complaint that Chief Lester filed related to Plaintiff's request that OLS Gottschalk lower the PPF at Dockweiler South and Plaintiff's subsequent lowering of the PPF. <br><br> Lester Decl. ¶5, Ex. C (CPOE complaint) at LAC-0000180-81 | 111. ██████████████████████ |
| 111. Plaintiff's Response does not refute this fact or the cited evidence. The CPOE complaint states "Captain Little asked her 'would she feel uncomfortable if he asked her to remove the Pride Flag from the station?'" (Dkt. 116-11 (CPOE complaint) at LAC-0000180-81.) The evidence cited by Plaintiff does not disprove the language in the CPOE complaint, which this fact refers to. However, Defendants do not dispute that the CPOE Investigation Report and OLS Gottschalk's testimony support that Plaintiff did not ask her to personally take down the PPF. | |
| 112. The CPOE complaint that Chief Lester filed did not relate to Plaintiff's inability to fulfill his job requirements. <br><br> Lester Decl. ¶5, Ex. C (CPOE complaint) at LAC-0000180-81 | 112. **Undisputed**. |

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
| --- | --- |
| 113. Lifeguards other than OLS Gottschalk contacted Chief Lester and Chief Uehara regarding Plaintiff's actions lowering the PPF on June 21, 2023.<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 171:4-7<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 289:17-290:23<br><br>Lester Decl. ¶4, Ex. B (text message correspondence between ocean lifeguard specialist and Chief Lester)<br><br>Uehara Decl. ¶3, Ex. A (text message correspondence between ocean lifeguard and Chief Uehara) | 113. **Undisputed**. |
| 114. One lifeguard took a video of Plaintiff lowering the PPF at El Segundo on June 21, 2023.<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 177:2-14, 290:3-23<br><br>Hastings Decl. ¶5, Ex. A (video from El Segundo Beach)<br><br>Uehara Decl. ¶3, Ex. A (text message correspondence between ocean lifeguard and Chief Uehara) | 114. **Disputed**. The testimony cited by Defendants refers only to an "employee," not a lifeguard. Uehara Depo., p.177:7-14 [ECF No. 115-9 at 96] |
| 114. Plaintiff's Response does not refute the fact or cited evidence. A lifeguard is a type of "employee," and other documents cited as evidence do identify the individual who took the video as a lifeguard.  (Dkt. 115-29 (Hastings Decl.) ¶¶2-5; Dkt. 116-34 (Uehara Decl.) ¶3.) | |
| 115. Plaintiff worked at Area 33 on June 22, 2023. | 115. **Undisputed**. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Portnoi Decl. Ex. B (Little Dep. Tr.) 269:3-7<br><br>Portnoi Decl. Ex. H (McMillon Dep. Tr.) 163:13-16 | |
| 116. On June 22, 2023, Chief Boiteux received from his chain of command a Direct Order addressed to Plaintiff requiring him to comply with EA-231.<br><br>Portnoi Decl. Ex. N (Boiteux Dep. Tr.) 253:23-256:9<br><br>Boiteux Decl. ¶7, Ex. E (Direct Order) | 116. **Disputed** as mischaracterizing the evidence. The statement implies that Chief Boiteux was not involved in the decision to issue the Direct Order, but he was.<br>Boiteux Depo., pp.254:9-256:9 [ECF No. 115-14 at 65-67]<br>Julia Kim testified that she was consulted by lifeguard management—probably Uehara or Boiteux.<br>Jonna MSJ Opp. Decl., Ex. C, Kim Depo., pp.248:11-249:10<br>Further, it is unclear whether Chief Boiteux received the direct order from someone within his chain of command, employee relations, or human resources. Julia Kim instructed that the direct order, among other things, was delivered to Capt. Little on June 22, 2023.<br>Jonna MSJ Opp. Decl., Ex. C, Kim Depo., Ex 29 |

116. Plaintiff's Response does not refute the fact or the cited evidence. Chief Boiteux's involvement, or lack thereof, in the decision to issue the Direct Order has no bearing on the fact as stated. Further, Plaintiff mischaracterizes Chief Boiteux's testimony. Chief Boiteux does not testify he was involved in the decision to issue the Direct Order, rather, he testifies that the decision to issue the Direct Order would have been made by Chief Mayfield in consultation with Chief Kim and Chief Sturdivant. (Dkt. 115-15 (Boiteux Dep. Tr.) 253:23-256:9.) Plaintiff's Separate Statement of Uncontroverted Facts also contradicts his argument here, as it reads: "The decision to issue the Direct Order was made

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| by Chief Mayfield in consultation with Kim and Sturdivant. [Dkt. 115-14 (Boiteux Dep. Tr.) 254:9-21, 255:1-15, 262:5-8.]." (Dkt. 118-2 ¶163.) Plaintiff's Response also mischaracterizes Chief Kim's testimony. When Plaintiff's counsel asked Chief Kim about the Direct Order, she testified "I don't recall the specifics. I just -- I recall that was consulted by it -- by -- I believe it was by lifeguard management." Then, Plaintiff's counsel asked "Do you remember who in lifeguard management reached out to you?" She replied "[a]gain, the same, probably could have been Chief Uehara, Chief Boiteux." She then repeated that she did not recall the conversation or remember what was discussed. (Dkt. 121-6 (Kim Dep. Tr.) 248:11-249:20.) | |
| 117. The Direct Order ordered Plaintiff to either "(1) Fly the [PPF] as instructed in [EA-231] during the month of June OR (2) Ensure that the PPF is flown as instructed in EA-231 during the month of June." Boiteux Decl. ¶7, Ex. E (Direct Order) | 117. **Disputed** to the extent "either" implies Captain Little had a choice in complying with the Direct Order or EA-231. **Undisputed** that the Direct Order ordered Captain Little to Fly the PPF as instructed in EA-231 or ensure that the PPF is flown as instructed in EA-231 during the month of June for each year going forward. |

117. Plaintiff's Response appears to misunderstand this fact. The term "either" as used in this fact refers to the instruction offered in the Direct Order, which explicitly requests compliance with EA-231. The referenced excerpt of the Direct Order states:

> You are hereby ordered to:
>
> (1) Fly the Progress Pride Flag (PPF) as instructed in Executive Action-231 (EA- 231)
>
> during the month of June;
>
> OR
>
> (2) Ensure that the PPF is flown as instructed in EA-231 during the month of June.

(Dkt. 115-20 (Boiteux Decl.) ¶7; Dkt. 115-25 (Direct Order).)

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 118. The Direct Order was prepared because Plaintiff took down the PPFs on June 21, 2023.<br><br>Portnoi Decl. Ex. N (Boiteux Dep. Tr.) 255:16-256:1<br><br>Portnoi Decl. Ex. L (Mayfield Dep. Tr. Vol. II) 263:22-25, 265:24-266:10 | 118. **Disputed** in part because Boiteux testified the Direct Order was caused by a combination of factors which included Captain Little's actions, the report of his actions, and notification of the CPOE complaint filed by Chief Lester.<br>Boiteux Dep., pp.255:16-256:1 [ECF No. 115-14 at 66-67]<br>Further, Plaintiff objects that this is vague. Plaintiff's retaliation claims allege that the issuance of the direct order, among other things, was pretextual and discriminatory because of his religious beliefs regardless of Defendants' purported reasoning. |

118. Plaintiff's Response does not refute the fact or the cited evidence. Plaintiff's response mischaracterizes Chief Boiteux's testimony. Plaintiff's counsel asked Chief Boiteux the compound questions: "Do you know whose initial idea it was to issue this direct order or to discuss whether to issue it? Do you know anything about the genesis of this?" Chief Boiteux responds "That was caused by Captain Little's actions, the report of his actions, the -- you know, the -- obviously, the department got notified – the department gets -- employees relations get notified of the CPOE complaint filed by Chief Lester. So it was -- that was a combination of facts that caused that." (Dkt. 115-14 (Boiteux Dep. Tr.) 255:16-256:1.) Here Chief Boiteux first identifies Plaintiff's actions as the "genesis" for the Direct Order, then attempts to explain how the Fire Department became aware of Captain Little's actions.

| | |
|---|---|
| 119. On June 22, 2023, Chief Boiteux delivered the Direct Order to Plaintiff.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 284:22-285:3 | 119. **Undisputed**. |
| 120. Also on June 22, 2023, Plaintiff emailed Chief Uehara to state that he | 120. **Disputed** as mischaracterizing the evidence. Little did not state that he was mentally sick or physically sick. |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| would be leaving work early because he was mentally and physically sick.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 274:6-12<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 263:23-264:20<br><br>Uehara Decl. ¶4, Ex. B (email correspondence between Plaintiff and Chief Uehara) | Rather, he stated that his health was deteriorating because his religious convictions were under assault, and he thought it was best to attend to his mental and physical health rather than be a distraction or cause conflict. Uehara Decl. ¶4, Ex. B (email correspondence between Plaintiff and Chief Uehara) [ECF Nos. 116-34, 116-36<br>Little's cited testimony merely states that he was able to go home sick. Little Depo., p.274:6-12 [ECF No. 115-2 at 179] |
| 120. Plaintiff's Response does not refute the fact or the cited evidence. This fact does not state Plaintiff made no mention of his "religious convictions" in his email to Chief Uehara. Rather, it states Plaintiff's email "state[d] that he would be leaving work early because he was mentally and physically sick." Defendants acknowledge that Plaintiff did not use the exact phrase "mentally and physically sick." However, in Plaintiff's email, he stated that his "mental and physical health [were] quickly deteriorating," he would "be leaving [his] shift at 1500 and going home sick," and that he thought "it would be best for [him] to attend to [his] mental and physical health." (Dkt. 116-36 (email correspondence between Plaintiff and Chief Uehara).) ||
| 121. Plaintiff remained on sick leave for the remainder of June 2023.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 283:24-284:7 | 121. **Undisputed**. |
| 122. The County removed Plaintiff from his role on the Background Investigation Unit because Plaintiff was the subject of an investigation.<br><br>Portnoi Decl. Ex. Q (Kim Dep. Tr.) 342:1-342:16, 343:2-21 | 122. **Disputed**, because Kim made the decision to remove Little from the BIU on her own. Kim's claim that the investigation was the reason she made this decision is undermined by the fact that no written policy called for the removal. |

