**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEFFREY LITTLE,<br><br>Plaintiff,<br><br>v.<br><br>LOS ANGELES COUNTY ET AL.,<br><br>Defendants. | CASE NO. 2:24-cv-04353-JLS-BFM<br><br>**ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 114), AND (2) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. 118)** |

REDACTED PURSUANT TO ORDER OF
COURT DATED JUNE 8, 2026

1

Before the Court is a Motion for Summary Judgment filed by Defendants County of Los Angeles, Fernando Boiteux, Arthur Lester, and Adam Uehara, and a Motion for Partial Summary Judgment filed by Plaintiff Jeffrey Little.  (Def. Mot., Doc. 114; Def. Mem., Doc. 114-1; Pltf. Mot., Doc. 118; Pltf. Mem., Doc. 127-1.)  The parties filed Oppositions and Replies to the Motions.  (Pltf. Opp., Doc. 158-1; Def. Reply, Doc. 166-1; Def. Opp., Doc. 152-1; Pltf. Reply, Doc. 168-1.)  The Court held a hearing on this matter on May 15, 2026.  Having considered the parties' briefing and heard oral argument, the Court GRANTS IN PART AND DENIES IN PART Defendants' Motion and GRANTS IN PART AND DENIES IN PART Plaintiff's Motion.

I.    **BACKGROUND**

**A. The Los Angeles County and Fire Department's Policy (EA-231)**

On March 7, 2023, the Los Angeles County Board of Supervisors adopted a motion entitled "Raising the Progress Pride Flag at Los Angeles County Facilities."  (Ex. A to Kim Decl., Doc. 116-1.)  The motion stated that the Progress Pride Flag ("PPF") should be flown at Los Angeles County facilities during the month of June to "show LA County's support for LGBTQ+ communities" during LGBTQ+ Pride Month.  (*Id.*)  To implement the motion, the Los Angeles County Fire Department issued policy memorandum EA-231 in May 2023.  (Ex. B to Kim Decl., EA-231, Doc. 116-2.)  EA-231 required that, in June, the PPF be flown at all Fire Department flagpoles, except for those that could accommodate only one flag, in which case only the United States flag would be flown.  (Pltf. Response to SGD ¶ 19, Doc. 168-2; Def. Response to SGD ¶ 5, Doc. 166-2.)  EA-231 further instructed Captains and Site Supervisors to "[e]nsure all flags are received and flown throughout the month of June[.]"  (EA-231 at 3.)  All employees in the Fire Department's Lifeguard Division, including Plaintiff Jeffrey Little, were sent EA-231 on May 25, 2023.  (Def. Response to SGD ¶ 3.)

2

### B. Plaintiff's Accommodation Request

Plaintiff has been a Los Angeles County lifeguard for over 22 years, and was promoted to Captain in 2020.  (Pltf. Response to SGD ¶¶ 1, 3.)  Plaintiff is an Evangelical Christian with the sincere religious beliefs that marriage is between one man and one woman, that same-sex sexual activity is morally wrong and dishonors God, that it is wrong to celebrate such activity, that gender and sex are inherently intertwined, and that attempts to change one's sex are morally wrong.  (*Id.* ¶¶ 7–8.)  Plaintiff understands the PPF as promoting "a sexual expression or sexual ethics that is outside of God's provision for sexual expression in the Bible."  (*Id.* ¶ 11.)

Plaintiff realized that he would have a conflict executing the requirements of EA-231.  (*Id.* ¶ 34.)  Plaintiff was on vacation in early June, but when Plaintiff returned to work on June 18, 2023, he emailed Defendant Lifeguard Division Chief Fernando Boiteux and his supervisors, Chief Kyle Power and Chief Danielle McMillon, requesting a religious accommodation from EA-231.  (Def. Response to SGD ¶¶ 26–28.)  Plaintiff's email was forwarded to Defendant Chief Adam Uehara, Deputy Chief Julia Kim, and administrative services manager Renee Nuanes-Delgadillo.  (*Id.* ¶ 29; Pltf. Response to SGD ¶ 38.)  Chief Uehara replied that Plaintiff's request was "probably orchestrated." (Ex. I to Portnoi Decl. at 44, Doc. 111-1.)  Nuanes-Delgadillo organized an interactive process meeting ("IPM") for June 19, 2023.  (Def. Response to SGD ¶ 29.)

Plaintiff, Chief Uehara, Chief McMillon, and Nuanes-Delgadillo attended the June 19 IPM.  (*Id.* ¶¶ 30–31.)  At the IPM, Plaintiff explained that he had religious objections to raising the PPF, instructing others to raise the PPF, and being generally responsible for flying the PPF.  (Def. Response to SGD ¶¶ 32, 41; Pltf. Response to SGD ¶ 60.)  Plaintiff requested that he not be required to fly the PPF at Will Rogers Beach, where he was normally stationed, or be reassigned to a site where he would not be responsible for flying the PPF.  (Def. Response to SGD ¶¶ 33, 34.)  Plaintiff was informed that he could be assigned to Area 33, which covers Malibu Beach, where Plaintiff would likely not be

3

responsible for flying the PPF because other captains would ensure it was flown.  (*Id.* ¶ 39.)  Plaintiff agreed to work at Area 33 until June 30.  (*Id.* ¶ 42.)

However, Plaintiff was scheduled to work a recall shift—which is a shift where employees are forced to work on days or at locations where they are normally not assigned—on June 21, 2023, at an area where the PPF would be flying.  (Pltf. Response to SGD ¶ 79; Def. Response to SGD ¶ 47.)  On June 19, 2023, Chief McMillon sent a text message to Plaintiff and Chief Uehara, informing Plaintiff that she was able to secure him an exemption from working the June 21 recall shift.  (Pltf. Response to SGD ¶ 80; McMillon Decl. ¶ 3, Doc. 116-16.)  However, at that point, Plaintiff had already independently arranged to swap shifts with another captain so that Plaintiff could work at Area 17, where no PPF flag was ordinarily flown, for his June 21 shift.  (Pltf. Response to SGD ¶¶ 73, 79.)  Plaintiff replied to Chief McMillon and Chief Uehara via text message that he would be working at Area 17 for his June 21 shift, and Chief McMillon acknowledged the shift swap.  (Ex. B to McMillon Decl., Doc. 116-18.)