63

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Kim Depo., pp.342:7-9, 343:22-24 [ECF No. 115-17 at 35-36] |

122. Plaintiff's Response does not refute the fact or cited evidence. The absence of a written policy calling for removal from the Background Investigation Unit during investigation does not disprove this fact. Chief Kim also testified that, prior to Plaintiff's removal from the Background Investigation Unit, the County had removed other individuals who were subjects of investigation. (Dkt. 115-17 (Kim Dep. Tr.) 342:1-16, 343:2-21.) Plaintiff identifies no evidence supporting any other motivation for his removal from the Background Investigation Unit.

To the extent that Plaintiff disputes that the County removed him from his role on the Background Investigation Unit, that contradicts the allegations in his verified Third Amended Complaint and his position throughout this litigation. (*See, e.g.*, Dkt. 69 (TAC) ¶82; Dkt. 118-2 (Pl.'s Separate Stmt. of Uncontroverted Facts) ¶¶179-80.)

| | |
|---|---|
| 123. The Background Investigation Unit investigates prospective employees and handles sensitive applicant and personnel information.<br><br>Portnoi Decl. Ex. Q (Kim Dep. Tr.) 339:6-340:4, 343:2-21 | 123. **Disputed**. Kim did not testify that Background Investigation Unit investigators handle sensitive applicant and personnel information. She testified regarding the employment structure and overtime hours Little accrued on the Unit, and the need for people of integrity on the Unit.<br>Kim Depo., pp.339:6-340:4, 343:2-21 [ECF No. 115-17 at 32-33, 36] |

123. Plaintiff's Response does not refute the fact or cited evidence. The evidence shows that the Background Investigation Unit conducts background investigations of candidates for employment and investigations into emergency incidents, and is given background files to analyze. (Dkt. 115-17 (Kim Dep. Tr.) 342:1-16, 343:2-21; Dkt. 121-3 (Plf.'s Separate Stmt. of Material Facts) ¶179.)

| | |
|---|---|
| 124. The County investigated the CPOE complaint against Plaintiff through its usual channels.<br><br>Portnoi Decl. Ex. P (Stormer Dep. Tr.) 40:14-43:24, 61:3-62:2, 75:1-78:2 | 124. ███████████████████████ |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
|  | ████████████████ |
| 124. ████████████████████████████████ | |
| 125. The process for investigating a CPOE complaint involves an investigation and interviews.<br><br>Portnoi Decl. Ex. P (Stormer Dep. Tr.) 12:11-13:15, 17:2-18:5, 22:22-24:16, 40:14-43:24, 61:3-62:2, 75:1-78:2 | 125. **Undisputed**. |
| 126. The CPOE investigation process occurs separate from the specific departments, such as the Fire Department.<br><br>Portnoi Decl. Ex. P (Stormer Dep. Tr.) 27:8-28:18 | 126. **Undisputed**. |
| 127. The County Equity Oversight Panel determined that the allegations in the CPOE complaint against Plaintiff were substantiated and rose to the level of a CPOE violation.<br><br>Portnoi Decl. Ex. P (Stormer Dep. Tr.) 80:10-22<br><br>Stormer Decl. ¶4, Ex. B (CPOE Briefing Information and Recommendations) at LAC-0000173-74 | 127. **Undisputed**. |
| 128. The Fire Department investigated Plaintiff for violating the County's flag policy when he lowered the PPFs. | 128. **Disputed** as unsupported by the cited evidence. Kim testified that she did not attend the Fire Advisory Board, and the cited testimony only shows |

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Portnoi Decl. Ex. Q (Kim Dep. Tr.) 307:9-308:3 | Kim's opinion that two suspensions should have been served sequentially rather than concurrently. It does not discuss an investigation by the Fire Department. Kim Depo., pp.307:9-308:3 [ECF No. 115-17 at 27-28] |
| 128. The cited testimony does support that the Fire Advisory Board conducted an investigation, and that they came an independent determination, recommending a 15-day suspension.  (Dkt. 115-17 (Kim Dep. Tr.) 307:9-308:3.)  The fact that the Fire Department investigated Plaintiff for violating the County's flag policy when he lowered the PPFs is supported by Chief Mayfield's deposition testimony.  (Portnoi Supp. Decl. Ex. B (Mayfield Dep. Tr. Vol. II) 189:14-190:5.) | |
| 129. The Fire Advisory Board determined based on the Fire Department's investigation that a suspension was appropriate. Portnoi Decl. Ex. Q (Kim Dep. Tr.) 307:9-308:3 | 129. **Disputed** as unsupported by the cited evidence. Kim testified that she did not attend the Fire Advisory Board, and the cited testimony only shows Kim's opinion that two suspensions should have been served sequentially rather than concurrently. It does not discuss an investigation by the Fire Department, or why the Fire Advisory Board made any decisions. Kim Depo., pp.307:9-308:3 [ECF No. 115-17 at 27-28] |
| 129. Whether Chief Kim attended the Fire Advisory Board ("FAB") is not grounds to dispute this fact, because Chief Kim was designated to testify on behalf of the County as a Rule 30(b)(6) witness on the subject of Plaintiff's suspension.  She is therefore a competent witness to testify as to evidence that reflects that the FAB conducted an investigation and, on the basis of that investigation, determined suspension was appropriate.  (Dkt. 115-17 (Kim Dep. Tr.) 306:4-308:3.) | |
| 130. Based on Plaintiff's CPOE violation and the FAB's conclusion, | 130. **Disputed** as unsupported by the cited evidence. The suspension letter |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| the County issued Plaintiff a notice of 15-day suspension on October 24, 2024.<br><br>Uehara Decl. ¶5, Ex. C (Notice of Suspension) | does not mention the Fire Advisory Board at all.<br>Uehara Decl. ¶5, Ex. C (Notice of Suspension) [ECF Nos. 116-34, 116-37] |

130. The October 24, 2024 Notice of Suspension clearly issues Plaintiff a notice of 15-day suspension. While the FAB is not listed specifically in the Notice of Suspension, evidence from Chief Kim's deposition provides "that you have the fire department investigation which culminated in the investigative report that Joanne Schaffer wrote. That report went to a separate internal panel called the fire advisory board, FAB for short." (Dkt. 115-17 (Kim Dep. Tr.) 306:4-9.) Chief Kim also testified that the FAB investigates the "non-equity conduct" issues, which are included in the reasons for suspension outlined in the Notice of Suspension. (*Id.* 306:24-308:3; Dkt. 116-37 (Notice of Suspension).)

| 131. Chief Boiteux was not involved in the CPOE review process, including the decision to remove Plaintiff from the Background Investigation Unit or to suspend him.<br><br>Portnoi Decl. Ex. N (Boiteux Dep. Tr.) 293:18-294:24 | 131. **Disputed** as unsupported by the cited evidence. The cited testimony only shows that Boiteux did not participate in the CPOE briefing. It does not show that Boiteux was not involved in a CPOE review process, and does not mention the removal or suspension decisions at all.<br>Boiteux Depo., pp.293:18-294:24 [ECF No. 115-14 at 77-78] |

131. Plaintiff's Response does not refute the fact or cited evidence. Plaintiff adduces no evidence that Chief Boiteux was involved in any stage of the CPOE review process. Plaintiff's Response also contradicts their Response to Fact No. 122, where Plaintiff asserts Chief Kim "made the decision to remove Little from the BIU on her own." (Dkt. 115-14 (Boiteux Dep. Tr.) 293:18-294:24; Dkt. 115-17 (Kim Dep. Tr.) 342:1-16, 343:2-21.) Chief Boiteux also testified that CPOE complaints do not come to him, and are not within his purview. (Dkt. 115-14 (Boiteux Dep. Tr.) 236:25-237:12.)

| 132. Chief Uehara had no knowledge of the briefing findings regarding the | 132. **Disputed** as unsupported by the cited evidence. Uehara only stated that he had no knowledge of "this", |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| CPOE complaint that Chief Lester filed against Plaintiff.<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 341:15-22 | referring to a *document* containing briefing findings. Uehara did not state that he had no knowledge of the briefing findings themselves.<br>Uehara Depo., p.341:15-22 [ECF No. 115-9 at 174] |