On June 20, 2023, Chief McMillon sent a text message to Plaintiff and Chief Uehara, informing Plaintiff that they needed to schedule another IPM follow-up.  (Def. Response to SGD ¶ 79.)  Plaintiff agreed.

### C.  The June 20 Directive

Throughout June, County Supervisors and lifeguards had raised concerns about the PPF not consistently flying despite the directive of EA-231.  (*Id.* ¶ 15.)  On the evening of June 20, 2023, Fire Chief Anthony Marrone held an "immediate Teams meeting for all Chief Deputies and Deputy Chiefs" regarding EA-231.  (*Id.* ¶ 17.)  The same day, at 7:14 p.m., Chief Marrone sent an email to the Chief Deputies with an attachment titled "Progress Pride Flag FAQs," and asked the Chief Deputies to share it with their managers.  (*Id.* ¶ 19.)  At 8:20 p.m., Chief Deputy Jon O'Brien forwarded this email to his Deputy Chiefs, including Deputy Chief William Mayfield.  (*Id.* ¶ 20.)  At 8:34 p.m., Chief

4

Mayfield forwarded the email to his Assistant Chiefs, including Chief Boiteux, and informed them:

> 100 percent compliance is to be achieved.  Please have all your Fire/Marine Battalion Chiefs perform site visits at every site within your divisions to ensure the flag is flown.  If the flag is not flown please include why it's not. (Halyard clips are not an excuse.)  Also per our conversation a confirming memo is due to my office no later than noon tomorrow 6/21/23 via email.

(*Id.* ¶ 21; Ex. D to O'Brien Decl., Doc. 116-30.)  At 9:19 p.m., Chief Boiteux emailed the lifeguard section chiefs, including Defendant Chief Arthur Lester, informing them that "100 percent compliance is to be achieved," asking them to conduct site visits to ensure the PPF was flown, and requiring them to confirm by email no later than 11:00 a.m. on June 21, 2023.  (Ex. A to Lester Decl., Doc. 116-9.)

At 8:00 a.m. on June 21, 2023, Chief Lester began personally visiting all sites he supervised, except those on Catalina Island, to ensure they were flying the PPF.  (Def Response to SGD ¶¶ 24–25.)  Included in Chief Lester's visits was a visit to Area 17, which encompasses Dockweiler North, Dockweiler South, and El Segundo.  (*Id.* ¶¶ 51, 57.)  Although Dockweiler North and Dockweiler South had generally not flown the PPF previously in June, Chief Lester brought additional clasps and PPFs to ensure the PPF would be raised at those sites.  (*Id.* ¶ 156.)  At this time, Chief Lester did not know that Plaintiff had requested a religious accommodation related to EA-231.  (*Id.* ¶ 66.)  At 10:22 a.m. on June 21, 2023, Chief Lester emailed Chief Boiteux to confirm where the PPF was flying.  (*Id.* ¶ 26.)

### D.  Plaintiff's June 21 Shift

When Plaintiff arrived at Area 17 for his shift at around 10:30 a.m. on June 21, 2023, the PPFs were already flying there.  (Pltf. Response to SGD ¶¶ 107–15; Def. Response to SGD ¶ 57, 154–55.)  Plaintiff was confused when he saw the PPFs, because he knew that PPFs had not previously flown during his prior shifts at Area 17.  (Pltf. Response to SGD ¶ 109.)  Plaintiff asked his direct report, Lauren Gottschalk, if she would

5

be okay with him taking down the PPF at Dockweiler South.  (*Id.* ¶ 112.)  Gottschalk responded that Chief Lester had ensured the PPF was raised, that she was fine with the PPF being raised, and that she was concerned about receiving conflicting orders.  (Def. Response to SGD ¶ 60.)  Plaintiff then personally lowered the Dockweiler South PPF.  (*Id.* ¶ 61.)  Plaintiff then drove to Dockweiler North and El Segundo, and personally removed the PPF at those sites.  (*Id.* ¶ 62.)  When Plaintiff removed the PPF at El Segundo, he did so in view of the public and in front of some minors who were participating in the County's junior lifeguard program.  (*Id.* ¶ 63.)  One employee took a video of Plaintiff lowering the PPF at El Segundo.  (*Id.* ¶ 114.)

Chiefs Lester, Uehara, and Boiteux learned that Plaintiff had lowered the Area 17 PPFs later in the day on June 21, 2023.  (*Id.* ¶ 65.)  Chief Lester went to Area 17, where he met privately with Plaintiff to discuss Plaintiff's lowering of the PPF.  (*Id.* ¶ 70.)  Chief Lester asked Plaintiff to ensure the PPFs were re-raised, but Plaintiff informed Chief Lester that Plaintiff had a religious objection to doing so.  (*Id.* ¶¶ 75–76.)  Chief Lester therefore stated that he would re-raise the PPFs himself, and ensure that someone else would lower the PPFs at the end of the day.  (*Id.* ¶ 77.)  Lester told Plaintiff: "I've been directed to inform you that whatever . . . the result of the IPM where you were able to work in that area without having the flags flown is no longer valid."  (Pltf. Response to SGD ¶ 119.)

The same day, Chief Lester also spoke with Gottschalk, who informed Chief Lester that Plaintiff's lowering of the PPFs had been in public view.  (Def. Response to SGD ¶ 106.)  Chief Lester believed that Plaintiff's conduct made Gottschalk uncomfortable and was a potential violation of the County Policy of Equity ("CPOE").  (*Id.* ¶ 107.)  Chief Lester also received reports from other lifeguards regarding Plaintiff's lowering of the PPF.  (*Id.* ¶ 113.)  Chief Lester, a mandatory reporter of CPOE violations, filed a CPOE complaint related to Plaintiff's lowering of the PPFs at Area 17.  (*Id.* ¶¶ 108–11.)

### E.  The June 21 IPM

On June 21, 2023, Nuanes-Delgadillo convened a second IPM related to Plaintiff's religious accommodation request.  (*Id.* ¶ 80.)  Plaintiff had been notified of the need for the second IPM the day before, on June 20, 2023.  (*Id.* ¶ 79.)

The June 21 IPM occurred after Plaintiff's June 21 shift, during which he had lowered the PPFs.  (*Id.* ¶ 80.)  However, at the time of the IPM, Nuanes-Delgadillo did not know that Plaintiff had lowered the PPFs earlier that day.  (*Id.* ¶¶ 79, 81.)