132. In Chief Uehara's deposition, Plaintiff's counsel stated, "I'm going to quickly show you Exhibit 45.  This is a February 7, 2024, document, briefing findings about a CPOE complaint filed against Captain Little, Bates stamped LAC-278 to 279. Do you have any knowledge about this?"  Chief Uehara responds "no," in reference to the CPOE briefing findings.  (Dkt. 115-9 (Uehara Dep. Tr.) 341:15-22.)  Chief Uehara's lack of knowledge of the CPOE briefing is further supported by the confidential nature of the briefing panel and their findings, and that the briefing findings are sent to the parties of the CPOE complaint, and that Chief Uehara was not a party to the CPOE complaint. (Dkt. 111-3 (Stormer Dep. Tr.) 18:17-20; 86:5-7.)  And in any case, Plaintiff adduces no evidence that Chief Uehara had any knowledge of the briefing findings regarding the CPOE complaint that Chief Lester filed against Plaintiff.

| | |
|---|---|
| 133. Chief Lester was not involved in the CPOE review process after he filed the CPOE complaint against Plaintiff on June 21, 2023.<br><br>Portnoi Decl. Ex. E (Lester Dep. Tr.) 150:25-151:10 | 133. **Disputed** as unsupported by the cited evidence. Lester merely said he did not remember further involvement, but did not expressly deny it.<br>Lester Depo., pp.150:25-151:7 [ECF No. 110-6 at 54-55] |

133. Plaintiff's Response mischaracterizes Chief Lester's testimony cited as evidence.  Chief Lester first explains he was not involved in the CPOE review process after filing the CPOE complaint against Plaintiff, then in response Plaintiff's counsel asks "[s]o from your perspective, that -- that was pretty much your last involve- -- or that was your last involvement in this situation involving Captain Little?"

Chief Lester responds "[f]rom what I can remember. I don't remember dealing with any as far as Captain Little is concerned. I didn't have any hand in anything else further beyond that."

Plaintiff's counsel then asks "Beyond the CPOE complaint?· Is that a yes?" To which Chief Lester responds "Correct."  (Dkt. 110-6 (Lester Dep. Tr.) 150:25-

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 151:10.)  Plaintiff adduces no evidence that Chief Lester was involved in the CPOE review process after he filed the CPOE complaint. | |
| 134. In 2024, Plaintiff requested a religious accommodation in advance of Pride Month, on May 8, 2024.<br><br>Nuanes-Delgadillo Decl. ¶5, Ex. C (email correspondence between Plaintiff and Ms. Nuanes-Delgadillo) at LAC-0000507-08 | 134. **Undisputed**. |
| 135. The Fire Department issued EA-232, which provided guidance about which Department facilities with flagpoles should fly the PPF in 2024, on May 30, 2024.<br><br>Kim Decl. ¶5, Ex. C (EA-232) | 135. **Disputed** as unsupported by the cited evidence. Ex. C does not contain guidance about which Department facilities with flagpoles should fly the PPF.<br>Kim Decl. ¶5, Ex. C (EA-232) [ECF Nos. 116, 116-3]<br>**Undisputed** to the extent that attachment A to EA-232 states that the PPF shall be flown at all facilities, illustrates the orientation of the flag, and instructs clasps to be added to poles safely capable of flying three flags, and providing the flag order. |
| 135. EA-232, including Attachment A, support this fact.  (Dkt. 116-3 (EA-232); Dkt. 121-4 (Little Dep. Tr.) at Ex. 1066 (PDF page 118).) | |
| 136. In 2024, the County held IPMs with Plaintiff on both May 29, 2024 and May 31, 2024.<br><br>Portnoi Decl. Ex. O (Crum Dep. Tr.) 179:8-16<br><br>Nuanes-Delgadillo Decl. ¶¶6-7, Ex. D (2024 IPM notes), Ex. E (2024 IPM report) | 136. **Undisputed**. |

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 137. In the 2024 IPM, the County informed Plaintiff that he could swap with other captains to work where the PPF would not be flown.<br><br>Portnoi Decl. Ex. F (Power Dep. Tr.) 82:10-25<br><br>Nuanes-Delgadillo Decl. ¶¶6-7, Ex. D (2024 IPM notes) at LAC-0001486, Ex. E (2024 IPM report) at LAC-0002412-13 | 137. **Undisputed** that the County stated it would not interfere with shift swaps. However, **disputed** to the extent it is misleading Power told Little that he could "pursue" a trade request, but stated that it would be "on his own" and "not through [an] accommodation."<br><br>Nuanes-Delgadillo Decl. ¶¶6-7, Ex. D (2024 IPM notes) at LAC-0001486 [ECF No. 116-23 at 5] |
| 137. Plaintiff's Response, to the extent it disputes this fact, does not refute the fact or cited evidence showing that the County informed Plaintiff that he could swap with other captains.  Further, the cited evidence states it is standard practice that the Fire Department does not facilitate shift swaps, and Chief Power did confirm that if Plaintiff sought a mutual trade, Chief Power would approve it. (Dkt. 116-23 (2024 IPM notes) at LAC-0001486.) | |
| 138. The County's 2024 proposal for Plaintiff to swap with other captains to work where the PPF would not be flown was an effective accommodation.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 294:13-295:9<br><br>TAC ¶113 | 138. **Disputed**. Little stated that the 2024 accommodation was only "partly" effective, but he made it work. The cited testimony and complaint paragraph do not discuss swaps and do not show that the County proposed swaps.<br>Little Depo., pp.294:13-295:9 [ECF No. 115-2 at 195-196]<br>TAC ¶ 113.<br>Further disputed because the County told Little that he could "pursue" a trade request, but stated that it would be "on his own" and "not through [an] accommodation."<br>Nuanes-Delgadillo Decl. ¶¶6-7, Ex. D (2024 IPM notes) at LAC-0001486 [ECF No. 116-23 at 5] |

70

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 138. Plaintiff's Response does not refute the fact or cited evidence. The cited evidence states it is standard practice that the Fire Department does not facilitate shift swaps, and Chief Power did confirm that if Plaintiff sought a mutual trade, Chief Power would approve it. (Dkt. 116-23 (2024 IPM notes) at LAC-0001486.) Further, Plaintiff's verified TAC, which is made under penalty of perjury, describes how Captain Little was able to "secure a practical accommodation of his religious beliefs in June 2024." (Dkt. 69 (TAC) ¶¶13, 16.) | |
| 139. The County was able to accommodate Plaintiff's request to use benefit time in 2024 because it had time to ensure adequate staffing beforehand.<br><br>Portnoi Decl. Ex. F (Power Dep. Tr.) 83:11-23, 87:6-17<br><br>Portnoi Decl. Ex. I (Uehara Dep. Tr.) 370:16-22 | 139. **Disputed** as unsupported by the evidence. Power merely testified that he would approve shift trades if Little found a trade partner, that Little had used some benefit time, and discussed an example of an approved trade. Power Depo., pp.83:11-15, 83:21-23, 87:6-17 [ECF No. 115-6 at 31, 35] Uehara's testimony regards Little's assignment to area 33 and a swap arrangement for Wednesdays in June. Neither citation discusses benefit time use as an accommodation or why it was approved. Uehara Depo., pp.369:1-370:22 [ECF No. 115-9 at 178-179]<br>Further disputed to the extent it is misleading and implies that Defendants were not able to accommodate Plaintiff's 2023 request to use benefit time because they lacked adequate time to ensure staffing beforehand. When Plaintiff left his post on sick-leave in 2023, Defendants adequately staffed and filled his role without any operational disruption, beachgoer injuries, or known issues relating to the mental health of individuals recalled by Plaintiff's absence. |

71

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Jonna MSJ Opp. Decl., Ex. C, Kim Depo., pp.133:17-142:24 |
| 139. Plaintiff's Response does not refute the fact or the evidence it cites. Use of benefit time was part of the accommodation request discussed by Chief Uehara, who testified the County was able to provide the accommodation in June 2024 that the County could not provide in June 2023 because it was "done ahead of time" and Plaintiff had entirely changed his annual schedule bid, which made his schedule changes easier to accommodate in June 2024. (Dkt. 115-9 (Uehara Dep. Tr.) 370:16-371:9.)<br><br>Plaintiff's Response related to Defendants' ability to accommodate Plaintiff's 2023 request is not supported by fact, for the reasons explained above with respect to Facts No. 85-86, 89-104, 120-121. | |
| 140. At Plaintiff's request, the County enumerated specific sites where the PPF would not be flown in 2024.<br><br>Portnoi Decl. Ex. B (Little Dep. Tr.) 77:1-15<br><br>Nuanes-Delgadillo Decl. ¶¶8, Ex. F (email correspondence between Plaintiff and Ms. Nuanes-Delgadillo) at LAC-0002258 | 140. **Disputed**. Power only confirmed that area 33 stations would not fly the PPF, but did not "enumerate" more than one specific site[]."<br>Nuanes-Delgadillo Decl. ¶¶8, Ex. F (email correspondence between Plaintiff and Ms. Nuanes-Delgadillo) at LAC-0002258 [ECF Nos. 116-19, 116-25]<br>Little testified that he asked Crum for locations where flying the PPF would be a requirement. But Little did not testify that Crum "enumerated specific sites."<br>Little Depo., p.77:1-15 [ECF No. 115-2 at 49] |
| 140. Plaintiff's Response does not refute the fact or cited evidence. The cited evidence shows that Chief Power confirmed multiple sites where the PPF would not be flown under EA-232 in June 2024, including "Nicholas Beach, Point Dume Beach, and Malibu Beach," which were within Area 33. (Dkt. 116-25 (email correspondence between Plaintiff and Ms. Nuanes-Delgadillo) at LAC-0002258.) | |