At the June 21 IPM, Plaintiff was told that his desire to not work under the PPF did not qualify him for an accommodation, in part because caselaw did not require granting his accommodation request.  (*Id.* ¶¶ 83, 84.)  Plaintiff asked whether he could remain at Area 33 for the remainder of June.  (*Id.* ¶ 87.)  Plaintiff was already scheduled for some shifts at Area 33, but he was told that he would return to his normal assignment on June 29 or 30, 2023.  (*Id.* ¶¶ 87–88; Ex. A to Nuanes-Delgadillo Decl. at 5, Doc. 116-20.)  Plaintiff further asked whether he could request time off for the rest of June, but he was told that time-off requests would be handled by his supervisors outside the IPM process.  (Def. Response to SGD ¶ 86.)

Plaintiff emailed Chief Uehara that same day, stating that in light of the IPM, Plaintiff was requesting to use his benefit time to take time off for the remainder of June. (Pltf. Response to SGD ¶ 152.)  Chief Uehara replied to Plaintiff, informing him that Plaintiff could use his benefit time to take time off as long as it did not cause a recall.  (*Id.* ¶ 156; Def. Response to SGD ¶ 90.)

The following day, on June 22, 2023, Plaintiff showed up to his shift, informing his supervisors that he had showed up so as not to trigger a recall.  (Pltf. Response to SGD ¶ 161.)

### F.  Plaintiff's June 22 Shift

Plaintiff worked at Area 33 on June 22, 2023.  (Def. Response to SGD ¶ 115.)  The same day, a written Direct Order was issued by the Fire Department to Plaintiff, in which

7

Plaintiff was ordered to "(1) Fly the Progress Pride Flag (PPF) as instructed in Executive Action-231 (EA-231) during the month of June; OR (2) Ensure that the PPF is flown as instructed in EA-231 during the month of June."  (Ex. E to Boiteux Decl., Doc. 115-25.)  Chief Boiteux had been involved in the decision to issue the Direct Order, and he met with Plaintiff in person at his shift on June 22 to provide Plaintiff with a copy of the Direct Order.  (Pltf. Response to SGD ¶ 162; Boiteux Decl. ¶ 7, Doc. 115-20.)  Chief Boiteux also delivered to Plaintiff a Notice of Instruction and a Subject of Internal Investigation Notice; both were issued because Plaintiff's had lowered the PPFs at Area 17 the previous day. (Pltf. Response to SGD ¶¶ 162, 167.)  Plaintiff testified that during his meeting with Chief Boiteux, Chief Boiteux repeatedly told him that his "religious beliefs don't matter" and that he needed to ensure the PPF was flown "regardless of [his] beliefs."  (*Id.* ¶ 165.) Plaintiff informed his supervisor that he needed to leave his shift because he was sick.  (*Id.* ¶ 173.)  Plaintiff used his sick time for his remaining shifts in June 2023.  (*Id.* ¶ 178.)

### G.  Subsequent Actions Taken Against Plaintiff

On June 23, 2023, the County suspended Plaintiff from his role on the Background Investigation Unit ("BIU"), which conducts investigations of emergency incidents, resulting in a loss of overtime and income for Plaintiff.  (Pltf. Response to SGD ¶ 179.) Chief Kim testified that she decided to remove Plaintiff from the BIU because he was under investigation, and she wanted "to be consistent" because other fire captains had previously been removed from the BIU for being under investigation.  (Ex. Q to Portnoi Decl., Kim Depo. at 35, Doc. 115-17.)

Furthermore, the County conducted an investigation into the CPOE complaint filed against Plaintiff for lowering the PPF on June 21, 2023.  (Def. Response to SGD ¶ 124.) The CPOE process typically involves interviews and an investigation, and is conducted by the County Equity Oversight Panel, which is separate from specific departments like the Fire Department.  (*Id.* ¶¶ 124–27.)  The County Equity Oversight Panel determined that the allegations were substantiated and rose to the level of a CPOE violation.  (*Id.* ¶ 127.)

Additionally, Chief Kim testified that the Fire Advisory Board conducted a separate investigation into Plaintiff's conduct and determined that a suspension was appropriate. (Kim Depo. at 26–27.)  On July 16, 2024, Plaintiff was presented with an intent to suspend letter, and on October 24, 2024, Plaintiff was notified that he would be suspended for 15 days without pay.  (Pltf. Response to SGD ¶¶ 184–85.)  The Notice of Suspension informed Plaintiff that he was being suspended for the "Removal of PPFs from Lifeguard Stations without Authorization," which "sent a message that sought to diminish the visibility of the LGBTQ+ community," "created confusion and discord among people who witnessed the incident," and "was nonconductive [sic] to teamwork, because it undermined the County's commitment to fostering a diverse and inclusive work environment for all employees" and "sent a message of disregard for your chain of command."  (Ex. C to Uehara Decl., Notice of Suspension Letter, Doc. 116-37.)  Plaintiff served his 15-day suspension in November 2024.  (Pltf. Response to SGD ¶ 200.) ███████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

In 2024, the County issued another policy regarding the flying of PPFs for Pride Month.  (*Id.* ¶ 135.)  In advance of June 2024, Plaintiff requested another religious accommodation.  (*Id.* ¶ 134.)  The County conducted IPMs regarding Plaintiff's accommodation request in May 2024.  (*Id.* ¶ 136.)  Plaintiff was informed that he need not raise and lower the PPFs himself, since the flags needed to be raised and lowered outside his work hours, but that he was still responsible for ensuring the PPF was flying during his shift.  (Pltf. Response to SGD ¶¶ 210–11.)  Plaintiff was also informed that he could swap shifts with other captains to work where the PPF would not be flown.  (Def. Response to SGD ¶¶ 136–37.)

9

**H. The Instant Lawsuit**

On May 24, 2024, Plaintiff filed the instant lawsuit against Defendants Los Angeles County, Fernando Boiteux, Adam Uehara, and Arthur Lester.  (Compl., Doc. 1.)  Plaintiff brings claims against Los Angeles County for (1) religious discrimination/failure to accommodate in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) and the Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12940(a); (2) retaliation in violation of Title VII and FEHA; and (3) failure to prevent discrimination, harassment, and retaliation in violation of FEHA.  (TAC, Doc. 69.)  Plaintiff brings additional claims against all Defendants for violations of the Free Exercise Clauses of the First Amendment of the United States Constitution and the First Article of the California Constitution.  (*See id.*)

Defendants now move for summary judgment as to all claims.  (Def. Mot.)  Plaintiff moves for partial summary judgment as to his claims for failure to accommodate, retaliation, and violation of the Free Exercise Clauses of the U.S. and California Constitutions.  (Pltf. Mot.)