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

## II.    DEFENDANTS' GENUINE DISPUTES OF PLAINTIFF'S ADDITIONAL FACTS[1]

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 141. Although, as a member of the Fire Department, following County policies was part of Plaintiff's job, see Fact No. 4, as alleged in the Complaint, pursuant to the U.S. and California Constitution, as well as federal and state laws, the County was prohibited from discriminating against Little because of his religion or retaliating against him for engaging in protected activities. Further the County of Los Angeles was required to provide Little with a reasonable accommodation with respect to job responsibilities which conflicted with his sincerely held religious beliefs unless it could demonstrate that providing such an accommodation would constitute an undue burden upon the conduct of its business. (U.S. Const. amend I; 42 U.S.C. § 2000e-2; Cal. Gov. Code § 12940.) | Neither Plaintiff's nor Defendants' Fact No. 4 supports Plaintiff's assertion here.  Plaintiff's Fact No. 4 states: "Captain Little's performance evaluation for April 2022-March 2023 discussed his laudable work as part of the Background Investigation Unit ("BIU"), and his overall rating for that period was very good and exceeded expectations."  This has no bearing on Plaintiff's Additional Fact.  To the extent that Plaintiff relies on Defendant's Fact No. 4, Plaintiff did not dispute Fact No. 4 as to the portion that "following County policies was part of Plaintiff's job." <br><br> Disputed as to the remainder, which constitutes a pure legal conclusion and cites—as support for a factual statement specific to Plaintiff—the United States Constitution and various state and federal codes. |

[1] Plaintiff's so-called "Additional Material Facts" are improper and should be stricken in their entirety.  Section 5 of the Court's Procedures and Section 9(c)(i) of the Court's Initial Standing Order prohibit legal argument in parties' statements of uncontroverted facts and statements of genuine issues.  Plaintiff is attempting to backdoor in legal argument through his "Additional Material Facts" instead of making the argument in his opposition brief, as expressly required by the Court.  Accordingly, the Court should strike Plaintiff's "Additional Material Facts" in their entirety or, at minimum, strike those portions that include legal argument as contrary to a court order.

DEFS.' STATEMENT OF GENUINE
DISPUTES & ADDITIONAL FACTS
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 142. Under EA-231, if a flagpole could accommodate only the U.S. flag, the PPF would not be flown; otherwise, it would be. See Fact No. 5. But EA-231 conflicts with the Board motion directing Internal Services Department to raise the PPF at "Los Angeles County facilities" "where the American and California Flags are displayed during the month of June."<br><br>EA-231 provides in relevant part: "With the exception of Flag Day, June 14th, when the Prisoner of War/Missing in Action flag is flown, the PFF shall be flown as follows: Single Flagpole<br><br>• Clasps for one flag: Fly the United States (U.S.) flag alone.<br><br>• Clasps for two flags: Fly the U.S. flag at peak and the PPF directly below.<br><br>• Clasps for three flags: Fly the U.S. flag at peak, State, and then PPF."<br><br>(Kim Decl. ¶3, Ex. A, Board Motion [ECF No. 116-1]) (Kim Decl. ¶3, Ex. B, EA-231 [ECF No. 116-2].) | Disputed that "EA-231 conflicts with the Board motion directing Internal Services Department to raise the PPF at 'Los Angeles County facilities' 'where the American and California flags are displayed during the month of June.'"<br><br>The Board motion directed the Internal Services Department to raise the PPF at "Los Angeles County facilities" "where the American and California Flags are displayed during the month of June".  (Dkt. 116-1 (Kim Decl.) ¶3; Dkt. 116-2 (Boad Motion).)  EA-231 provides in relevant part, "[c]lasps for two flags: Fly the U.S. flag at peak and the PPF directly below" and "[c]lasps for three flags: Fly the U.S. flag at peak, State, and then PPF."  (Dkt. 116-1 (Kim Decl.) ¶4; Dkt. 116-3 (EA-231).)<br><br>The Board motion did not dictate the removal of the California state flag in order to fly the PPF.  (Dkt. 119-2 (Boiteux Dep. Tr.) 56:10-25.) |
| 143. ███████████████████ | Undisputed that in June 2023, clasps went missing at lifeguard stations, for which no employees ultimately received discipline.  Disputed that comparing the experience of these instances where clasps went missing, apparently with no specific employees suspected for removing them, to Plaintiff's lowering of the PPFs at Area 17 on June 21, 2023 reveals a |

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
|  | "stark disparity in how the County Equity Oversight Panel applied the process to" Plaintiff. <br><br> Further, Chief Kim stated that she did not "believe that ***most*** of them [referring to the individuals who had CPOE complaints filed against them] got disciplined after the Skellys with me." (Dkt. 115-17 (Kim Dep. Tr.) 416:14-16. (emphasis added).) |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| ███████████████████ (Jonna MSJ Opp. Decl., Ex. B, Boiteux Dep., pp.75:9-23, 85:2-87:4, 321:4-18.) (Jonna MSJ Opp. Decl., Ex. C; Kim Dep., pp. 414:22-415, 417:6-418:5 & Ex. 44) (Jonna MSJ Opp. Decl., Ex. I.) | |
| 144. In June 2023, flag lines were cut at lifeguard stations and flagpoles were taken down. *See* Fact Nos. 11-12.<br><br>Some of the vandalism of flag lines and flag poles was done by employees. Chief Power testified: "A. People cut flagpole lines. People dismantled flagpoles. I don't know if they were employees. Some were employees. Some were the public possibly. And our lifeguard towers were vandalized extensively."<br><br>███████████████ (Power Dep., 54:15-19 [ECF No. 115-6 at 20]) (Jonna MSJ Opp. Decl., Ex. I.) | Undisputed. |
| 145. On June 18, 2023, Plaintiff emailed Chiefs Boiteux, Kyle Power, and Danielle McMillon to request to be | Undisputed. |

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| exempt from EA-231. *See* Fact No. 27. Plaintiff requested as follows: "I am requesting to be exempt to adhering to EA-231 and am requesting a religious accommodation on grounds that it infringes on my sincere religious beliefs. I have always made it a priority to carry out the mission of the department, serve the community, and be an exemplary employee, but this board motion and the responsibilities accompanying it is in conflict with my deep religious faith." (McMillon Decl., ¶2 and Ex. A [ECF Nos. 116-16, 116-17].) | |
| 146. Plaintiff's June 18, 2023 email was forwarded to Renee Nuanes-Delgadillo, who organized an interactive process meeting ("IPM") for June 19, 2023. *See* Fact No. 29.<br><br>The email exchange reflects that Chief McMillon "had spoken at length" with Captain Little regarding his request for a religious accommodation, had recommended an IPM to determine whether he could be accommodated and had already discussed with him possible ways in which he might be accommodated, thereby conceding he held a sincere religious belief that required accommodation in the absence of the County demonstrating any "undue hardship" and the existence of a conflict between his sincerely held religious belief and a work requirement. | Undisputed that Plaintiff's June 18, 2023 e-mail was forwarded to Renee Nuanes-Delgadillo, that the e-mail exchange reflects that "Chief McMillon "had spoken at length" with Captain Little regarding his request for a religious accommodation, had recommended an IPM to determine whether he could be accommodated and had already discussed with him possible ways in which he might be accommodated." Further undisputed that Ms. Nuanes-Delgadillo suggested a "quick pre meet."<br><br>Disputed that this demonstrates that Defendants "conced[ed] he held a sincere religious belief that required accommodation in the absence of the County demonstrating any "undue hardship" and the existence of a conflict between his sincerely held |

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
| --- | --- |
| Similarly, as part of the same exchange, Nuanes-Delgadillo proposed a meeting with the other individuals on the email (Uehara, Boiteux, Kim, Power and McMillon), in advance of her meeting with Captain Little "to go over how he can be accommodated either at work, or providing him a leave of absence." (McMillon Decl., ¶2-3, Ex. A [ECF Nos. 116-16, 116-17].) | religious belief and a work requirement."  Nothing in the e-mail exchange suggests any such concession.  Notably, Chief McMillion also stated that "the other possible accommodation would be that he burns his own benefit time until July." (Dkt. 116-16 (McMillon Decl.) ¶¶2-3; Dkt. 116-17 (email communication between Chiefs Uehara, Kim, Power, and McMillon, and Ms. Nuanes-Delgadillo).) |
| 147. Chiefs Uehara and McMillon attended the June 19 IPM to represent the Lifeguard Division chain of command. *See* Fact No. 130. Concerning her role, Chief McMillon testified: <br><br> "[Q.] Was there any point— is it fair to say that there was never a point where you questioned whether he had sincere religious beliefs, that was never something that you questioned? <br><br> "A. No. I believed him when he said he had religious beliefs. Absolutely, I believed him." <br><br> McMillon further testified that she was present at the June 19, 2023 IPM "to look at" specific accommodation options. She testified: <br><br> "A. I think I was looking at the Area 33 option, and he had also been assigned a recall, maybe, in Torrence/Redondo, or it might have been a relief shift. I—I mean, I'd have | Undisputed that Chiefs Uehara and McMillon attended the June 19, 2023 IPM and that Plaintiff accurately cites Chief McMillon's and Chief Uehara's deposition transcripts. |