II.    **LEGAL STANDARD**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075, 1079-80 (9th Cir. 2004) ("Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting Fed. R. Civ. P. 56(c))).  "A dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Freecycle Sunnyvale v. Freecycle Network*, 626 F.3d 509, 514 (9th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is "material" when its resolution "'might affect the outcome of the suit under the

10

governing law.'" *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013) (quoting *Anderson*, 477 U.S. at 248).

"When, as in this case, both parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard." *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006) (citing *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968) ("Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified.")). Further, the Court "must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

### III.    ANALYSIS

#### A. Failure to Accommodate

Plaintiff brings claims against Los Angeles County for its failure to accommodate his religious practices in violation of Title VII and FEHA. Both Defendants and Plaintiff have moved for summary judgment as to these claims. As explained below, the Court finds that there are triable issues of fact going to Plaintiff's failure-to-accommodate claims, and thus concludes that neither party is entitled to summary judgment.

Title VII and FEHA "require employers to accommodate [employee]s' religious beliefs unless doing so would impose an undue hardship." *Bolden-Hardge v. Office of California State Controller*, 63 F.4th 1215, 1222 (9th Cir. 2023); 42 U.S.C. § 2000e(j); Cal. Gov. Code § 12940(a)(1). Claims for religious discrimination under both statutes are analyzed under the same two-step framework. *See Bolden-Hardge*, 63 F.4th at 1222; *see also Ambat v. City and County of San Francisco*, 757 F.3d 1017, 1023 n.2 (9th Cir. 2014) ("Because FEHA is interpreted consistent with Title VII, we conduct our analysis of both federal and state claims according to Title VII case law.") (citation omitted). First, to establish a prima face case of failure to accommodate religion, a plaintiff must show that:

11

"(1) he had a bona fide religious belief, the practice of which conflicted with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer threatened him with or subjected him to discriminatory treatment, including discharge, because of his inability to fulfill the job requirements." *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993). Then, if the employee is successful, the burden shifts to the employer to show that it "initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004).

### 1. Plaintiff's Religious Belief Conflicting with Employment Duty

Defendants do not contest that Plaintiff held a bona fide religious belief regarding the PPF. Specifically, the parties agree that Plaintiff has a sincere religious belief which precludes him from raising the PPF and ensuring that it remains flying, including by directing others to raise the PPF.

Defendants argue, however, that Plaintiff religious beliefs never conflicted with his employment duties because "[t]here is no evidence that Plaintiff was ever required to take any affirmative actions with respect to the PPF." (Def. Mem. at 15.) But EA-231 explicitly directed captains such as Plaintiff to "[e]nsure all flags are received and flown throughout the month of June," and Plaintiff received a Direct Order to do the same. (*See* EA-231.) Even though flags were generally raised before Plaintiff's shifts started in June 2023, (*see* Def. Response to SGD ¶ 54–55), Plaintiff was nevertheless responsible for ensuring that the PPF remained flying throughout his shifts. There exists at least a triable issue of fact as to whether such responsibility posed a conflict with Plaintiff's bona fide religious beliefs.

### 2. Employer Notice

It is undisputed that on June 18, 2023, Plaintiff emailed his supervisors to request a religious accommodation for EA-231, and that on June 19, 2023, the County conducted an

12

IPM with Plaintiff at which he explained that he had religious objections to raising the PPF and instructing others to raise the PPF.  (*See* Def. Response to SGD ¶¶ 145–47.)  Plaintiff thus "informed his employer of the belief and conflict," as required under the second prong of the prima facie case.  *Heller*, 8 F.3d at 1438.

### 3. Discriminatory Treatment Because of Inability to Fulfill Job Requirements

Under the third prong of the prima facie case, Plaintiff must show that Defendants "subjected him to discriminatory treatment . . . because of his inability to fulfill the job requirements."  *Id.*  In other words, the employee must show that he was subjected to some penalty because of his religious conflict with his job responsibilities.  *See E.E.O.C. v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 614 n.5 (9th Cir. 1988).

There is evidence that the County subjected Plaintiff to certain adverse employment actions: Plaintiff was suspended from the BIU, and was further suspended for 15 days without pay based on a finding that he violated the County's Policy of Equity.  Some of the evidence suggests that the County took such actions against Plaintiff because he lowered three PPFs, in public view and without authorization, on June 21, 2023.  In particular, the Notice of Suspension informed Plaintiff that he was suspended for 15 days the "Removal of PPFs from Lifeguard Station without Authorization."  (Notice of Suspension Letter.)  And Chief Kim testified that Plaintiff was suspended from the BIU because he was under investigation; the investigation in question was opened only because Plaintiff lowered three PPFs.  Defendants argue that because the County's decisions were based on Plaintiff lowering the PPFs, rather than Plaintiff's inability to raise the PPF, Plaintiff was not subject to adverse action due to his religious conflict.[1]

---

[1] Plaintiff argues that by being penalized for lowering the PPFs, Plaintiff was effectively penalized for "ensuring he would not have to raise the PPF or direct another to do so in violation of his religion."  (Pltf. Opp. at 14.)  In other words, Plaintiff argues that lowering the PPF, and refusing to raise the PPF, are "two halves of the same coin," and being penalized for either constitutes being penalized for adhering to his religious beliefs.  (*Id.*)  But the Court disagrees that
(footnote continued)

However, there is also evidence to suggest that Plaintiff's discipline was driven by the conflict between his religion and his job duties. Specifically, in June 2023, ██████████ ████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████ ████████████████████████████████ while Plaintiff, who had expressed the need for a religious accommodation, was suspended for 15 days. (Def. Response to SGD ¶ 143.) ████████████████████████ could give rise to an inference that Plaintiff's religious conflict motivated his suspension, or at least the length of his suspension. In the face of conflicting evidence, the Court concludes that there is a triable issue of fact as to whether Plaintiff has met the third prong of the prima facie case.