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
| --- | --- |
| to look at a calendar, but I know there was some discussion around he had a shift in Torrance/ Redondo, whether it was recall or just his relief day—I think it was a recall, because he had already done his relief day, maybe, and maybe the following week, he was assigned somewhere on a Sunday. Anyway, my discussion was, I was looking at his calendar, and I was looking at shifts, and just talking about, Okay. Can we get you to Area 33? What do we do with the Redondo shift. I think that was mostly my contribution, was trying to look at that accommodation." Similarly, Uehara testified that his role in the June 19, 2023 IPM was also to explore potential accommodations: "How do you describe what role you played in the handling of [Little's] religious accommodation request? "A. We met with Captain Little. We met with LACoLA. His union represent, I believe, is Greg Crum at the time. I believe Chief McMillon was the supervisor. And then from HR, it was Rachel Lara. And so he gave his request, and then we came up with recommendations of possible accommodations that we could make for Captain Little at that time." (McMillon Dep., pp. 108:24-109:17, 115:4-9 [ECF No. 115-8 at 43-44, 50]) (Uehara Dep., pp. 48:19-49:1-3 [ECF No. 115-9 at 11-13].) | |

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 148. At the June 19 IPM, Plaintiff explained that he had religious objections to raising the PPF. *See* Fact No. 32.<br><br>He did not explain that he had an objection to working in a place where he could see the PPF flying. Rather, Nuanes-Delgadillo made that statement, apparently attempting to lead Captain Little into making it his objection, but he disputed it. Captain Little explained he had religious objections to raising the PPF and to being responsible for ensuring that it was raised.<br><br>With regard to *seeing* the PPF flag, Little testified:<br><br>"Q. Did you not want to work where you could see the PPF?<br><br>"A. My request was to be exempt from these responsibilities in EA-231. I mean, I—and the best way to do that, accommodate, is to work an area where it's—you're not responsible for it.<br><br>"Q. Did you want authority to take down the PPF when you did see it?<br><br>"A. That was never discussed."<br><br>Little further testified that he initially requested just to stay at Will Rogers and not to fly the PPF there, but that wasn't really up for discussion and he would be responsible for the PPF there. So they "entertained other possibilities, and the easiest place was | Undisputed that "[a]t the June 19 IPM, Plaintiff explained that he had religious objections to raising the PPF and to working in a place where he could see the PPF flying."<br><br>Disputed as to the remainder. This is Plaintiff's deposition testimony over two years after the IPM. Defendants dispute this fact to the extent it implies that he explained this position during his IPM, as the IPM summary and notes are not consistent with this testimony. (Dkt. 116-20 (2023 IPM notes) at LAC-0001488; Dkt. 116-21 (2023 IPM summary) LAC-0000374.) |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| to move somewhere where I wouldn't have those responsibilities. Not necessarily because it wasn't being flown, because I wouldn't have the responsibilities. That's the easiest way to find a solution." <br><br> Little further clarified: <br><br> "A. My—my request was I don't want the responsibilities of it, not to necessarily be placed in, like, in a station where it's not flown. Because, you know, further in this discussion, I got moved into area 33, there was a PPF being flown there. I did not dispute that. I did not ask for an accommodation to, like, not have that being flown. It was still up, I was seeing it every day. I didn't contend that. The difference was I just wasn't responsible for and that—I was okay with that, that was very acceptable to me. And so, yeah, I don't think—I don't think this is a hundred percent accurate." (Jonna MSJ Opp. Decl., Ex. A, Little Dep., pp. 100:17-25) (Little Dep., pp.120:7-12, 120:20-121:4, 121:10-23, 127:3-129:22 [ECF No.115-2 at 65-66, 72-74].) | |
| 149. Plaintiff did not voice any objections to working at Will Rogers Beach or Venice Beach which have lifeguard towers painted with the colors of the Pride Flag. *See* Fact Nos. 35, 37. <br><br> Rather, although it was Captain Little's understanding that the rainbow painted | Undisputed that "Plaintiff did not voice any objections to working at Will Rogers Beach or Venice Beach which have lifeguard towers painted with the colors of the Pride Flag." Further undisputed that, as to these facilities, Plaintiff stated during his deposition that he was "never required |

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| towers were intended to promote support for the LGBTQ+ community, which he understood to be along the same lines as the message of endorsement and promotion sought to be conveyed by the PPF, he explained that "I was never required to paint it myself, I was never asked to, like, do anything for it and to endorse it and be part of it. That's the big difference. It's a huge distinction."<br><br>He further explained:<br><br>"Q. Did you state that you did not want to look at the Progress Pride Flag while at work?<br><br>"A. They may have asked me that. And—I mean, to be honest, like, I—I didn't want to look at it. But it wasn't the factor of an acceptable accommodation or not. It was—the factor was the responsibilities, and we've mentioned before, like, there's Pride Flags, like, all over the place. There's rainbow towers, there's—this is everywhere, and I didn't object to any of those things because they didn't outline a responsibility for me to participate and, you know, endorse. This is—this is where it crossed the line, that's where I really felt it—it conflicted."<br><br>It was Little's understanding that the rainbow painted towers were meant to promote support for the LGBT community. But he distinguished the rainbow painted towers from his | to paint it myself, I was never asked to, like, do anything for it and to endorse it and be part of it. That's the big difference. It's a huge distinction."<br><br>Disputed as to the remainder and as to what was conveyed during his IPM or his request for an accommodation. This is Plaintiff's deposition testimony over two years after the IPM. Defendants dispute this fact to the extent it implies that he explained this position during his IPM, as the IPM summary and notes are not consistent with this testimony. (Dkt. 116-20 (2023 IPM notes) at LAC-0001488; Dkt. 116-21 (2023 IPM summary) LAC-0000374.) Further, the evidence cited in support of Facts No. 32-33 contradicts this fact. Plaintiff further objected to working in a place where he could see the PPF flying. (Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 170:13-15, 219:3-219:14; Dkt. 115-8 (McMillon Dep. Tr.) 107:16-108:1, 118:14-119:1; Dkt. 115-15 (Crum Dep. Tr.) 96:21-97:1, 97:7-13,105:10-106:2, 137:24-138:2; Dkt. 115-9 (Uehara Dep. Tr.) 89:2-90:16, 166:15-167:1; Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4; Dkt. 116-20 (2023 IPM notes) at LAC-0001488-89; Dkt. 116-21 (2023 IPM report) at LAC-0000374.)<br><br>Defendants further dispute this fact as contradicting Plaintiff's own Separate Statement of Uncontroverted Facts, which states that "[d]uring the June 19 IPM meeting, Captain Little confirmed |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| objection to the PPF, explaining, "But I was never required to paint [a rainbow tower] myself, I was never asked to, like, do anything for it and to endorse it and be part of it. That's the big difference." Little explained that although he did not agree with the message conveyed by the Pride painted towers, he was not being forced to participate in it. He acknowledged he had never sought an accommodation "not to look at the painted towers at Will Rogers." (Little Dep., pp.117:8-21, 118:16-119:14, 119:16-18, 21-23, 119:25-120:4 [ECF No. 115-2 at 62-65].) | that he can work in lifeguard towers that are painted/decorated to support LGBTQ+, *oversee maintenance of the towers*, provide lifeguard assistance to LGBTQ+ patrons, or *anything else that is required of him as captain*." (Dkt. 121-3 ¶70 (emphasis added).) |
| 150. Following the IPM meeting, Nuanes-Delgadillo sent a written "memorialization of what was discussed during our meetings," dated July 13, 2023. She sent the memorialization to Little, McMillon, Crum, Uehara and Rachel Lara (Nuanes-Delgadillo's "peer" who was also present at Little's IPM). That document reflects:<br><br>"During the discussion on June 19, 2023, we reviewed your request for a religious accommodation; wherein, you were asked to provide further clarification to your request. You responded that you would like a religious accommodation to be exempt of the board motion that was outlined in EA 231: Raising the Progress Pride Flag dated May 25, 2023, which | Undisputed that following the IPM meeting, Ms. Nuanes-Delgadillo emailed the individuals listed, and that the quote accurately reflects the email. Further undisputed that this fact accurately cites Chief Uehara's testimony.<br><br>Disputed to the extent Plaintiff frames Defendants as having agreed to an accommodation. The evidence cited in support of Fact No. 44 contradicts Plaintiff's framing of this as a "religious accommodation." (Dkt. 115-2 (Little Dep. Tr.) 131:22-132:5; Dkt. 115-8 (McMillon Dep. Tr.) 109:21-110:4, 111:20-24, 112:12-17; Dkt. 115-15 (Crum Dep. Tr.) 112:8-17; Dkt. 116-19 ¶¶3-4, Dkt. 116-20 (2023 IPM notes) at LAC-0001489; Dkt. 116-21 (2023 IPM report) at LAC- |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
| --- | --- |
| indicates that the Progress Pride Flag (PPF) is to be flown at County facilities during the month of June, which will now be recognized as LGBTQ + Pride month moving forward. You explained that you are assigned to Will Rogers Beach. You stated that you feel that based on EA 231, Will Rogers should be exempt from adhering to flying the PPF based on the flow chart attachment which indicates that only locations where American and State flags are flown need to fly the PPF. Further, you explained that Will Rogers Beach does not fly both. You were informed that I would not be able to address the requirements within this discussion; however, I would address the request for religious accommodation. It was confirmed that you are requesting to not fly the PPF at Will Rogers Beach, and if this is not a possibility, then you would like to be placed at a station where the PPF is not flown. You were informed that this request was discussed with your chain of command and the department is able to accommodate you with an assignment at Area 33, which you accepted. It was explained that you would not be the Area 33 Headquarters Captain; therefore, you would not be responsible for ensuring that the PPF is flown." Chief Uehara testified: | 0000375.)  The evidence cited in support of Facts No. 40 and 42 contradicts Plaintiff's subjective belief "he would not be responsible for ensuring the PPF was flying there." (Dkt. 115-2 (Little Dep. Tr.) 127:24-128:1, 128:3-129:22; Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 120:13-122:6, 212:25-213:2; Dkt. 115-8 (McMillon Dep. Tr.) 109:18-110:4, 111:20-25, 112:12-17, 126:18-127:8, 187:24-188:18, 189:5-14, 190:14-17; Dkt. 115-15 (Crum Dep. Tr.) 101:17-102:24, 104:10-106:2; Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4; Dkt. 116-20 (2023 IPM notes) at LAC-0001488-89; Dkt. 116-21 (2023 IPM report) at LAC-0000374; TAC ¶¶49, 52.) Undisputed as to Plaintiff agreeing to work at Area 33. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| "Q. What do you remember?<br><br>"A. That they would move Captain Little to—recommended to move Captain Little to Zuma headquarters, which was called area 33, and that he can— where the flag was being flown, and he would pick up his vehicle and leave and would not have—there's multiple captains in that facility. So he would not be directly responsible for raising the flag, and someone else could order someone to put the flag. But if [there] were to be—if he was to be recalled, we would ask him to do his best to do a personnel exchange to a facility that he felt was granted—or can suffice his deeply held religious beliefs and—if he was to get a recall to a specific area."<br><br>Despite the language of IPM memo, Uehara claimed the agreement was "tentative". (Nuanes-Delgadillo Decl, Ex. B (2023 IPM report) [ECF No. 116-21]) (Nuanes-Delgadillo Dep., p. 18:5-8 [ECF No. 115-7 at 9]) (Uehara Dep., p. 95:2-17 [ECF No. 115-9 at 36]) (Uehara Dep., pp. 126:21-127:22 [ECF No. 115-9 at 55-56].) | |
| 151. With respect to Area 33, Captain Little explained, "The whole reason being moved there was because I wouldn't be responsible for it [the PPF] and that was acceptable to me and I accepted it." (Little Dep. 127:19-128:1 [ECF No. 115-2 at 72-73].) | Disputed to the extent that this conflicts with Plaintiff's own Separate Statement of Uncontroverted Facts, which reads, "Captain Little agreed to work at Area 33 as a religious accommodation from EA-231 despite knowing that it was flying the PPF, because he believed he would not be |