### 4. Undue Hardship of Accommodation

Defendants further argue that even if there is a factual dispute as to the prima facie case, Defendants have shown as a matter of law that accommodating Plaintiff would have imposed undue hardship on the County. The Court disagrees.

After the June 21 IPM, Plaintiff requested to use his benefit time to work at sites which were not flying the PPFs, but Chief Uehara informed him that he could not do so if a recall would be triggered. Defendants argue that allowing Plaintiff to use his benefit time, even if it triggered recalls, would have "significantly affected the operations of the Lifeguard Division," by, for example, having "detrimental effects on other employees'

---

penalizing Plaintiff for lowering three PPFs constitutes penalizing Plaintiff "because of his inability to fulfill the job requirements." *Heller*, 8 F.3d at 1438. Title VII and FEHA apply to employers who take adverse action based on a conflict that has actually manifested and rendered an employee unable to fulfill their job requirements. *See, e.g.*, *Bolden-Hardge*, 63 F.4th at 1219, 1222–24 (prima facie case met where employee was required to sign a loyalty oath, but refused because of her religion, leading the employer to rescind her job offer). This is not such a case. Instead of waiting until he was expected to monitor or re-raise the PPFs, and facing a penalty for failing to do so, Plaintiff actively chose to lower three already-flying PPFs.

physical and mental health given the demands of lifeguarding and the limited pool of captains to pool from." (Def. Mem. at 19.) Defendants further argue that the County abided by the Memorandum of Understanding ("MOU") between itself and the LA County Lifeguard Association in denying Plaintiff his requested accommodation to the extent it would trigger recalls. (Def. Response to SGD ¶¶ 93–96.) But the facts do not definitively show that the MOU expressly precluded Plaintiff from using his benefit time even if it triggered recalls. Moreover, Plaintiff provides evidence to show that no accommodation has previously been denied on the basis that it would trigger a recall, (*see* Pltf. Response to SGD ¶ 150), and that the cost of granting such an accommodation would have been a small fraction of the Fire Department's annual budget. (*Id.* ¶ 142.) In weighing this evidence, a reasonable jury could find that allowing Plaintiff to use his benefit time, even if it triggered recalls, would not amount to undue hardship for the County. *See Tabura v. Kellogg USA*, 880 F.3d 544, 557–58 (10th Cir. 2018) ("An employer incurs an undue hardship if it must bear more than a de minimis cost. . . . Whether an employer will incur an undue hardship is a fact question . . . that turns on the particular factual context of each case[.]" (internal quotation marks and citations omitted)). Defendants have therefore failed to show that Plaintiff's failure-to-accommodate claims fail on this basis as a matter of law.[2]

Accordingly, both Defendants' motion for summary judgment and Plaintiff's motion for summary judgment as to Plaintiff's failure-to-accommodate claims are DENIED.

### B. Retaliation

Plaintiff next brings claims against the County for retaliation in violation of Title VII and FEHA. Both parties have moved for summary judgment as to these claims. As

---

[2] The Court need not consider Plaintiff's argument that Defendants cannot maintain their undue burden defense as a matter of law, because the Court has already determined that Plaintiff is not entitled to summary judgment, as he has not proven his prima facie case beyond factual dispute.

with Plaintiff's failure-to-accommodate claims, the Court concludes that neither party is entitled to summary judgment because a triable issue of fact exists.

To establish a prima facie retaliation claim under Title VII and FEHA, a plaintiff must allege: (1) a protected activity; (2) an adverse employment action; and (3) a causal link between the protected activity and the adverse employment action. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1034–35 (9th Cir. 2006) (Title VII); *Cal. Fair Emp't & Hous. Comm'n v. Gemini Aluminum Corp.*, 122 Cal. App. 4th 1004, 1018 (2004) (FEHA). "Once established, the burden shifts to the defendant to set forth a legitimate, non-retaliatory reason for its actions; at that point, the plaintiff must . . . show that the stated reasons were a pretext for retaliation." *Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008).

Plaintiff argues, and Defendants do not dispute, that he engaged in protected activity by requesting a religious accommodation and exemption from EA-231. It is further undisputed that Plaintiff was subject to certain adverse employment actions: Plaintiff was investigated by the CPOE and the Fire Advisory Board, suspended from the BIU, and suspended for 15 days without pay. The parties' dispute therefore revolves around the third prong of the prima facie case: whether the evidence could show a causal link between the protected activity and the adverse employment actions.

To support causation, Plaintiff primarily highlights that (1) several adverse actions were taken shortly after Plaintiff's religious accommodation request, and (2) the decisionmakers knew about Plaintiff's religious accommodation request when they engaged in such adverse actions. Plaintiff stresses that the timeline of events flowed as follows: Plaintiff requested a religious accommodation on June 18, 2023, and an IPM was convened regarding his request on June 19, 2023. On June 21, 2023, Chief Lester, knowing of Plaintiff's religious accommodation request, filed a CPOE complaint against Plaintiff, which ultimately led to Plaintiff's 15-day suspension, and on June 22, 2023, Chief Boiteux, knowing of Plaintiff's religious accommodation request, delivered a Direct

16

Order, Notice of Instruction, and a Subject of Internal Investigation Notice to Plaintiff. On June 23, 2023, Plaintiff was removed from the BIU. Plaintiff argues that "[c]ausation can be inferred . . . where [as here] an adverse employment action follows on the heels of protected activity." (*See* Pltf. Mem. at 17 (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002)).)

But timing and knowledge alone do not establish causation as a matter of law when an additional key event in the timeline is considered: on June 21, 2023, Plaintiff made the unauthorized decision to lower three already-flying PPFs in public view, in what the County ultimately determined to be a violation of its policies. As the Court discussed in evaluating Plaintiff's failure-to-accommodate claims, there is substantial evidence that Plaintiff was investigated, suspended from the BIU, and ultimately suspended for 15 days because of his decision to lower the PPFs. Specifically, Chief Lester, who is a mandated reporter of all potential CPOE violations, filed a CPOE complaint after learning of Plaintiff's actions taken to lower the PPFs on June 21, reporting that Plaintiff's actions made his direct report Gottschalk "uncomfortable not to display the flag as was directed by the Department EA." (Ex. C to Lester Decl., Doc. 116-11.) The investigation ultimately culminated in Plaintiff's suspension for "Removal of PPFs from Lifeguard Stations without Authorization." (Notice of Suspension Letter.) Further, Chief Kim testified that Plaintiff was removed from the BIU because he was subject to an investigation, which was consistent with how other employees had been treated in the past. Such evidence could suggest that the adverse actions initiated on June 21, 22, and 23 were taken in response to Plaintiff lowering the PPFs on June 21, rather than his June 18 or 19 accommodation requests. Accordingly, Plaintiff is not entitled to summary judgment on his retaliation claims.