85

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | responsible for ensuring the PPF was flying there. [Dkt. 119-1 (Little Dep. Tr.) 124:1-5, Ex. 1069 (PDF pages 122-24)]." (Dkt. 118-2 (Pl.'s Separate Stmt. of Uncontroverted Facts) ¶65.) |
| 152. An email exchange between Delgadillo, Kim and Boiteux, with copies to Uehara, Power and McMillon reflects that on June 19, 2023 at 10:03 a.m., prior to the June 19, 2023 IPM, Nuanes-Delgadillo stated, "Good Morning, I just spoke with Chief Uehara. We discussed the recommendations available and that we will inform CA Little of in the IPM today at 2:00 pm. Once the IPM has been conducted. I will notify you all with his decision." <br><br> After the IPM, on June 20, 2023 at 11:05 a.m., Nuanes-Delgadillo advised as part of the same exchange: "Good Morning, We conducted an IPM with Captain Jeffrey Little yesterday and he accepted the following accommodation: <br><br> • Stationed at Area 33 through June 30, 2023 <br><br> • Although the Area 33 HQ Captain will be responsible in ensuring that the PPF is town, in extenuating circumstances, Captain Little understands that it will be his responsibility to ensure that it is flown <br><br> • Recalls were discussed and it was agreed that if he is recalled at a | Undisputed. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| location where the he would be responsible for the PPF, he would try to find someone to switch with.<br><br>• I am preparing the IPM discussion form and will send to all parties on the IPM<br><br>Please note that I am meeting with DHR today to discuss Religious Accommodations in general and this particular case for their guidance and if they have encountered this before." (Jonna MSJ Opp. Decl., Ex. E, McMillon Dep. Ex. 8.) | |
| 153. Defendants' [*sic*] assert that "Dockweiler HQ is a Beaches and Harbors facility, not a Lifeguard Division facility." *See* Fact No. 53. But Chief Uehara testified the Dockweiler facility is shared, with the entrance to the Dockweiler facility parking lot managed by the Department of Beaches and Harbors. (Uehara Dep., p.183:16-22 [ECF No. 115-9 at 102].) | Disputed.  Dockweiler HQ is a Beaches and Harbors facilities.  Chief Uehara says, "in that area [referring to the "Dockweiler Area"], I do know that it's a shared facility with Beaches and Harbors."  (Dkt. 115-9 (Uehara Dep. Tr.) 183:16-22.)  Chief Boiteux said that "Dockweiler Beach, the entrance to the parking lot, it's managed by [] Department of Beach and Harbors."  (Dkt. 115-14 (Boiteux Dep. Tr.) 147:10-15.) |
| 154. Plaintiff's shifts in June 2023 generally started at 10:00 a.m. See Fact No. 54. But on June 21, 2023, his shift started at 10:30 a.m. (Little Dep., p.194:5-12 [ECF No. 115-2 at 122].) | Disputed, Plaintiff said that he "believe[d]" he "started at 10:30, which there's a discrepancy in the schedule … ," but also that "Area 33, that time of year is a late start, so it would start at 10:00 o'clock." (Dkt. 115-2 (Little Dep. Tr.) 143:4-13, 194:5-12.) |

87

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 155. Plaintiff arrived at the beach on June 21, 2023 to find the PPF flying at Dockweiler South and Dockweiler North. *See* Fact No. 56.<br><br>But the asserted fact strips away critical context. Little arrived under an accommodation that no flags would be flying in his area of responsibility. Little was surprised to find the flag flying because Lester had added clasps to the flagpoles at Dockweiler South and Dockweiler North that very morning.<br><br>Area 17 had not flown the PPF flag during any earlier day in June 2023. By stating only that Little "found" the PPF flying, Defendants omit that no one in the chain of command notified Little of the changed conditions.<br><br>The 100% compliance mandate issued on June 20, 2023, was not communicated to the captains who bore compliance duties under EA-231 prior to the morning of the incident. (Lester Dep. 84:12-85:3 [ECF No. 110-5 at 65-66]) (Crum Dep. 115:3-8 [ECF No. 115-15 at 73]) (Jonna MSJ Opp. Decl., Ex. B, Boiteux Dep. 161:19-162:10, 163:7-18.) | Undisputed that "Plaintiff arrived at the beach on June 21, 2023 to find the PPF flying at Dockweiler South and Dockweiler North."<br><br>Disputed to the extent that this fact assumes Plaintiff had received an accommodation.  The evidence cited in Defendants' Separate Statement of Uncontroverted Facts (Dkt. 114-2) ¶44 contradicts Plaintiff's claim that he received   a "religious accommodation."  (Dkt. 115-2 (Little Dep. Tr.) 131:22-132:5; Dkt. 115-8 (McMillon Dep. Tr.) 109:21-110:4, 111:20-24, 112:12-17; Dkt. 115-15 (Crum Dep. Tr.) 112:8-17; Dkt. 116-19 ¶¶3-4, Dkt. 116-20 (2023 IPM notes) at LAC-0001489; Dkt. 116-21 (2023 IPM report) at LAC-0000375.)  The evidence in support of Facts No. 40 and 42 contradicts Plaintiff's belief that "he would not be responsible for ensuring the PPF was flying there." (Dkt. 115-2 (Little Dep. Tr.) 127:24-128:1, 128:3-129:22; Dkt. 115-7 (Nuanes-Delgadillo Dep. Tr.) 120:13-122:6, 212:25-213:2; Dkt. 115-8 (McMillon Dep. Tr.) 109:18-110:4, 111:20-25, 112:12-17, 126:18-127:8, 187:24-188:18, 189:5-14, 190:14-17; Dkt. 115-15 (Crum Dep. Tr .) 101:17-102:24, 104:10-106:2; Dkt. 116-19 (Nuanes-Delgadillo Decl.) ¶¶3-4; Dkt. 116-20 (2023 IPM notes) at LAC-0001488-89; Dkt. 116-21 (2023 IPM report) at LAC-0000374; TAC ¶¶49, 52.) |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | Further, disputed that "Area 17 had not flown the PPF during any earlier day in June 2023." This is contradicted by Plaintiff's own Separate Statement of Uncontroverted Facts, which states, "Area 17, where Captain Little worked on June 21, 2023, had not flown a PPF from June 2, 2023, up to June 21, 2023. [Dkt. 119-1 (Little Dep. Tr.) Ex. 1070 (PDF pages 125-26); Dkt. 119-13 (Crum Dep. Tr.) 115:3-8.]." (Dkt. 118-2 ¶73.)