But Defendants have also failed to carry their burden to show that no genuine dispute of material fact exists which could support a retaliation claim. "In some cases, temporal proximity can by itself constitute sufficient circumstantial evidence of

17

retaliation," *see Dawson v. Entek Int'l*, 630 F.3d 928, 937 (9th Cir. 2011); thus, the timeline of events as outlined by Plaintiff supports a finding that the County's adverse actions were retaliatory.  Additionally, Plaintiff shows that ████████████████████ ████████████████████████████████████████████████████████ ████████████████████  Such evidence is sufficient to create a triable issue of fact as to whether Plaintiff would not have been subject to the discipline he faced if not for his religious accommodation request.  Accordingly, Defendants' motion for summary judgment as to Plaintiff's retaliation claims is DENIED, and Plaintiff's motion as to these claims is also DENIED.

### C.  Failure to Prevent Discrimination, Harassment, and Retaliation

Plaintiff brings one claim against the County for failure to prevent discrimination, harassment, and retaliation in violation of FEHA.  On this claim, only Defendants have moved for summary judgment.

In opposition to Defendants' motion, Plaintiff clarifies that his "claim is not based on a hostile work environment, but is instead based on Defendants' failure to take reasonable steps necessary to prevent discrimination."  (Pltf. Opp. at 18.)  Specifically, Plaintiff argues that "[a]s a result of Defendants' failure to properly train its employees on religious accommodations, Plaintiff faced discrimination."  (*Id.*)  "To prove a failure-to-prevent claim, Plaintiff must establish: (1) Plaintiff was subjected to discrimination[]; (2) Defendant failed to take all reasonable steps to prevent discrimination[]; and (3) this failure caused plaintiff to suffer injury, damage, loss or harm."  *Moss v. City & Cnty. of San Francisco*, 714 F. Supp. 3d 1167, 1185 (N.D. Cal. 2024), *appeal dismissed,* 2025 WL 2472442 (9th Cir. July 1, 2025).

The Court has already determined that there is a triable issue of fact as to whether the County unlawfully failed to accommodate or retaliated against Plaintiff; these same facts can also support a claim that the County did not take reasonable steps to prevent discrimination against Plaintiff.  *See Rux v. Starbucks Corp.*, 2007 WL 1470134, at *9

(E.D. Cal. May 18, 2007) ("Plaintiff's FEHA claims of discrimination and retaliation survive summary judgment.  Given that finding, there is a genuine issue of material fact regarding whether, in the event the jury concludes Plaintiff did suffer discrimination and retaliation, Defendant violated section 12940(k) by failing to prevent the same."); *Ravel v. Hewlett-Packard Enter., Inc.*, 228 F. Supp. 3d 1086, 1098–99 (E.D. Cal. 2017) ("Because plaintiff's FEHA disability discrimination claim survives defendant's motion to dismiss, her failure to prevent discrimination claim survives the motion as well.").  Because Defendants are not entitled to summary judgment on Plaintiff's failure-to-accommodate or retaliation claims, they are also not entitled to summary judgment on his failure to prevent discrimination claim.  Defendants' motion as to this claim is DENIED.

### D.  Violation of the Free Exercise Clause

Plaintiff brings two claims against all Defendants, for violation of the Free Exercise Clause of the U.S. Constitution and violation of the Free Exercise Clause of the California Constitution.  A plaintiff can establish a free exercise violation under both constitutions by "showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'"  *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022); *see Vernon v. City of L.A.*, 27 F.3d 1385, 1392 (9th Cir. 1994) ("California case law suggests that analysis of a claim of the constitutional right to the free exercise of religion is generally similar under both federal and state constitutional law.").  In a prior Order, the Court dismissed with prejudice Plaintiff's claim that the County's policy was not "generally applicable."  (Doc. 50 at 11–12.)  Plaintiff's free exercise claims therefore proceed under the theory that Plaintiff was not treated neutrally.

The government "cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices."  *Masterpiece Cakeshop v. Colorado Civil Rights Comm'n*, 584 U.S. 617, 640 (2018).  The Supreme Court has instructed that "upon even slight suspicion that proposals for state intervention stem from animosity to

19

religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures." *Id.* at 638–39 (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 547 (1993)). Accordingly, Plaintiff was entitled to a "neutral decisionmaker who would give full and fair consideration to his religious objection." *Id.* at 640. "[G]overnment actions coupled with 'official expressions of hostility to religion . . . [are] inconsistent with what the Free Exercise Clause requires[.]'" *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 690 (9th Cir. 2023) (quoting *Masterpiece Cakeshop*, 584 U.S. at 639).

Both parties move for summary judgment as to these claims. Once again, the Court concludes that there are triable issues of fact as to these claims, and that neither party is entitled to summary judgment.

Plaintiff argues that Defendants' actions toward Plaintiff—including the revocation of his accommodation, the issuance of the Direct Order, and the investigation resulting in Plaintiff's ultimate suspension—were driven by "antireligious hostility." (Pltf. Mem. at 21.) Plaintiff cites to cases such as *Masterpiece Cakeshop*, 584 U.S. 617 (2018), and *Fellowship of Christian Athletes*, 82 F.4th 664, 690 (9th Cir. 2023), arguing that (1) statements made by Defendants exhibited a distrust or disfavor of religion, and (2) Defendants' unequal treatment of Plaintiff, as compared to other employees, show their lack of neutrality toward Plaintiff's religious beliefs.