Further, Chief Boiteux testified that "EA-231 should reflect that," referring to the 100% percent compliance obligation, and further that, "A lot of times, on urgent situations, like this was put on us, it's best to be informed by the direct supervisor because people don't read emails necessarily. Lifeguards are not in our building, where they have access to e-mails." (Dkt. 157-3 (Boiteux Dep. Tr.) 161:19-162:10, 163:7-18.) |
| 156. Chief Lester had ensured that the PPF was raised at Dockweiler South and Dockweiler North on June 21 before Plaintiff arrived at work. *See* Fact No. 57.

But the asserted fact conceals that Lester's actions before Little arrived at work included bringing additional clasps and PPFs to Area 17 sites that had not previously been flying the PPF. | Undisputed that "Chief Lester had ensured that the PPF was raised at Dockweiler South and Dockweiler North on June 21 before Plaintiff arrived at work." Further undisputed that Chief Lester brought additional clasps to Area 17.

Disputed that "Area 17 had not flown the PPF during any earlier day in June 2023." This is contradicted by Plaintiff's own Separate Statement of Uncontroverted Facts, which states, |

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| The asserted fact is framed to make Lester's actions seem like routine compliance with a preexisting practice or policy, omitting that he affirmatively changed the physical conditions at Area 17 to enable the PPF to fly there at the very site where Little had an accommodation to work that day without the PPF. (Little Dep. 203:6-21 [ECF No. 115-2 at 131]) (Lester Dep. 74:21-84:11 [ECF No. 110-5 at 55-65].) | "Area 17, where Captain Little worked on June 21, 2023, had not flown a PPF from June 2, 2023, up to June 21, 2023. [Dkt. 119-1 (Little Dep. Tr.) Ex. 1070 (PDF pages 125-26); Dkt. 119-13 (Crum Dep. Tr.) 115:3-8.]." (Dkt. 118-2 ¶73.)<br><br>Further disputed that the "asserted fact is framed to make Lester's actions seem like routine compliance with a preexisting practice or policy." This constitutes legal argument. |
| 157. OLS Gottschalk told Plaintiff that Chief Lester had ensured the PPF was raised that morning, that she was fine with the PPF up, and that she was concerned about receiving conflicting orders. *See* Fact No. 60.<br><br>But the asserted fact frames Gottschalk as being troubled by Little's question whether she would object to Little lowering the PPF. In fuller context, Gottschalk in fact would not have argued about taking the PPF down had she known that Little had a religious accommodation. (Jonna MSJ Opp. Decl., Ex. H, Gottschalk Dep. 221:7-9.) | Undisputed that "OLS Gottschalk told Plaintiff that Chief Lester had ensured the PPF was raised that morning, that she was fine with the PPF up, and that she was concerned about receiving conflicting orders."<br><br>Disputed that "the asserted fact frames Gottschalk as being troubled by Little's question whether she would object to Little lowering the PPF. In fuller context, Gottschalk in fact would not have argued about taking the PPF down had she known that Little had a religious accommodation." This framing mischaracterizes OLS Gottschalk's testimony. OLS Gottschalk testified that Plaintiff "didn't even tell me that day that he had a religious accommodation … . I don't know that I would have really argued it to the soft – even though I was pretty soft with it, wouldn't have argued it to the extent that I did if the county had granted him something that |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
|  | I was aware of. But he did not make me aware of his religious accommodation." (Dkt. 119-6 (Gottschalk Dep. Tr.) 221:2-11.) Further disputed to the extent Plaintiff implies OLS Gottschalk was not "troubled by Little's question whether she would object to Little lowering the PPF." The cited evidence does not support that assertion. |
| 158. Plaintiff took down the Dockweiler South PPF himself. *See* Fact No. 61. But the bare statement that Little "took down" the PPF "himself" implies disrespect for the PPF and unilateral defiance of his chain of command. In reality, Little carefully folded each PPF and placed it on a counter inside where it would be protected from the elements, theft, or the kind of vandalism that other PPFs had been subjected to at other county sites—he did not discard or damage the PPFs. Additionally, Little acted in reliance on what he understood to be a valid accommodation granted him two days earlier and never in the interim communicated to him as rescinded. (Little Dep., pp.197:13-15, 210:3-8 [ECF No. 115-2 at 125, 138].) | Undisputed that Plaintiff took down the Dockweiler South PPF himself. Disputed that "the bare statement that Little 'took down' the PPF 'himself' implies disrespect for the PPF and unilateral defiance of his chain of command." This statement is argument, not a statement of fact. The fact is a neutral statement about Plaintiff's action, and Plaintiff offers no support for the assertion that it implies or communicates anything beyond that Plaintiff took down the Dockweiler South PPF himself. Plaintiff's Separate Statement of Uncontroverted Facts states "Captain Little then removed the PPF flag from the Area 17-3 building's flagpole and carefully folded it and placed it on a counter inside," to which Defendants responded "undisputed." (Dkt. 118-2 ¶113; Dkt. 153-1 (Defs.' Stmt. of Genuine Disputes of Material Fact) ¶113.) |

DEFS.' RESP. TO PL.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | Disputed that Plaintiff had been granted a "valid accommodation" at this time, based on the evidence set forth in support of Facts No. 44-49 and 83-90. |
| 159. Plaintiff then drove to Dockweiler North and El Segundo, removing the PPF at both sites. *See* Fact No. 62.<br><br>But the asserted fact omits that Little consulted with the lifeguards at each site before removing the PPF and received no objections. At Dockweiler North, OLS Miller said he "would not be offended" if Little were to lower the flag there. At El Segundo, the OLS and co-lifeguard said they did not care whether Little lowered the PPF there.<br><br>Additionally, at each site, Little folded the lowered PPF respectfully and stored it inside a building where it would be protected from the elements, theft, and the kind of vandalism that other PPFs in the county had suffered.<br><br>Moreover, the asserted fact omits that Captain Crum had similarly lowered a PPF at Area 17 on June 1, 2023, at the request of Chiefs Uehara and Lester, with no discipline. (Little Dep. 204:22-205:15, 210:14-214:15 [ECF No. 115-2 at 132-133, 138-142]) (Jonna MSJ Opp. Decl., Ex. B, Boiteux Dep. 175:4-25.) | Undisputed that "Plaintiff then drove to Dockweiler North and El Segundo, removing the PPF at both sites."<br><br>Disputed that Plaintiff's other statements here are omissions from Fact No. 62, rather than statements of additional facts.<br><br>Disputed that "[a]t Dockweiler North, OLS Miller said he 'would not be offended' if Little were to lower the flag there." The cited evidence does not support this fact because neither OLS Miller, nor the OLS and co-lifeguard at El Segundo have testified.<br><br>Objection, hearsay. (Defs.' Separate Stmt. of Add'l Evidentiary Objs. ¶159.)<br><br>Undisputed that Captain Little folded and lowered the PPF and stored it inside a building. Disputed to the extent "respectfully" implies Plaintiff's lowering of the PPFs was respectful in nature. Defendants do not dispute that Plaintiff lowered the PPFs "carefully." (Dkt. 153-1 (Defs.' Stmt. of Genuine Disputes of Material Fact) ¶113.)<br><br>Disputed that "Captain Crum had similarly lowered a PPF at Area 17 on June 1, 2023, at the request of Chiefs Uehara and Lester, with no discipline." |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | This fact lacks context. Immediately prior to the cited portion of Chief Boiteux's testimony, Chief Boiteux states: "I don't do discipline. Discipline is done through deputy chiefs and above. And that conversation between him and Chief Lester and Chief Uehara, you need to ask them." (Dkt. 121-5 (Boiteux Dep. Tr.) 174:25-175:3.) Objection, foundation. (Defs.' Separate Stmt. of Add'l Evidentiary Objs. ¶159.) |
| 160. Area 17, where Captain Little worked on June 21, 2023, had not flown a PPF at any time from June 2, 2023, through June 20, 2023. (Jonna MSJ Opp. Decl., Ex. A, Little Dep. Ex. 1070) (Crum Dep. 115:3-8 [ECF No. 115-15 at 73].) | Undisputed. |
| 161. On June 1, 2023, Captain Crum began putting up PPFs on Dockweiler Beach in Area 17 but received a call from Chief Lester informing him that Chief Uehara had determined that the flags were not to be flown at flagpoles that do not typically fly more than one flag throughout the rest of the year. As a result of this instruction, Captain Crum removed a PPF that he had previously raised. (Jonna MSJ Opp. Decl., Ex. A, Little Dep. Ex. 1070 at p.1) (Jonna MSJ Opp. Decl., Ex. B, Boiteux Dep. 88:11-89:13, 90:4-10, | Undisputed. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Ex. 65) (Crum Dep. 202:19-207:23 [ECF No. 115-15 at 102-107].) | |
| 162. As of June 19, 2023, none of the Area 17 sites were flying the Progress Pride Flag or were capable of doing so, due to insufficient flag clasps on the halyards of the flagpoles and a lack of Progress Pride Flags at any of the sites. (Little Dep. 203:6-21 [ECF No. 115-2 at 131].) | Disputed.  The cited evidence does not support this statement, other than that it supports that Chief Lester had dropped off additional flags in Area 17 the morning of June 21, 2023.  (Dkt. 115-2 (Little Dep. Tr.) 203:6-21.) Chief Lester testified that he dropped off *clasps*, not *flags*, at Area 17 on the morning of June 21, 2023.  (Dkt. 115-5 (Lester Dep. Tr.) 69:5-11.) |
| 163. The June 20, 2023 compliance directive was not communicated to Captain Little before he arrived at work the next morning. (Jonna MSJ Opp. Decl., Ex. D, Lester Dep. 88:12-90:10, 92:8-16, 94:1-7, 99:13-18) (Jonna MSJ Opp. Decl., Ex. B, Boiteux Dep. 161:12-162:10) (Boiteux Dep., pp.271:23-272:11 [ECF No. 115-14 at pp.73-74) (Jonna MSJ Opp. Decl., Ex. E, McMillon Dep. 59:19-60:2.) | Disputed to the extent that the citation to Chief McMillon's deposition testimony does not support this statement.  Chief McMillon testifies she was "not sure" when the directive was conveyed to captains.  (Dkt. 121-10 (McMillon Dep. Tr.) 60:4-11.) Undisputed otherwise. |
| 164. Upon arriving at Area 17, Captain Little was confused to see a PPF flying at the 17-2 station, because he knew Area 17 stations had not flown PPFs when he worked there on June 19, 2023. He checked his phone and email for a policy change but found none. (Little Dep. 201:12-203:5 [ECF No. 115-2 at 129-131].) | Disputed. The cited excerpt does not include support for the following statement: "As a result, Captain Little checked his phone and email to see if there had been a change in policy, but Captain Little did not see any such change."  (Dkt. 119-1 (Little Dep. Tr.) 201:12-203:5.) |