In *Masterpiece Cakeshop*, a Colorado baker told a same-sex couple that he would not create a wedding cake for them because of his religious opposition to same-sex marriage. 584 U.S. at 626. The couple filed a charge with the Colorado Civil Rights Commission under the Colorado Anti-Discrimination Act, which prohibits discrimination based on sexual orientation. *Id.* at 628. The Commission referred the case to a state Administrative Law Judge, who ruled in favor of the couple; the Commission affirmed. *Id.* at 629–30. However, in considering the case, the Commission made statements that the Supreme Court found to "disparage [the baker's] religion." *Id.* at 635. Specifically, the

20

commissioner compared the baker's "invocation of his sincerely held religious beliefs to defenses of slavery and the Holocaust," and stated that it "is one of the most despicable pieces of rhetoric that people can use to—to use their religion to hurt others." *Id.*  The Supreme Court found these statements "inappropriate for a Commission charged with the solemn responsibility of fair and neutral enforcement," and concluded that because these statements were made "by an adjudicatory body deciding a particular case," they created "doubt [as to] the fairness and impartiality of the Commission's adjudication of [the baker's] case." *Id.* at 636.  Additionally, the Supreme Court noted that "the Commission's consideration of [the] religious objection did not accord with its treatment of [] other objections," which were found to be lawful. *Id.* at 619.

*Fellowship of Christian Athletes* involved similar disparaging comments toward religion and similar disparate treatment of religious groups.  In *Fellowship of Christian Athletes*, the school district refused to recognize Fellowship of Christian Athletes ("FCA"), a club for Christian student athletes.  82 F.4th at 672, 678–79.  The district's view was that FCA, which allowed only students holding certain religious beliefs to serve in a leadership capacity, violated the district's anti-discrimination policies. *Id.* at 678–79.  The Ninth Circuit found that there were "significant concerns with the District's lack of neutrality," highlighting statements made by the district's Climate Committee, which was comprised of "individuals with positions of importance within the schools" and "made a recommendation [to derecognize FCA] that was ratified by the District." *Id.* at 688, 691.  Specifically, FCA members were told that their religious views "were objectionable and hurtful and had no rightful place on campus"; that their beliefs were "bullshit"; that they were "'choos[ing] darkness' and 'perpetuat[ing] ignorance'"; that they were "'charlatans,' who 'conveniently forget what tolerance means'"; that they were "twisting the truth"; and that their religious views were "of a discriminatory nature." *Id.* at 692.  A Climate Committee member also oversaw the formation of the Satanic Temple Club, which was created "for the sole purpose of mocking FCA." *Id.* at 692–93.  Additionally, the district

21

allowed other clubs to admit only certain students based on individual characteristics, but did not allow FCA to admit only students who agreed with certain religious beliefs. *Id.* at 689. The Ninth Circuit found that these expressions of hostility toward religion, and the preference shown toward secular clubs, showed that the district was not a neutral decisionmaker with respect to religion. *Id.* at 693.

Here, Plaintiff points out that when he first made his religious accommodation request, Chief Uehara, who was forwarded the email, replied that Plaintiff's request was "probably orchestrated." (Ex. I to Portnoi Decl. at 44, Doc. 111-1.) At the IPM convened the following day at which Chief Uehara was present, Plaintiff contends that he was granted an accommodation. Two days later, on June 21, 2023, Plaintiff lowered three PPFs. Later that day, Plaintiff's accommodation was revoked. When Plaintiff asked Chief Uehara whether he could use benefit time to avoid working for the rest of June, Chief Uehara informed him that he could use his benefit time as long as it did not cause a recall. Plaintiff showed up to his June 22 shift to avoid a recall; there, Chief Boiteux delivered Plaintiff a Direct Order and Notice of Instruction and told him his "religious beliefs do not matter." The Notice of Instruction stated that all employees must comply with EA-231 "irrespective of personal beliefs." (Pltf. Response to SGD ¶ 164.) Plaintiff was later suspended as a result of an investigation into him lowering the PPFs. ████████

████████████████████████████████

████████████████████████████████

while Plaintiff was suspended for 15 days for his conduct. (Pltf. Response to SGD ¶¶ 86–90; Def. Response to SGD ¶ 143.)

Plaintiff is not entitled to summary judgment on these facts.[3] Chief Uehara's and Chief Boiteux's statements regarding Plaintiff's religion are a far cry from the degrading and demeaning statements cited in *Masterpiece Cakeshop* and *Fellowship of Christian*

---

[3] Because the Court concludes that Plaintiff has not shown as a matter of law that Defendants acted non-neutrally toward him, the Court need not evaluate Plaintiff's arguments regarding strict scrutiny or *Monell* liability.

*Athletes*.  And while Plaintiff additionally cites the County's statements, such as its assertion that Plaintiff must comply with EA-231 "irrespective of personal beliefs," and that removing the PPFs "sent a message that sought to diminish the visibility of the LGBTQ+ community," (*see* Notice of Suspension Letter), these do not establish beyond factual dispute that the County harbored religious animus.  Indeed, the Supreme Court in *Masterpiece Cakeshop* considered similar statements, such as, "[I]f a businessman [has] got an issue with the – the law's impacting his personal belief system, he needs to look at being able to compromise," and concluded that such statements "are susceptible of different interpretations" and "might mean simply that [someone] cannot [discriminate] based on sexual orientation, regardless of . . . personal views."  584 U.S. at 634–35.  And unlike in *Masterpiece Cakeshop*, in which all the relevant statements degrading religion were made by the commissioners before the Commission ruled against the baker, here, the statements made by Chiefs Boiteux and Uehara are unrelated to some of the County's actions that were taken against Plaintiff, such as its decision to ultimately suspend Plaintiff.  Finally, although Plaintiff references ███████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ Plaintiff's conduct was in public view and on video, ███████████████████████████████ ███████████████████████ (Pltf. Response to SGD ¶ 310.)  On these facts, a reasonable jury could conclude that Defendants acted neutrally toward Plaintiff in considering his accommodation request and ultimately disciplining him for lowering PPFs.

However, Defendants have not carried their burden to establish that there is no factual dispute as to whether they exhibited non-neutrality or animus toward Plaintiff's religion.  The County's Notice of Instruction, which informed Plaintiff that he must comply with EA-231 "irrespective of personal beliefs," could be seen as a neutral statement about EA-231, but could also "be seen as [an] inappropriate and dismissive comment[] showing lack of due consideration for [Plaintiff's] free exercise rights and the

23

dilemma he faced." *Masterpiece Cakeshop*, 584 U.S. at 635.  And Chief Uehara's comment that Plaintiff's religious accommodation request was "probably orchestrated" could give rise to an inference that Chief Uehara was harbored skepticism or bias toward Plaintiff's proffered beliefs when he informed Plaintiff that he could not use his benefit time if it triggered a recall.  *See id.* at 635 (reasoning that characterizing one's religion as "something insubstantial and even insincere" is disparaging to religion).  These facts, coupled with Plaintiff's evidence that ███████████████████████████ ████████████████████ are sufficient to create a factual dispute as to whether Defendants failed to act neutrally toward Plaintiff because of his religion.