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 165. OLS Jake Miller at Area 17-2 informed Captain Little that Chief Lester had dropped off the PPFs and clasps earlier that morning with instructions to raise them. Captain Little understood that Lester did not have authority to change department policies or Captain Little's religious accommodation. (Little Dep. 203:6-21 [ECF No. 115-2 at 131].) | Undisputed. Objection, foundation. (Defs.' Separate Stmt. of Add'l Evidentiary Objs. ¶165.) |
| 166. When Captain Little removed PPFs, he carefully folded each flag and placed it on a counter inside the nearest lifeguard building. He did not discard or damage any flag. (Little Dep. 210:3-8 [ECF No. 115-2 at 138].) | Undisputed. |
| 167. At Area 17-1 (El Segundo), the flagpole had not flown a flag in years. Captain Little asked OLS Tenan-Snow and his co-lifeguard if they would be offended if he took the PPF down, and they said they didn't care. (Little Dep. 210:14-214:15 [ECF No. 115-2 at 138-142].) | Disputed that Plaintiff "then went to Area 17-1." Plaintiff first went to Area 17-2 to do a "quick workout." (Dkt. 119-1 (Little Dep. Tr.) 210:14-214:15.) Undisputed as to the remainder of the Fact. Objection, hearsay, to the extent that the statement that OLS Tenan-Snow and his co-lifeguard "said they didn't care" is being used for the truth of the matter asserted. (Defs.' Separate Stmt. of Add'l Evidentiary Objs. ¶167.) |
| 168. Chief Boiteux assumed that Captain Little agreed to work at Area 17 on June 21, 2023, on the expectation that the PPF would not be flying there, and acknowledged it would have been better for someone in Captain Little's chain of command to | Disputed. Chief Boiteux did not state it would have "been better for someone" to inform Plaintiff, but rather agreed with counsel's line of questioning that it "would have been good for someone" to inform him. |

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| inform him that the PPF was now flying in Area 17 before he arrived. (Jonna MSJ Opp. Decl., Ex. B, Boiteux Dep. 173:16-174:10, 183:7-13.) | (Dkt. 119-2 (Boiteux Dep. Tr.) 183:7-13.) Objection, foundation and personal knowledge. (Defs.' Separate Stmt. of Add'l Evidentiary Objs. ¶168.) |
| 169. Captain Little broke down mentally and emotionally after meeting with Chief Lester on June 21, 2023, and would have gone home for the day if Lester had offered it. (Little Dep. 246:5-11 [ECF No. 115-2 at 160].) | Undisputed. |
| 170.  (Lester Dep. 128:1-130:6, 138:9-19 [ECF No. 110-6 at 32-34, 42]) | Disputed. The cited excerpt does not include support for the following statement: (Dkt. 119-4 (Lester Dep. Tr.) 138:9-19.)  Undisputed that |
| 171. On June 1, 2023, Captain Crum lowered a PPF that was already flying at Area 17 at the request of Chiefs Uehara and Lester, and was not disciplined. (Jonna MSJ Opp. Decl., Ex. B, Boiteux Dep. 175:4-25) (Crum | Disputed. This fact lacks context. Immediately prior to the cited portion of Chief Boiteux's testimony, Chief Boiteux states: "I don't do discipline. Discipline is done through deputy chiefs and above. And that |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Dep. 202:19-207:23 [ECF No. 115-15 at 102-107].) | conversation between him and Chief Lester and Chief Uehara, you need to ask them." (Dkt. 121-5 (Boiteux Dep. Tr.) 174:25-175:3.)<br><br>Objection, foundation. (Defs.' Separate Stmt. of Add'l Evidentiary Objs. ¶171.) |
| 172. On June 22, 2021, the Board issued a Board Motion, "Addressing Fire Department Workplace Trauma or Potential Workplace Trauma," in response to a murder and attempted murder, and subsequent suicide, perpetrated by a firefighter against two other firefighters. *See* Fact No. 101.<br><br>However, this statement is misleading and irrelevant because the motive for the violent incident is unexplained and therefore remains unlinked to any burdens imposed by recalls. (Kim Depo., pp.114:17-118:20 [ECF No. 115-17 at 10-14].) | Disputed. The statement in Fact No. 101 is not misleading. That Fact does not allege any specific motivation for the violent incident. Rather, it alleges the June 22, 2021 Board Motion was issued in response to the violent incident. The cited testimony from Chief Kim's deposition supports this fact. (Dkt. 115-17 (Kim Dep. Tr.) 114:17-118:20.)<br><br>Undisputed that on June 22, 2021, the Board issued a Board Motion, "Addressing Fire Department Workplace Trauma or Potential Workplace Trauma," in response to a murder and attempted murder, and subsequent suicide, perpetrated by a firefighter against two other firefighters.<br><br>Plaintiff's Additional Fact includes an evidentiary objection. As such, Defendants address this portion of Plaintiff's Response in their separately filed Response to Plaintiff's Separate Statement of Evidentiary Objections.<br><br>Plaintiff's statement that "this statement is misleading and irrelevant because the motive for the violent |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | incident is unexplained and therefore remains unlinked to any burdens imposed by recalls," is improper legal argument, and not a material fact. |
| 173. The Board Motion directed the Fire Department's Executive Staff to draft a report that, in relevant part, addressed how to "[r]educ[e] staff recall due to vacancies and injury vacancies by at least 50% by March 1, 2022." *See* Fact No. 102.<br><br>However, this statement is misleading and irrelevant because the Board Motion from 2021 does not provide insight into the burden of recalls in 2023, considering that the Department was tasked with reducing recall by at least 50% by March 2022. Also, the Board Motion also required the Fire Department staff to enhance access to mental health providers and improve hiring standards to reduce injury vacancies. (Kim Decl. ¶8, Ex. G (Addressing Fire Department Workplace Trauma or Potential Workplace Trauma resolution) at LAC-0003273 [ECF Nos. 116, 116-7].) | Disputed. The statement in Defendants' Fact No. 102 is not misleading. That Fact does not allege that the June 22, 2021 Board Motion provides any insight into the burden of recalls in 2023. Rather, it alleges the June 22, 2021 Board Motion "directed the Fire Department's Executive Staff to draft a report that, in relevant part, addressed how to '[r]educ[e] staff recall due to vacancies and injury vacancies by at least 50% by March 1, 2022.'" The cited evidence supports this fact. (Dkt. 116 (Kim Decl.) ¶8; Dkt. 116-7 (Addressing Fire Department Workplace Trauma or Potential Workplace Trauma resolution) at LAC-0003272-73.)<br><br>Undisputed that the Board Motion directed the Fire Department's Executive Staff to draft a report that, in relevant part, addressed how to "[r]educ[e] staff recall due to vacancies and injury vacancies by at least 50% by March 1, 2022."<br><br>Plaintiff's Additional Fact includes an evidentiary objection. As such, Defendants address this portion of Plaintiff's Response in their separately filed Response to Plaintiff's Separate Statement of Evidentiary Objections. |

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM

| Plaintiff's Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
|  |  |

Dated: April 24, 2026

/s/ *Dimitri D. Portnoi*
Dimitri D. Portnoi
Kyle M. Grossman
Marni B. Robinow
O'MELVENY & MYERS LLP

*Attorneys for Defendants County of Los Angeles, Fernando Boiteux, Adam Uehara, and Arthur Lester*

DEFS.' RESP. TO PL.'S STATEMENT OF
GENUINE DISPUTES OF MATERIAL FACT
2:24-CV-04353-JLS-BFM