Accordingly, Plaintiff's motion for summary judgment as to his free exercise claims is DENIED, and Defendants' motion for summary judgment is also DENIED.

### E.  Qualified Immunity

Defendants alternatively argue that even if they are not entitled to summary judgment on Plaintiff's free exercise claims, Chiefs Boiteux, Lester, and Uehara are entitled to qualified immunity for such claims.  Qualified immunity shields government officials from liability unless their actions "violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Thus, qualified immunity attaches unless "(1) the facts taken in the light most favorable to the party asserting the injury show that the defendants' conduct violated a constitutional right and (2) the right was clearly established at the time of the alleged violation."  *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1160 (9th Cir. 2014) (internal alterations, quotation marks, and citations omitted).  A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Lacey v. Maricopa County*, 693 F.3d 896, 915 (9th Cir. 2012).

As the Court has previously reasoned, a "qualified immunity analysis often turns on the specific facts of each alleged violation."  *NAACP of San Jose v. City of San Jose*, 562

24

F. Supp. 3d 382, 396 (N.D. Cal. Sept. 24, 2021). "And that is especially so here, given that [Plaintiff's] allegations of religious animus differ with respect to each individual defendant." (Doc. 50 at 18.) "In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation[.]" *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002).

The Court concludes that Chief Lester is entitled to qualified immunity because Plaintiff cannot show that his conduct violated his free exercise rights. Plaintiff identifies no statement indicating any religious animosity made by Chief Lester toward Plaintiff. And his actions, even construed in a light most favorable to Plaintiff, do not show that Chief Lester acted non-neutrally with respect to Plaintiff's religion. First, although Chief Lester added clasps to Area 17 such that the PPFs could be raised, he did so not knowing that Plaintiff had requested a religious accommodation. Second, while Chief Lester filed a CPOE complaint against Plaintiff for lowering the PPFs, he did so as a mandatory reporter of CPOE violations and under the impression that Plaintiff's conduct made Plaintiff's direct report Gottschalk uncomfortable. These facts do not suggest that Chief Lester engaged in any wrongful conduct which would give rise to his individual liability for violation of Plaintiff's free exercise rights.

However, Chiefs Boiteux and Uehara are not entitled to qualified immunity. With respect to Chief Boiteux, Plaintiff highlights that he told Plaintiff that his "religious beliefs don't matter" while delivering to Plaintiff a Direct Order that Plaintiff comply with EA-231—an Order which Chief Boiteux had a hand in issuing. Construing these facts in a light most favorable to Plaintiff, they could support a claim that Chief Boiteux was a non-neutral decisionmaker whose biases against Plaintiff's religion influenced the adverse action taken against Plaintiff: the issuance of the Direct Order. Similarly, Chief Uehara's comment that Plaintiff's religious accommodation request was "probably orchestrated" could give rise to an inference that Chief Uehara was a non-neutral decisionmaker when he informed Plaintiff that he could not use his benefit time if it triggered a recall. Plaintiff has

25

a clearly established right to be free government decisions which target or are otherwise made with animus toward religion, *see Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 541–42 (1993), so, assuming that Chiefs Boiteux and Uehara acted with animus in issuing the Direct Order and denying Plaintiff's accommodation request, they were on notice that doing so was unconstitutional.

The Court therefore GRANTS Defendants' motion with respect to qualified immunity for Chief Lester, but DENIES the motion with respect to qualified immunity for Chief Boiteux and Chief Uehara.

### F.  Punitive Damages

Defendants move for summary judgment on Plaintiff's request for punitive damages.  The parties agree that punitive damages are not available against the County, but they are available against individual officers under § 1983.  *See Smith v. Wade*, 461 U.S. 30, 56 (1983).  "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Id.*  The Court has found that there is a triable issue of fact as to whether Chief Uehara and Chief Boiteux acted with religious hostility; thus the Court concludes that the issue of punitive damages with respect to those Defendants may be evaluated by a jury. Defendants' motion for summary judgment on the issue of punitive damages is therefore GRANTED IN PART as to the County and Chief Lester, but DENIED as to Chief Uehara and Chief Boiteux.

### G.  Sovereign Immunity

Finally, Plaintiff argues in his motion for summary judgment that he is entitled to summary judgment on Defendants' sovereign immunity affirmative defense, arguing that "the Ninth Circuit recently held the County of Los Angeles is not entitled to sovereign immunity because it is not an arm of the State for Eleventh Amendment immunity purposes."  (Pltf. Mem. at 26 (citing *Ray v. County of Los Angeles*, 935 F.3d 703, 705,

26

708–11 (9th Cir. 2019)).)  Defendants do not oppose.  The Court agrees with Plaintiff that the County is not entitled to sovereign immunity as a matter of law, and GRANTS Plaintiff's motion as to Defendants' affirmative defense.

IV.     **CONCLUSION**

For the foregoing reasons, the Court DENIES Plaintiff's Motion for Partial Summary Judgment in all respects except with respect to sovereign immunity; on that affirmative defense, Plaintiff's Motion is GRANTED.

The Court GRANTS IN PART Defendants' motion for qualified immunity to Chief Lester, but DENIES qualified immunity to the other individual Defendants.  The Court further GRANTS IN PART Defendants' motion for summary judgment as to punitive damages, except the motion is DENIED with respect to punitive damages for Chief Uehara and Chief Boiteux.  In all other respects, Defendants' motion is DENIED.

The Court issues the present Order provisionally under seal.  Within **ten (10) court days** of the entry of this Order, the parties are to identify those portions of the Court's Order that they believe should remain under seal.  To do so efficiently, the parties are directed to provide a highlighted PDF version of the present Order (identifying the portions proposed to be redacted) via chambers email, together with a declaration explaining why the proposed redactions are justified.  Any such redactions must be limited to factual information in this Order that is currently sealed pursuant to a prior order of this Court.  If no such proposal is timely made, this Order will be unsealed.

DATED:  May 18, 2026

_____
HON. JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE

27